**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| NEWTYN PARTNERS, LP and NEWTYN TE PARTNERS, LP, Individually and on behalf of all others similarly situated, | Case No. 2:23-cv-01451-EAS-EPD |
| Plaintiff, | Hon. Edmund A. Sargus, Jr., District Judge |
| vs. | Hon. Elizabeth A. Preston Deavers, Magistrate Judge |
| ALLIANCE DATA SYSTEMS CORPORATION N/K/A BREAD FINANCIAL HOLDINGS, INC., CHARLES L. HORN, JOHN J. CHESNUT, and RALPH J. ANDRETTA, | <u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## <u>TABLE OF CONTENTS</u>

Page

I.  INTRODUCTION ......................................................................................... 2

II.  JURISDICTION AND VENUE ..................................................................... 8

III.  PARTIES AND RELEVANT NON-PARTIES ............................................... 8

IV.  OVERVIEW OF THE FRAUD...................................................................... 13

    A.  ADS Announces The Spinoff As Part Of Its Business Transformation To Deleverage Its Oversized Debt ............................................................... 13

    B.  In The Registration Statement For The Spinoff, Defendants Tout The Success of Loyalty Ventures' AIR MILES Business Due To Its "Deep, Long-Term Relationships" With Its Top Ten Sponsors ..................................... 15

    C.  Loyalty Ventures Is Spun Off With An Inflated Share Price Of Nearly $50 Per Share, While Defendants Continue To Tout The Company's Top Sponsor Relationships.......................................................................... 19

    D.  Defendants' Statements About AIR MILES' Sponsors Were Materially False Because The Program Had Already Lost—Or Was In The Process Of Losing—No Less Than Five Of Its Top Ten Sponsors, Including Sobeys ........................................................................................ 21

    E.  The Truth Is Slowly Revealed: Loyalty Ventures Discloses The Loss of Two Sponsors, But Continues To Downplay Their Significance And Promote Purportedly Strong Relationships With Remaining Top Sponsors ....... 22

    F.  The Truth Is Fully Revealed: Sobeys Exits The AIR MILES Program, Loyalty Ventures Files for Bankruptcy, And The Fraud Is Exposed .................. 26

    G.  Defendant Horn Files A Sworn Declaration Containing A Series Of Damning Admissions Regarding Defendants' False And Misleading Statements About AIR MILES' Top Sponsors.................................................... 27

V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................ 31

    A.  Defendants' Materially False And Misleading Statements And Omissions Prior To The Spinoff.................................................................... 32

        1.  The October 14, 2021 Registration Statement ........................................... 32

        2.  The October 14, 2021 Investor Presentation............................................. 36

   3. The October 28, 2021 Press Release And November 3, 2021 Form 10-Q ........................................................................... 38

  B. Defendants' Materially False And Misleading Statements After the Spinoff ..................................................................................... 39

   1. The November 9, 2021 Form S-8 ................................... 39

   2. The November 24, 2021 Form 10-Q ................................ 39

   3. The December 15, 2021 Form 8-K ................................. 40

   4. February 3, 2022 Statements ........................................... 40

   5. The February 8, 2022 Form S-8 ..................................... 42

   6. The February 28, 2022 Form 10-K .................................. 42

   7. March 23, 2022 Sidoti Conference .................................. 44

   8. The April 28, 2022 Earnings Call ................................... 46

   9. The May 6, 2022 Form 10-Q .......................................... 47

VI. ADDITIONAL SCIENTER ALLEGATIONS ..................................... 47

VII. LOSS CAUSATION ............................................................................ 52

VIII. PRESUMPTION OF RELIANCE ........................................................ 55

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ................................... 57

X. CLASS ACTION ALLEGATIONS .................................................... 57

XI. CLAIMS FOR RELIEF ....................................................................... 59

XII. PRAYER FOR RELIEF ....................................................................... 65

XIII. JURY TRIAL DEMANDED ................................................................ 65

Lead Plaintiff Newtyn Partners, LP and Newtyn TE Partners, LP ("Lead Plaintiff"), by and through the undersigned counsel, brings this securities class action against Defendants[1] under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), on behalf of itself and all other persons and entities who purchased Loyalty Ventures common stock between November 8, 2021 and June 7, 2022, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiff alleges the following upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, based upon the ongoing investigation of its counsel. Lead Counsel's investigation included, among other things, review and analysis of: (i) ADS's and Loyalty Ventures' public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports issued by securities and financial analysts; (iii) transcripts of ADS's and Loyalty Ventures' conference calls with analysts and investors; (iv) presentations, press releases, and media reports regarding Loyalty Ventures and ADS; (v) data reflecting the pricing of Loyalty Ventures shares; (vi) public filings in the Chapter 11 bankruptcy proceeding *In re: Loyalty Ventures Inc., et al.*, No. 23-90111 (Bankr. S.D. Tex.); and (vii) other publicly available information. Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery, as many of the facts are known only by Defendants, or are exclusively within Defendants' custody or control.

---

[1] Defendants are Alliance Data Systems Corporation ("ADS"), now known as Bread Financial Holdings, Inc., ADS's Chief Executive Officer ("CEO"), Ralph J. Andretta ("Andretta"), the former CEO of Loyalty Ventures, Inc. ("Loyalty Ventures" or the "Company"), Charles L. Horn ("Horn"), and Loyalty Ventures' former Chief Financial Officer ("CFO") and Executive Vice President, John J. Chesnut ("Chesnut") (collectively, "Defendants"). Defendants Andretta, Horn, and Chesnut are collectively referred to herein as the "Individual Defendants."

## I.      INTRODUCTION

1.      Leading up to the Class Period, ADS—a company that issues credit cards for retailers—was struggling mightily, having accumulated billions of dollars in debt to fund its credit card operations.  To escape from this crushing debt load, ADS hatched a plan: it would spin-off a business segment that operated loyalty programs for its retail clients (the "Spinoff"), and in connection with the Spinoff, the new, publicly traded company ("Loyalty Ventures" or the "Company") would incur substantial debt financing to fund a ***$750 million cash payment back to ADS***.[2]  To justify this massive payout, Defendants portrayed Loyalty Ventures as a healthy business that would thrive "as a standalone data-driven, tech-enabled global loyalty solutions provider," and that the Spinoff would "provide distinct benefits" and "unlock growth potential" for the Company.  In particular, Defendants emphasized Loyalty Ventures' dependence on its "top 10" clients—which together accounted for the vast majority of its earnings—and assured investors that the Company maintained excellent relationships with these critical customers.

2.      On the strength of these statements, the Spinoff was a resounding success, with the Company's stock closing at nearly $50 per share on November 8, 2021.  However, Defendants' portrayal of Loyalty Ventures was a complete fabrication.  Unbeknownst to shareholders, at the time of the Spinoff, the Company's business was in an absolute freefall, as no fewer than ***five***— fully half—of its ten most important clients had either terminated their agreements with the Company, or were in the process of doing so.  When this news was disclosed, Loyalty Ventures' business disintegrated, and its stock collapsed. Just sixteen months after the Spinoff, Loyalty Ventures' stock was worthless, the Company was forced to file for bankruptcy, and it subsequently liquidated its assets for pennies on the dollar.

---

[2] Unless otherwise noted, all emphasis is added.

3.     The centerpiece of Loyalty Venture's business was the Company's AIR MILES Reward Program ("AIR MILES"), which was a Canadian customer loyalty program where retail clients—called "Sponsors"—issued "Air Miles" to their customers that could be redeemed for travel-related rewards. The Sponsors paid Loyalty Ventures a fee for every mile issued. ADS had historically trumpeted AIR MILES as a cash cow and a "***great cash flow machine***" that just "***prints money***." In fact, in 2019 and 2020, AIR MILES produced 67% and 77% of the legacy Loyalty Ventures segment's adjusted EBITDA, respectively, and leading up to the Spinoff, Defendants repeatedly boasted that AIR MILES was "the #1 loyalty program in Canada" with approximately "two-thirds of Canadian households actively participat[ing]."

4.     In turn, the success of AIR MILES was entirely reliant on Loyalty Ventures' relationships with its clients—and in particular, the Company's relationships with what it called its "10 largest sponsors." Indeed, Defendants repeatedly represented to investors that these top-ten Sponsors were absolutely critical to Loyalty Ventures' business, as they represented 46% and 55% of its revenue in 2019 and 2020, respectively, and were in fact responsible for issuing more than 90% of all Air Miles in both 2019 and 2020. Moreover, Defendants made clear that the Company's business depended on maintaining its relationship with ***each*** of its top-ten Sponsors, stating that "***the loss of any of these clients could cause a significant reduction in our [] revenue***."

5.     Accordingly, to reassure investors about the strength of Loyalty Ventures' business, the registration statement filed in connection with the Spinoff ("Registration Statement") boasted that the Company "***maintained deep, long-standing relationships***" with its Sponsors, and that "success with sponsors" was one of Loyalty Ventures' "***competitive strengths***" and "[drove] the appeal of AIR MILES Reward Program." The Registration Statement even highlighted that large Canadian companies—including Canada's second-largest grocer, Sobeys Inc. and its affiliate

3

Safeway (collectively, "Sobeys")—were loyal clients and that these relationships were reasons to invest in the Company. Similarly, Defendants issued investor presentations that specifically highlighted Loyalty Ventures' "***Exclusive Relationships***" with its Sponsors as a "***Point of Differentiation***" for the Company—including, in particular, its Sobeys partnership.

6. Defendants' statements had their intended effect, with numerous analysts crediting Defendants' statements in recommending Loyalty Ventures' stock. For example, Morgan Stanley highlighted that Loyalty Ventures' "***deep relationships with consumers, clients, and sponsors***, helps form its ***competitive advantage over the longer term***." Sidoti & Company praised Loyalty Ventures' "***attractive sponsor and customer bases with high client retention***," and Morningstar noted that AIR MILES, in particular, was a "***good asset and a reliable source of income***." In turn, Defendants successfully completed the Spinoff, and on November 8, 2021—the first day of the Class Period—Loyalty Ventures closed its first day of trading at just below $50 per share.

7. As would soon be revealed, however, Defendants' statements about Loyalty Ventures' relationships with its top Sponsors were materially false, and in reality, the Company's business at the time of the Spinoff was disintegrating. Indeed, as Loyalty Ventures' own former CEO, Defendant Horn, explicitly admitted in a sworn declaration submitted in connection with the Company's bankruptcy ("Horn's Declaration" or "Horn Declaration"), ***at the time of the Spinoff***, no fewer than ***four*** of Loyalty Ventures' top-ten Sponsors from 2020 had already terminated or were in the process of terminating their contracts with the Company, and a fifth top-ten Sponsor was threatening to do so. This included the Company's second-largest Sponsor, Sobeys, which had threatened to leave the AIR MILES program all the way back in ***2020***, and by the time of the November 2021 Spinoff, Sobeys' exit was likely to occur in the near term. Significantly, and as Defendant Horn's declaration makes clear, Defendants ***knew*** that the departure of these top ten

4

Sponsors would cripple the AIR MILES program soon after the Spinoff occurred—and that Sobeys' early termination of its contract would sound the death knell for the Company.

8.      The truth came to light shortly after the Spinoff was completed.  On February 3, 2022—the first time the newly public Company independently reported its earnings—Loyalty Ventures revealed a decrease in the number of miles issued due to "the non-renewal of two sponsors and their exit from the program in the first quarter of 2021"—*i.e.*, at least ***eight months*** before the Spinoff.  The news that the Company had lost significant Sponsors sent its stock tumbling 11%, from $26.90 to $23.88 on February 4, 2022.  On the Company's very next earnings call, on April 28, 2022, Defendants disclosed that the loss of these two Sponsors caused yet another decrease in the number of miles issued, further confirming the significance of the lost Sponsors. In response, Loyalty Ventures' stock dropped an additional 24%, from $14.79 to $11.25 per share.

9.      Then, on June 8, 2022, Loyalty Ventures stunned the market by disclosing that Sobeys—which was responsible for 10% of Loyalty Ventures' 2021 adjusted EBIDTA and was a top-two Sponsor relationship that Defendants repeatedly touted to investors in advance of the Spinoff—was prematurely exiting the AIR MILES program two years before the end of its contract with the Company.  On this news, Loyalty Ventures' stock crashed 45%, declining from a close of $11.03 per share on June 7, 2022 to a close of $6.02 per share on June 8, 2022.

10.     The loss of the Company's top Sponsors, including Sobeys, caused Loyalty Ventures to enter a death spiral.  Within weeks, Staples Canada ("Staples") announced that it too was leaving the AIR MILES program, and three of the largest remaining Sponsors renegotiated their contracts with substantially worse economics for the Company.  As a result, in March 2023, the Company filed for bankruptcy protection and began liquidating its assets.  Just sixteen months after the Spinoff, Loyalty Ventures' stock was worthless, and the Company ceased to exist.

11.     In a rarity for a securities class action pleading, Defendants' own sworn admissions confirm that they *knew* that their Class Period statements to investors were materially false. Specifically, in the Company's bankruptcy proceedings, Defendant Horn—Loyalty Ventures' CEO who transitioned from ADS as part of the Spinoff—submitted a sworn declaration containing stunning admissions that directly contradicted Defendants' prior representations to investors regarding Loyalty Ventures' business. For example, in direct contrast to the wholly positive statements Defendants made in connection with the Spinoff that the Company "maintained deep, long-standing relationships" with its Sponsors, and that those relationships were "competitive strengths" and a "point of differentiation" for the Company, Horn now admitted that the Company had been hemorrhaging its largest and most significant Sponsors: the "*AIR MILES Business was and had been suffering the effects of an ongoing shift in the loyalty programs market prior to the Spinoff Transaction*." Indeed, Horn explicitly confirmed that the Company endured "*multiple major client departures from the AIR MILES Reward Program in 2020 and 2021*"—*i.e.*, *in the months leading up to the Spinoff*. Significantly, these departures included "*three top ten sponsors*…*which amounted to approximately 10% of the Sponsor revenue*," and "*another major Sponsor…gave notice that it was also leaving the AIR MILES Reward Program*." Thus, by the time of the Spinoff, no less than *four* critical top-ten Sponsors had already left the program.

12.     Moreover, while Defendants repeatedly touted the strength of the Company's all-important Sobeys' partnership in connection with the Spinoff, Defendant Horn's Declaration revealed that this portrayal was also a façade. In reality, Sobeys had threatened to leave the AIR MILES program *a full year before the Spinoff*, and throughout this timeframe, Defendants were in a race against the clock to complete the transaction before that news became public. Indeed, Horn admitted that "*in late 2020*, Sobeys informed ADS that it was considering exercising its early

6

termination rights and renegotiating or discontinuing its participation in the AIR MILES Reward Program before the expiration of its contract." As a result, Sobeys' impending departure "*loomed throughout 2021 in the lead up to the Spinoff*." Tellingly, Horn's Declaration made clear that Defendants fully expected Sobeys' departure well before the Spinoff was completed, as Sobeys' termination notification in June 2022 was "*consistent with [Sobeys'] statements in 2020*."

13. Defendants' failure to disclose these facts was no accident, as they knew full well that if the market knew that the Company had already lost four of its top ten Sponsors and stood to lose its second-largest Sponsor soon thereafter, the Spinoff would be imperiled. Indeed, not only did the Registration Statement specifically note that "*the loss of any of these clients could cause a significant reduction in our combined revenue*," but Defendant Horn explicitly admitted that the loss of any single one of these Sponsors would cause a broader "network effect" on the entire AIR MILES program that was certain to send the Company into a tailspin soon after the Spinoff was completed. This was particularly true for Sobeys, who Horn stated acted "[m]uch like an anchor tenant in a mall" in that it was a large grocer and "consumers tend to visit grocery stores on a weekly basis, creating regular opportunities for Collectors to earn and redeem reward miles." Thus, Horn's Declaration admitted that the "*previously expected consequence*" of Sobeys' departure was that other major Sponsors would renegotiate their contracts on unfavorable terms, which, along with the Company's "crippling debt burden," led the Company to collapse.

14. In total, as a result of Defendants' fraud, the share price for Loyalty Ventures lost 87% of its value, falling from a close of $49.08 on November 8, 2021—the first day of trading— to just $6.02 per share after Sobeys' exit on June 8, 2022. The Company's stock price never recovered. By the time of the bankruptcy filing, Loyalty Ventures' stock price dropped to just $0.24 per share and over $270 million in shareholder market capitalization had vanished.

## II.    JURISDICTION AND VENUE

15.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District, and many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as ADS is headquartered in this Judicial District.  In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES AND RELEVANT NON-PARTIES

17.    Lead Plaintiff are funds of investment management firm Newtyn Management, LLC, which is located in New York, New York.  As set forth in the previously-filed certification in this Action (ECF No. 4-1), Lead Plaintiff purchased Loyalty Ventures common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

18.    Defendant ADS is incorporated under the laws of Delaware with its principal executive offices located in Columbus, Ohio.  At the start of the Class Period, ADS's shares traded during the Class Period on the New York Stock Exchange (the "NYSE") under the ticker symbol

"ADS." On March 23, 2022, ADS announced that it would be known as Bread Financial Holdings, Inc. and would begin trading on the NYSE under the new ticker symbol "BFH" on April 4, 2022.

19. Defendant Andretta has served as the CEO of ADS (now Bread Financial) since February 2020. Andretta is "responsible for [ADS'] growth, development and financial performance." In the months leading up to the Spinoff, Defendant Andretta made several positive statements about the Spinoff and Loyalty Ventures being "well positioned for success." Loyalty Ventures' October 14, 2021 Registration Statement included a cover letter dated October 13, 2021 that was signed by Andretta. Andretta's cover letter stated that the Registration Statement "describe[ed] the [Spinoff] in detail and contains important information about Loyalty Ventures," with Andretta "urg[ing]" investors to "read this information statement carefully." Andretta made materially false and misleading statements and omissions in the Registration Statement.

20. Defendant Horn served as Loyalty Ventures' CEO from November 2021 through the Company's bankruptcy filing. Prior to joining Loyalty Ventures, Horn was an Executive Vice President ("EVP") and senior advisor at ADS, beginning in February 2020, where according to the Horn Declaration, Horn "worked on (i) the BrandLoyalty Business and AIR MILES Business," and "(ii) additional strategic initiatives." Prior to that, Horn served as the acting CEO of ADS from November 2019 to February 2020, where he "continue[d] driving initiatives aimed at streamlining Alliance Data's cost structure and operating model while overseeing the Company as acting CEO." Horn previously served as EVP and Vice Chairman of ADS from June 2019 to February 2020, and was ADS's CFO from December 2009 to June 2019.

21. Defendant Chesnut served as Loyalty Ventures' CFO and EVP from November 2021 through the bankruptcy. Chesnut stated that at Loyalty Ventures, "[t]he finance organization work[ed] collaboratively with the CEO and the leadership team to establish and influence the

operating aspects and organizational culture of the business."  Additionally, Chesnut, "le[d] and mentor[ed] the heads of [Loyalty Ventures'] Accounting, Financial Reporting, FP&A, IT, Tax, Treasury and IR departments."  Chesnut previously served as ADS's Treasury & Corporate Development Vice President from October 2010 to May 2015, and served as ADS's Senior Vice President and Treasurer from May 2015 until the Spinoff in 2021.  In his role as ADS's SVP and Treasurer, according to Chesnut, he "had direct responsibility for Treasury, Risk Management, Corporate Development, Portfolio Acquisitions, Portfolio Pricing, Real Estate and Long-Range Planning. . . managed the [c]ompany's liquidity and capital structure at both the holding company level as well as at the segment levels."  His "team also built and maintained the long-range forecasts that underpinned [ADS'] strategic plan."  "During the pandemic of 2020, [Chesnut] presented liquidity and cash flow updates directly to the Board of Directors on a daily and weekly basis, and during 2021 [Chesnut] helped execute the spinout of Loyalty Ventures from ADS."

22.    Loyalty Ventures is a relevant non-party.  On March 10, 2023, Loyalty Ventures filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, and its assets were substantially liquidated. *See In re Loyalty Ventures Inc.*, No. 23-90111 (CML).  In light of the Company's bankruptcy, Loyalty Ventures is not named as a defendant in this action.

23.    The Individual Defendants, as senior executive officers and/or directors of Loyalty Ventures and/or ADS, were privy to confidential, proprietary and material adverse non-public information concerning Loyalty Ventures and/or ADS, their operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other

information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

24.     Defendants ADS and Andretta are liable as direct participants in the wrongs complained of herein for their conduct and misstatements made about Loyalty Ventures in connection with the Spinoff.  In addition, Defendants ADS and Andretta were "controlling persons" within the meaning of Section 20(a) of the Exchange Act over Loyalty Ventures and its officers and directors, including Defendants Horn and Chesnut, prior to the Spinoff.  Defendants ADS and Andretta had the power and influence to cause Loyalty Ventures and its officers and directors to engage in the unlawful conduct complained of herein prior to the Spinoff, including in regard to the statements made in the Registration Statement filed in connection with the Spinoff. Because of their positions of control, Defendants ADS and Andretta were able to and did, directly or indirectly, control the conduct of Loyalty Ventures' business prior to the Spinoff, including through the actions of its officers and directors, including Defendants Horn and Andretta.

25.     Defendants ADS and Andretta, because of their control over Loyalty Ventures prior to the Spinoff, controlled and/or possessed the authority to control the contents of Loyalty Ventures' Registration Statement, SEC filings, press releases, and presentations to securities analysts, and through them, to the investing public.  Defendants ADS and Andretta were provided with copies of Loyalty Ventures' reports and publicly disseminated documents filed prior to the Spinoff alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, Defendants ADS and Andretta had the opportunity to commit the fraudulent acts alleged herein.

11

26. As controlling persons of Loyalty Ventures prior to the Spinoff, whose securities were registered with the SEC pursuant to the Exchange Act and governed by the federal securities laws, Defendants ADS and Andretta had a duty to disseminate promptly accurate and truthful information with respect to Loyalty Ventures' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of the Loyalty Ventures' common stock would be based on truthful and accurate information once its trading began after the Spinoff. Defendants ADS and Andretta's misrepresentations and omissions prior to the Spinoff violated these specific requirements and obligations.

27. Defendants Horn and Chesnut are liable as direct participants in the wrongs complained of herein. In addition, Defendants Horn and Chesnut, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause Loyalty Ventures to engage in the unlawful conduct complained of herein. Because of their positions of control, Defendants Horn and Chesnut were able to and did, directly or indirectly, control the conduct of Loyalty Ventures' business.

28. Defendants Horn and Chesnut, because of their positions within Loyalty Ventures, controlled and/or possessed the authority to control the contents of Loyalty Ventures' Registration Statement, reports, SEC filings, press releases, and presentations to securities analysts, and through them, to the investing public. Defendants Horn and Chesnut were provided with copies of Loyalty Ventures' reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause

them to be corrected. Thus, Defendants Horn and Chesnut had the opportunity to commit the fraudulent acts alleged herein.

29. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were registered with the SEC pursuant to the Exchange Act and governed by the federal securities laws, Defendants Horn and Chesnut had a duty to disseminate promptly accurate and truthful information with respect to Loyalty Ventures' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Loyalty Ventures' common stock would be based on truthful and accurate information. Defendants Horn's and Chesnut's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV. OVERVIEW OF THE FRAUD

### A. ADS Announces The Spinoff As Part Of Its Business Transformation To Deleverage Its Oversized Debt

30. Prior to 2020, ADS consisted of three operating segments—Card Services, Epsilon, and LoyaltyOne. Card Services, the largest segment accounting for over 75% of ADS's operating income, issued private label and co-branded credit cards to well-known retailers. Epsilon provided digital marketing services to large businesses. And the LoyaltyOne segment—the predecessor to Loyalty Ventures—consisted of two marketing programs, AIR MILES and BrandLoyalty, both of which were focused on helping retail clients institute and operate customer loyalty programs.

31. ADS struggled in the years leading to the Spinoff. Unlike the banks that ADS competed against in the credit card industry, ADS did not have a large source of cheap deposits to fund its credit card loans. As a result, ADS was forced to borrow funds at high costs via traditional

13

capital markets, causing it to be over-leveraged. Indeed, in early 2019, analysts at Compass Point noted that ADS was "basically…a highly leveraged, lower valuation credit card company."

32.     To address its over $5 billion in debt, ADS formed a plan to transform its business into a pure financial services company through strategic initiatives to separate its two smaller business segments. First, in July 2019, ADS sold the Epsilon segment to "improve [ADS's] capital structure," as much of the sale price would "go to debt retirement." Soon thereafter, analysts and market participants surmised that LoyaltyOne could be next on ADS's chopping block. As Morgan Stanley wrote on October 13, 2020, "ADS is now fully committed to its future as a pure-play consumer finance company," and therefore analysts expected ADS to sell "the remaining non-card business, LoyaltyOne" and "pay[] down parent debt."

33.     Rather than sell LoyaltyOne, on May 12, 2021, ADS issued a press release, filed with the SEC on Form 8-K, announcing that it would spin off the LoyaltyOne segment by the fourth quarter of 2021. The Spinoff would be tax-free and was to be accomplished by providing ADS stockholders with 81% of the shares of the new entity, ***with ADS retaining a 19% minority position, valued at $50 million.*** As part of the Spinoff, the new Company would incur substantial debt financing and funnel the proceeds back to ADS who would use the money to deleverage. Defendant Horn, the Executive Vice President of the LoyaltyOne segment at the time, was slated to become the CEO of the new entity and Blair Cameron, the long-time President of the AIR MILES program, would continue in his role post-Spinoff.

34.     According to ADS, the Spinoff was set to "***unlock growth potential for [the] LoyaltyOne segment as a standalone data-driven, tech-enabled global loyalty solutions provider***." In the press release announcing the transaction, Defendant Andretta was quoted as stating "this transaction, once completed, would provide ***distinct benefits*** to each company,

enhancing the businesses' ability to execute their respective strategic priorities." ADS later announced that the new Company would be called Loyalty Ventures—and that, as part of the Spinoff, Loyalty Ventures would pay a total of *$750 million in cash to ADS*. In addition, ADS made clear prior to the Spinoff that *it did not intend to keep its $50 million minority ownership interest in the spun-off Company, but would instead seek to "monetize" it within one year* and use the funds to further pay down its corporate debts.

35.     Analysts reacted favorably to the news of the Spinoff. For example, analysts at Jefferies wrote on May 12, 2021 that the Spinoff allowed ADS to "strengthen its B/S [balance sheet] via de-leveraging," "provides ADS with an avenue to unlock additional value within both segments as standalone companies," and noted that AIR MILES was "Canada's premier coalition loyalty program." Analysts at Truist credited Defendants' statements that the Spinoff would help in "unlocking growth potential for [the] LoyaltyOne segment as a standalone loyalty solutions provider," and praised AIR MILES as "Canada's most recognized loyalty program."

**B.     In The Registration Statement For The Spinoff, Defendants Tout The Success of Loyalty Ventures' AIR MILES Business Due To Its "Deep, Long-Term Relationships" With Its Top Ten Sponsors**

36.     To justify the Spinoff and its associated $750 million payout to ADS, Defendants needed to convince the market that LoyaltyOne—soon to be transitioned to Loyalty Ventures— was a viable business that was poised to succeed as an independent entity after the Spinoff was completed.

37.     As set forth above, LoyaltyOne contained two distinct operating entities: AIR MILES and BrandLoyalty. AIR MILES was a Canadian based loyalty program which contracted with participating businesses to allow retail customers to earn and accumulate "Air Miles," which could then be used on travel, merchandise, and other rewards. Under the program, AIR MILES' participating retail-clients, known as "Sponsors," paid a fee to AIR MILES for each mile issued to

consumers enrolled in the program, known as "Collectors," and, in return, AIR MILES provided all marketing, customer service, and redemption services associated with the program.

38.     The other LoyaltyOne operating entity was BrandLoyalty, a Netherlands based marketing company that designed and implemented short-term rewards programs for grocers across the world.  However, BrandLoyalty was a low-margin business that, despite generating significant revenue, did not meaningfully contribute to the Company's bottom line.

39.     Accordingly, AIR MILES was by far the more important operating segment, accounting for the vast majority of the Company's earnings.  For example, in 2018, ADS' former CEO, Edward Heffernan, described AIR MILES as a "great cash flow machine" that just "prints money."  Indeed, in 2020 and 2019—the two years before the spinoff—***AIR MILES comprised 67% and 77% of LoyaltyOne's adjusted EBITDA***, respectively, which was highly significant given that, according to the Registration Statement, the Company "use[d] adjusted EBITDA as an integral part of our internal reporting to measure the performance of our reportable segments" and was "considered an important indicator of the operational strength of our businesses."

40.     Accordingly, leading up to the Spinoff, Defendants repeatedly touted AIR MILES as being critical to LoyaltyOne's success as a standalone entity, describing it as "the #1 loyalty program in Canada" with approximately "two-thirds of Canadian households participating"— resulting in it having an "expansive" reach that "cover[ed] approximately 80% of the average household spend categories across all regions in Canada."

41.     Significantly, the key to AIR MILES' success was its participating Sponsors, whose products and services allowed the end-users, or "Collectors," to earn miles on everyday purchases such as groceries, pharmacy, and gas.  Accordingly, the Registration Statement—the final version of which was filed by Loyalty Ventures with the SEC on October 14, 2021, and

included cover letters from both Defendants Andretta and Horn endorsing its contents—repeatedly touted that AIR MILES successfully maintained "deep, long-term relationships" with its Sponsors, and proclaimed that the program's purported "success with sponsors" was what "d[rove] the appeal of [the] AIR MILES Reward Program" to participants.

42.     Moreover, the Registration Statement repeatedly disclosed that while AIR MILES partnered with approximately 135 Sponsors, AIR MILES' relationships with its *"ten largest [Sponsors]"* were the key to the Company's success.   Indeed, these top ten Sponsors were responsible for issuing *over 90% of Air Miles in both 2019 and 2020*, and the Registration Statement made clear that *"[r]elationships with our largest and most well-known sponsors account for a significant portion of our combined revenue,"* such that "*our 10 largest sponsors represented approximately 55% of our revenue*" in 2020.   In fact, these top ten Sponsors were so crucial that the Registration Statement explicitly warned that the loss of even *one* of them could be highly material due to the impact it could have on both the Company's combined revenue and the future success of the AIR MILES program.  For example, the Registration Statement explicitly warned that because *Loyalty Ventures "depend[ed]" on AIR MILES' "10 largest clients" for "a significant portion of our combined revenue," the "loss of any of these clients could cause a significant reduction in our combined revenue*":

> *Our 10 largest clients represented 55% and 46%, respectively, of our combined revenue for the years ended December 31, 2020 and 2019, and the loss of any of these clients could cause a significant reduction in our combined revenue.*
>
> *We depend on a limited number of large clients for a significant portion of our combined revenue.* Our 10 largest clients represented approximately 55% and 46%, respectively, of our revenue for the years ended December 31, 2020 and 2019.  The Bank of Montreal represented approximately 15% and 12%, respectively, of our combined revenue for the years ended December 31, 2020 and 2019.  Our contract with Bank of Montreal expires in 2023, subject to further automatic renewals as well as certain rights of either party to terminate following notice of default and cure provisions.  *A decrease in revenue from any of our significant clients, including Bank of Montreal, for any reason, including a decrease in pricing or activity, or a decision either to utilize another service provider or*

***to no longer procure the services we provide, could have a material adverse effect on our combined revenue***.

43.     The Registration Statement further separately warned that "[i]f we are unable to maintain or renew our relationships with our most significant sponsors," the overall "value proposition" of the AIR MILES program to other Sponsors could significantly decrease and cause them to leave the program—resulting in "a material adverse effect on our business, results of operations, financial condition and liquidity."

44.     However, while warning of the hypothetical risk of losing a top Sponsor, the Registration Statement also strongly reassured investors that AIR MILES' current relationships with its top Sponsors were longstanding and secure.  For example, the Registration Statement proclaimed that AIR MILES "***maintained deep, long-standing relationships" with its "large" Sponsors***, which consisted of "consumer-based businesses" that were "well-known worldwide brands" in key household spending sectors.  The Registration Statement further asserted that "***some of [these Sponsors] have been part of the program for almost 30 years***," purportedly demonstrating that the Sponsors "***recognize[d] the significant benefit to staying in the AIR MILES Reward Program and increasing their customer spend (issuance) opportunity***."  To underscore the point, the Registration Statement emphasized that while AIR MILES' contracts with its Sponsors "generally vary in length from three to five years," "***our top 6 sponsors have an average tenure [with the AIR MILES] of 25 years***."

45.     Despite the critical and obvious importance of AIR MILES' top ten sponsors to the Company's financial success, aside from disclosing that AIR MILES' top-most Sponsor was the Bank of Montreal ("BMO")—which as set forth above the Registration Statement stated was responsible for 15% and 12% of LoyaltyOne's combined revenue in 2020 and 2019, respectively—Defendants at no time provided any complete list of AIR MILES' top ten Sponsors

18

or the percentage of combined revenue each of them represented.  Nonetheless, the Registration Statement repeatedly touted AIR MILES' relationships with certain "well-known worldwide brands" as being prime examples of its "deep, long-standing relationships" with top Sponsors in key household spending sectors, ***including Sobeys, Canada's ubiquitous grocery chain***.

> ***Deep, long-term relationships with clients and sponsors***
>
> ***We have maintained deep, long-standing relationships with the large consumer-based businesses, including well-known worldwide brands***, such as Shell Canada, ***Sobeys Inc.***, Bank of Montreal, Rewe and Albert Heijn.
>
> For the AIR MILES Reward Program, we utilize our large collector base together with our data and analytical capabilities to deepen ***our existing relationship with our sponsors, some of which have been part of the program for almost 30 years,*** and continue to drive powerful benefits to collectors in the program.  By continuing to engage our collectors with personalized marketing experiences and scaled rewards, ***our sponsors recognize the significant benefit to staying in the AIR MILES Rewards*** program and increasing their customer spend (issuance) opportunity.  We believe that ***our success with sponsors and our ability to offer a variety of redemption options, both aspirational and instant, drive the appeal of AIR MILES Reward Program*** to collectors.

46.     In fact, the Registration Statement repeatedly emphasized AIR MILES' relationship with Sobeys in particular as allowing the program to expansively infiltrate the crucial "grocery" sector, which was highly beneficial for loyalty programs like AIR MILES due to groceries being consistent everyday household purchases.  Indeed, unbeknownst to investors, Sobeys was AIR MILES' second top Sponsor, individually representing 10% of the Company's adjusted EBITDA—*i.e.*, just behind top Sponsor BMO.

**C.     Loyalty Ventures Is Spun Off With An Inflated Share Price Of Nearly $50 Per Share, While Defendants Continue To Tout The Company's Top Sponsor Relationships**

47.      The Spinoff was accomplished after the markets closed on Friday, November 5, 2021, and Loyalty Ventures began regular trading on Monday, November 8, 2021.  As announced in ADS's public filings, Loyalty Ventures raised over $650 million in new debt to fund the vast majority of the $750 million in cash Loyalty Ventures paid to ADS in connection with the Spinoff.

48. Significantly, analysts fully credited Defendants' prior positive remarks about Loyalty Ventures and its strong relationships with its top Sponsors. Indeed, on November 1, 2021, just days before the Spinoff, analysts at Morgan Stanley commented that Loyalty Ventures' "***deep relationships with consumers, clients, and sponsors***, helps form its ***competitive advantage over the longer term***." Then, on the first day of trading after the Spinoff, November 8, 2021, analysts at Sidoti & Company initiated their coverage of Loyalty Ventures with a "BUY" rating and a $63 per share price target, which amounted to an enterprise value of ***$1.83 billion***. The Sidoti analysts expressly based their positive rating on "the 30-year history of AIR MILES, ***the attractive sponsor and customer bases with high client retention***, and free cash flow generation." Similarly, a Morningstar analyst noted that AIR MILES was a "good asset and a reliable source of income."

49. Defendants' representations had their intended effect. Bolstered by Defendants' strong positive representations, Loyalty Ventures closed its first trading day as a public company with a price of $49.08 per share.

50. Even after Loyalty Ventures became a separate, independent entity, Defendants Chesnut and Horn perpetuated the same false statements touting AIR MILES' strong relationships with its key Sponsors that Defendants had made prior to the Spinoff. For example, on December 15, 2021, Loyalty Ventures issued an investor presentation, filed with the SEC on Form 8-K, that continued to tout AIR MILES' relationships with its top Sponsors. The presentation included a slide promoting Sobeys in particular as an AIR MILES top Sponsor representing a "Key Part of Everyday Commerce" in both the crucial grocery and pharmacy sectors, and touting AIR MILES' purportedly "***[st]able client base***" represented by top Sponsors like Sobeys that could be relied upon to "***generate[] recurring campaign demand***." The presentation also contained a slide touting AIR MILES' "***Exclusive Relationships***" with these key Sponsors as a crucial "***Point of***

*Differentiation*" for the Company.  These representations reassured investors that, post-Spinoff, Loyalty Ventures' partnerships remained secure and AIR MILES was in a position to continue to excel as the "#1 loyalty program in Canada."

> **D.     Defendants' Statements About AIR MILES' Sponsors Were Materially False Because The Program Had Already Lost—Or Was In The Process Of Losing—No Less Than Five Of Its Top Ten Sponsors, Including Sobeys**

51.     Unbeknownst to investors, in reality, Loyalty Ventures' AIR MILES business was on the verge of collapse at the time of Spinoff.  Indeed, contrary to Defendants' representations, *four of AIR MILES' top ten Sponsors*—who were collectively responsible for well over 10% of the Company's combined revenue—*had either already left the program or had notified Defendants that they would definitively leave the program.*  Moreover, *a fifth top ten Sponsor*— Sobeys, which was in fact *the Company's second largest Sponsor that was alone responsible for 10% of the Company's adjusted EBITDA*—had seriously threatened to leave AIR MILES in late 2020, which "loomed" over Defendants both leading up to and after the Spinoff.

52.     *First*, *long before the Registration Statement for the Spinoff was filed in October 2021*, no less than *four* of AIR MILES' top ten Sponsors from 2020, who collectively comprised over 10% of the Company's combined revenue, *had either already completely exited the AIR MILES program or had formally notified ADS that they would definitively leave the program shortly after the Spinoff.*  These four Sponsors included:  (1) Rexall, which had left AIR MILES before the end of 2020; (2) Rona Inc. /Lowe's Canada ("RONA"), which had left AIR MILES in the first quarter of 2021; (3) the Liquor Control Board of Ontario ("LCBO"), which had also left AIR MILES in the first quarter of 2021; and (4) Staples Canada, which had formally notified ADS before the Spinoff in 2021 that it would terminate its relationship with AIR MILES effective in 2022.  However, significantly, Defendants did not disclose the loss of *any* of these top ten Sponsors

at any point prior to the Spinoff. To the contrary, as set forth above, the October 2021 Registration Statement instead only warned that a top ten Sponsor "could" leave the AIR MILES program—not that four of them had already done so.

53.     *Second*, despite the fact that Defendants had repeatedly touted Sobeys as a key top Sponsor, in reality, ***Sobeys had informed ADS as far back as late 2020***, nearly a year before the Spinoff, ***that it was seriously considering exercising its early termination rights and discontinuing its participation in the AIR MILES program***. This was hugely significant, as ***Sobeys singlehandedly generated 10% of Loyalty Ventures' adjusted EBITDA and was AIR MILES' second largest sponsor behind BMO***—meaning that its departure would inevitably have a significant impact on the value and attractiveness of the overall AIR MILES program to other key Sponsors. Moreover, as would later be revealed, the threat of Sobeys' departure was so apparent and so drastic that it had "***loomed throughout 2021 in the lead up to the Spinoff***," causing Defendants to scramble to complete the transaction before the loss of Sobeys decimated the AIR MILES program.

**E.     The Truth Is Slowly Revealed: Loyalty Ventures Discloses The Loss of Two Sponsors, But Continues To Downplay Their Significance And Promote Purportedly Strong Relationships With Remaining Top Sponsors**

54.     The truth about AIR MILES' Sponsors started to come to light just months after the Spinoff, when Loyalty Ventures began reporting as an independent Company. Specifically, on February 3, 2022, Loyalty Ventures issued a press release, filed with the SEC on Form 8-K, announcing its results for the fourth quarter of 2021.

55.     In the press release, the Company disclosed disappointing results for the full year 2021. Company-wide revenue was $735 million compared to $765 million in 2020 and "[a]djusted EBITDA was $166 million compared to adjusted EBITDA of $173 million for 2020." Significantly, the press release also revealed that in the fourth quarter of 2021, the Company saw

*a 7% decrease in the number of miles issued* as compared to the same quarter from the prior year—which it directly attributed to "*the non-renewal of two sponsors and their exit from the program in the first quarter of 2021*," *i.e.*, RONA and LCBO, whose departures had occurred nearly a year prior.

56.  The news that AIR MILES had previously lost significant Sponsors that materially affected Loyalty Ventures' financial results caused the Company's stock price to drop 11%, from a close on February 3, 2022 of $26.90 to close on February 4, 2022 at $23.88.

57.  Defendants, however, continued to fail to disclose that these two lost Sponsors ranked among AIR MILES' crucial top ten Sponsors. Defendants also failed to disclose the highly material facts that: (1) a third "top ten" Sponsor, Rexall, had also left AIR MILES in 2020; (2) a fourth "top ten" Sponsor, Staples, had already given notice prior to the Spinoff that it was withdrawing from the program in 2022; and (3) AIR MILES' second largest Sponsor, Sobeys, was threatening to terminate its participation in the program as well. Instead, Defendants Horn and Chesnut represented that Loyalty Ventures retained strong relationships with its remaining clients. Horn, for example, was quoted in the press release touting the Company's "*roster of marquee clients*" and praising the executives for effectively "*managing relationships with our sponsors*," which would "*produce relatively stable results*" in 2022 for AIR MILES. Similarly, on the earnings call held that day, Horn repeated the claim that AIR MILES' "*long-standing customer relationships*" was a "*key investment strength*" of the business—and Chesnut stated that, despite the loss of the two Sponsors, Loyalty Ventures expected the number of miles issued in 2022 to grow "*between 4% and 5% … trending back up towards $5 billion of issuance.*"

58.  These misleading statements worked. Analysts continued to stress that Loyalty Ventures would rebound post-pandemic, and remained completely unaware of the fact that several

23

of the Loyalty Ventures' top ten Sponsors had left AIR MILES and others would soon exit as well. For example, on February 25, 2022, Morgan Stanley initiated its coverage of Loyalty Ventures with a $26 price target, noting that the Company's "*deep relationships with consumers, clients, and sponsors* helps form its competitive advantage over the longer term, while it should also benefit from the COVID reopening in the coming years."

59.     Defendants continued to dramatically downplay the significance of the loss of RONA and LCBO during a March 23, 2022 investor conference. When an analyst directly asked Defendant Chesnut about "the overall turnover with AIR MILES as far as partners and the potential impact on near-term profitability," Chesnut falsely claimed that LCBO and RONA had left for purely benign reasons that had nothing to do with issues in the AIR MILES program, and that their departures were of little significance due to them *not* being among AIR MILES' "biggest partners." Specifically, Chesnut claimed that RONA left because it simply "had a different focus" since it was "moving more towards the pro side instead of the consumer side where we operate," and that the Company just "economically couldn't find an agreeable meeting spot" with LCBO. Chesnut then went out of his way to make clear that the loss of RONA and LCBO should not concern investors because they were *not* among the Company's top Sponsors. Specifically, Chesnut stated that "while [RONA and LCBO] [had] exited in Q1 [2021], *our biggest partners, the bank, grocery and gas, represent north of 2/3 of all MILES issued."*

60.     However, the significance of the top Sponsors AIR MILES had lost was further revealed approximately one month later, on April 28, 2022, when Loyalty Ventures reported its financial results for the first quarter of 2022—the Company's second quarter as a stand-alone company. Loyalty Ventures reported that revenue for the AIR MILES segment had decreased 6%, with adjusted EBITDA down 19% as compared to the first quarter of 2021—and that the number

of AIR MILES issued in the quarter had ***dropped again by another 4%,*** which the Company was forced to again attribute to "***the non-renewal of two Sponsors in the first quarter of 2021***," *i.e.*, the loss of RONA and LCBO. Moreover, when asked during the conference call held that same day whether the decrease in miles issued had been impacted by COVID restrictions, Horn was forced to admit that the pandemic was not "much of a headwind" for the Company—rather, it was the "***two programs that are no longer with***" AIR MILES that made the miles issuance "***weaker***." Through these disclosures, Defendants revealed that the loss of RONA and LCBO in 2021 was in fact far more significant than they had originally communicated, as the departures of these Sponsors from the AIR MILES program were having a continuing significant negative impact on the AIR MILES program.

61. Analysts were again surprised by the poor results from AIR MILES. Morgan Stanley commented that "while we were expecting a decline due to increasing redemption value, the decline was more than expected," and that the "Miles issued in the quarter of -4% y/y does not bode well for a quick recovery." Sidoti expressly blamed the poor results "primarily due to the loss of two sponsors."

62. On this news, Loyalty Ventures' stock price dropped approximately 24% over the next two trading days from a close on April 28, 2022 of $14.79 to close on May 2, 2022 at $11.25.

63. Nonetheless, the market still remained in the dark about the full extent of Loyalty Ventures' failing relationships with its top Sponsors—including most critically Sobeys. Indeed, on June 3, 2023, Needham & Company initiated its analyst coverage of Loyalty Ventures with a BUY rating. Needham's report titled "***Loyalty Ventures: Poised to Thrive as the Global Economy Reopens***" supported its positive assessment by stressing that "**Air Miles is a force to be reckoned with**" and a "**Powerhouse within Canada**." (emphasis in original). The analysts concluded that

AIR MILES was a "valuable asset" due to its "**notable corporate partners such as BMO, American Express, Safeway, and Shell**," while stressing the "**well-known clients and sponsors that help LYT scale and maintain high levels of consumer engagement**." The Needham report also included a "Snapshot of some of LYLT's Key Clients/Partners," which likewise expressly referenced Sobeys by name and included its logo. Given AIR MILES' purportedly excellent relationships, Needham was **"confident that the business will be able to meet or exceed its pre-pandemic performance in the coming years**."

### F. The Truth Is Fully Revealed: Sobeys Exits The AIR MILES Program, Loyalty Ventures Files for Bankruptcy, And The Fraud Is Exposed

64.     Before markets opened on June 8, 2022—just seven months after the Spinoff, and mere days after analysts reiterated the close connection between AIR MILES and its significant Sponsors—Loyalty Ventures shocked investors by filing a Current Report on Form 8-K disclosing that Sobeys had provided "notice of its intent to exit the [AIR MILES] program." The accompanying press release disclosed that AIR MILES and Sobeys "were unable to align on extension terms" and therefore Sobeys would "exit the program on a region-by-region basis" between August 2022 and the first quarter of 2023.

65.     The press release further disclosed, for the first time, how significant Sobeys was to the overall AIR MILES business. The press release revealed that "Sobeys represented approximately 10% of Loyalty Ventures' adjusted EBITDA in 2021," and explained that the "primary impact of this development in 2022 will be on the number of AIR MILES reward miles issued," which would, in turn, affect the Company's revenue for years to come. Given this massive loss, Loyalty Ventures was forced to rescind its previously provided revenue and adjusted EBITDA guidance for the remainder of 2022.

66. The market reacted strongly to this news. On June 8, 2022, the stock price of Loyalty Ventures plummeted *45%* from a close of $11.03 on June 7, 2022 down to $6.02 on the day of the disclosure.

67. The impact of Sobeys' departure—which had followed the departure of no less than four other of AIR MILES' top ten Sponsors—was essentially the straw that broke the camel's back. Specifically, after Sobeys exited the AIR MILES program, Loyalty Ventures entered a tailspin from which it never recovered. Within weeks, on June 21, 2022, Staples revealed what Defendants had already long known—that it too was leaving the AIR MILES program, effective July 1, 2022. Shortly thereafter, the loss of Sobeys—which had significantly impacted the overall value of the AIR MILES program to other Sponsors due to Sobeys' significance as a critical top Sponsor—prompted three other top Sponsors, namely BMO, Shell Canada and Metro Ontario Inc. ("Metro"), to renegotiate their contracts with AIR MILES with substantially worse economics. These significant price concessions substantially compressed AIR MILES' earnings margins for the next three years, such that the debt service of the Company's credit agreements was soon far more than the cash being generated. Loyalty Ventures' stock collapsed, closing at a price of $0.24 on March 10, 2023—a drop of 99.9% from its Spinoff price of nearly $50 per share.

68. As a result, on March 10, 2023—just sixteen months after the Spinoff—the Company filed a petition in the Bankruptcy Court for the Southern District of Texas, *In re Loyalty Ventures Inc.,* No. 23-90111, and proceeded with a liquidation of its assets.

**G.    Defendant Horn Files A Sworn Declaration Containing A Series Of Damning Admissions Regarding Defendants' False And Misleading Statements About AIR MILES' Top Sponsors**

69. Significantly, the Company's March 10, 2023 bankruptcy filings included a sworn declaration from Defendant Horn, which he filed in his capacity as the "Chief Executive Officer and President of Loyalty Ventures, Inc." In that declaration, which Horn signed and filed on March

10, 2023, Horn made a series of remarkable and damning admissions confirming that Defendants'

had made numerous material misrepresentations about AIR MILES' business before the Spinoff.

Specifically, Horn described in detail how Defendants had starkly misrepresented the overall

health of the AIR MILES business and had concealed the departures of numerous "top ten"

Sponsors—including the "looming" departure of Sobeys, the Company's second top Sponsor that

Horn admitted was "critical" to the AIR MILES program.

70.     *First*, Horn admitted that, despite Defendants repeatedly touting AIR MILES as a

booming business driven by "our success with sponsors," in reality, at the time of the Spinoff, AIR

MILES "***was and had been suffering the effects of an ongoing shift in the loyalty programs***

***market prior to the Spinoff Transaction***"—resulting in "***multiple major client departures from***

***the AIR MILES Reward Program in 2020 and 2021***":

> Prior to the Spinoff Transaction, ***AIR MILES's top ten participating sponsors***
> ***generated more than 90% of the Reward Miles issued under the program in 2020***
> ***and 2019, and represented approximately 55% and 46%, respectively, of the pre-***
> ***spin LoyaltyOne segment's revenue*** for the years ended December 31, 2020 and
> 2019. . . ***Sobeys, a Canadian supermarket chain***, and Shell Canada Products
> ("Shell Canada"), a major oil and gas company, ***were major clients, both in AIR***
> ***MILES's top ten participating sponsors. The AIR MILES Business was and had***
> ***been suffering the effects of an ongoing shift in the loyalty programs market prior***
> ***to the Spinoff Transaction***, with retailers increasingly launching their own in-
> house loyalty programs and ***multiple major client departures from the AIR***
> ***MILES Reward Program in 2020 and 2021.***

71.     Moreover, Horn further admitted that ***even* "*[a]fter the Spinoff Transaction in***

***November 2021, conditions with respect to the AIR MILES Business did not improve***." To the

contrary, "and as a result of the Spinoff Transaction"—which required Loyalty Ventures to make

a cash payment to ADS of $750 million and enter a credit agreement that "severely strained" its

cash flows—"***the Company did not have the liquidity to provide the necessary investment***" to

stop the top Sponsor exodus.

72.     *Second,* after confirming that AIR MILES was totally dependent on its "top ten participating sponsors," Horn admitted that leading up to the Spinoff, no fewer than ***four*** of these critical top ten Sponsors comprising well over 10% of the Company's revenue—*i.e.,* Rexall, LCBO, RONA and Staples Canada—***had either already left AIR MILES months prior to the Spinoff or explicitly provided notice to Defendants that they would do so***:

> ***The AIR MILES Business lost three top ten sponsors in 2020 and 2021***—Rexall, Liquor Control Board of Ontario ["LCBO"], and Rona Inc./Lowe's Canada [RONA]—***which amounted to approximately 10% of the Sponsor revenue at the time***, and in 2021, ***another major Sponsor (Staples) gave notice that it was also leaving the AIR MILES Reward Program***, citing concerns that the AIR MILES Reward Program no longer matched expectations based on the price.

73.     *Third*, Horn admitted that Defendants understood full well that the loss of these top Sponsors would be devastating to the Company.  Indeed, as Horn made clear, Defendants fully "expected" that the loss of ***any*** "top ten" Sponsor would cause the Company's business to crater: as Horn explained, "***[i]n addition to the direct impact from the loss of revenue and earnings attributable to the loss of"*** these top-ten Sponsors, the "***departure of one would have a broader 'network effect' on the value of the entire AIR MILES Reward Program to the remaining Sponsors and Collectors***" and cause a mass Sponsor exodus.  As Horn stated, because the top Sponsors' participation was critical for attracting customers to the AIR MILES program, "***[t]he fewer the Sponsors from whom consumers can earn or redeem rewards, the less the program's value to customers and hence the less the incentive for retailers to become or remain sponsors***."

74.     *Fourth*, contrary to Defendants' representations that Sobeys was a "stable" key top Sponsor that could be relied upon to "generate[] recurring demand," Horn revealed that, in reality, Defendants knew as far back as "***late 2020***," long before the Spinoff, that Sobeys was highly likely to, and in fact was constantly threatening to, terminate its participation in the AIR MILES program:

> The AIR MILES Business, in particular, suffered from a lack of investment prior to the Spinoff Transaction, something that major Sponsors observed and sought to

leverage. Specifically, *in late 2020, Sobeys informed ADS that it was considering exercising its early termination rights and renegotiating or discontinuing its participation in the AIR MILES Reward Program before the expiration of its contract.* The threat of Sobeys's departure or re-pricing *loomed throughout 2021 in the lead up to the Spinoff Transaction*.

75.     Indeed, Horn made clear that when Sobeys "informed the Company in June 2022 that it would discontinue its participation in the AIR MILES Reward Program," it was not a surprise to Defendants—rather, *Sobeys' departure was "consistent with its statements in 2020 about its intentions to leave the program*. Horn further explained precisely how important Sobeys was to Loyalty Ventures, stating that Sobeys was "*critical to the AIR MILES Reward Program*" because it acted "[*m]uch like an anchor tenant in a mall*." Horn also explained that as a result, Sobeys' departure had the "*previously expected consequence*" of causing AIR MILES' remaining three top Sponsors to devalue the program and demand significant price concessions that directly led to the Company's bankruptcy:

> In addition to the direct impact from the loss of revenue and earnings attributable to the loss of Sobeys (or any of the AIR MILES Business's major Sponsors), *a departure of one would have a broader 'network effect' on the value of the entire AIR MILES Reward Program to the remaining Sponsors and Collectors.* The value of a coalition loyalty program such as the AIR MILES Reward Program depends on the number and quality of participating Sponsors. The fewer the Sponsors from whom consumers can earn or redeem rewards, the less the program's value to consumers and hence the less the incentive for retailers to become or remain sponsors. *Much like an anchor tenant in a mall, Sobeys was critical to the AIR MILES Reward Program* because consumers tend to visit grocery stores on a weekly basis, creating regular and frequent opportunities for Collectors to earn and redeem reward miles.
>
> *Sobeys's departure had the previously expected consequence of causing the remaining two of the AIR MILES Reward Program's top three customers (BMO and Shell Canada) to demand and obtain substantial price concessions upon renewal of their contracts.* The Company also negotiated a contract renewal with Metro Ontario Inc. ("Metro") in late 2022. In light of the Company's limited negotiating power (due to the customer concentration risk represented by those three clients) and crippling debt burden, along with *the reduced network effect as a result of Sobeys's exit*, these contract renewals incorporated reduced economics, shorter terms and certain termination risks. *The price concessions substantially compressed the AIR MILES Business's earnings margin.*

76. *Finally*, as Horn further made clear, the loss of the Sobeys relationship was so significant to Loyalty Ventures that its impact would be felt for at least three full years. Indeed, without Sobeys, the Company could no longer generate sufficient cash flow to cover the payments on the massive debt it incurred in the Spinoff, which ***directly led to the Company's bankruptcy***:

> Because there is a deferred revenue impact on the AIR MILES Business, the Company began to feel the cash impact of the loss of the Sobeys relationship and the repricing of the BMO, Shell Canada and Metro contracts in late 2022, ***but the substantial earnings impact will be felt over a three-year period.*** The renegotiated contract with BMO alone will result in approximately $40 million less in pre-tax cash flow in the AIR MILES Business than under the previous contract terms. ***With the loss of Sobeys as a Sponsor and the repricing of the BMO, Shell Canada and Metro contracts, the debt service on the Company's Credit Agreement was more than the cash flow being generated.***

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

77. As discussed herein, Defendants made false and misleading statements and material omissions in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder. These material misstatements and/or omissions concerned Loyalty Ventures' financial condition and growth, which included, among other misrepresentations, statements concerning the Company's relationships with its Sponsors and information concerning the departures or threatened departures of its top Sponsors, that were significantly impacting the Company's business and future prospects.

78. Defendants' representations set forth below were materially false. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Loyalty Ventures' business, operational status, and future growth prospects as, in truth, Defendants had falsely presented to investors a materially misleading portrayal of Loyalty Ventures' business.

A.   **Defendants' Materially False And Misleading Statements And Omissions Prior To The Spinoff**

1.   **The October 14, 2021 Registration Statement**

79.    To complete the Loyalty Ventures Spinoff, ADS participated in the preparation and filing of the Form 10, which registered Loyalty Ventures shares.  Specifically, in a Current Report on Form 8-K filed by ADS on September 1, 2021, ADS confirmed that it "***participated in the preparation and filing of a registration statement on Form 10 with the Securities and Exchange Commission by Loyalty Ventures Inc***. ('Spinco') in connection with Alliance Data's previously announced proposed separation of its LoyaltyOne reporting segment into an independent, public company."  On or about October 14, 2021, Defendants ADS, Andretta, and Horn caused Loyalty Ventures to file with the SEC an amended registration statement to Form-10,[3] which became the effective Registration Statement for the Spinoff on October 22, 2021.

80.    The Registration Statement also included two cover letters signed by Defendants Andretta and Horn that expressly endorsed its contents.  Specifically, Defendant Andretta's cover letter stated that "[t]he enclosed information statement . . . describes the [Spinoff] in detail and contains important information about Loyalty Ventures, including the historical combined financial statements prepared on a carve-out basis."  Andretta "urg[ed] [investors] to read this information statement carefully."  Defendant Horn's cover letter stated that the Spinoff would permit Loyalty Ventures "to concentrate on its core competencies and growth opportunities," and specifically touted AIR MILES, which Horn emphasized was "Canada's most recognized loyalty program."  Horn also similarly urged investors "to learn more about Loyalty Ventures and our business by reading the attached information statement."

_____

[3] The Registration Statement was dated October 13, 2021.

81.   In the Registration Statement, Defendants ADS, Andretta and Horn repeatedly represented that one of AIR MILES' key "*competitive strengths*" was its "*deep, long-term relationships*" with its top Sponsors, including Sobeys.  The Registration Statement stated, "*[w]e have maintained deep, long-standing relationships with large consumer-based businesses*, including well-known worldwide brands, such as Shell Canada, *Sobeys Inc.*, Bank of Montreal, Rewe and Albert Heijn."  In so doing, the Registration Statement emphasized AIR MILES' purported "*success*" with these Sponsors, and these Sponsors' supposed recognition of the "*significant benefit to staying in the AIR MILES Reward Program*":

> For the AIR MILES Reward Program, we utilize our large collector base together with our data and analytical capabilities to *deepen our existing relationships with our sponsors*, some of which have been part of the program for almost 30 years, and continue to drive powerful benefits to collectors in the program. By continuing to engage our collectors with personalized marketing experiences and scaled rewards, *our sponsors recognize the significant benefit to staying in the AIR MILES Reward Program and increasing their customer spend (issuance) opportunity*. We believe that *our success with sponsors* and our ability to offer a variety of redemption options, both aspirational and instant, *drive the appeal of AIR MILES Reward Program* to collectors.

82.   Additionally, the Registration Statement included a separate "*Our sponsors*" section that further touted the Company's relationship with Sobeys and Sobeys' importance as a "brand name sponsor[]" representing the crucial "grocery" sector.  In addition, the Registration Statement further emphasized that AIR MILES' top ten Sponsors were critical to Loyalty Ventures' business, as those Sponsors represented the majority of the Company's revenue. Furthermore, the Registration Statement touted that Loyalty Ventures' "*top 6*" Sponsors had secure, longstanding relationships with AIR MILES with "*an average tenure of 25 years*":

> **Our sponsors**
>
> Approximately 135 brand name sponsors participate in our AIR MILES Reward Program, including Shell Canada Products, Jean Coutu, Amex Bank of Canada, *Sobeys Inc.* and Bank of Montreal.  Our sponsor base covers a diverse set of market spend categories, including gas, pharmacy, credit card, and grocery. *Relationships with our largest and most well-known sponsors account for a significant portion*

*of our combined revenue. For the year ended December 31, 2020*, *our 10 largest sponsors represented approximately 55% of our revenue* . . . Contracts with our sponsors generally vary in length from three to five years. However, *our top 6 sponsors have an average tenure of 25 years*.

83. The statements in paragraphs 81-82 were materially false and misleading, and omitted material facts when made. Contrary to Defendants' statements touting their "success with partners"; that the Company maintained "deep, long-standing" relationships with its "large, consumer-based" Sponsors; that these Sponsors "recognize[d] the significant benefit to staying in the AIR MILES Reward Program"; and that the largest Sponsors had secure, longstanding relationships with AIR MILES, in reality, the exact opposite was true. Indeed, *at the exact same time* that Defendants were making these statements, no less than four of the Company's top ten Sponsors had either already exited AIR MILES or had directly notified Defendants that they would soon do so, and a fifth, Sobeys—which was AIR MILES' second largest Sponsor responsible for 10% of the Company's adjusted EBITDA—had been threatening that it would similarly depart the program dating back to "*late 2020*." As Defendant Horn explicitly *admitted* in his sworn declaration filed as part of Loyalty Ventures' bankruptcy proceeding: "*The AIR MILES Business was and had been suffering the effects of an ongoing shift in the loyalty programs market prior to the Spinoff Transaction*," as the Company was experiencing "*multiple major client departures from the AIR MILES Reward Program in 2020 and 2021*"—including top-ten Sponsors Rexall, LCBO, RONA and Staples. Horn also made clear that Defendants knew that the loss of any one of these Sponsors would trigger a "network effect" that would decimate the AIR MILES program, stating: "a departure of one would have a broader 'network effect' on the value of the entire AIR MILES Reward Program to the remaining Sponsors and Collectors."

84. Furthermore, it was misleading for Defendants to repeatedly highlight the Company's relationship with Sobeys in particular as a "competitive strength" and as emblematic

of its "deep, longstanding relationships" with its "large" Sponsors, without disclosing the highly material fact that Sobeys was threatening to terminate its participation in AIR MILES. Specifically, Defendant Horn admitted that "***in late 2020, Sobeys informed ADS that it was considering exercising its early termination rights and renegotiating or discontinuing its participation in the AIR MILES Reward Program*** before the expiration of its contract," and that the threat of Sobeys' departure was so significant that it "***loomed throughout 2021 in the lead up to the spinoff transaction***." Tellingly, Horn explicitly admitted that Sobeys' departure shortly after the Spinoff was "***consistent with its statements in 2020***," and that the ensuing ramifications on the AIR MILES program that led to the Company's collapse was a "***previously expected consequence***" of Sobeys' departure.

85. Additionally, the Registration Statement included two purported "risk factors" regarding risks concerning AIR MILES' top Sponsors. One risk factor stated that "***[o]ur 10 largest clients*** represented 55% and 46%, respectively, of our combined revenue for the years ended December 31, 2020 and 2019, and ***the loss of any of these clients could cause a significant reduction in our combined revenue***." The other risk factor stated that ***if AIR MILES was*** "***unable to maintain or renew our relationships with our most significant sponsors,***" ***the*** "***value proposition for sponsors and collectors in the AIR MILES Reward Program coalition . . . may be impacted***," including by other Sponsors leaving the program, which "***could have a material adverse effect on our business, results, operations, financial condition and liquidity***."

86. The above purported "risk factors" were materially false and misleading and omitted material facts because, in reality, the "risk" of the loss of several of AIR MILES' "10 largest clients" had already materialized. Indeed, as Defendant Horn unequivocally admitted, there were "***multiple major client departures in 2020 and 2021***," including no less than ***four*** of AIR

MILES' "top ten" Sponsors—Rexall, RONA, LCBO and Staples Canada. As Defendant Horn made clear, "[t]he AIR MILES Business *lost three top ten sponsors* in 2020 and 2021—Rexall, Liquor Control Board of Ontario, and RONA—which amounted to approximately 10% of the Sponsor revenue at the time, and in 2021, *another major Sponsor (Staples) gave notice that it was also leaving the AIR MILES Reward Program*." Additionally, the departure of Sobeys, "*the second largest Sponsor*" in the AIR MILES program, *"loomed"* over Defendants for the entirety of 2021 because *"in late 2020*," Sobeys informed ADS that it was considering exercising its early termination rights and leaving the AIR MILES program. As noted above, Defendants knew full well that "*the loss of any of these [top-ten] clients*"—much less *five* of them, including their *second-largest Sponsor*—"*would have a broader 'network effect' on the value of the entire AIR MILES Reward Program*" and "*could cause a significant reduction in our [] revenue*." For these reasons, the purported "risks" of which the Registration Statement warned had, in fact, already materialized, as Loyalty Ventures had in truth *already failed* to "maintain or renew our relationships with our most significant clients," rendering these statements materially false.

### 2. The October 14, 2021 Investor Presentation

87.     Also on October 14, 2021, ADS filed with the SEC on Form 8-K, an investor presentation titled "Loyalty Ventures Overview" (the "Investor Presentation"). ADS's Investor Presentation was "to be given to investors and others by senior officers of Loyalty Ventures in connection with the Separation."

88.     The Investor Presentation prominently and repeatedly touted Loyalty Ventures' relationship with "*Sobeys*" and its affiliate "*Safeway*" in particular as support for Defendants' claims that the soon-to-be independent Company had a "*stable client base*" of large Sponsors in key areas of "Everyday Commerce," including grocery and pharmacy, that could be relied upon to "*generate[] recurring campaign demand*":

36



89.    The statements in paragraph 88 were materially false and misleading and omitted

material facts.  In reality, as noted above, the Company did not have a "stable client base" of top

Sponsors such as Sobeys that could be relied upon for "generat[ing] recurring campaign demand."

To the contrary, and as Defendant Horn admitted, the Company's business was in absolute freefall.

Indeed, by this time, *four* of the Company's top ten Sponsors had either already exited AIR MILES or had directly notified Defendants that they would soon do so, and Sobeys—AIR MILES' second largest Sponsor—had been threatening that it would similarly depart the program dating back to "*late 2020*," such that Sobeys' departure "*loomed*" over Defendants throughout this time period.

### 3. The October 28, 2021 Press Release And November 3, 2021 Form 10-Q

90.     On October 28, 2021, ADS filed a Form 8-K accompanied by a press release announcing the Company's financial results for 3Q21.  Notably, the 3Q21 press release touted to investors the "*long-term potential*" of Loyalty Ventures.  On November 3, 2021, ADS filed its Form 10-Q for 3Q21, which was signed by Defendant Andretta.

91.     In both the 3Q21 press release and the 10-Q for 3Q21, ADS provided false explanations for why AIR MILES had issued fewer miles than in the past.  Specifically, the press release stated that the "*[i]ssuance of AIR MILES reward miles decreased 7% compared to the third quarter of 2020, reflecting certain promotional activity in the prior year not present in the current year*."  In the 10-Q for 3Q21, ADS similarly stated that for AIR MILES, "*[i]ssuance for the third quarter of 2021 was down due to timing of promotional activity*."

92.     The statements in paragraph 91 were materially false and misleading and omitted material facts.  The decrease in Air Miles issued in the third quarter of 2021 was not due to a lack of "promotional activity," but rather to the fact that multiple of AIR MILES' top ten Sponsors— *i.e.*, Rexall, LCBO, RONA—*had already left the AIR MILES program by the first quarter of 2021*.  As Defendants would be forced to admit only a few months later, the "decline in AIR MILES reward miles issuance" during 3Q21 was in truth "*relate[d] to the non-renewal of two sponsors and their exit from the program in the first quarter of 2021*"—*i.e.,* LCBO and RONA.

**B.** **Defendants' Materially False And Misleading Statements After the Spinoff**

**1.** **The November 9, 2021 Form S-8**

93.    On November 9, 2021, Loyalty Ventures filed with the SEC a Registration Statement on Form S-8 ("2021 Form S-8"), signed by Defendants Horn and Chesnut.  The 2021 Form S-8 incorporated by reference the Registration Statement,[4] which included the same misstatements discussed in paragraphs 81-82, and 85, which were false and misleading for the same reasons alleged in paragraphs 83-84, and 86.

**2.** **The November 24, 2021 Form 10-Q**

94.    On November 24, 2021, less than three weeks after the Spinoff, Loyalty Ventures filed a quarterly report on Form 10-Q regarding the Company's 3Q21 financial results (the "November 2021 10-Q").  The November 2021 10-Q was signed by Defendants Horn and Chesnut.

95.    Like ADS's 3Q21 Form 10-Q, Loyalty Ventures' 10-Q provided a false explanation for the decrease in AIR MILES issued.  Specifically, the November 2021 10-Q stated that AIR MILES Reward Program issuances "***declined 7% . . . as compared to the third quarter of 2020. . . Issuance for the quarter was down due to timing of promotional activity***."

96.    The statements in paragraph 95 were materially false and misleading and omitted material facts.  The decrease in rewards miles issued was not due to the lack of "promotional activity," but to the fact that multiple of AIR MILES' top ten Sponsors—*i.e.*, Rexall, LCBO, RONA—***had already left the AIR MILES program by the first quarter of 2021***.  As Defendants would be forced to admit only a few months later, the "decline in AIR MILES reward miles

---

[4] The S-8 incorporated by reference, the "Registration Statement on Form 10, filed by the Registrant with the Commission on September 24, 2021 (File No. 001-40776), as subsequently amended (the "Form 10 Registration Statement")."  The subsequent amendment is the Registration Statement.

issuance" during 3Q21 was in truth "***relate[d] to the non-renewal of two sponsors and their exit from the program in the first quarter of 2021***"—*i.e.,* LCBO and RONA.

### 3. The December 15, 2021 Form 8-K

97. On December 15, 2021, Loyalty Ventures filed a Current Report on Form 8-K that included an investor presentation touting Loyalty Ventures' relationship with "***Sobeys***" and its affiliate "***Safeway***" as key support for their claims that Loyalty Ventures had a "***stable client base***" that was "***generat[ing] recurring campaign demand***" for the AIR MILES program. The presentation included the slides discussed in paragraph 88, that explicitly showcased the logos of Sobeys and Safeway as strong partners of AIR MILES. These statements were false and misleading for the same reasons alleged in paragraph 89.

### 4. February 3, 2022 Statements

98. As discussed above, Defendants' false and misleading statements, and omission of material facts, first began to be revealed on February 3, 2022, when Loyalty Ventures announced poor results which it attributed to the non-renewal and exit from the AIR MILES Program of two Sponsors in the first quarter of 2021. However, this partial corrective disclosure was accompanied by Defendants' continued false reassurances that Loyalty Ventures maintained strong relationships with its top Sponsors.

99. Specifically, on February 3, 2022, Loyalty Ventures issued a press release reporting its financial results from the fourth quarter of 2021, which was filed with the SEC on Form 8-K and included several statements by Defendant Horn (the "4Q21 press release"). In the 4Q21 press release, Defendant Horn assured investors that the Company still had strong relationships with its top Sponsors. For example, Horn congratulated the Loyalty Ventures team who purportedly "navigated challenging business conditions over the last two years, ***while managing relationships***

*with our sponsors,* collectors, consumers, clients, and partners." Horn also conveyed that Loyalty Ventures had "*a roster of marquee clients to which we can offer a…solid financial position*."

100. Also on February 3, 2022, the Company held an earnings call attended by Defendants Horn and Chesnut (the "4Q21 earnings call"). During the 4Q21 earnings call, Horn continued to claim that *the Company maintained "long-standing customer relationships" with AIR MILES' Sponsors*, which he asserted was a *"key" reason* to invest in Loyalty Ventures. During the same call, Chesnut explained that, despite the departure of two Sponsors, Loyalty Ventures expected the number of miles issued in 2022 to grow "*between 4% and 5% … trending back up towards $5 billion of issuance*."

101. The statements in paragraphs 99 and 100 were materially false and misleading when made and omitted material facts. In reality, the Company was not "managing relationships" with its Sponsors, its "customer relationships" were not a "key investment strength," and it did not have a strong "roster of marquee clients." Rather, by this time—and as Defendant Horn admitted in his sworn declaration—no less than *four* of AIR MILES' "top ten" Sponsors had either already left AIR MILES or had informed Defendants that they would definitively do so. Moreover, the Company's second largest Sponsor, Sobeys, had seriously threatened that it planned to leave the program dating back to "*late 2020*," causing the threat of its departure to "loom[] throughout 2021." Indeed, in making these statements, Defendants misleadingly failed to disclose the highly material facts that: (1) RONA and LCBO, far from being "two sponsors" of little consequence, were in fact two of AIR MILES' crucial "top ten" Sponsors; (2) a third "top ten" Sponsor, Rexall, had also already left the AIR MILES program back in 2020; (3) a fourth "top ten" Sponsor, Staples, had given notice prior to the Spinoff that it was withdrawing from the AIR MILES program; and (4) AIR MILES' second largest Sponsor, Sobeys, was similarly likely to leave the program as it

had been actively threatening to do so all year.  As Horn made clear in his declaration, Defendants knew that the loss of any one of these Sponsors would trigger a "network effect" that would decimate the AIR MILES program, stating: "a departure of one would have a broader 'network effect' on the value of the entire AIR MILES Reward Program to the remaining Sponsors and Collectors."

### 5.  The February 8, 2022 Form S-8

102.  On February 8, 2022, Loyalty Ventures filed with the SEC Registration Statement on Form S-8 ("2022 Form S-8"), signed by Defendants Horn and Chesnut.  The 2022 Form S-8 expressly incorporated the Registration Statement, stating: "The following documents are incorporated herein by reference: (a) The Registrant's Amendment No. 3 to the Registration Statement on Form 10 (the "Form 10 Registration Statement") (File No. 001-40776) filed on October 14, 2021."  Thus, the Form S-8 incorporated the same false and misleading statements described in paragraphs 81-82, 85, which were materially false and misleading when made for the same reasons as stated in paragraphs 83-84, 86.

### 6.  The February 28, 2022 Form 10-K

103.  On February 28, 2022, Loyalty Ventures filed with the SEC its first and only Annual Report on Form 10-K, discussing the financial results for the year ended December 31, 2021 (the "Form 10-K"), which was signed by Defendants Horn and Chesnut.

104.  In the Form 10-K, Loyalty Ventures continued to tout its relationships with its Sponsors, specifically highlighting Sobeys:

> ***Sponsors***
>
> ***We have over 100 brand name sponsors that participate in our AIR MILES Reward Program, including*** Shell Canada Products, Jean Coutu, Amex Bank of Canada***, Sobeys Inc.*** and Bank of Montreal. Our sponsor base covers a diverse set of market spend categories, including gas, pharmacy, credit card, and grocery. ***Relationships with our largest and most well-known sponsors account for a***

> *significant portion of our consolidated and combined revenue,* including approximately 17% from Bank of Montreal for the year ended December 31, 2021. We typically grant participating sponsors exclusivity in their market category, enabling them to realize incremental sales and increase market share as a result of their participation in the AIR MILES Reward Program.

105.     The statements in paragraph 104 were materially false and misleading and omitted material facts when made.  Indeed, as noted above, it was misleading for Defendants to highlight that the Company's "largest and most well-known sponsors" accounted for the "majority" of the Company's combined revenue—and to highlight Sobeys in particular as being emblematic of the Company's longstanding key Sponsor relationships—while misleadingly omitting the highly material facts that, as Defendant Horn admitted in his sworn declaration:  (1) RONA and LCBO were among AIR MILES' crucial "top ten" Sponsors in 2020 and had already left the AIR MILES program as of the first quarter of 2021; (2) Rexall, another "top ten" Sponsor, had already left the program in 2020; (3) a fourth "top ten" Sponsor, Staples, had given notice prior to the Spinoff that it was withdrawing from the AIR MILES program; and (4) Sobeys, the Company's second largest Sponsor, was actively threatening to leave the AIR MILES program.

106.     Additionally, the Form 10-K included purported "risk factors" concerning the potential loss of Loyalty Ventures' ten largest clients, which represented **58% of the Company's combined revenue in 2021.**  The risk factors stated that **"the loss of any of these clients could cause a significant reduction in our consolidated revenue"**:

> **Our 10 largest clients** represented 58%, 55% and 46% respectively, of our consolidated and combined revenue for the years ended December 31, 2021, 2020 and 2019, and **the loss of any of these clients could cause a significant reduction in our consolidated revenue**. . . *A decrease in revenue from any of our significant clients,* including Bank of Montreal, **for any reason, including a decrease in pricing or activity, or a decision either to utilize another service provider or to no longer procure the services we provide, could have a material adverse effect on our consolidated revenue**.

107.     The Form 10-K also included a second risk factor stating that AIR MILES "reli[ed] on relationships with sponsors," and that **if the Company was "unable to maintain or renew our**

*relationships with our most significant sponsors . . . the value proposition for sponsors and collectors in the AIR MILES Reward Program collation . . . may be impacted,"* including by the departure of other Sponsors, which "*could have a material adverse effect on our business, result of operations, financial condition and liquidity*."

108.     The above purported "risk factors" were materially false and misleading and omitted material facts because the "risk" of the loss of "significant clients," including of the "10 largest clients," had already materialized—as Defendant Horn unequivocally admitted, there were "*multiple major client departures in 2020 and 2021*."  Indeed, Defendant Horn testified under penalty of perjury that "[t]he AIR MILES Business lost three top ten sponsors in 2020 and 2021— Rexall, Liquor Control Board of Ontario, and [RONA] Inc./Lowe's Canada—which amounted to approximately 10% of the Sponsor revenue at the time, and in 2021, another major Sponsor (Staples) gave notice that it was also leaving the AIR MILES Reward Program."  Horn further admitted that Defendants knew that these top Sponsor departures would trigger a mass Sponsor exodus due to the "network effect," which made the AIR MILES program increasingly less valuable to Sponsors as larger Sponsors departed, thus significantly hurting the Company's future prospects.  These "risk factors" were misleading for the additional reason that, as Horn further admitted, Defendants knew at this time that Sobeys, AIR MILES' "second largest Sponsor," was also likely to leave the program at this time.  Indeed, Horn stated that the threat of Sobeys' departure was so significant and imminent that it had been "*loom[ing]*" over Defendants throughout 2021, and that Sobeys' departure was "*consistent with [Sobeys]*' statements in 2020."

**7.     March 23, 2022 Sidoti Conference**

109.     On March 23, 2022, Defendant Chesnut participated in Sidoti's Spring 2022 Small Cap Virtual Conference.  During the question-and-answer session, the first question asked to Chesnut was regarding turnover of AIR MILES Partners.  In response, Defendant Chesnut assured

the market that the previously-revealed loss of Sponsors RONA and LCBO was inconsequential and that AIR MILES' relationship with its key Sponsors remained strong, while continuing to conceal the impending loss of Sobeys and the expected "network effect" of that loss:

**Marc Frye Riddick, Sidoti & Company, LLC**

So let's start with our first question, which is *a request to discuss the overall turnover with AIR MILES as far as partners and the potential impact on near-term profitability.*

**John Jeffrey Chesnut, CFO & EVP**

Yes, you bet. *I think the question may be referencing there were some client -- 2 clients lost in 2021.* LCBO, which was the Liquor Control Board of Ontario, as well as RONA, which is a home hardware -- home improvement retailer up in Canada. RONA was acquired by Lowe's out of the U.S., ultimately had a different focus, I think, for their loyalty program or especially they were moving more towards the pro side instead of the consumer side where we operate. And with LCBO, we just economically couldn't find an agreeable meeting spot. *But both of those partners were -- while they exited in Q1, our biggest partners, the bank, grocery and gas represent north of 2/3 of all MILES issued*. And we're actively engaged in adding new sponsors, both in the traditional sense, which is through issuance avenues in the way that we have with say, Shell or Bank of Montreal, but also in newer avenues like the [card-link-offers] that we discussed at the end of the last quarter, so that there's a lighter touch integration between our systems and theirs, and it's an opportunity for a retailer to enter the coalition on a trial basis and really see what kind of momentum that can help create in their business. *So we're excited about the pipeline that we have, and you'll see us focus on delivering the new sponsors and new ways to earn throughout 2022*.

110.  The statements in paragraph 109 were materially false and misleading, and omitted material facts when made.  Rather than the departure of LCBO and RONA being inconsequential because they were not among AIR MILES' "biggest partners," in reality, the opposite was true: as Defendant Horn admitted in his sworn declaration, LCBO and RONA were among AIR MILES' crucial "top ten sponsors."  Moreover, in his response, Chesnut also failed to disclose that:  (1) a third top ten Sponsor, Rexall, had left the AIR MILES program in 2020; and that (2) a fourth top ten Sponsor, Staples, had also already given notice that it would exit the program in 2022.  In addition, it was misleading for Chesnut to promote AIR MILES' relationships with its "biggest

partners" in the bank, gas, and grocery sectors considering that, as Defendant Horn admitted in his sworn declaration: (1) AIR MILES' key "grocery" partner, Sobeys, had already seriously threatened to leave the AIR MILES program dating back to "late 2020," such that the threat of its departure was now imminent and had been "loom[ing]" over Defendants throughout 2021; and that (2) Defendants fully "expected" that the departure of even one top Sponsor, let alone four of them with a fifth major Sponsor actively threatening to leave, "would have a broader 'network effect' on the value of the entire AIR MILES Reward Program to the remaining Sponsors."

### 8. The April 28, 2022 Earnings Call

111. On April 28, 2022, Defendants Horn and Chesnut participated in an investor earnings call to discuss the Company's financial results from the first quarter of 2022 (the "1Q22 earnings call"). As discussed above, Defendants' false and misleading statements, and omission of material facts, were further revealed on April 28, 2022, when Loyalty Ventures announced that the two Sponsors lost in 2021 were more than significant than originally disclosed, as their departures were having continuing negative impacts on the Company's financials. However, Defendants continued to fail to disclose the full truth, and specifically that AIR MILES had in fact lost no less than *four* of its "top ten" Sponsors, with its second top-most Sponsor, Sobeys, also threatening to leave.

112. Specifically, during the 1Q22 earnings call, Defendant Horn continued to conceal AIR MILES' mass exodus of top Sponsors, and downplayed the significance of RONA and LCBO's departures by stating that "AIR MILES reward miles issued in the first quarter *were consistent with the year ago quarter after adjusting for nonrenewals* . . . The burn rate appears elevated partly due to lower issuance levels in Q1, *driven by nonrenewals I just mentioned*."

113. The statements in paragraph 112 were materially false and misleading, and omitted material facts when made. Indeed, as noted above, these statements misleading omitted the highly

material facts that, as Defendant Horn admitted in his sworn declaration: (1) RONA and LCBO, rather than constituting routine "nonrenewals," were in fact two of Loyalty Ventures' crucial "top ten" Sponsors; (2) a third "top ten" Sponsor, Rexall, had also already left the AIR MILES program in 2020; (3) a fourth "top ten" Sponsor, Staples, had given notice that it too was withdrawing from the AIR MILES program; and (4) the Company's second largest Sponsor, Sobeys, had been actively threatening to leave the AIR MILES program since "*late 2020*"—such that this threat was now imminent and had "***loomed***" over Defendants both leading up to the Spinoff and throughout 2021.

### 9. The May 6, 2022 Form 10-Q

114. On May 6, 2022, filed a quarterly report on Form 10-Q, signed by Defendants Horn and Chesnut (the "1Q22 10-Q"). The 1Q22 10-Q incorporated the same purported "risk factor" as the prior Form 10-K (¶¶106-07), which was materially false and misleading for the reasons alleged in ¶108.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

115. Numerous facts, including those detailed above, considered collectively and holistically, demonstrate that Defendants knew or were reckless in not knowing that Defendants acted fraudulently and that the statements identified in Section V above were materially false and misleading when made. The scienter of ADS as a corporate entity is derived from the scienter of its executives, including Defendant Andretta at all relevant times, as well as Defendants Horn and Chesnut as senior executives of ADS prior to the Spinoff.

116. *First*, Defendant Horn's damning admissions in his bankruptcy declaration that Defendants knew well before the Spinoff that the AIR MILES business was on the verge of collapse—to the extent that no less than ***four*** of its top Sponsors had either already left the program or given formal notice that they would do so, with Sobeys, the Company's second largest Sponsor,

also expected to leave—is highly probative of Defendants' scienter. Specifically, Horn admitted that, directly contrary to what Defendants had represented leading up to and after the Spinoff about the strength of the AIR MILES business due to its "deep, longstanding relationships" with top Sponsors, in reality the AIR MILES business "*was and had been suffering the effects of an ongoing shift in the loyalty programs market prior to the Spinoff Transaction, with retailers increasingly launching their own in-house loyalty programs and multiple major client departures from the AIR MILES Reward Program in 2020 and 2021*"—*i.e.*, prior to the Spinoff. Specifically, Horn admitted that three top ten Sponsors—RONA, LCBO and Rexall—had *already left* the AIR MILES program *by the first quarter of 2021*, and a fourth, Staples, also had formally given notice that it would definitively leave *before the Spinoff*.

117. Defendant Horn further admitted that Defendants knew that the loss of even *one* top ten Sponsor would create a *"network effect*," causing other top Sponsors to devalue the AIR MILES program and either themselves exit the program or demand to reprice their contracts. Moreover, *"conditions with respect to the AIR MILES Business did not improve"* after the Spinoff. Rather, the opposite was true, as the Spinoff had been structured in a way that left Loyalty Miles with virtually no liquidity and no ability to adequately invest in the AIR MILES business. This prompted the inevitable departure of Sobeys—the Company's second largest Sponsor whose threat to leave the program had *"loomed"* throughout 2021—which *"had the previously expected consequence"* of causing the Company's remaining top Sponsors to renegotiate their contracts with highly unfavorable terms, resulting in Loyalty Ventures' bankruptcy.

118. *Second*, the fact that AIR MILES was responsible for *77%* of the Company's adjusted EBITDA in 2020—and its "top ten" Sponsors alone comprised "over half," or *55%*, of Loyalty Ventures' combined revenue—further supports a strong inference of Defendants' scienter.

48

Indeed, AIR MILES' top ten Sponsors were so critical to the Company that both the Company's Registration Statement and Form 10-K prominently warned that the loss of even **one** of these Sponsors would have a highly material impact on the Company: **"*Our 10 largest clients represented 55% and 46%, respectively, of our combined revenue for the years ended December 31, 2020 and 2019, and the loss of any of these clients could cause a significant reduction in our combined revenue*."** Indeed, Sobeys—the Company's second largest Sponsor that Defendants had repeatedly touted as a prime example of its "deep, longstanding relationships" with "worldwide" brands—alone generated 10% of the Company's adjusted EBITDA.

119. Moreover, the Registration Statement and Form 10-K further warned that, aside from the loss of even one of these Sponsors causing a "significant reduction" in combined revenue, it also could cause other Sponsors to devalue the AIR MILES program and leave AIR MILES as a result. In light of how critical AIR MILES and its top ten Sponsors were to the Company's success, Defendants were undoubtedly fully aware of the fact that **four** of these Sponsors had either left the program or had given notice that they would do so, and that Sobeys—who by itself generated 10% of the Company's adjusted EBITDA—was also highly likely to depart.

120. *Third*, Defendants' scienter is further supported by their consistent efforts to deny and downplay the significance of the departures of top ten Sponsors Rexall, RONA and LCBO, even in response to direct investor questions about the significance of these departures. Indeed, in 2020 and 2021, media reports circulated that Rexall, LCBO and RONA had terminated their participation in the AIR MILES program. Tellingly, in response to these reports, Defendants at no time ever acknowledged that these three Sponsors were part of the Company's critical "top ten" Sponsors, nor did they ever disclose how material the loss of these Sponsors was—even though they collectively represented over **10%** of the Company's combined revenue in 2020. To the

49

contrary, Defendants affirmatively downplayed the significance of these Sponsors as ***not*** being among the Company's top ten, with an AIR MILES spokesperson "***insist[ing] the company [was] still in a good spot***" and that ***AIR MILES remained*** "***really strong***" ***because it maintained*** "***several high-profile partnerships, including Shell, Metro and Sobeys***."

121.    Similarly, during a March 23, 2021 investor conference—just after Defendants had been forced to reveal that the departures of LCBO and RONA had negatively impacted the Company's financials—an analyst directly asked Defendant Chesnut about the ***"turnover with AIR MILES partners" and "the potential impact on near-term profitability."*** Rather than admit that RONA and LCBO ranked among AIR MILES' "top ten" Sponsors such that their departures would have a significant and continuing impact on the AIR MILES program, Chesnut responded by asserting the exact opposite:  that the departures of RONA and LCBO were of little moment because these Sponsors were decidedly *not* among the Company's "**biggest partners**":  "***[W]hile [RONA and LCBO] exited in Q1, our biggest partners, the bank, grocery and gas, represent north of 2/3 of all MILES issued.***" Moreover, in downplaying these departures in response to direct market inquiries, Defendants never once breathed a word about the fact that a fourth top Sponsor, Staples, had also given notice that it would soon leave the program, or that the Company's second largest Sponsor—Sobeys—was also expected to leave.

122.    *Fourth*, ADS and Andretta had motive and opportunity to commit the fraud.  Not only did ADS receive $750 million in cash from the Spinoff, which it badly needed to pay down its corporate debt, it was also able to purge itself of the flailing LoyaltyOne segment that was on the verge of collapse.  Defendant Horn himself stated in his declaration that Defendants knew that Loyalty Ventures' business "suffered from a lack of investment" in the years prior to the Spinoff, and that Defendants fully expected significant repercussions to the Company's business from that

lack of investment after the Spinoff: "The AIR MILES Business, in particular, suffered from a lack of investment prior to the Spinoff Transaction, something that major Sponsors observed and sought to leverage." Moreover, as analysts at Morningstar explained, ADS's "excessively leveraged balance sheet" stood out as the "one exception" amongst "credit card issuers," resulting in Morningstar giving ADS an "Extreme uncertainty rating" in April 2020. Indeed, Andretta told investors at ADS's May 18, 2021 Investor Day that ADS needed to improve its "enterprise capital metrics to be more in line with [its financial company] peers," and the "***primary way*** [ADS would] achieve this is through paying down debt" via the "planned spin-off of the LoyaltyOne segment." In fact, during ADS's first post-Spinoff public presentation, held on December 7, 2021, Andretta compared the cash infusion from the Spinoff to a much needed "shot of B1" for the Company: "***We need to pay down our debt. We did that with the spin and our balance sheet got a shot of B1 with the spin***."

123. Similarly, Andretta's and ADS's efforts to cash out ADS's 19% minority interest in Loyalty Ventures that it had obtained as part of the Spinoff, ***valued at $50 million***, further evidence their scienter. Indeed, at the time of the Spinoff, ADS had made clear to investors that it intended to monetize its $50 million minority interest within a year in order to further pay down its debt. Significantly, ADS ultimately entered into a 10b5-1 plan to sell its minority share ***during the Class Period*** on May 25, 2022—***less than two weeks before Defendants were forced to reveal the critical loss of Sobeys on June 8, 2022***—in a last-ditch effort to cash out. However, ADS was too late, as the first day of trading under the plan was scheduled for June 16, 2022—only a few days after Sobeys terminated its participation in the AIR MILES program. Indeed, ADS admitted during a June 14, 2022 investor conference held a few days later that due to Loyalty Ventures' stock price plummeting below the "floor" set forth in the 10b5-1 plan, the Company was unable

to cash out and had been forced to significantly write down the value of its minority interest—before ultimately being forced to write it off altogether when Loyalty Ventures' stock price never recovered.  ADS's last ditch effort to cash in on its minority share in Loyalty Ventures only two weeks before the fraud was revealed is highly probative of ADS's and Andretta's scienter.

## VII.  LOSS CAUSATION

124.    As further described above, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of Loyalty Ventures securities at an artificially high level, and operated as a fraud or deceit on Class Period purchasers of Loyalty Ventures common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

125.    As detailed below, the truth was revealed through three corrective disclosures, causing Lead Plaintiff and the Class to suffer significant damages as a result.

126.    Lead Plaintiff and members of the Class purchased Loyalty Ventures common stock at artificially inflated prices during the Class Period. But for Defendants' fraudulent scheme and material misrepresentations and omissions, Lead Plaintiff and members of the Class would not have purchased Loyalty Ventures common stock at artificially inflated prices.

127.    As Defendants' fraudulent scheme and material misrepresentations and omissions were gradually revealed to the market through four corrective disclosures, the price of Loyalty Ventures common stock declined significantly. The corrective impact of the initial partial disclosures alleged herein was tempered, however, by Defendants' continued material misrepresentations and omissions, as detailed above.

128.    Lead Plaintiff and the Class suffered economic losses as the price of Loyalty Ventures common stock fell in response to the corrective disclosures, as demonstrated below.  The

disclosures described below, however, do not necessarily represent an exhaustive list of all stock price declines attributable to Defendants' fraudulent conduct, given that fact and expert discovery in this case has not yet begun. Lead Plaintiff expressly reserves the right to identify additional relevant disclosures and price declines following an opportunity to conduct full fact and expert discovery in this case.

A.     **February 3, 2022 Corrective Disclosure**

129.    On February 3, 2022, after the market closed, Loyalty Ventures filed a Form 8-K accompanied by a press release which revealed poor financial results for 2021, noting "total revenue was $735 million compared to $765 million in 2020" and "[a]djusted EBITDA was $166 million compared to adjusted EBITDA of $173 million for 2020." The press release also disclosed a 7% decrease in the number of miles issued in 4Q21 as compared to the same quarter in the prior year, explaining that the "decline in AIR MILES reward miles issuance relates to the non-renewal of two sponsors and their exit from the program in the first quarter of 2021."

130.    On this news, Loyalty Ventures' stock price fell from a closing price of $26.90 on February 3, 2022, to a closing price of $23.88 on February 4, 2022, a decline of approximately 11%.

131.    Notwithstanding the price decline following Defendants' February 3, 2022 disclosures, Loyalty Ventures' stock price remained artificially inflated as Defendants continued to materially mislead the market regarding the true state of Loyalty Ventures' business, including by concealing the true extent of the harm caused by the Sponsors lost in 2020 and 2021, the impending loss of additional major Sponsors, and the network effect of the loss of Sponsors.

**B.      April 28, 2022 Corrective Disclosure**

132.    On April 28, 2022, after the market closed, Loyalty Ventures filed a Form 8-K accompanied by a press release which revealed a 4% decrease in the number of AIR MILES issued in 1Q22 as compared to the prior year quarter which "related to the non-renewal of two Sponsors in the first quarter of 2021."   On the earnings call held with investors to discuss the 1Q22 financial results, also held after market close on April 28, 2022, an analyst asked whether the Company saw "notable headwinds, particularly in Canada from the Omicron outbreak" and "if that might have been part of the headwinds on some of the issuance of new miles with AIR MILES."   In response, Horn confirmed that the sole reason for the Company's disappointing results was in fact the departure of the two Sponsors:  "I really don't think [Omicron  was much of a headwind for us. I ***think you should be more [comping] against two programs that are no longer with us***, and so it makes it look like it's a little bit weaker than what it is, but ***I'd say nothing from Omicron***."

133.    In response to these disclosures, Loyalty Ventures' stock price plummeted nearly 14% from a closing price of $14.79 on April 28, 2022 to a closing price of $12.79 on April 29, 2022.  Loyalty Ventures' share price continued to fall the next trading day as the market continued to digest the news, dropping an additional 12% on May 2, 2022 to close at $11.25.

134.    Notwithstanding the price decline following Defendants' April 28, 2022 disclosures, Loyalty Ventures' stock price remained artificially inflated because Defendants continued to materially mislead the market regarding the true state of Loyalty Ventures' business, including by concealing the full extent of the top Sponsors lost prior to the Spinoff, the impending loss of additional top Sponsors, including Sobeys and Staples, and the expected consequences of the loss of the top Sponsors.

### C.    June 8, 2022 Corrective Disclosure

135.    On June 8, 2022, before the market opened, Loyalty Ventures filed a Form 8-K accompanied by a press release which revealed that Sobeys was leaving the AIR MILES program. Specifically, the press release disclosed that "AIR MILES Reward Program segment and AIR MILES' Sponsor, Sobeys were unable to align on extension terms; consequently, Sobeys provided notice of its intent to exit the program on a region-by-region basis, beginning with Atlantic Canada, between August and the first quarter of 2023." The press release also revealed that the "primary impact of this development in 2022 will be on the number of AIR MILES reward miles issued, as Sobeys represented approximately 10% of Loyalty Ventures' adjusted EBITDA in 2021." As a result, Loyalty Ventures was going to "re-evaluate its 2022 revenue and EBITDA guidance when there is more clarity."

136.    In response to these disclosures, Loyalty Ventures' stock price crashed from a closing price of $11.03 on June 7, 2022, to a closing price of $6.02 on June 8, 2022, a decline of over 45%.

## VIII.  PRESUMPTION OF RELIANCE

137.    At all relevant times, the market for the Company's common stock was an open, efficient and well-developed market for the following reasons, among others:

> a.    Loyalty Ventures' common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;
>
> b.    As a regulated issuer, Loyalty Ventures filed periodic reports with the SEC and the NASDAQ;

    c.    Loyalty Ventures regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.    Loyalty Ventures was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

138.    As a result of the foregoing, the market for Loyalty Ventures' common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's common stock. All investors who purchased the Company's common stock during the Class Period suffered similar injury through their purchase of Loyalty Ventures' common stock at artificially inflated prices, and a presumption of reliance applies.

139.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Loyalty Ventures' business and operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important

in making investment decisions.  Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

140.  The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

141.  To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading.  Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Loyalty Ventures who knew that such statement was false when made.

## X.  CLASS ACTION ALLEGATIONS

142.  Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all persons and entities that purchased Loyalty Ventures common stock between November 8, 2021 and June 7, 2022, inclusive (the "Class"), and

who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of Loyalty Ventures and ADS at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

143.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Loyalty Ventures' shares were actively traded on the NASDAQ.  As of March 2, 2023, the Company had more than 24 million shares outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

144.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

145.    Lead Plaintiff will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

146.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

> a.    whether the federal securities laws were violated by Defendants' acts, as alleged herein;

b.   whether the Defendants made statements to the investing public that were false, misleading or omitted material facts;

c.   whether Defendants acted with scienter; and

d.   the proper way to measure damages.

147.   A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.   CLAIMS FOR RELIEF

**COUNT I**
**For Violations Of Section 10(b) Of The Exchange Act,**
**And SEC Rule 10b-5 Promulgated Thereunder**
**(Against Defendants)**

148.   Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

149.   This cause of action is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  Rule 10b-5(a) makes it unlawful for any person, directly or indirectly to employ any device, scheme, or artifice to defraud. Rule 10b-5(b) makes it unlawful for any person, directly or indirectly to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of

business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

150. Lead Plaintiff asserts Section 10(b) and Rule 10b-5(a), (b) and (c) claims against all Defendants.

151. During the Class Period, Defendants carried out a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Loyalty Ventures securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase Loyalty Ventures securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

152. Defendants participated directly or indirectly in the preparation and/or issuance of the Registration Statement, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Loyalty Ventures securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Loyalty Ventures' finances and business prospects.

153. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the business, operations, and financial results of Loyalty Ventures as specified herein.

154. Defendants ADS and Andretta are liable under Section 10(b) and SEC Rule 10b-5(b) for all conduct and materially false and misleading statements and omissions made prior to and in connection with the Spinoff, as alleged herein.

155. Defendants Chesnut and Horn as executives of ADS and then Loyalty Ventures are liable under Section 10(b) and SEC Rule 10b-5(b) for all conduct and the materially false and misleading statements and omissions made before and after the Spinoff, as alleged herein.

156. Defendants made or were responsible for the materially false and misleading statements and omissions alleged herein, which they knew or severely recklessly disregarded to be materially false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157. Defendants had actual knowledge of the materially false and misleading statements and omissions alleged herein, or severely recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Loyalty Ventures' true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

158. Defendants are also liable under SEC Rule 10b5(a) and SEC Rule 10b-5(c) for engaging in deceptive and manipulative acts in a scheme to defraud investors. As part of their scheme to defraud investors in violation of SEC Rule 10b-5(a) and (c), Defendants directed that ADS artificially inflate the perceived value of the LoyaltyOne segment to investors, effectuate the

Spinoff, including the payment to ADS, and continue to conceal the truth about Loyalty Ventures after the Spinoff occurred.

159. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Loyalty Ventures' common stock. Lead Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Loyalty Ventures' common stock had been artificially inflated by Defendants' fraudulent course of conduct.

160. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

161. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against ADS And The Individual Defendants)

162. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

163. This Count is asserted on behalf of all members of the Class against ADS and the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

### A. Individual Defendants

164. The Individual Defendants participated in the operation and management of ADS and Loyalty Ventures, and conducted and participated, directly and indirectly, in the conduct of ADS's and Loyalty Ventures' business affairs. Because of their senior positions, they knew the

adverse non-public information about the LoyaltyOne segment's and Loyalty Ventures' business, operations, and financial results as specified herein.

165. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ADS and Loyalty Ventures disseminated in the marketplace concerning the LoyaltyOne segment's and Loyalty Ventures' business operations and results. The Individual Defendants exercised their power and authority to cause ADS and Loyalty Ventures to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of ADS and Loyalty Ventures within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Loyalty Ventures securities.

166. Each of the Individual Defendants, therefore, acted as a controlling person of ADS and Loyalty Ventures. By reason of their control, senior management positions and/or being directors of ADS and Loyalty Ventures, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ADS and Loyalty Ventures to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of ADS and Loyalty Ventures and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

167. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ADS and Loyalty Ventures.

**B. ADS**

168. ADS participated in the operation and management of Loyalty Ventures prior to the Spinoff, and conducted and participated, directly and indirectly, in the conduct of Loyalty Ventures' business affairs. Because of its control over Loyalty Ventures, ADS knew the adverse non-public information about the LoyaltyOne segment's and Loyalty Ventures' business, operations, and financial results as specified herein.

169. Because of its position of control and authority, ADS was able to, and did, control the contents of the various reports, press releases and public filings which Loyalty Ventures disseminated in the marketplace concerning the LoyaltyOne segment's and Loyalty Ventures' business operations and results prior to the Spinoff. ADS exercised its power and authority to cause Loyalty Ventures to engage in the wrongful acts complained of herein. ADS, therefore, was a "controlling person" of Loyalty Ventures within the meaning of Section 20(a) of the Exchange Act. In this capacity, ADS participated in the unlawful conduct alleged which artificially inflated the market price of Loyalty Ventures securities.

170. ADS, therefore, acted as a controlling person of Loyalty Ventures. By reason of its control, overlapping senior management positions, including Defendants Horn and Chesnut, and/or being the parent of Loyalty Ventures, ADS had the power to direct the actions of, and exercised the same to cause, Loyalty Ventures to engage in the unlawful acts and conduct complained of herein. ADS exercised control over the general operations of Loyalty Ventures prior to the Spinoff and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

171. By reason of the above conduct, ADS is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Loyalty Ventures.

## XII.    PRAYER FOR RELIEF

172.    WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a.    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.    Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## XIII.   JURY TRIAL DEMANDED

173.    Lead Plaintiff demands a trial by jury.

Dated: January 26, 2024

Respectfully submitted,

By: */s/ John C. Camillus*
John C. Camillus (OH Bar No. 77435)
**LAW OFFICES OF JOHN C. CAMILLUS, LLC**
P.O. Box 141410
Columbus, OH 43214
Tel.: (614) 992-1000
Fax: (614) 559-6731
jcamillus@camilluslaw.com

*Local Counsel for Lead Plaintiff Newtyn Partners, LP and Newtyn TE Partners, LP*

Maya Saxena (admitted *pro hac vice*)
Lester R. Hooker (admitted *pro hac vice*)
Dianne M. Pitre (*pro hac vice* forthcoming)
Jonathan Lamet (admitted *pro hac vice*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com
jlamet@saxenawhite.com

-and-

Steven B. Singer (*pro hac vice* forthcoming)
David J. Schwartz (admitted *pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
dschwartz@saxenawhite.com

*Counsel for Lead Plaintiff Newtyn Partners, LP and Newtyn TE Partners, LP*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all registered users.

*/s/ John C. Camillus*
John C. Camillus (OH Bar No. 77435)
