# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| NEWTYN PARTNERS, LP and NEWTYN TE PARTNERS, LP, Individually and on behalf of all others similarly situated, | Case No. 2:23-cv-01451-EAS-EPD |
| Plaintiff, | Hon. Edmund A. Sargus, Jr., District Judge |
| vs. | Hon. Elizabeth A. Preston Deavers, Magistrate Judge |
| ALLIANCE DATA SYSTEMS CORPORATION N/K/A BREAD FINANCIAL HOLDINGS, INC., CHARLES L. HORN, JOHN J. CHESNUT, and RALPH J. ANDRETTA, | <u>CLASS ACTION</u> |
| | DEMAND FOR JURY TRIAL |
| Defendants. | |

## SECOND AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................ 2

II.   JURISDICTION AND VENUE .......................................................... 7

III.  PARTIES AND RELEVANT NON-PARTIES ................................. 8

IV.  OVERVIEW OF THE FRAUD........................................................ 13

    A.    ADS Announces The Spinoff As Part Of Its Business Transformation To Deleverage Its Oversized Debt ............................................................ 13

    B.    In The Registration Statement For The Spinoff, Defendants Tout The Success of Loyalty Ventures' AIR MILES Business And Its "Deep, Long-Term Relationships" With Its Top Ten Sponsors ................................... 15

    C.    Loyalty Ventures Is Spun Off With An Inflated Share Price Of Nearly $50 Per Share, While Defendants Continue To Tout The Company's Top Sponsor Relationships ........................................................................... 19

    D.    Defendants' Statements About AIR MILES' Sponsors Were Materially False Because The Program Had Already Lost—Or Was In The Process Of Losing—Five Of Its Top Ten Sponsors, Including Sobeys............................ 20

    E.    The Truth Is Slowly Revealed: Loyalty Ventures Discloses The Loss of Two Sponsors, But Continues To Downplay Their Significance And Promote Purportedly Strong Relationships With Remaining Top Sponsors ........ 22

    F.    The Truth Is Fully Revealed: Sobeys Exits The AIR MILES Program, Loyalty Ventures Files for Bankruptcy, And The Fraud Is Exposed ................. 25

    G.    Bankruptcy Filings Contain A Series Of Damning Revelations And Admissions Regarding Defendants' False And Misleading Statements About Sobeys and AIR MILES' Other Top Sponsors.......................................... 28

V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................................ 42

    A.    Defendants' Materially False And Misleading Statements And Omissions Prior To The Spinoff........................................................................... 43

        1.    The October 14, 2021 Registration Statement......................... 43

        2.    The October 14, 2021 Investor Presentation............................ 47

i

        3.       The October 28, 2021 Press Release And November 3, 2021  Form 10-Q ................................................................................................ 49

   B.     Defendants' Materially False And Misleading Statements After The Spinoff................................................................................................................ 50

        1.       The November 9, 2021 Form S-8 ................................................... 50

        2.       The November 24, 2021 Form 10-Q ............................................. 51

        3.       The December 15, 2021 Form 8-K ............................................... 51

        4.       February 3, 2022 Statements........................................................ 52

        5.       The February 8, 2022 Form S-8..................................................... 53

        6.       The February 28, 2022 Form 10-K ............................................... 54

        7.       March 23, 2022 Sidoti Conference .......................................... 56

        8.       The April 28, 2022 Earnings Call ................................................. 57

        9.       The May 6, 2022 Form 10-Q ......................................................... 58

VI.    ADDITIONAL SCIENTER ALLEGATIONS.................................................... 59

VII.   LOSS CAUSATION.............................................................................................. 65

VIII.  PRESUMPTION OF RELIANCE ...................................................................... 69

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ................................................................... 70

X.     CLASS ACTION ALLEGATIONS ................................................................... 71

XI.    CLAIMS FOR RELIEF ......................................................................................... 73

      COUNT I ................................................................................................................. 73

      COUNT II ............................................................................................................... 76

XII.   PRAYER FOR RELIEF ........................................................................................ 78

XIII.  JURY TRIAL DEMANDED................................................................................. 79

Lead Plaintiff Newtyn Partners, LP and Newtyn TE Partners, LP ("Lead Plaintiff"), by and through the undersigned counsel, brings this securities class action against Defendants Alliance Data Systems Corporation ("ADS"), now known as Bread Financial Holdings, Inc.; ADS's Chief Executive Officer ("CEO"), Ralph J. Andretta ("Andretta"); the former CEO of Loyalty Ventures, Inc. ("Loyalty Ventures" or the "Company"), Charles L. Horn ("Horn"); and Loyalty Ventures' former Chief Financial Officer ("CFO"), John J. Chesnut ("Chesnut" and together with Andretta and Horn, the "Individual Defendants") (collectively with ADS, "Defendants"). Lead Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), on behalf of itself and all other persons and entities who purchased Loyalty Ventures common stock between November 8, 2021 and June 7, 2022, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiff alleges the following upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, based upon the ongoing investigation of its counsel. Lead Counsel's investigation included, among other things, review and analysis of: (i) ADS's and Loyalty Ventures' public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports issued by securities and financial analysts; (iii) transcripts of ADS's and Loyalty Ventures' conference calls with analysts and investors; (iv) presentations, press releases, and media reports regarding Loyalty Ventures and ADS; (v) data reflecting the pricing of Loyalty Ventures shares; (vi) public filings in the Chapter 11 bankruptcy proceeding *In re: Loyalty Ventures Inc., et al.*, No. 23-90111 (Bankr. S.D. Tex.) and the adversary proceeding *Pirinate Consulting Group LLC, as Trustee of the Loyalty Ventures Liquidating Trust v. Bread Financial Inc. et al.*, No. 24-03027 (Bankr. S.D. Tex); and (vii) other publicly available information. Lead Plaintiff believes that substantial additional evidentiary support for its

1

allegations will be developed after a reasonable opportunity for discovery, as many of the facts are known only by Defendants, or are exclusively within Defendants' custody or control.

## I.    INTRODUCTION

1.    Leading up to the Class Period, ADS—a company that issues credit cards for retailers—was struggling mightily, having accumulated billions of dollars in debt to fund its credit card operations.  To escape from this crushing debt load, ADS hatched a plan: it would spin-off a business segment that operated loyalty programs for its retail clients (the "Spinoff"), and in connection with the Spinoff, the new, publicly traded company ("Loyalty Ventures" or the "Company") would incur substantial debt financing to fund a *$750 million cash payment back to ADS*.[1]  To justify this massive payout, Defendants portrayed the Company as a healthy business that would thrive "as a standalone data-driven, tech-enabled global loyalty solutions provider," and represented that the Spinoff would "provide distinct benefits" and "unlock growth potential" for Loyalty Ventures.  In particular, Defendants emphasized Loyalty Ventures' dependence on its "top 10" clients—which together accounted for the vast majority of its earnings—and assured investors that the Company maintained excellent relationships with these critical customers.

2.    On the strength of these statements, the Spinoff was a resounding success, with the Company's stock closing at nearly $50 per share on November 8, 2021.  However, Defendants' portrayal of Loyalty Ventures was a complete fabrication.  Unbeknownst to shareholders, at the time of the Spinoff, the Company's business was in an absolute freefall, as no fewer than *five* of its ten most important clients had either terminated their agreements with the Company or had given notice that they would do so.  This included Loyalty Ventures' second largest client, Sobeys, Inc., which along with its affiliate Safeway (collectively, "Sobeys") was one of Canada's largest

---

[1] Unless otherwise noted, all emphasis is added.

grocers. Significantly, Sobeys had notified Loyalty Ventures in January 2021—***ten months before the Spinoff***—that it would terminate its contract with the Company by the end of 2022. When this news was disclosed, Loyalty Ventures' business disintegrated, and its stock collapsed. Just sixteen months after the Spinoff, Loyalty Ventures' stock was worthless, the Company was forced to file for bankruptcy, and it subsequently liquidated its assets for pennies on the dollar.

3.       The centerpiece of Loyalty Venture's business was the Company's AIR MILES Reward Program ("AIR MILES"), which was a Canadian customer loyalty program where retail clients—called "Sponsors"—issued "Air Miles" to their customers that could be redeemed for travel-related rewards. The Sponsors paid Loyalty Ventures a fee for every mile issued. ADS had historically trumpeted AIR MILES as a cash cow and a "***great cash flow machine***" that just "***prints money***." In fact, in 2019 and 2020, AIR MILES produced 67% and 77% of the legacy Loyalty Ventures segment's adjusted EBITDA, respectively, and leading up to the Spinoff, Defendants repeatedly boasted that AIR MILES was "the #1 loyalty program in Canada" with approximately "two-thirds of Canadian households actively participat[ing]."

4.       In turn, the success of AIR MILES was entirely reliant on Loyalty Ventures' relationships with its clients—and in particular, the Company's relationships with what it called its "10 largest sponsors." Indeed, Defendants repeatedly represented to investors that these top-ten Sponsors were absolutely critical to Loyalty Ventures' business, as they represented 46% and 55% of its revenue in 2019 and 2020, respectively, and were in fact responsible for issuing more than 90% of all Air Miles in both 2019 and 2020. Moreover, Defendants made clear that the Company's business depended on maintaining its relationship with ***each*** of its top-ten Sponsors, stating that "***the loss of any of these clients could cause a significant reduction in our [] revenue***."

3

5.     Accordingly, to reassure investors about the strength of Loyalty Ventures' business, the registration statement filed in connection with the Spinoff ("Registration Statement") boasted that the Company "**maintained deep, long-standing relationships**" with its Sponsors, and that "success with sponsors" was one of Loyalty Ventures' "**competitive strengths**" and "[drove] the appeal of AIR MILES Reward Program." The Registration Statement further emphasized that large Canadian companies, including Sobeys, were loyal clients, and that these relationships were reasons to invest in the Company. Similarly, Defendants issued investor presentations that specifically highlighted Loyalty Ventures' "**Exclusive Relationships**" with its Sponsors as a "**Point of Differentiation**" for the Company—including, in particular, its Sobeys partnership.

6.     Defendants' statements had their intended effect, with numerous analysts crediting Defendants' statements in recommending Loyalty Ventures' stock. For example, Morgan Stanley highlighted that Loyalty Ventures' "**deep relationships with consumers, clients, and sponsors**, helps form its **competitive advantage over the longer term**." Sidoti & Company praised Loyalty Ventures' "**attractive sponsor and customer bases with high client retention**," and Morningstar noted that AIR MILES, in particular, was a "**good asset and a reliable source of income**." In turn, Defendants successfully completed the Spinoff, and on November 8, 2021—the first day of the Class Period—Loyalty Ventures closed its first day of trading at just below $50 per share.

7.     However, Defendants' statements were materially false, as in reality, Loyalty Venture's business at the time of the Spinoff was disintegrating. Specifically, **months prior to the Spinoff**, no less than **three** of Loyalty Ventures' top-ten Sponsors from 2020 had exited the AIR MILES program, and **two** had provided notice to ADS that they were terminating their AIR MILES contracts—**including the Company's second-largest and most important Sponsor, Sobeys**. Indeed, in January 2021—**ten months before the Spinoff**—ADS's management made an internal

4

presentation to ADS's Board of Directors explicitly stating that Sobeys had "***relayed its intention to terminate [its AIR MILES contract] by the end of 2022***." Despite the fact that Defendants knew full well that the departure of these top Sponsors would decimate Loyalty Ventures' business and sound the death knell for the Company, Defendants deliberately concealed these highly material facts in order to complete the Spinoff and pocket $750 million for ADS.

8. The truth came to light shortly after the Spinoff was completed. On February 3, 2022—the first time the newly public Company independently reported its earnings—Loyalty Ventures revealed a decrease in the number of miles issued due to "the non-renewal of two sponsors and their exit from the program in the first quarter of 2021," *i.e.*, at least ***eight months*** before the Spinoff. The news that the Company had lost significant Sponsors sent its stock tumbling 11%, from $26.90 to $23.88 on February 4, 2022. On the Company's next earnings call, on April 28, 2022, Defendants disclosed that the loss of these two Sponsors caused yet another decrease in the number of miles issued, further confirming the significance of the lost Sponsors. In response, Loyalty Ventures' stock dropped an additional 24%, from $14.79 to $11.25 per share.

9. Then, on June 8, 2022, Loyalty Ventures stunned the market by disclosing that Sobeys—which was singularly responsible for over 20% of AIR MILES' 2020 gross revenue, 28% of all Air Miles issued, and 10% of Loyalty Ventures' 2021 combined adjusted EBIDTA—was prematurely exiting the AIR MILES program two years before the end of its contract with the Company. On this news, Loyalty Ventures' stock crashed 45%, declining from a close of $11.03 per share on June 7, 2022 to a close of $6.02 per share on June 8, 2022, and continued to fall over the next three trading days, closing at $4.80 per share on June 13, 2022—a ***56% total decline*** in response to the news of Sobeys' departure.

10.     The loss of Loyalty Ventures' top Sponsors, including Sobeys, caused the Company to enter a death spiral.  Within weeks, Staples Canada ("Staples") announced that it too was leaving the AIR MILES program, and three of the largest remaining Sponsors renegotiated their contracts with substantially worse economics for the Company.  As a result, in March 2023, the Company filed for bankruptcy protection and began liquidating its assets.  Just sixteen months after the Spinoff, Loyalty Ventures' stock was worthless, and the Company ceased to exist.

11.     In a rarity for a securities class action pleading, documents submitted in Loyalty Ventures' bankruptcy proceedings—including a sworn declaration submitted by the Company's own former CEO, Defendant Horn ("Horn Declaration"), and an adversary complaint brought by Loyalty Ventures' Liquidating Trustee ( "Adversary Complaint")—confirm that Defendants **_knew_** that their Class Period statements to investors were materially false.  For example, in contrast to the wholly positive statements Defendants made to investors in connection with the Spinoff, Horn now admitted that the "**_AIR MILES Business was and had been suffering the effects of an ongoing shift in the loyalty programs market prior to the Spinoff Transaction_**."  Indeed, Horn confirmed that the Company endured "**_multiple major client departures from the AIR MILES Reward Program in 2020 and 2021_**"—including "**_three top ten sponsors_**" representing "**_approximately 10% of the Sponsor revenue_**"—and that "**_another major Sponsor . . . gave notice that it was also leaving the AIR MILES Reward Program_**."  Similarly, internal ADS documents cited in the Adversary Complaint show that Sobeys unequivocally informed ADS in January 2021 that Sobeys was terminating its AIR MILES contract before the end of 2022, and that Defendants intentionally concealed that highly material information from investors.  As the Trustee made clear, "**_[i]t was known internally at ADS, but undisclosed to the public, that the success of the AIR MILES program was at risk because of Sobeys' impending and intended termination_**."

6

12.     Defendants not only deceived investors about Sobeys' impending exit, but they also deliberately concealed this critical information from third party ratings agencies and lenders. Defendants did so for one simple reason:  to ensure that ADS would receive its $750 million payout from Loyalty Ventures before the truth was revealed.  Indeed, the Adversary Complaint makes clear that the sole purpose of the Spinoff was to "***maximize the value for [ADS]***," and that ADS threatened its employees whenever they raised concerns about the Spinoff: "***[t]he leadership at what would become [Loyalty Ventures] was told to get with the program, or they would no longer be employed by ADS or [Loyalty Ventures]***."

13.     In total, as a result of Defendants' fraud, the share price for Loyalty Ventures lost over 90% of its value, falling from a close of $49.08 on November 8, 2021—the first day of trading—to just $4.80 per share on June 13, 2022 after the market absorbed the news of Sobeys' exit.  The Company's stock price never recovered, and just nine months later, Loyalty Ventures filed for bankruptcy and was subsequently liquidated.  By the time of the bankruptcy filing, Loyalty Ventures' stock price dropped to just $0.24 per share and over $270 million in shareholder market capitalization had vanished.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District, and many of the acts and omissions

charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as ADS is headquartered in this Judicial District.  In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.  PARTIES AND RELEVANT NON-PARTIES

16.  Lead Plaintiff are funds of investment management firm Newtyn Management, LLC, which is located in New York, New York.  As set forth in the previously-filed certification in this Action (ECF No. 4-1), Lead Plaintiff purchased Loyalty Ventures common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

17.  Defendant ADS is incorporated under the laws of Delaware with its principal executive offices located in Columbus, Ohio.  At the start of the Class Period, ADS's shares traded during the Class Period on the New York Stock Exchange (the "NYSE") under the ticker symbol "ADS."  On March 23, 2022, ADS announced that it would be known as Bread Financial Holdings, Inc. and would begin trading on the NYSE under the new ticker symbol "BFH" on April 4, 2022.

18.  Defendant Andretta has served as the CEO of ADS (now Bread Financial), and as a member of the ADS Board, since February 2020.  Andretta is "responsible for [ADS'] growth, development and financial performance."  In the months leading up to the Spinoff, Defendant Andretta made several positive statements about the Spinoff and Loyalty Ventures being "well positioned for success."  Loyalty Ventures' October 14, 2021 Registration Statement included a cover letter dated October 13, 2021 that was signed by Andretta.  Andretta's cover letter stated

8

that the Registration Statement "describe[ed] the [Spinoff] in detail and contains important information about Loyalty Ventures," with Andretta "urg[ing]" investors to "read this information statement carefully." Andretta made materially false and misleading statements and omissions in the Registration Statement.

19.     Defendant Horn served as Loyalty Ventures' CEO from November 2021 through the Company's bankruptcy filing. Horn was also a member of the Loyalty Ventures "Spin Team" leading up to the Spinoff, a team consisting of Loyalty Ventures' senior management that was assembled by ADS to accomplish the Spinoff, and was officially appointed as Loyalty Ventures' CEO on June 21, 2021. Prior to joining Loyalty Ventures, Horn was an Executive Vice President ("EVP") and senior advisor at ADS, beginning in February 2020, where according to the Horn Declaration, Horn "worked on (i) the BrandLoyalty Business and AIR MILES Business," and "(ii) additional strategic initiatives." Prior to that, Horn served as the acting CEO of ADS from November 2019 to February 2020, where he "continue[d] driving initiatives aimed at streamlining Alliance Data's cost structure and operating model while overseeing the Company as acting CEO." Horn previously served as EVP and Vice Chairman of ADS from June 2019 to February 2020, and was ADS's CFO from December 2009 to June 2019.

20.     Defendant Chesnut served as Loyalty Ventures' CFO and EVP from November 2021 through the bankruptcy. Chesnut stated that at Loyalty Ventures, "[t]he finance organization work[ed] collaboratively with the CEO and the leadership team to establish and influence the operating aspects and organizational culture of the business." Additionally, Chesnut, "le[d] and mentor[ed] the heads of [Loyalty Ventures'] Accounting, Financial Reporting, FP&A, IT, Tax, Treasury and IR departments." Chesnut was also a member of the Loyalty Ventures "Spin Team" leading up to the Spinoff, a team consisting of Loyalty Ventures' senior management that was

9

assembled by ADS to accomplish the Spinoff, and was officially appointed as Loyalty Ventures'
CFO on June 21, 2021.  Chesnut previously served as ADS's Treasury & Corporate Development
Vice President from October 2010 to May 2015, and served as ADS's Senior Vice President and
Treasurer from May 2015 until the Spinoff in November 2021.  In his role as ADS's SVP and
Treasurer, according to Chesnut, he "had direct responsibility for Treasury, Risk Management,
Corporate Development, Portfolio Acquisitions, Portfolio Pricing, Real Estate and Long-Range
Planning. . . managed the [c]ompany's liquidity and capital structure at both the holding company
level as well as at the segment levels."  His "team also built and maintained the long-range
forecasts that underpinned [ADS'] strategic plan."  "During the pandemic of 2020, [Chesnut]
presented liquidity and cash flow updates directly to the Board of Directors on a daily and weekly
basis, and during 2021 [Chesnut] helped execute the spinout of Loyalty Ventures from ADS."

21.     Loyalty Ventures is a relevant non-party.  On March 10, 2023, Loyalty Ventures
filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code in the United States
Bankruptcy Court for the Southern District of Texas, and its assets were substantially liquidated.
*See In re Loyalty Ventures Inc.*, No. 23-90111 (CML).  In light of the Company's bankruptcy,
Loyalty Ventures is not named as a defendant in this action.

22.     The Individual Defendants, as senior executive officers and/or directors of Loyalty
Ventures and/or ADS, were privy to confidential, proprietary and material adverse non-public
information concerning Loyalty Ventures and/or ADS, their operations, finances, financial
condition and present and future business prospects via access to internal corporate documents,
conversations and connections with other corporate officers and employees, attendance at
management and/or board of directors meetings and committees thereof, and via reports and other
information provided to them in connection therewith. Because of their possession of such

10

information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being actively concealed from, the investing public.

23.     Defendants ADS and Andretta are liable as direct participants in the wrongs complained of herein for their conduct and misstatements made about Loyalty Ventures in connection with the Spinoff.  In addition, Defendants ADS and Andretta were "controlling persons" within the meaning of Section 20(a) of the Exchange Act over Loyalty Ventures and its officers and directors, including Defendants Horn and Chesnut, prior to the Spinoff.  Defendants ADS and Andretta had the power and influence to cause Loyalty Ventures and its officers and directors to engage in the unlawful conduct complained of herein prior to the Spinoff, including in regard to the statements made in the Registration Statement filed in connection with the Spinoff. Because of their positions of control, Defendants ADS and Andretta were able to and did, directly or indirectly, control the conduct of Loyalty Ventures' business prior to the Spinoff, including through the actions of its officers and directors, including Defendants Horn and Andretta.

24.     Defendants ADS and Andretta, because of their control over Loyalty Ventures prior to the Spinoff, controlled and/or possessed the authority to control the contents of Loyalty Ventures' Registration Statement, SEC filings, press releases, and presentations to securities analysts, and through them, to the investing public.  Defendants ADS and Andretta were provided with copies of Loyalty Ventures' reports and publicly disseminated documents filed prior to the Spinoff alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, Defendants ADS and Andretta had the opportunity to commit the fraudulent acts alleged herein.

25. As controlling persons of Loyalty Ventures prior to the Spinoff, whose securities were registered with the SEC pursuant to the Exchange Act and governed by the federal securities laws, Defendants ADS and Andretta had a duty to disseminate promptly accurate and truthful information with respect to Loyalty Ventures' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of the Loyalty Ventures' common stock would be based on truthful and accurate information once its trading began after the Spinoff. Defendants ADS and Andretta's misrepresentations and omissions prior to the Spinoff violated these specific requirements and obligations.

26. Defendants Horn and Chesnut are liable as direct participants in the wrongs complained of herein. In addition, Defendants Horn and Chesnut, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause Loyalty Ventures to engage in the unlawful conduct complained of herein. Because of their positions of control, Defendants Horn and Chesnut were able to and did, directly or indirectly, control the conduct of Loyalty Ventures' business.

27. Defendants Horn and Chesnut, because of their positions within Loyalty Ventures, controlled and/or possessed the authority to control the contents of Loyalty Ventures' Registration Statement, reports, SEC filings, press releases, and presentations to securities analysts, and through them, to the investing public. Defendants Horn and Chesnut were provided with copies of Loyalty Ventures' reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause

them to be corrected. Thus, Defendants Horn and Chesnut had the opportunity to commit the fraudulent acts alleged herein.

28. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose securities were registered with the SEC pursuant to the Exchange Act and governed by the federal securities laws, Defendants Horn and Chesnut had a duty to disseminate promptly accurate and truthful information with respect to Loyalty Ventures' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Loyalty Ventures' common stock would be based on truthful and accurate information. Defendants Horn's and Chesnut's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV. OVERVIEW OF THE FRAUD

### A. ADS Announces The Spinoff As Part Of Its Business Transformation To Deleverage Its Oversized Debt

29. Prior to 2020, ADS consisted of three operating segments—Card Services, Epsilon, and LoyaltyOne. Card Services, the largest segment accounting for over 75% of ADS's operating income, issued private label and co-branded credit cards to well-known retailers. Epsilon provided digital marketing services to large businesses. And the LoyaltyOne segment—the predecessor to Loyalty Ventures—consisted of two marketing programs, AIR MILES and BrandLoyalty, both of which were focused on helping retail clients institute and operate customer loyalty programs.

30. ADS struggled in the years leading to the Spinoff. Unlike the banks that ADS competed against in the credit card industry, ADS did not have a large source of cheap deposits to fund its credit card loans. As a result, ADS was forced to borrow funds at high costs via traditional

13

capital markets, causing it to be over-leveraged as it amassed over $5 billion in debt.  Indeed, in early 2019, analysts at Compass Point noted that ADS was "basically…a highly leveraged, lower valuation credit card company."

31.     To address its over $5 billion in debt, ADS formed a plan to transform its business into a pure financial services company by discarding its two smaller business segments.  First, in July 2019, ADS sold the Epsilon segment to "improve [ADS's] capital structure," as much of the sale price would "go to debt retirement."  Soon thereafter, analysts and market participants surmised that LoyaltyOne could be next on ADS's chopping block.  As Morgan Stanley wrote on October 13, 2020, "ADS is now fully committed to its future as a pure-play consumer finance company," and therefore analysts expected ADS to sell "the remaining non-card business, LoyaltyOne," and "pay[] down parent debt."

32.     Rather than sell LoyaltyOne, on May 12, 2021, ADS issued a press release, filed with the SEC on Form 8-K, announcing that it would spin off the LoyaltyOne segment by the fourth quarter of 2021.  The Spinoff would be tax-free and was to be accomplished by providing ADS stockholders with 81% of the shares of the new entity, with ADS retaining a 19% minority position, valued at $50 million.  As part of the Spinoff, the new Company would incur substantial debt financing and funnel the proceeds back to ADS, which would use the money to deleverage. Defendant Horn, the Executive Vice President of the LoyaltyOne segment at the time, was slated to become the CEO of the new entity and Blair Cameron, the long-time President of the AIR MILES program, would continue in his role post-Spinoff.

33.     According to ADS, the Spinoff was set to "***unlock growth potential for [the] LoyaltyOne segment as a standalone data-driven, tech-enabled global loyalty solutions provider***."  In the press release announcing the transaction, Defendant Andretta was quoted as

stating "this transaction, once completed, would provide ***distinct benefits*** to each company, enhancing the businesses' ability to execute their respective strategic priorities." ADS later announced that the new Company would be called Loyalty Ventures—and that, as part of the Spinoff, Loyalty Ventures would pay a total of ***$750 million in cash to ADS***. In addition, ADS made clear prior to the Spinoff that it did not intend to keep its $50 million minority ownership interest in the spun-off Company, but would instead seek to "monetize" it within one year and use the funds to further pay down its corporate debts.

34. Analysts reacted favorably to the news of the Spinoff. For example, analysts at Jefferies wrote on May 12, 2021 that the Spinoff allowed ADS to "strengthen its B/S [balance sheet] via de-leveraging," "provides ADS with an avenue to unlock additional value within both segments as standalone companies," and noted that AIR MILES was "Canada's premier coalition loyalty program." Analysts at Truist credited Defendants' statements that the Spinoff would help in "unlocking growth potential for [the] LoyaltyOne segment as a standalone loyalty solutions provider," and praised AIR MILES as "Canada's most recognized loyalty program."

**B. In The Registration Statement For The Spinoff, Defendants Tout The Success of Loyalty Ventures' AIR MILES Business And Its "Deep, Long-Term Relationships" With Its Top Ten Sponsors**

35. To justify the Spinoff and its associated $750 million payout to ADS, Defendants needed to convince the market that LoyaltyOne—soon to be transitioned to Loyalty Ventures— was a viable business that was poised to succeed as an independent entity after the Spinoff was completed.

36. As set forth above, LoyaltyOne contained two distinct operating entities: AIR MILES and BrandLoyalty. AIR MILES was a Canadian based loyalty program which contracted with participating businesses to allow retail customers to earn and accumulate "Air Miles," which could then be used on travel, merchandise, and other rewards. Under the program, AIR MILES'

15

participating retail-clients, known as "Sponsors," paid a fee to AIR MILES for each mile issued to consumers enrolled in the program, known as "Collectors." In return, AIR MILES provided all marketing, customer service, and redemption services associated with the program.

37.     The other LoyaltyOne operating entity was BrandLoyalty, a Netherlands based marketing company that designed and implemented short-term rewards programs for grocers across the world. BrandLoyalty was a low-margin business that, despite generating significant revenue, did not meaningfully contribute to the Company's bottom line.

38.     Accordingly, AIR MILES was by far the more important operating segment, accounting for the vast majority of the Company's earnings. For example, in 2018, ADS' former CEO, Edward Heffernan, described AIR MILES as a "great cash flow machine" that just "prints money." Indeed, in 2020 and 2019—the two years before the spinoff—***AIR MILES comprised 67% and 77% of LoyaltyOne's adjusted EBITDA***, respectively. Adjusted EBITDA was a highly significant financial metric for investors: according to the Registration Statement, the Company "use[d] adjusted EBITDA as an integral part of our internal reporting to measure the performance of our reportable segments" and it was "considered an important indicator of the operational strength of our businesses."

39.     As a result, leading up to the Spinoff, Defendants repeatedly touted AIR MILES as being critical to LoyaltyOne's success as a standalone entity, describing it as "the #1 loyalty program in Canada" with approximately "two-thirds of Canadian households participating"—resulting in it having an "expansive" reach that "cover[ed] approximately 80% of the average household spend categories across all regions in Canada."

40.     Significantly, Defendants made clear that the key to AIR MILES' success was its participating Sponsors, whose products and services allowed the end-users, or "Collectors," to earn

16

miles on everyday purchases such as groceries, pharmacy, and gas. Indeed, the Registration Statement—the final version of which was filed by Loyalty Ventures with the SEC on October 14, 2021, and included cover letters from both Defendants Andretta and Horn endorsing its contents—repeatedly touted that AIR MILES successfully maintained "deep, long-term relationships" with its Sponsors, and proclaimed that the program's purported "success with sponsors" was what "d[rove] the appeal of [the] AIR MILES Reward Program" to participants.

41. Moreover, the Registration Statement repeatedly disclosed that AIR MILES' relationships with its *"ten largest [Sponsors]"* were especially critical. Indeed, these top ten Sponsors were responsible for issuing *over 90% of Air Miles in both 2019 and 2020*, and the Registration Statement made clear that *"[r]elationships with our largest and most well-known sponsors account for a significant portion of our combined revenue,"* such that "*our 10 largest sponsors represented approximately 55% of our revenue*" in 2020.

42. The Registration Statement also strongly reassured investors that AIR MILES' current relationships with its top Sponsors were longstanding and secure. For example, the Registration Statement proclaimed that AIR MILES "*maintained deep, long-standing relationships" with its "large" Sponsors*, which consisted of "consumer-based businesses" that were "well-known worldwide brands" in key household spending sectors. The Registration Statement further asserted that "*some of [these Sponsors] have been part of the program for almost 30 years*," purportedly demonstrating that the Sponsors "*recognize[d] the significant benefit to staying in the AIR MILES Reward Program and increasing their customer spend (issuance) opportunity*." To underscore the point, the Registration Statement emphasized that while AIR MILES' contracts with its Sponsors "generally vary in length from three to five years," "*our top 6 sponsors have an average tenure [with the AIR MILES] of 25 years*."

43.     Despite the critical and obvious importance of AIR MILES' top ten sponsors to the Company's financial success, Defendants at no time provided any complete list of these Sponsors, or the percentage of combined revenue each of them represented.  Nonetheless, the Registration Statement repeatedly touted AIR MILES' relationships with certain "well-known worldwide brands" as being prime examples of its "deep, long-standing relationships" with top Sponsors in key sectors—*including Sobeys, Canada's ubiquitous grocery chain*:

> *Deep, long-term relationships with clients and sponsors*
>
> *We have maintained deep, long-standing relationships with the large consumer-based businesses, including well-known worldwide brands*, such as Shell Canada, *Sobeys Inc.*, Bank of Montreal, Rewe and Albert Heijn.
>
> For the AIR MILES Reward Program, we utilize our large collector base together with our data and analytical capabilities to deepen *our existing relationship with our sponsors, some of which have been part of the program for almost 30 years,* and continue to drive powerful benefits to collectors in the program.  By continuing to engage our collectors with personalized marketing experiences and scaled rewards, *our sponsors recognize the significant benefit to staying in the AIR MILES Rewards* program and increasing their customer spend (issuance) opportunity.  We believe that *our success with sponsors and our ability to offer a variety of redemption options, both aspirational and instant, drive the appeal of AIR MILES Reward Program* to collectors.

44.     Significantly, AIR MILES' top ten Sponsors were so crucial that the Registration Statement explicitly stated that the loss of even *one* of them could be highly material due to the impact it could have on both the Company's combined revenue and the future success of the AIR MILES program:

> *Our 10 largest clients represented 55% and 46%, respectively, of our combined revenue for the years ended December 31, 2020 and 2019, and the loss of any of these clients could cause a significant reduction in our combined revenue.*
>
> *We depend on a limited number of large clients for a significant portion of our combined revenue.*  Our 10 largest clients represented approximately 55% and 46%, respectively, of our revenue for the years ended December 31, 2020 and 2019.  The Bank of Montreal represented approximately 15% and 12%, respectively, of our combined revenue for the years ended December 31, 2020 and 2019.  Our contract with Bank of Montreal expires in 2023, subject to further automatic renewals as well as certain rights of either party to terminate following notice of default and cure provisions.  *A decrease in revenue from*

18

*any of our significant clients, including Bank of Montreal, for any reason, including a decrease in pricing or activity, or a decision either to utilize another service provider or to no longer procure the services we provide, could have a material adverse effect on our combined revenue.*

45.     The Registration Statement further separately warned that "[i]f we are unable to maintain or renew our relationships with our most significant sponsors," the overall "value proposition" of the AIR MILES program to the remaining Sponsors could significantly decrease and cause them to leave the program—resulting in "a material adverse effect on our business, results of operations, financial condition and liquidity."

**C.     Loyalty Ventures Is Spun Off With An Inflated Share Price Of Nearly $50 Per Share, While Defendants Continue To Tout The Company's Top Sponsor Relationships**

46.     The Spinoff was accomplished after the markets closed on Friday, November 5, 2021, and Loyalty Ventures began regular trading on Monday, November 8, 2021.  As announced in ADS's public filings, Loyalty Ventures raised over $650 million in new debt to fund the vast majority of the $750 million in cash Loyalty Ventures paid to ADS in connection with the Spinoff.

47.     Significantly, analysts fully credited Defendants' prior positive remarks about Loyalty Ventures and its strong relationships with its top Sponsors.  On November 1, 2021, just days before the Spinoff, analysts at Morgan Stanley commented that Loyalty Ventures' "***deep relationships with consumers, clients, and sponsors***, helps form its ***competitive advantage over the longer term***."  Then, on the first day of trading after the Spinoff, November 8, 2021, analysts at Sidoti & Company initiated their coverage of Loyalty Ventures with a "BUY" rating and a $63 per share price target, which amounted to an enterprise value of ***$1.83 billion***.  The Sidoti analysts expressly based their positive rating on "the 30-year history of AIR MILES, ***the attractive sponsor and customer bases with high client retention***, and free cash flow generation."  Similarly, a Morningstar analyst noted that AIR MILES was a "good asset and a reliable source of income."

48.    Defendants' representations had their intended effect. Bolstered by Defendants' strong positive representations, Loyalty Ventures closed its first trading day as a public company with a price of $49.08 per share.

49.    Even after Loyalty Ventures became a separate, independent entity, Defendants Chesnut and Horn perpetuated the same false statements touting AIR MILES' strong relationships with its key Sponsors that Defendants had made prior to the Spinoff.   For example, on December 15, 2021, Loyalty Ventures issued an investor presentation, filed with the SEC on Form 8-K, that continued to tout AIR MILES' relationships with its top Sponsors.  The presentation included a slide promoting Sobeys in particular as an AIR MILES top Sponsor representing a "Key Part of Everyday Commerce" in both the crucial grocery and pharmacy sectors, and touting AIR MILES' purportedly "*[st]able client base*" represented by top Sponsors like Sobeys that could be relied upon to "*generate[] recurring campaign demand*."  The presentation also contained a slide touting AIR MILES' "*Exclusive Relationships*" with these key Sponsors as a crucial "*Point of Differentiation*" for the Company.  These representations reassured investors that, post-Spinoff, Loyalty Ventures' key partnerships remained secure and AIR MILES was in a position to continue to excel as the "#1 loyalty program in Canada."

**D.    Defendants' Statements About AIR MILES' Sponsors Were Materially False Because The Program Had Already Lost—Or Was In The Process Of Losing—Five Of Its Top Ten Sponsors, Including Sobeys**

50.    Unbeknownst to investors, in reality, Loyalty Ventures' AIR MILES business was on the verge of collapse at the time of Spinoff.  Indeed, contrary to Defendants' representations, months prior to the Spinoff, *five of AIR MILES' top ten Sponsors had already left the program or had notified Defendants that they would do so.*  Critically, the most significant of these five top ten Sponsors was Sobeys, AIR MILES' second largest Sponsor, which had unequivocally

informed ADS and Loyalty Ventures' senior officers in January 2021—*a full ten months before the Spinoff*—that it would exit the AIR MILES program by no later than the end of 2022.

51.     *First*, long before the Registration Statement for the Spinoff was filed in October 2021, no less than *four* of AIR MILES' top ten Sponsors from 2020, who collectively comprised over 10% of the Company's combined revenue, *had either already completely exited the AIR MILES program or had formally notified ADS that they would definitively leave the program shortly after the Spinoff*.  These four Sponsors included:  (1) Rexall, which had left AIR MILES before the end of 2020; (2) Rona Inc. /Lowe's Canada ("RONA"), which had left AIR MILES in the first quarter of 2021; (3) the Liquor Control Board of Ontario ("LCBO"), which had also left AIR MILES in the first quarter of 2021; and (4) Staples Canada, which had formally notified ADS before the Spinoff in 2021 that it would terminate its relationship with AIR MILES effective in 2022.  However, significantly, Defendants did not disclose the loss of *any* of these top ten Sponsors at any point prior to the Spinoff.  To the contrary, as set forth above, the October 2021 Registration Statement instead only warned that a top ten Sponsor "could" leave the AIR MILES program— not that four of them had already done so.

52.     *Second*, despite the fact that Defendants had repeatedly touted Sobeys as a key top Sponsor, in reality, *Sobeys had informed ADS in January 2021 that it would "terminate [its participation in the AIR MILES program] by the end of 2022."*  In late 2020, nearly a year before the Spinoff, Sobeys told ADS that it was seriously considering exercising its early termination rights and discontinuing its participation in the AIR MILES program.  Then, in January 2021, Sobeys "confirmed" its departure—a development that was so significant that ADS management informed the ADS Board that "*Sobeys relayed its intention to terminate [its contract] by the end of 2022.*"  The loss of Sobeys was hugely significant, as Sobeys was an "anchor sponsor[]," and

Defendants knew that its departure would inevitably have a devastating impact on the value and attractiveness of the overall AIR MILES program to other key Sponsors.  Sobeys' departure was so apparent and so drastic that it had "*loomed throughout 2021 in the lead up to the Spinoff*," causing Defendants to scramble to complete the Spinoff before the loss of Sobeys decimated the AIR MILES program and prevented ADS from securing its $750 million payout from the transaction.

> E.     **The Truth Is Slowly Revealed: Loyalty Ventures Discloses The Loss of Two Sponsors, But Continues To Downplay Their Significance And Promote Purportedly Strong Relationships With Remaining Top Sponsors**

53.     The truth about AIR MILES' Sponsors started to come to light just months after the Spinoff, when Loyalty Ventures began reporting as an independent Company.  Specifically, on February 3, 2022, Loyalty Ventures issued a press release, filed with the SEC on Form 8-K, announcing its results for the fourth quarter of 2021.

54.     In the press release, the Company disclosed disappointing results for the full year 2021.  Company-wide revenue was $735 million compared to $765 million in 2020 and "[a]djusted EBITDA was $166 million compared to adjusted EBITDA of $173 million for 2020." Significantly, the press release also revealed that in the fourth quarter of 2021, the Company saw *a 7% decrease in the number of miles issued* as compared to the same quarter from the prior year—which it directly attributed to "*the non-renewal of two sponsors and their exit from the program in the first quarter of 2021*," *i.e.*, RONA and LCBO, whose departures had occurred nearly a year prior.

55.     The news that AIR MILES had previously lost two significant Sponsors caused the Company's stock price to drop 11%, from a close on February 3, 2022 of $26.90 to close on February 4, 2022 at $23.88.

56.     Defendants, however, falsely minimized the loss of these Sponsors on the AIR
MILES business, and continued to fail to disclose the highly material facts that:  (1) a third "top
ten" Sponsor, Rexall, had also left AIR MILES in 2020; (2) a fourth "top ten" Sponsor, Staples,
had already given notice prior to the Spinoff that it was withdrawing from the program in 2022;
and (3) AIR MILES' second largest Sponsor, Sobeys, had unequivocally informed ADS that it
would not renew its contract in 2023 and would instead terminate the contract prior to year-end
2022.  Horn, for example, touted the Company's "*roster of marquee clients*" and praised the
executives for effectively "*managing relationships with our sponsors*," which would "*produce
relatively stable results*" in 2022 for AIR MILES.  Similarly, on the earnings call held that day,
Horn repeated the claim that AIR MILES' "*long-standing customer relationships*" was a "*key
investment strength*" of the business—and Chesnut stated that, despite the loss of the two
Sponsors, Loyalty Ventures expected the number of miles issued in 2022 to grow "*between 4%
and 5% … trending back up towards $5 billion of issuance*."

57.     These misleading statements had their intended effect.  Analysts continued to stress
that Loyalty Ventures would rebound post-pandemic, and remained completely unaware of the
fact that several of the Loyalty Ventures' top ten Sponsors had left AIR MILES and others would
soon exit as well.  For example, on February 25, 2022, Morgan Stanley initiated its coverage of
Loyalty Ventures with a $26 price target, noting that the Company's "*deep relationships with
consumers, clients, and sponsors* helps form its competitive advantage over the longer term, while
it should also benefit from the COVID reopening in the coming years."

58.     Defendants continued to dramatically—and falsely—downplay the significance of
the loss of RONA and LCBO during a March 23, 2022 investor conference.  Not only did
Defendants fail to disclose that these Sponsors were two of the Company's most important top ten

23

Sponsors, but they actually said the exact opposite.  Indeed, when an analyst directly asked Defendant Chesnut about "the overall turnover with AIR MILES as far as partners and the potential impact on near-term profitability," Chesnut falsely claimed that LCBO and RONA had left for purely benign reasons that had nothing to do with issues in the AIR MILES program, and that their departures were of little significance due to them ***not*** being among AIR MILES' "biggest partners."  Specifically, Chesnut claimed that RONA left because it simply "had a different focus" since it was "moving more towards the pro side instead of the consumer side where we operate," and that the Company just "economically couldn't find an agreeable meeting spot" with LCBO.  Chesnut then went out of his way to make clear that the loss of RONA and LCBO should not concern investors because they were ***not*** among the Company's top Sponsors.  Specifically, Chesnut stated that "while [RONA and LCBO] [had] exited in Q1 [2021], ***our biggest partners, the bank, grocery and gas, represent north of 2/3 of all MILES issued.***"

59.     However, the significance of the top Sponsors AIR MILES had lost was further revealed approximately one month later, on April 28, 2022, when Loyalty Ventures reported its financial results for the first quarter of 2022—the Company's second quarter as a stand-alone company.  Loyalty Ventures reported that revenue for the AIR MILES segment had decreased 6%, with adjusted EBITDA down 19% as compared to the first quarter of 2021—and that the number of AIR MILES issued in the quarter had ***dropped again by another 4%,*** which the Company was forced to again attribute to "***the non-renewal of two Sponsors in the first quarter of 2021,***" *i.e.*, the loss of RONA and LCBO.  Moreover, when asked during the conference call held that same day whether the decrease in miles issued had been impacted by COVID restrictions, Horn was forced to admit that the pandemic was not "much of a headwind" for the Company—rather, it was the "***two programs that are no longer with***" AIR MILES that made the miles issuance "***weaker.***"

60. On this news, Loyalty Ventures' stock price dropped approximately 24% over the next two trading days from a close on April 28, 2022 of $14.79 to close on May 2, 2022 at $11.25. Analysts were again surprised by the poor results from AIR MILES. Morgan Stanley commented that "while we were expecting a decline due to increasing redemption value, the decline was more than expected," and that the "Miles issued in the quarter of -4% y/y does not bode well for a quick recovery." Sidoti expressly blamed the poor results "primarily due to the loss of two sponsors."

61. Nonetheless, the market still remained in the dark about the full extent of Loyalty Ventures' failing relationships with its top Sponsors—including most critically Sobeys. Indeed, on June 3, 2023, Needham & Company initiated its analyst coverage of Loyalty Ventures with a BUY rating. Needham's report titled "***Loyalty Ventures: Poised to Thrive as the Global Economy Reopens***" supported its positive assessment by stressing that "**Air Miles is a force to be reckoned with**" and a "**Powerhouse within Canada**." (emphasis in original). The analysts concluded that AIR MILES was a "valuable asset" due to its "***notable corporate partners such as BMO, American Express, Safeway, and Shell***," while stressing the "***well-known clients and sponsors that help LYT scale and maintain high levels of consumer engagement***." The Needham report also included a "Snapshot of some of LYLT's Key Clients/Partners," which likewise expressly referenced Sobeys by name and included its logo. Given Defendants' representations about AIR MILES' purportedly excellent relationships, Needham was "***confident that the business will be able to meet or exceed its pre-pandemic performance in the coming years***."

**F.     The Truth Is Fully Revealed: Sobeys Exits The AIR MILES Program, Loyalty Ventures Files for Bankruptcy, And The Fraud Is Exposed**

62. Before markets opened on June 8, 2022—just seven months after the Spinoff, and mere days after analysts reiterated the close connection between AIR MILES and its significant Sponsors, including Sobeys and Safeway—Loyalty Ventures shocked investors by filing a Current

25

Report on Form 8-K disclosing that Sobeys had provided "notice of its intent to exit the [AIR MILES] program." The accompanying press release disclosed that AIR MILES and Sobeys "were unable to align on extension terms" and therefore Sobeys would "exit the program on a region-by-region basis" between August 2022 and the first quarter of 2023.

63.     The press release further disclosed, for the first time, how significant Sobeys was to the overall AIR MILES business. The press release revealed that "Sobeys represented approximately 10% of Loyalty Ventures' adjusted EBITDA in 2021," and explained that the "primary impact of this development in 2022 will be on the number of AIR MILES reward miles issued," which would, in turn, affect the Company's revenue for years to come. Given this massive loss, Loyalty Ventures was forced to rescind its previously provided revenue and adjusted EBITDA guidance for the remainder of 2022.

64.     The market reacted strongly to this news. On June 8, 2022, the stock price of Loyalty Ventures plummeted **45%** from a close of $11.03 on June 7, 2022 down to $6.02—and over the next three trading days, the Company's stock price continued to fall as the fallout from Sobeys' departure continued, dropping more than 20% from $6.02 per share on June 8, 2022 to close at $4.80 per share on June 13, 2022. Thus, in total, ***Loyalty Ventures' stock fell over 56% between June 8, 2022 and June 13, 2022*** in response to the news of Sobeys' departure.

65.     In addition, numerous media articles continued to report on the fallout from Sobeys' departure, with a *Retail Insider* article reporting that Sobeys had "dump[ed] [AIR MILES]" not because it had failed to "align on extension terms" with AIR MILES as Loyalty Ventures had reported, but in order to "start its own loyalty program" that would compete with AIR MILES known as "Scene+," which Sobeys had launched by partnering with Scotiabank and Cineplex. *Saltwire* similarly reported that "Sobeys has decided to dump Air Miles" in order to "start its own

26

loyalty program," commenting that "for Sobeys, working with Air Miles was like rowing against the current," and "Sobeys was likely just waiting for its contractual obligations to end so it could move on to bolster a program it can better control."  A *Supermarket News* article likewise reported on Sobeys' "major new loyalty strategy" with Scene+, and commented that the new program was already far along as "Scene+ already boasts over 10 million members who can earn points at Scotiabank, Cineplex Theaters" and numerous other entertainment venues and restaurants.

66.      The impact of Sobeys' departure—which had followed the departure of no less than four other of AIR MILES' top ten Sponsors—was essentially the straw that broke the camel's back.  Specifically, after Sobeys exited the AIR MILES program, Loyalty Ventures entered a tailspin from which it never recovered.  Within weeks, on June 21, 2022, Staples revealed what Defendants had already long known—that it too was leaving the AIR MILES program, effective July 1, 2022.  Shortly thereafter, the loss of Sobeys prompted three other top Sponsors, namely BMO, Shell Canada and Metro Ontario Inc., to renegotiate their contracts with AIR MILES with substantially worse economics.  These significant price concessions substantially compressed AIR MILES' earnings margins for the next three years, such that the debt service of the Company's credit agreements was soon far more than the cash being generated. Loyalty Ventures' stock collapsed, closing at a price of $0.24 on March 10, 2023—a drop of 99.9% from its Spinoff price of nearly $50 per share.

67.      As a result, on March 10, 2023—just sixteen months after the Spinoff—the Company filed a petition in the Bankruptcy Court for the Southern District of Texas, *In re Loyalty Ventures Inc.,* No. 23-90111, and proceeded with a liquidation of its assets.

G.    **Bankruptcy Filings Contain A Series Of Damning Revelations And Admissions Regarding Defendants' False And Misleading Statements About Sobeys and AIR MILES' Other Top Sponsors**

68.    Documents filed in Loyalty Ventures' bankruptcy proceedings contain a series of extraordinary admissions confirming that Defendants made numerous material misrepresentations about AIR MILES' business in connection with the Spinoff, and deliberately concealed what they knew was highly material information from the public.  These documents include: (i) a sworn declaration from Defendant Horn dated March 10, 2023, which he signed and filed in his capacity as the "Chief Executive Officer and President of Loyalty Ventures, Inc." (the "Horn Declaration"); and (ii) the Trustee's February 20, 2024 adversary complaint filed against ADS on behalf of Loyalty Ventures, which cites numerous internal ADS and LoyaltyOne documents in support of its allegations and asserts no less than 25 counts of fraudulent transfer against ADS in connection with the Spinoff (the "Adversary Complaint").  These documents reveal that, months prior to the Spinoff, Defendants unequivocally knew that: (i) AIR MILES was on the brink of financial collapse, as it was hemorrhaging its critical top ten Sponsors; (ii) AIR MILES' crucial second-largest sponsor, Sobeys, would not renew its contract in February 2023 and would instead terminate its contract before the end of 2022; (iii) Sobeys' impending exit would cause a devastating and irrevocable impact on Loyalty Ventures' future revenue and business prospects; and (iv) as a result, Defendants deceived ratings agencies, third party advisors, lenders, and the market by engaging in a concerted effort to conceal Sobeys' planned departure, and in fact deliberately timed the Spinoff to occur before that news would become public.

1.    **Defendants Concealed From Investors That, Leading Up To The Spinoff, AIR MILES Was Hemorrhaging Top Sponsors And Was On The Brink Of Collapse**

69.    Both the Horn Declaration and the Adversary Complaint described in detail how Defendants starkly misrepresented the overall health of the AIR MILES business in connection

with the Spinoff and concealed the departures of numerous "top ten" Sponsors, which Defendants knew would have a significant adverse impact on Loyalty Ventures' business and its ability to retain key Sponsors—including Sobeys.

70.    *First*, in his Declaration, Horn admitted that, despite Defendants repeatedly touting AIR MILES as a booming business driven by "our success with sponsors," in reality, at the time of the Spinoff, AIR MILES "***was and had been suffering the effects of an ongoing shift in the loyalty programs market prior to the Spinoff Transaction***"—resulting in "***multiple major client departures from the AIR MILES Reward Program in 2020 and 2021***":

> Prior to the Spinoff Transaction, ***AIR MILES's top ten participating sponsors generated more than 90% of the Reward Miles issued under the program in 2020 and 2019, and represented approximately 55% and 46%, respectively, of the pre-spin LoyaltyOne segment's revenue*** for the years ended December 31, 2020 and 2019. . . ***Sobeys, a Canadian supermarket chain***, and Shell Canada Products ("Shell Canada"), a major oil and gas company, ***were major clients, both in AIR MILES's top ten participating sponsors. The AIR MILES Business was and had been suffering the effects of an ongoing shift in the loyalty programs market prior to the Spinoff Transaction***, with retailers increasingly launching their own in-house loyalty programs and ***multiple major client departures from the AIR MILES Reward Program in 2020 and 2021.***

71.    Specifically, Horn admitted that leading up to the Spinoff, no fewer than ***four*** of AIR MILES' critical top ten Sponsors comprising well over 10% of the Company's revenue—*i.e.,* Rexall, LCBO, RONA and Staples Canada—***had either already left AIR MILES months prior to the Spinoff or explicitly provided notice to Defendants that they would do so***:

> ***The AIR MILES Business lost three top ten sponsors in 2020 and 2021***—Rexall, Liquor Control Board of Ontario ["LCBO"], and Rona Inc./Lowe's Canada [RONA]—***which amounted to approximately 10% of the Sponsor revenue at the time***, and in 2021, ***another major Sponsor (Staples) gave notice that it was also leaving the AIR MILES Reward Program***, citing concerns that the AIR MILES Reward Program no longer matched expectations based on the price.

72.    Significantly, Horn admitted that Defendants understood full well that the loss of even one of these top ten Sponsors would be devastating to the Company.  Indeed, Horn made

29

clear that Defendants fully "expected" that the loss of *any* "top ten" Sponsor would cause the Company's business to crater. As Horn explained, "*[i]n addition to the direct impact from the loss of revenue and earnings attributable to the loss of*" these top-ten Sponsors, the "*departure of one would have a broader 'network effect' on the value of the entire AIR MILES Reward Program to the remaining Sponsors and Collectors*" and cause a mass Sponsor exodus. Moreover, Horn explained that because the top Sponsors' participation was critical for attracting customers to the AIR MILES program, "*[t]he fewer the Sponsors from whom consumers can earn or redeem rewards, the less the program's value to customers and hence the less the incentive for retailers to become or remain sponsors*."

73.     *Second*, the Adversary Complaint confirmed these facts, similarly describing AIR MILES' business as "distressed" leading up to the Spinoff "as a result of losses of their major customers in 2020 and 2021 with known intended terminations in 2022." In fact, the AIR MILES business was performing so poorly that, unbeknownst to investors, in 2019 and 2020, ADS unsuccessfully attempted to sell the AIR MILES business. However, that effort failed because ADS only received bids that provided highly unfavorable terms specifically because AIR MILES' business was struggling, and Sobeys refused to sign a multi-year extension of its contract with AIR MILES.

74.     The Adversary Complaint further explained, in line with the Horn Declaration, that Defendants knew that "the loss of any major sponsor" would "severely impact the AIR MILES business and LoyaltyOne as a whole"—and that it would have the further "effect of empowering any remaining major sponsor (like BMO) to demand more favorable pricing terms, greater service levels, and more desirable rewards, which would further cut into the bottom line of AIR MILES." This risk was "particularly acute" after the departures of Rexall, RONA and LCBO in early 2021

30

in light of the fact that AIR MILES' top three Sponsors—BMO, Sobeys, and Shell Canada—all had contracts that were due to expire in 2022 and 2023. Moreover, because so many of the Company's top Sponsors had already left or were leaving by early 2021—and because, as Horn also described, "[r]etailers were increasingly moving loyalty program operations in-house," causing an ongoing strain on the AIR MILES business for the foreseeable future—"the continued participation of Sobeys and BMO" was "even more important."

75.     However, as the Horn Declaration and the Adversary Complaint make clear, it was at this exact same time—*i.e.*, in the midst of the top Sponsor exodus of Rexall, LCBO and RONA in late 2020 and early 2021—that Sobeys "relayed its intention to terminate [its participation in the AIR MILES program] by the end of 2022," effectively sounding a death knell for Loyalty Ventures before it was even spun off.

>        **2.      Defendants Knew By January 2021 That Top Sponsor Sobeys Had Informed ADS That Sobeys Would Exit The AIR MILES Program— Leading To Inevitable And Disastrous Consequences For The Spun Off Entity**

76.     The Adversary Complaint makes clear that Defendants unequivocally knew that Sobeys had informed them that it would leave the AIR MILES program by the end of 2022, but deliberately concealed that extraordinarily material information from investors. Indeed, as the Adversary Complaint explicitly stated, ***"[i]t was known internally at ADS, but undisclosed to the public, that the success of the AIR MILES program was at risk because of Sobeys' impending and intended termination."***

77.     *First*, Defendants knew that Sobeys was "critical" to AIR MILES, and that its loss would have a devastating impact on the Company. As both the Adversary Complaint and Horn Declaration explained, ***"[m]uch like an anchor tenant in a mall, Sobeys was critical to the AIR***

*MILES program* because consumers tend to visit grocery stores on a weekly basis, creating regular and frequent opportunities for collectors to earn and redeem reward miles."

78. *Second,* the Horn Declaration described how, in late 2020, "*Sobeys informed ADS that it was considering exercising its early termination rights" and leaving the AIR MILES program*—and that, as a result, Sobeys' imminent departure "*loomed throughout 2021 in the lead up to the Spinoff Transaction*." Indeed, Horn made clear that when Sobeys "informed the Company in June 2022 that it would discontinue its participation in the AIR MILES Reward Program," it was not a surprise to Defendants. To the contrary, the Horn Declaration stated that *Sobeys' departure was "consistent with its [prior] statements" dating back to 2020 about its intentions to leave the program*. Horn further explained that as a result of how "critical" Sobeys was to the overall AIR MILES program, Sobeys' departure had the "*previously expected consequence*" of causing AIR MILES' remaining three top Sponsors to devalue the program and demand significant price concessions that directly led to the Company's bankruptcy:

> *Sobeys's departure had the previously expected consequence of causing the remaining two of the AIR MILES Reward Program's top three customers (BMO and Shell Canada) to demand and obtain substantial price concessions upon renewal of their contracts.* The Company also negotiated a contract renewal with Metro Ontario Inc. ("Metro") in late 2022. In light of the Company's limited negotiating power (due to the customer concentration risk represented by those three clients) and crippling debt burden, along with *the reduced network effect as a result of Sobeys's exit*, these contract renewals incorporated reduced economics, shorter terms and certain termination risks. *The price concessions substantially compressed the AIR MILES Business's earnings margin.*

79. Horn further made clear that the loss of the Sobeys relationship was so significant to Loyalty Ventures that its impact would be felt for at least the next three full years. Indeed, without Sobeys, the Company could no longer generate sufficient cash flow to cover the payments on the massive debt it incurred in the Spinoff, which *directly led to the Company's bankruptcy*:

> Because there is a deferred revenue impact on the AIR MILES Business, the Company began to feel the cash impact of the loss of the Sobeys relationship and the repricing of the

32

BMO, Shell Canada and Metro contracts in late 2022, ***but the substantial earnings impact will be felt over a three-year period.*** The renegotiated contract with BMO alone will result in approximately $40 million less in pre-tax cash flow in the AIR MILES Business than under the previous contract terms. ***With the loss of Sobeys as a Sponsor and the repricing of the BMO, Shell Canada and Metro contracts, the debt service on the Company's Credit Agreement was more than the cash flow being generated.***

80.    *Third*, relying on internal ADS documents, the Adversary Complaint provided additional details confirming that Defendants unequivocally knew ***ten months prior to the Spinoff*** that Sobeys intended to terminate its participation in the AIR MILES Program. Specifically, the Adversary Complaint detailed that ***dating back to January 2021***—only four months before Defendants would announce the Spinoff—***Sobeys was "transparent about its intention to terminate" its contract with AIR MILES by the end of 2022, "with the full knowledge of the employees of [LoyaltyOne] and ADS."*** The Adversary Complaint further explained that, "in late 2020, Sobeys informed ADS that it would elect to discontinue its participation in the AIR MILES program, and would exercise its early termination rights in 2022." Sobeys then ***"confirmed its intent to terminate in early 2021"***—a development so significant that it caused ADS management to inform the ADS Board of the issue. Internal ADS documents show that in January 2021, during a "strategy retreat" of the ADS Board, ADS's management (including Defendants Andretta and Chesnut) explicitly informed the ADS Board via an internal presentation entitled "Project Legacy Update" that "***Sobey[s] relayed its intention to terminate [its participation in the AIR MILES program] by the end of 2022."*** Significantly, Sobeys' termination notice was understood by ADS management at this time as being so clear, and so definitive, that ADS had already begun "taking steps to replace Sobeys." Indeed, the January 2021 "Project Legacy Update" presentation explicitly referenced ***"Replacement of Sobeys"*** as an issue that needed to be considered with respect to the timing of the Spinoff, which the presentation advised should be completed during Q4 2021—*i.e.*, before Sobeys' departure.

33

81.     *Fourth*, the Adversary Complaint described numerous internal ADS documents, as well as communications between ADS and Sobeys, that made crystal clear that, in the months that followed, Defendants were not only planning for Sobeys' departure, but secretly amended their agreement with Sobeys in order to delay Sobeys' departure until after the Spinoff was complete. For example, on February 18, 2021, Todd Gulbransen, LoyaltyOne's Senior Vice President, sent an email to Sandra Sanderson, Sobeys' Chief Marketing Officer, regarding the need to amend Sobeys' AIR MILES contract in light of its decision to terminate by the end of 2022. In the email, Gulbransen provided Sanderson with "some high level talking points that [Gulbransen] will be communicating to [his] team that is responsible for the Sobeys/IGA relationship as well as the broader [AIR MILES] organization." The email then confirmed that while Sobeys' contract with AIR MILES was not scheduled to expire until 2024, there was "***a term that allows Sobeys to provide notice and exit sooner so long as that right is exercised in Q1 '21***"—and "***[u]nfortunately, Sobeys has made a decision to exercise this right***."

82.     The email then described how Gulbransen and Blair Cameron, the President of AIR MILES, held "very open discussions with [Sanderson]" about Sobeys' decision to terminate, and as a result, the parties agreed to amend Sobeys' contract. Specifically, Sobeys' prior contract was scheduled to expire in April 2024, but provided an option for Sobeys to terminate the contract early during a prescribed "exit window" upon Sobeys giving notice in the first quarter of 2021, which Sobeys had now done. However, significantly, the "exit window" prescribed under the original contract was ***July 15, 2021 to September 15, 2021—i.e., before the Spinoff.***

83.     Accordingly, in an effort to delay Sobeys' departure until after ADS could complete the Spinoff, on March 12, 2021, ADS and Sobeys entered into an amendment to their contract that provided that the contract would now expire in February 2023 (over a year earlier than the prior

contract), and that Sobeys' "exit window" would be delayed by a few months until ***July 2022***. Thus, as the Adversary Complaint made clear, this amendment did not at all indicate that Sobeys was open to changing its mind about its 2022 departure—to the contrary, the goal of the amendment was merely to "***postpone Sobeys' inevitable and preordained exit from the AIR MILES program***." Tellingly, in order to get Sobeys to agree to postpone its planned departure until after the Spinoff, ADS was forced to provide Sobeys with enormously significant concessions—including a staggering ***50% price discount*** in its annual fee for 2021. Remarkably, despite the critical importance of Sobeys to Loyalty Ventures' business, the Registration Statement did not disclose any of these highly material facts to investors.

84. Even with this amendment, Defendants knew that Sobeys still intended to exit AIR MILES by the end of 2022 as it had previously stated. Removing any doubt, the Adversary Complaint stated that subsequent internal documents circulated between September 2021 and October 12, 2021—*i.e.*, up until just before ADS signed off on the Spinoff on October 13, 2021— made clear that ***the "reality" of Sobeys' inevitable 2022 departure "was in plain sight to the Defendants and their employees and Directors."*** As a result, Defendants conducted numerous analyses and preparations in advance of Sobeys' 2022 departure.

85. For example, on September 20, 2021, a LoyaltyOne employee circulated an email at the direction of Gulbransen attaching a "Sobeys Exit Impact" analysis that "outline[d] the impact of a Sobeys exit," and that had been prepared based on "the discussion you three had on Sobeys." LoyaltyOne employees continued to refine these internal financial models reflecting the impact of Sobeys' exit up until ADS signed off on the Spinoff in mid-October 2021. The models, which showed five different scenarios—"No Impact," "Low Impact," Mid Impact," "High Impact," and "100% loss"—"reflect[ed] that Sobeys' departure would have a devastating impact on the AIR

35

MILES business."  Indeed, even the "No Impact" scenario, which assumed the loss only of the Sobeys business, showed a significant reduction of $32 million in gross margin for AIR MILES. The "Mid Impact" scenario, which assumed a 13% loss of business from other sponsors, showed a $46 million reduction in gross margin, and the "High Impact" scenario, which assumed a 27% loss of business from other sponsors, showed a $56 million reduction in gross margin.  The final scenario—which assumed a "100% loss" of business of other sponsors, a very real possibility in light of Sobeys' status as an "anchor" to the overall AIR MILES program—showed a staggering $127 million loss in gross margin.

86.    Significantly, by the time of ADS's final approval of the Spinoff in mid-October 2021, *"[Michael] Medline, [Sobeys' CEO], had not retracted Sobeys' statement that it intended to terminate [its contract with AIR MILES] in 2022*."  In November 2021, the Spinoff occurred, allowing ADS to drop the failing business and put $750 million in its pockets.  Then, eight months later on June 7, 2022—"[c]onsistent with [Sobeys'] statement in late 2020 regarding its early termination rights"—Sobeys announced "that it would discontinue its participation in the AIR MILES program beginning in August 2022, terminating its contract early."  Tellingly, the Adversary Complaint highlighted that Loyalty Ventures publicly provided an entirely "different explanation" for Sobeys' departure in an attempt to cover up that it had known about Sobeys' planned exit for over a year.  Specifically, Loyalty Ventures stated that the Company and Sobeys were merely "unable to align on extension terms."

### 3. Defendants Deliberately Deceived The Market, Lenders, Ratings Agencies, And Third Party Advisors Regarding Sobeys' Planned Departure In Order To Push The Spinoff Through And Obtain A $750 Million Payout For ADS That Would Bankrupt Loyalty Ventures

87.    As the Adversary Complaint has described, Defendants not only deceived the investing public regarding Sobeys' planned departure and the devastating effects it would have on

Loyalty Ventures' business, but also the credit rating agencies, lenders, auditors, and advisors. Defendants effectuated this fraud to ensure that ADS would receive the necessary funding for the Spinoff so that it could obtain the $750 million payout from Loyalty Ventures.

88.     As the Adversary Complaint stated, "[d]espite multiple internal acknowledgements by ADS that (i) they understood Sobeys to be terminating its contract, and (ii) internal acknowledgements of how important Sobeys['] role as an anchor sponsor was to the viability of the [AIR MILES] program, the fact that Sobeys would not renew its contract in February 2023, and [that] Sobeys would terminate its contract by the end of 2022[,] wasn't incorporated into the financial projections that were considered by Moody's, S&P, E&Y, and Bank of America in connection with what became a Spinoff Transaction *because it was concealed from the market*." Significantly, this "***key fact was also withheld from potential lenders*** during 'roadshow' presentations through which ADS procured the debt-financing that provided [Loyalty Ventures] with proceeds in order to transfer $650 million to ADS as part of the Spinoff Transaction."

89.     Indeed, "as early as March 2021," ADS "assembled a team of historical ADS management members" to serve as the "Spin Team" for Loyalty Ventures—including Defendants Horn and Chesnut.  It was "undisputed" that "the 'Spin Team' members (officers and employees of ADS who were appointed, and served simultaneously as, officers of [Loyalty Ventures]) ***did not tell the lenders who funded the Spinoff Transaction the whole truth about [Loyalty Ventures'] business prospects*.*"  Specifically, even though "at all relevant times[] it was known or knowable to ADS [and] ADS's senior management"—including Defendants Andretta, Horn, and Chesnut—"that ***any AIR MILES projections prepared in conjunction with the Spinoff Transaction which included Sobeys as a sponsor during the 5-year projection period were***

***inflated and materially inaccurate,"*** Defendants engaged in a concerted effort to conceal this critical information from investors, the ratings agencies, lenders, and third party advisors.

90.     According to the Adversary Complaint and the internal documents and conversations recounted therein, ADS concealed this information because it was laser focused on obtaining the $750 million dividend from Loyalty Ventures as part of the Spinoff in order to pay down its billions of dollars in debt, and it knew that would not be possible if the ratings agencies and lenders knew the truth about Sobeys' impending departure.  Indeed, the Adversary Complaint detailed how ADS's most senior executives—including Andretta and members of the ADS Board—***"knew that prospective lenders who were asked to fund the Spinoff Transaction were spooked by the prospect that the contracts for BMO and Sobeys were up for renewal in 2023."*** As a result, ***"the news that Sobeys planned to terminate in 2022, before the renewal date in 2023, was withheld from those prospective lenders."***  Moreover, internal presentations for the ADS Board regarding the Spinoff repeatedly warned that as the contract renewal dates for Sobeys and BMO got nearer, ***"raising debt will be more difficult for SpinCo due to lender and rating agency concerns around renewal risk."***  These presentations also repeatedly and explicitly stated that, as a result, ***a key part of the "thesis" for the Spinoff was its "[f]avorable [t]iming"—i.e., that it "could be accomplished in advance of the BMO and Sobeys renewal dates"*** and thereby ensure that ADS would receive the $750 million payout.

91.     As a result, Defendants deliberately excluded from all of the presentations and other materials they provided to Moody's, S&P, prospective lenders, and third party advisors (such as Bank of America Securities and E&Y) any information about Sobeys' intended departure—including the internal "Sobeys Exit Impact" analyses that had been exhaustively prepared by LoyaltyOne, and that showed Sobeys' departure would cause an inevitably devastating impact on

the AIR MILES business.  Instead, **the "Spin Team"—including Defendants Horn and Chesnut—knowingly provided false financial forecasts projecting that, for the years ended December 31, 2021 through December 31, 2025, Sobeys would purportedly represent 28% to 30% of all Air Miles issued by the AIR MILES program.**  As the Adversary Complaint explained, these projections were materially inaccurate because, among other things, they (i) "assumed that the Sobeys [contract] would be renewed in 2023," (ii) "did not reflect pricing concessions that were likely in connection with the renegotiation of sponsor contracts" with Shell Canada and BMO which were also up for renewal, and (iii) "reflected unreasonably high projected revenue growth" for AIR MILES.  Additionally, Defendant Chesnut, acting on behalf of ADS and at the direction of Perry Beberman, ADS's CFO, "**coached two then ADS 'Spin Team' members on talking points for meetings with Moody's and S&P, to act as if ADS did not know that 'Sobey[s] relayed its intention to terminate by the end of 2022.'**"  Furthermore, the April 2021 and September 2021 presentations ADS provided to the ratings agencies in connection with its effort to raise the $750 million in debt falsely identified Sobeys as a "Key Brand[]" for AIR MILES, and touted it as one of the "Premium Sponsors" that was emblematic of AIR MILES' "Deep and Long-Term Relationships With Customer Base."

92.    When Defendants Horn and Chesnut repeatedly internally raised concerns leading up to the Spinoff about the false information that was being provided to lenders and the crippling amount of debt Loyalty Ventures would be saddled with as a result, ADS's senior management threatened them with termination, telling them in no uncertain terms "**to get with the program, or they would no longer be employed by ADS or [Loyalty Ventures]."**  For example, during an August 2, 2021 Board meeting, when ADS sought to increase the amount of the dividend that Loyalty Ventures would be required to pay to ADS as part of the Spinoff to $750 million,

Defendant Horn raised concerns about the severe impact this would have on Loyalty Ventures'
viability post-spin.  As a result, the meeting "became confrontational between Horn and Andretta,"
with John Gerspach, the chair of the ADS Board Audit Committee, "ultimately interven[ing] and
ask[ing] that Horn leave the meeting."  From then on, Horn "was effectively sidelined and
prohibited from participating in spin-related meetings with ADS leadership."  When Horn later
emailed Andretta and Beberman to inform them that the impact of the $750 million in debt would
be even worse because Loyalty Ventures' business was projected to decline further in 2021,
Beberman responded by telling Horn and Chesnut, per Andretta, that "***the purpose of the spin is
to maximize the value for RemainCo***."

93.     A similar incident occurred on August 29, 2021, when Beberman called Defendant
Chesnut after conferring with the ADS Board Audit Committee and ADS's management, including
Defendant Andretta, about the $750 million payout.  On the call, Beberman pressured Chesnut to
push for the completion of the Spinoff on the terms ADS demanded.  According to the Adversary
Complaint, Beberman told Chesnut: "***you need to get your guy [i.e., Horn] on board or else you
won't like where this goes***."  An internal "recap" of this meeting prepared by Defendant Chesnut
showed that when Chesnut nonetheless continued to raise concerns about the size of the $750
million dividend ADS was demanding from Loyalty Ventures, Beberman responded by repeating
that, per Andretta, ***"the point of spinning [LoyaltyOne] is to maximize the value for
RemainCo"***—and while extracting $750 million from Loyalty Ventures would concededly "put[]
the Spin Team in a tough spot," "if [they] wanted a smooth outcome at the [ADS Board] Audit
Committee meeting, the Spin Team should line up behind delivering at least $750 million
[including] at least $100 million of cash."  Beberman added that falling in line would have personal
financial benefits for Chesnut, as ***it would be "beneficial" for Chesnut's compensation if he***

*"aligned and supported that outcome, given that Roger [Ballou]"*—a member of the ADS Board Audit Committee—*"would also be the chairman of [S]pinco and would have influence there."*

94.     As a result of Defendants' deception, in September 2021, ADS successfully obtained financing for the Spinoff to fund the $750 million in debt Loyalty Ventures would be saddled with. However, and significantly, despite lenders specifically raising concerns about the Sobeys "renewal risk," at no point did Defendants disclose to them that the risk had already materialized because Sobeys had informed ADS in January 2021 that it would terminate its contract by the end of 2022. After ADS secured the $750 million in funding, Horn "spoke privately with ADS Chairman, Ballou," and "pleaded to Ballou that the Spinoff Transaction simply required too much debt for [Loyalty Ventures] to service." While Ballou responded by conceding that it was indeed too much debt for Loyalty Ventures, he stated that it was not his decision and the Spinoff was supported by the ADS Board and the ADS Board Audit Committee. When Horn then asked "how he was supposed to run a company in that condition, Ballou purportedly told Horn to *think of it like a kidney stone; it's painful, but all you can do is wait for it to pass."*

95.     On October 13, 2021, the ADS Board met to make a final "go or no-go" decision on the Spinoff, including the $750 million dividend. During the meeting, it was highlighted to the Board again that *"[the] timing [of] the Spin for early November 2021 would be ideal—from ADS's perspective—because it preceded the critical upcoming attempted sponsor contract renewals."* By this point, this concern was especially "critical," because *"Medline[,] [Sobeys' CEO], had not retracted Sobeys' statement that it intended to terminate the Sobeys [contract with AIR MILES] in 2022."* As a result, if the Spinoff could be "completed in the immediate near term, *then the consequences of a failure of Sobeys to renew its respective contract would fall*

*solely on [Loyalty Ventures], with ADS having already pocketed the proceeds of [Loyalty Ventures'] debt."*

96.     Furthermore, the Adversary Complaint detailed how, during the October 13, 2021 meeting, *the ADS Board "openly contemplate[ed] a near-term bankruptcy of [Loyalty Ventures]"* due to the known devastating impact of Sobeys' impending departure.  Specifically, at the meeting, ADS Board Audit Committee chairman Gerspach explicitly "asked ADS's tax advisors present at the meeting *what would happen to the tax-free treatment of the transaction if [Loyalty Ventures] went bankrupt within the first year"*—and after the tax advisors assured the Board that it would have no impact on ADS, Gerspach "cast his vote in favor [of the Spinoff] along with the rest of the ADS Board."

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

97.     As discussed herein, Defendants made false and misleading statements and material omissions in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.  These material misstatements and/or omissions concerned Loyalty Ventures' financial condition and growth, which included, among other misrepresentations, statements concerning the Company's relationships with its top ten Sponsors and information concerning the departures of those Sponsors, that were significantly impacting the Company's business and future prospects.

98.     Defendants' representations set forth below were materially false. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Loyalty Ventures' business, operational status, and future growth prospects as, in truth, Defendants had falsely presented to investors a materially misleading portrayal of Loyalty Ventures' business.

A.    **Defendants' Materially False And Misleading Statements And Omissions Prior To The Spinoff**

1.    **The October 14, 2021 Registration Statement**

99.    To complete the Loyalty Ventures Spinoff, ADS participated in the preparation and filing of the Form 10, which registered Loyalty Ventures shares.  Specifically, in a Current Report on Form 8-K filed by ADS on September 1, 2021, ADS confirmed that it "***participated in the preparation and filing of a registration statement on Form 10 with the Securities and Exchange Commission by Loyalty Ventures Inc****. ('Spinco') in connection with Alliance Data's previously announced proposed separation of its LoyaltyOne reporting segment into an independent, public company." On or about October 14, 2021, Defendants ADS, Andretta, and Horn caused Loyalty Ventures to file with the SEC an amended registration statement to Form-10, which became the effective Registration Statement for the Spinoff on October 22, 2021.

100.    The Registration Statement also included two cover letters signed by Defendants Andretta and Horn that expressly endorsed its contents. Specifically, Defendant Andretta's cover letter stated that "[t]he enclosed information statement . . . describes the [Spinoff] in detail and contains important information about Loyalty Ventures, including the historical combined financial statements prepared on a carve-out basis." Andretta "urg[ed] [investors] to read this information statement carefully." Defendant Horn's cover letter stated that the Spinoff would permit Loyalty Ventures "to concentrate on its core competencies and growth opportunities," and specifically touted AIR MILES, which Horn emphasized was "Canada's most recognized loyalty program." Horn also similarly urged investors "to learn more about Loyalty Ventures and our business by reading the attached information statement."

101.    In the Registration Statement, Defendants ADS, Andretta and Horn repeatedly represented that one of AIR MILES' key "***competitive strengths***" was its "***deep, long-term***

*relationships*" with its top Sponsors, including Sobeys.  The Registration Statement stated, "*[w]e have maintained deep, long-standing relationships with large consumer-based businesses*, including well-known worldwide brands, such as Shell Canada, *Sobeys Inc.*, Bank of Montreal, Rewe and Albert Heijn."  In so doing, the Registration Statement emphasized AIR MILES' purported "*success*" with these Sponsors, and these Sponsors' supposed recognition of the "*significant benefit to staying in the AIR MILES Reward Program*":

> For the AIR MILES Reward Program, we utilize our large collector base together with our data and analytical capabilities to *deepen our existing relationships with our sponsors*, some of which have been part of the program for almost 30 years, and continue to drive powerful benefits to collectors in the program. By continuing to engage our collectors with personalized marketing experiences and scaled rewards, *our sponsors recognize the significant benefit to staying in the AIR MILES Reward Program and increasing their customer spend (issuance) opportunity*. We believe that *our success with sponsors* and our ability to offer a variety of redemption options, both aspirational and instant, *drive the appeal of AIR MILES Reward Program* to collectors.

102.    Additionally, the Registration Statement included a separate "*Our sponsors*" section that further touted the Company's relationship with Sobeys and Sobeys' importance as a "brand name sponsor[]" representing the crucial "grocery" sector.  The Registration Statement further emphasized that AIR MILES' top ten Sponsors were critical to Loyalty Ventures' business, as those Sponsors represented the majority of the Company's revenue.   Furthermore, the Registration Statement touted that Loyalty Ventures' "*top 6*" Sponsors had secure, longstanding relationships with AIR MILES with "*an average tenure of 25 years*":

> **Our sponsors**
>
> Approximately 135 brand name sponsors participate in our AIR MILES Reward Program, including Shell Canada Products, Jean Coutu, Amex Bank of Canada, *Sobeys Inc.* and Bank of Montreal.  Our sponsor base covers a diverse set of market spend categories, including gas, pharmacy, credit card, and grocery.  *Relationships with our largest and most well-known sponsors account for a significant portion of our combined revenue. For the year ended December 31, 2020*, *our 10 largest sponsors represented approximately 55% of our revenue* . . . Contracts with our sponsors generally vary in length from three to five years. However, *our top 6 sponsors have an average tenure of 25 years*.

44

103.    The statements in paragraphs 100-102 were materially false and misleading, and omitted material facts when made.  Contrary to Defendants' statements touting their "success with partners"; that the Company maintained "deep, long-standing" relationships with its "large, consumer-based" Sponsors; that these Sponsors "recognize[d] the significant benefit to staying in the AIR MILES Reward Program"; and that the largest Sponsors had secure, longstanding relationships with AIR MILES, in reality, the exact opposite was true.  Indeed, *at the exact same time* that Defendants were making these statements, no less than four of the Company's top ten Sponsors had either already exited AIR MILES or had directly notified Defendants that they would soon do so, and a fifth, Sobeys—which was AIR MILES' second largest Sponsor responsible for 10% of the Company's adjusted EBITDA—had "*relayed its intention to terminate [its contract] by the end of 2022*." As Defendant Horn explicitly *admitted* in his sworn declaration filed as part of Loyalty Ventures' bankruptcy proceeding: "*The AIR MILES Business was and had been suffering the effects of an ongoing shift in the loyalty programs market prior to the Spinoff Transaction*," as the Company was experiencing "*multiple major client departures from the AIR MILES Reward Program in 2020 and 2021*"—including top-ten Sponsors Rexall, LCBO, RONA and Staples.  Horn also made clear that Defendants knew that the loss of any one of these Sponsors would trigger a "network effect" that would decimate the AIR MILES program, stating: "a departure of one would have a broader 'network effect' on the value of the entire AIR MILES Reward Program to the remaining Sponsors and Collectors."

104.    Furthermore, it was misleading for Defendants to repeatedly highlight the Company's relationship with Sobeys as a "competitive strength" and as emblematic of its "deep, longstanding relationships" with its "large" Sponsors, without disclosing the highly material fact that *Sobeys had informed them that it would not renew its contract in February 2023, and would*

45

*in fact terminate its contract by the end of 2022*.  Specifically, the Adversary Complaint revealed that ADS' Board was expressly told in January 2021 that Sobeys "*relayed its intention to terminate [its contract] by the end of 2022*," that ADS was actively seeking a "*Replacement of Sobey's*" as a result, and that ADS had effectuated the Spinoff to avoid the outcome of Sobeys' departure and obtain its $750 million payout.  As Defendant Horn admitted in his Declaration, Sobeys' departure was so significant that it "*loomed throughout 2021 in the lead up to the spinoff transaction*."  Tellingly, Horn explicitly admitted that Sobeys' departure shortly after the Spinoff was "*consistent with its statements*" dating back to late 2020, and that the ensuing ramifications on the AIR MILES program that led to the Company's collapse was a "*previously expected consequence*" of Sobeys' departure.  These statements were materially false and misleading for the additional reason that they failed to disclose that, in March 2021, ADS and Sobeys had amended Sobeys' contract to provide for a staggering *50% discount* of Sobeys' annual AIR MILES fee in order to postpone Sobeys' departure until after the Spinoff.

105.    Additionally, the Registration Statement included two purported "risk factors" regarding risks concerning AIR MILES' top Sponsors.  One risk factor stated that "*[o]ur 10 largest clients* represented 55% and 46%, respectively, of our combined revenue for the years ended December 31, 2020 and 2019, and *the loss of any of these clients could cause a significant reduction in our combined revenue*."  The other risk factor stated that *if AIR MILES was* "*unable to maintain or renew our relationships with our most significant sponsors,*" the "*value proposition for sponsors and collectors in the AIR MILES Reward Program coalition . . . may be impacted*," including by other Sponsors leaving the program, which "*could have a material adverse effect on our business, results, operations, financial condition and liquidity*."

106.    The above purported "risk factors" were materially false and misleading and omitted material facts because, in reality, the "risk" of the loss of several of AIR MILES' "10 largest clients" had already materialized.  Indeed, as Defendant Horn unequivocally admitted, there were "*multiple major client departures in 2020 and 2021*," including no less than *four* of AIR MILES' "top ten" Sponsors—Rexall, RONA, LCBO and Staples Canada.  As Defendant Horn made clear, "[t]he AIR MILES Business *lost three top ten sponsors* in 2020 and 2021—Rexall, Liquor Control Board of Ontario, and RONA—which amounted to approximately 10% of the Sponsor revenue at the time, and in 2021, *another major Sponsor (Staples) gave notice that it was also leaving the AIR MILES Reward Program*."  Additionally, the departure of Sobeys, "*the second largest Sponsor*" in the AIR MILES program, *"loomed"* over Defendants for the entirety of 2021 because in January 2021, "*Sobey[s] relayed its intention to terminate [its contract] by the end of 2022*."  As noted above, Defendants knew full well that "*the loss of any of these [top-ten] clients*"—much less *five* of them, including their *second-largest Sponsor*—"*would have a broader 'network effect' on the value of the entire AIR MILES Reward Program*" and "*could cause a significant reduction in our [] revenue*."  For these reasons, the purported "risks" of which the Registration Statement warned had, in fact, already materialized, as Loyalty Ventures had in truth *already failed* to "maintain or renew our relationships with [its] most significant clients," rendering these statements materially false.

## 2.    The October 14, 2021 Investor Presentation

107.    Also on October 14, 2021, ADS filed with the SEC on Form 8-K, an investor presentation titled "Loyalty Ventures Overview" (the "Investor Presentation").  ADS's Investor Presentation was "to be given to investors and others by senior officers of Loyalty Ventures in connection with the Separation."

47

108.    The Investor Presentation prominently and repeatedly touted Loyalty Ventures'

relationship with "**Sobeys**" and its affiliate "**Safeway**" in particular as support for Defendants'

claims that the soon-to-be independent Company had a "**stable client base**" of large Sponsors in

key areas of "Everyday Commerce," including grocery and pharmacy, that could be relied upon

to "***generate[] recurring campaign demand***":





109.    The statements in paragraph 108 were materially false and misleading and omitted

material facts.  In reality, as noted above, the Company did not have a "stable client base" of top

Sponsors such as Sobeys that could be relied upon for "generat[ing] recurring campaign demand."

To the contrary, and as Defendant Horn admitted, the Company's business was in absolute freefall.

Indeed, by this time, *four* of the Company's top ten Sponsors had either already exited AIR MILES

or had directly notified Defendants that they would soon do so, and Sobeys—AIR MILES' second

largest Sponsor—had "*relayed its intention to terminate [its contract] by the end of 2022*," such

that Sobeys' departure "*loomed*" over Defendants throughout this time period.

### 3.    The October 28, 2021 Press Release And November 3, 2021 Form 10-Q

110.    On October 28, 2021, ADS filed a Form 8-K accompanied by a press release

announcing the Company's financial results for 3Q21.  Notably, the 3Q21 press release touted to

investors the "*long-term potential*" of Loyalty Ventures.  On November 3, 2021, ADS filed its

Form 10-Q for 3Q21, which was signed by Defendant Andretta.

111. In both the 3Q21 press release and the 10-Q for 3Q21, ADS provided false explanations for why AIR MILES had issued fewer miles than in the past. Specifically, the press release stated that the "*[i]ssuance of AIR MILES reward miles decreased 7% compared to the third quarter of 2020, reflecting certain promotional activity in the prior year not present in the current year*." In the 10-Q for 3Q21, ADS similarly stated that for AIR MILES, "*[i]ssuance for the third quarter of 2021 was down due to timing of promotional activity*."

112. The statements in paragraph 111 were materially false and misleading and omitted material facts. The decrease in Air Miles issued in the third quarter of 2021 was not due to a lack of "promotional activity," but rather to the fact that multiple of AIR MILES' top ten Sponsors— *i.e.*, Rexall, LCBO, RONA—*had already left the AIR MILES program by the first quarter of 2021*. As Defendants would be forced to admit only a few months later, the "decline in AIR MILES reward miles issuance" during 3Q21 was in truth "*relate[d] to the non-renewal of two sponsors and their exit from the program in the first quarter of 2021*"—*i.e.,* LCBO and RONA.

**B.  Defendants' Materially False And Misleading Statements After The Spinoff**

**1.  The November 9, 2021 Form S-8**

113. On November 9, 2021, Loyalty Ventures filed with the SEC a Registration Statement on Form S-8 ("2021 Form S-8"), signed by Defendants Horn and Chesnut. The 2021 Form S-8 incorporated by reference the Registration Statement,[2] which included the same misstatements discussed in paragraphs 100-102, and 108, which were false and misleading for the same reasons alleged in paragraphs 103-106, and 109.

---

[2] The S-8 incorporated by reference, the "Registration Statement on Form 10, filed by the Registrant with the Commission on September 24, 2021 (File No. 001-40776), as subsequently amended (the "Form 10 Registration Statement")." The subsequent amendment is the Registration Statement.

### 2. The November 24, 2021 Form 10-Q

114. On November 24, 2021, less than three weeks after the Spinoff, Loyalty Ventures filed a quarterly report on Form 10-Q regarding the Company's 3Q21 financial results (the "November 2021 10-Q"). The November 2021 10-Q was signed by Defendants Horn and Chesnut.

115. Like ADS's 3Q21 Form 10-Q, Loyalty Ventures' 10-Q provided a false explanation for the decrease in AIR MILES issued. Specifically, the November 2021 10-Q stated that AIR MILES Reward Program issuances "*declined 7% . . . as compared to the third quarter of 2020. . . Issuance for the quarter was down due to timing of promotional activity*."

116. The statements in paragraph 115 were materially false and misleading and omitted material facts. The decrease in rewards miles issued was not due to the lack of "promotional activity," but to the fact that multiple of AIR MILES' top ten Sponsors—*i.e.*, Rexall, LCBO, RONA—*had already left the AIR MILES program by the first quarter of 2021*. As Defendants would be forced to admit only a few months later, the "decline in AIR MILES reward miles issuance" during 3Q21 was in truth "*relate[d] to the non-renewal of two sponsors and their exit from the program in the first quarter of 2021"*—*i.e.,* LCBO and RONA.

### 3. The December 15, 2021 Form 8-K

117. On December 15, 2021, Loyalty Ventures filed a Current Report on Form 8-K that included an investor presentation touting Loyalty Ventures' relationship with "*Sobeys*" and its affiliate "*Safeway*" as key support for their claims that Loyalty Ventures had a "*stable client base*" that was "*generat[ing] recurring campaign demand*" for the AIR MILES program. The presentation included the slides discussed in paragraph 108, that explicitly showcased the logos of Sobeys and Safeway as strong partners of AIR MILES. These statements were false and misleading for the same reasons alleged in paragraph 109.

### 4. February 3, 2022 Statements

118. As discussed above, Defendants' false and misleading statements, and omission of material facts, first began to be revealed on February 3, 2022, when Loyalty Ventures announced poor results which it attributed to the non-renewal and exit from the AIR MILES Program of two Sponsors in the first quarter of 2021. However, this partial corrective disclosure was accompanied by Defendants' continued false reassurances that Loyalty Ventures maintained strong relationships with its top Sponsors.

119. Specifically, on February 3, 2022, Loyalty Ventures issued a press release reporting its financial results from the fourth quarter of 2021, which was filed with the SEC on Form 8-K and included several statements by Defendant Horn (the "4Q21 press release"). In the 4Q21 press release, Defendant Horn assured investors that the Company still had strong relationships with its top Sponsors. For example, Horn congratulated the Loyalty Ventures team who purportedly "navigated challenging business conditions over the last two years, *while managing relationships with our sponsors,* collectors, consumers, clients, and partners." Horn also conveyed that Loyalty Ventures had "*a roster of marquee clients to which we can offer a…solid financial position*."

120. Also on February 3, 2022, the Company held an earnings call attended by Defendants Horn and Chesnut (the "4Q21 earnings call"). During the 4Q21 earnings call, Horn continued to claim that *the Company maintained "long-standing customer relationships" with AIR MILES' Sponsors*, which he asserted was a *"key" reason* to invest in Loyalty Ventures. During the same call, Chesnut explained that, despite the departure of two Sponsors, Loyalty Ventures expected the number of miles issued in 2022 to grow "*between 4% and 5% … trending back up towards $5 billion of issuance*."

121. The statements in paragraphs 119 and 120 were materially false and misleading when made and omitted material facts. In reality, the Company was not "managing relationships"

52

with its Sponsors, its "customer relationships" were not a "key investment strength," and it did not have a strong "roster of marquee clients." Rather, by this time—and as Defendant Horn admitted in his sworn declaration—no less than *four* of AIR MILES' "top ten" Sponsors had either already left AIR MILES or had informed Defendants that they would definitively do so. Moreover, in January 2021, the Company's second largest Sponsor, Sobeys, "*relayed its intention to terminate [its contract] by the end of 2022*," causing its departure to "loom[] throughout 2021." Indeed, in making these statements, Defendants misleadingly failed to disclose the highly material facts that: (1) RONA and LCBO, far from being "two sponsors" of little consequence, were in fact two of AIR MILES' crucial "top ten" Sponsors; (2) a third "top ten" Sponsor, Rexall, had also already left the AIR MILES program back in 2020; (3) a fourth "top ten" Sponsor, Staples, had given notice prior to the Spinoff that it was withdrawing from the AIR MILES program; and (4) AIR MILES' second largest Sponsor, Sobeys, was not going to *renew its contract in February 2023, and would instead terminate its contract by the end of 2022*. As Horn made clear in his declaration, Defendants knew that the loss of any one of these Sponsors would trigger a "network effect" that would decimate the AIR MILES program, stating: "a departure of one would have a broader 'network effect' on the value of the entire AIR MILES Reward Program to the remaining Sponsors and Collectors."

### 5. The February 8, 2022 Form S-8

122. On February 8, 2022, Loyalty Ventures filed with the SEC Registration Statement on Form S-8 ("2022 Form S-8"), signed by Defendants Horn and Chesnut. The 2022 Form S-8 expressly incorporated the Registration Statement, stating: "The following documents are incorporated herein by reference: (a) The Registrant's Amendment No. 3 to the Registration Statement on Form 10 (the "Form 10 Registration Statement") (File No. 001-40776) filed on October 14, 2021." Thus, the Form S-8 incorporated the same false and misleading statements

described in paragraphs 100-102, and 108, which were materially false and misleading when made for the same reasons as stated in paragraphs 103-106, and 109.

### 6. The February 28, 2022 Form 10-K

123. On February 28, 2022, Loyalty Ventures filed with the SEC its first and only Annual Report on Form 10-K, discussing the financial results for the year ended December 31, 2021 (the "Form 10-K"), which was signed by Defendants Horn and Chesnut.

124. In the Form 10-K, Loyalty Ventures continued to tout its relationships with its Sponsors, specifically highlighting Sobeys:

> ***Sponsors***
>
> ***We have over 100 brand name sponsors that participate in our AIR MILES Reward Program, including*** Shell Canada Products, Jean Coutu, Amex Bank of Canada***, Sobeys Inc.*** and Bank of Montreal. Our sponsor base covers a diverse set of market spend categories, including gas, pharmacy, credit card, and grocery. ***Relationships with our largest and most well-known sponsors account for a significant portion of our consolidated and combined revenue,*** including approximately 17% from Bank of Montreal for the year ended December 31, 2021. We typically grant participating sponsors exclusivity in their market category, enabling them to realize incremental sales and increase market share as a result of their participation in the AIR MILES Reward Program.

125. The statements in paragraph 124 were materially false and misleading and omitted material facts when made. Indeed, as noted above, it was misleading for Defendants to highlight that the Company's "largest and most well-known sponsors" accounted for the "majority" of the Company's combined revenue—and to highlight Sobeys in particular as being emblematic of the Company's longstanding key Sponsor relationships—while misleadingly omitting the highly material facts that: (1) one of the Company's "top ten" Sponsors, Staples, had given notice prior to the Spinoff that it was withdrawing from the AIR MILES program; and (2) Sobeys, the Company's second largest Sponsor, had previously "***relayed its intention to terminate [its contract] by the end of 2022***" in January 2021, such that its departure was now imminent.

54

126.    Additionally, the Form 10-K included purported "risk factors" concerning the potential loss of Loyalty Ventures' ten largest clients, which represented *58% of the Company's combined revenue in 2021.* The risk factors stated that *"the loss of any of these clients could cause a significant reduction in our consolidated revenue"*:

> *Our 10 largest clients* represented 58%, 55% and 46% respectively, of our consolidated and combined revenue for the years ended December 31, 2021, 2020 and 2019, and *the loss of any of these clients could cause a significant reduction in our consolidated revenue*. . . *A decrease in revenue from any of our significant clients,* including Bank of Montreal, *for any reason, including a decrease in pricing or activity, or a decision either to utilize another service provider or to no longer procure the services we provide, could have a material adverse effect on our consolidated revenue*.

127.    The Form 10-K also included a second risk factor stating that AIR MILES "reli[ed] on relationships with sponsors," and that *if the Company was "unable to maintain or renew our relationships with our most significant sponsors . . . the value proposition for sponsors and collectors in the AIR MILES Reward Program collation . . . may be impacted,"* including by the departure of other Sponsors, which "*could have a material adverse effect on our business, result of operations, financial condition and liquidity*."

128.    The above purported "risk factors" were materially false and misleading and omitted material facts because the "risk" of the loss of "significant clients," including of the "10 largest clients," had already materialized—as Defendant Horn unequivocally admitted, there were "*multiple major client departures in 2020 and 2021*." Indeed, Defendant Horn testified under penalty of perjury that "[t]he AIR MILES Business lost three top ten sponsors in 2020 and 2021—Rexall, Liquor Control Board of Ontario, and [RONA] Inc./Lowe's Canada—which amounted to approximately 10% of the Sponsor revenue at the time, and in 2021, another major Sponsor (Staples) gave notice that it was also leaving the AIR MILES Reward Program." Horn further admitted that Defendants knew that these top Sponsor departures would trigger a mass Sponsor exodus due to the "network effect," which made the AIR MILES program increasingly less

55

valuable to Sponsors as larger Sponsors departed, thus significantly hurting the Company's future prospects.  These "risk factors" were misleading for the additional reason that, as was made clear to ADS' Board in January 2021, Sobeys, AIR MILES' second largest Sponsor, had "*relayed its intention to terminate [its contract] by the end of 2022*." Indeed, Horn stated that Sobeys' departure was so significant and imminent that it had been "*loom[ing]*" over Defendants throughout 2021, such that Sobeys' actual departure in June 2022 was "*consistent with [Sobeys']*" prior statements.

### 7.    March 23, 2022 Sidoti Conference

129.    On March 23, 2022, Defendant Chesnut participated in Sidoti's Spring 2022 Small Cap Virtual Conference.  During the question-and-answer session, the first question asked to Chesnut was regarding turnover of AIR MILES Partners.  In response, Defendant Chesnut assured the market that the previously-revealed loss of Sponsors RONA and LCBO was inconsequential and that AIR MILES' relationship with its key Sponsors remained strong, while continuing to conceal the impending loss of Sobeys and the expected "network effect" of that loss:

**Marc Frye Riddick, Sidoti & Company, LLC**

So let's start with our first question, which is *a request to discuss the overall turnover with AIR MILES as far as partners and the potential impact on near-term profitability.*

**John Jeffrey Chesnut, CFO & EVP**

Yes, you bet. *I think the question may be referencing there were some client -- 2 clients lost in 2021.* LCBO, which was the Liquor Control Board of Ontario, as well as RONA, which is a home hardware -- home improvement retailer up in Canada. RONA was acquired by Lowe's out of the U.S., ultimately had a different focus, I think, for their loyalty program or especially they were moving more towards the pro side instead of the consumer side where we operate. And with LCBO, we just economically couldn't find an agreeable meeting spot. *But both of those partners were -- while they exited in Q1, our biggest partners, the bank, grocery and gas represent north of 2/3 of all MILES issued*. And we're actively engaged in adding new sponsors, both in the traditional sense, which is through issuance avenues in the way that we have with say, Shell or Bank of Montreal, but

also in newer avenues like the [card-link-offers] that we discussed at the end of the last quarter, so that there's a lighter touch integration between our systems and theirs, and it's an opportunity for a retailer to enter the coalition on a trial basis and really see what kind of momentum that can help create in their business. ***So we're excited about the pipeline that we have, and you'll see us focus on delivering the new sponsors and new ways to earn throughout 2022***.

130. The statements in paragraph 129 were materially false and misleading, and omitted material facts when made. Rather than the departure of LCBO and RONA being inconsequential because they were not among AIR MILES' "biggest partners," in reality, the opposite was true: as Defendant Horn admitted in his sworn declaration, LCBO and RONA were among AIR MILES' crucial "top ten sponsors." Moreover, in his response, Chesnut also failed to disclose that: (1) a third top ten Sponsor, Rexall, had left the AIR MILES program in 2020; and that (2) a fourth top ten Sponsor, Staples, had also already given notice that it would exit the program in 2022. In addition, it was misleading for Chesnut to promote AIR MILES' relationships with its "biggest partners" in the bank, gas, and grocery sectors considering that, as made clear in the bankruptcy filings: (1) AIR MILES' second "biggest partner" in the key "grocery" sector, Sobeys, had already "***relayed its intention to terminate [its contract] by the end of 2022,***" such that its departure was now imminent; and that (2) Defendants fully "expected" that the departure of even one top Sponsor, let alone ***half*** of them including its second largest Sponsor, "would have a broader 'network effect' on the value of the entire AIR MILES Reward Program to the remaining Sponsors."

### 8. The April 28, 2022 Earnings Call

131. On April 28, 2022, Defendants Horn and Chesnut participated in an investor earnings call to discuss the Company's financial results from the first quarter of 2022 (the "1Q22 earnings call"). As discussed above, Defendants' false and misleading statements, and omission of material facts, were further revealed on April 28, 2022, when Loyalty Ventures announced that

57

the two Sponsors lost in 2021 were more significant than originally disclosed, as their departures were having continuing negative impacts on the Company's financials. However, Defendants continued to fail to disclose the full truth, and specifically that AIR MILES had in fact lost no less than *five* of its "top ten" Sponsors, including its second top-most Sponsor, Sobeys, which had "***relayed its intention to terminate [its contract] by the end of 2022***" over a year ago.

132. Specifically, during the 1Q22 earnings call, Defendant Horn continued to conceal AIR MILES' mass exodus of top Sponsors, and downplayed the significance of RONA and LCBO's departures by stating that "AIR MILES reward miles issued in the first quarter ***were consistent with the year ago quarter after adjusting for nonrenewals*** . . . The burn rate appears elevated partly due to lower issuance levels in Q1, ***driven by nonrenewals I just mentioned***."

133. The statements in paragraph 132 were materially false and misleading, and omitted material facts when made. Indeed, as noted above, these statements misleading omitted the highly material facts that, as Defendant Horn admitted in his sworn declaration: (1) RONA and LCBO, rather than constituting routine "nonrenewals," were in fact two of Loyalty Ventures' crucial "top ten" Sponsors; (2) a third "top ten" Sponsor, Rexall, had also already left the AIR MILES program in 2020; (3) a fourth "top ten" Sponsor, Staples, had given notice that it too was withdrawing from the AIR MILES program; and (4) the Company's second largest Sponsor, Sobeys, had previously "***relayed its intention to terminate [its contract] by the end of 2022***" in January 2021—such that this event was now imminent after it had "***loomed***" over Defendants both leading up to the Spinoff and throughout 2021.

### 9. The May 6, 2022 Form 10-Q

134. On May 6, 2022, filed a quarterly report on Form 10-Q, signed by Defendants Horn and Chesnut (the "1Q22 10-Q"). The 1Q22 10-Q incorporated the same purported "risk factor" as

58

the prior Form 10-K (¶¶126-127), which was materially false and misleading for the reasons alleged in ¶128.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

135.   Numerous facts, including those detailed above, considered collectively and holistically, demonstrate that Defendants knew or were reckless in not knowing that Defendants acted fraudulently and that the statements identified in Section V above were materially false and misleading when made.  The scienter of ADS as a corporate entity is derived from the scienter of its executives, including Defendant Andretta at all relevant times, as well as Defendants Horn and Chesnut as senior executives of ADS prior to the Spinoff.

136.   *First*, Defendant Horn's admissions in his bankruptcy declaration that Defendants knew well before the Spinoff that the AIR MILES business was on the verge of collapse is highly probative of Defendants' scienter.  Specifically, Horn admitted that, directly contrary to what Defendants had represented leading up to and after the Spinoff about the strength of the AIR MILES business due to its "deep, longstanding relationships" with top Sponsors, in reality the AIR MILES business "***was and had been suffering the effects of an ongoing shift in the loyalty programs market prior to the Spinoff Transaction, with retailers increasingly launching their own in-house loyalty programs and multiple major client departures from the AIR MILES Reward Program in 2020 and 2021***"—*i.e.*, prior to the Spinoff.  Specifically, Horn admitted that no fewer than five of the Company's top ten Sponsors had either exited the AIR MILES program, or provided notice of termination, long before the Spinoff occurred.

137.   Defendant Horn further admitted that Defendants knew that the loss of even ***one*** top ten Sponsor would create a "***network effect***," causing other top Sponsors to devalue the AIR MILES program and either themselves exit the program or demand to reprice their contracts.

59

Moreover, **"conditions with respect to the AIR MILES Business did not improve"** after the Spinoff.  Rather, the opposite was true, as the Spinoff had been structured in a way that left Loyalty Miles with virtually no liquidity and no ability to adequately invest in the AIR MILES business.  Thus, when Sobeys—the Company's second largest Sponsor whose known and impending departure was first communicated to Horn and ADS in "late 2020," and had **"loomed"** throughout 2021—exited the program, it triggered **"the previously expected consequence"** of causing the Company's remaining top Sponsors to renegotiate their contracts with highly unfavorable terms, resulting in Loyalty Ventures' bankruptcy.

138.    *Second*, the Adversary Complaint reveals that Defendants unequivocally knew in January 2021—**ten months before the Spinoff**—that Sobeys had informed ADS that it would exit the AIR MILES program in 2022, and that Sobeys' exit would inevitably cause a devastating impact on Loyalty Ventures' business.  As set forth in the Adversary Complaint, in late 2020, Sobeys informed ADS management that it planned to terminate its participation in the AIR MILES program.  Sobeys then "confirmed" its decision in January 2021, a development so significant that ADS's management immediately informed ADS's Board that "**Sobey[s] relayed its intention to terminate [its contract] by the end of 2022**."  Significantly, Sobeys never modified or retracted its decision to exit the AIR MILES program in 2022, as evidenced by subsequent conversations and internal documents detailed in the Adversary Complaint confirming Sobeys' intention to leave in 2022.  These communications showed, among other things, that Sobeys amended its contract in March 2021 in exchange for a **staggering 50% discount** so that ADS could ensure that Sobeys' termination would not occur until after the Spinoff, and that ADS exhaustively quantified what the "Sobeys Exit Impact" would be leading up to the Spinoff.  Thus, as the Adversary Complaint makes clear, "**[i]t was known internally at ADS, but undisclosed to the public, that the success**

*of the AIR MILES program was at risk because of Sobeys' impending and intended termination*." The Adversary Complaint further establishes why Defendants concealed this information: in the words of ADS's senior management, ***"the purpose of the spin [was] to maximize the value for RemainCo"*** and secure the $750 million payout to ADS before the public learned about Sobeys' exit.

139. *Third*, as internal documents cited in the Adversary Complaint further confirm, despite the fact that this highly material information was known to Defendants Andretta, Horn, and Chesnut at all relevant times, they engaged in a concerted effort to deliberately conceal it not only from investors, but also ratings agencies, lenders, and third party advisors. Indeed, the Adversary complaint details how Defendants Horn and Chesnut knowingly provided false 5-year financial forecasts to accomplish the Spinoff that misleadingly projected that Sobeys would represent between 28% and 30% of all AIR MILES issued. Additionally, Defendant Chesnut "coached" ADS's Spin Team "on talking points for meetings with Moody's and S&P, to act as if ADS did not know that 'Sobeys['] relayed its intention to terminate by the end of 2022," and Defendants repeatedly provided presentations to ratings agencies and lenders that falsely highlighted Sobeys as a "Key Brand[]" for AIR MILES and as a "Premium Sponsor[]" that was emblematic of AIR MILES' "Deep and Long-Term Relationships" with its top Sponsors.

140. *Fourth*, Defendants' scienter is further established by the fact that Defendants Horn and Chesnut concealed this highly material information to maintain their lucrative positions at Loyalty Ventures after the Spinoff, as they knew full well that failing to do so meant that they would no longer work at the Company or maintain their former positions at ADS. Indeed, as documents cited in the Adversary Complaint demonstrate, when these Defendants internally raised concerns about the fraud, ADS's senior management was quick to vehemently squelch them,

telling them to ***"get with the program[] or they would no longer be employed by ADS or [Loyalty Ventures]."***  ADS had the ability to make such threats "given that Roger [Ballou] would also be the chairman of [s]pinco and would have influence there."

141.    *Fifth*, the fact that AIR MILES was responsible for ***77%*** of the Company's adjusted EBITDA in 2020—and its "top ten" Sponsors alone comprised "over half," or ***55%***, of Loyalty Ventures' combined revenue—further supports a strong inference of Defendants' scienter.  Indeed, AIR MILES' top ten Sponsors were so critical to the Company that both the Company's Registration Statement and Form 10-K prominently warned that the loss of even ***one*** of these Sponsors would have a highly material impact on the Company: ***"Our 10 largest clients represented 55% and 46%, respectively, of our combined revenue for the years ended December 31, 2020 and 2019, and the loss of any of these clients could cause a significant reduction in our combined revenue*.**"  Indeed, Sobeys—the Company's second largest Sponsor that Defendants had repeatedly touted as a prime example of its "deep, longstanding relationships" with "worldwide" brands—alone generated 20% of AIR MILES' 2020 gross revenue and 10% of the Company's adjusted EBITDA.

142.    Moreover, the Registration Statement and Form 10-K further warned that, aside from the loss of even one of these Sponsors causing a "significant reduction" in combined revenue, it also could cause other Sponsors to devalue the AIR MILES program and leave AIR MILES as a result.  In light of how critical AIR MILES and its top ten Sponsors were to the Company's success, Defendants were undoubtedly fully aware of the fact that ***five*** of these Sponsors, including Sobeys, had either left the program or had given notice that they would do so.

143.    *Sixth*, Defendants' scienter is further supported by their consistent efforts to deny and downplay the significance of the departures of top ten Sponsors Rexall, RONA and LCBO,

even in response to direct investor questions about the significance of these departures.  Indeed, in 2020 and 2021, media reports circulated that Rexall, LCBO and RONA had terminated their participation in the AIR MILES program.  Tellingly, in response to these reports, Defendants at no time ever acknowledged that these three Sponsors were part of the Company's critical "top ten" Sponsors, nor did they ever disclose how material the loss of these Sponsors was—even though they collectively represented over ***10%*** of the Company's combined revenue in 2020.  To the contrary, Defendants affirmatively downplayed the significance of these Sponsors as ***not*** being among the Company's top ten, with an AIR MILES spokesperson "***insist[ing] the company [was] still in a good spot***" ***and that AIR MILES remained*** "***really strong***" ***because it maintained*** "***several high-profile partnerships, including Shell, Metro and Sobeys***."

144.    Similarly, during a March 23, 2021 investor conference—just after Defendants had been forced to reveal that the departures of LCBO and RONA had negatively impacted the Company's financials—an analyst directly asked Defendant Chesnut about the ***"turnover with AIR MILES partners" and "the potential impact on near-term profitability."***  Rather than admit that RONA and LCBO ranked among AIR MILES' "top ten" Sponsors such that their departures would have a significant and continuing impact on the AIR MILES program, Chesnut responded by asserting the exact opposite:  that the departures of RONA and LCBO were of little moment because these Sponsors were decidedly *not* among the Company's "***biggest partners***":  ***"[W]hile [RONA and LCBO] exited in Q1, our biggest partners, the bank, grocery and gas, represent north of 2/3 of all MILES issued."***  Moreover, in downplaying these departures in response to direct market inquiries, Defendants never once breathed a word about the fact that a fourth top Sponsor, Staples, had given notice that it would soon leave the program.  Nor did Defendants reveal that, in reality, the Company's second "biggest partner" that was responsible for the

"grocery" sector—Sobeys—had already unequivocally "***relayed its intention to terminate [its contract] by the end of 2022***."

145.     *Seventh*, ADS and Andretta had motive and opportunity to commit the fraud.  Not only did ADS receive $750 million in cash from the Spinoff, which it badly needed to pay down its corporate debt, it was also able to purge itself of the failing LoyaltyOne segment that was on the verge of collapse.  As internal documents included in the Adversary Complaint reveal, ADS's senior management, including Defendant Andretta, made clear to Defendants Horn and Chesnut that "the point of spinning LoyaltyOne is to ***maximize the value for RemainCo***" even if that meant putting the new Loyalty Ventures in a "***tough spot***."  In fact, these internal documents show that ADS deliberately hastened the transaction to take advantage of the of the "***favorable***" timing because ***"raising debt will be more difficult for [Loyalty Ventures] due to lender and rating agency concerns around renewal risk***" that affected AIR MILES' "***anchor sponsors***"—*i.e.*, Sobeys' impending departure.

146.     Furthermore, Defendant Horn himself stated in his declaration that Defendants knew that Loyalty Ventures' business "suffered from a lack of investment" in the years prior to the Spinoff, and that Defendants fully expected significant repercussions to the Company's business from that lack of investment after the Spinoff: "The AIR MILES Business, in particular, suffered from a lack of investment prior to the Spinoff Transaction, something that major Sponsors observed and sought to leverage."  Moreover, as analysts at Morningstar explained, ADS's "excessively leveraged balance sheet" stood out as the "one exception" amongst "credit card issuers," resulting in Morningstar giving ADS an "Extreme uncertainty rating" in April 2020.  Indeed, Andretta told investors at ADS's May 18, 2021 Investor Day that ADS needed to improve its "enterprise capital metrics to be more in line with [its financial company] peers," and the

"*primary way* [ADS would] achieve this is through paying down debt" via the "planned spin-off of the LoyaltyOne segment." In fact, during ADS's first post-Spinoff public presentation, held on December 7, 2021, Andretta compared the cash infusion from the Spinoff to a much needed "shot of B1" for the Company: "*We need to pay down our debt. We did that with the spin and our balance sheet got a shot of B1 with the spin.*"

147. Similarly, Andretta's and ADS's efforts to cash out ADS's 19% minority interest in Loyalty Ventures that it had obtained as part of the Spinoff, *valued at $50 million*, further evidence their scienter. Indeed, at the time of the Spinoff, ADS had made clear to investors that it intended to monetize its $50 million minority interest within a year in order to further pay down its debt. Significantly, ADS ultimately entered into a 10b5-1 plan to sell its minority share *during the Class Period* on May 25, 2022—*less than two weeks before Defendants were forced to reveal the critical loss of Sobeys on June 8, 2022*—in a last-ditch effort to cash out. However, ADS was too late, as the first day of trading under the plan was scheduled for June 16, 2022—only a few days after Sobeys terminated its participation in the AIR MILES program. Indeed, ADS admitted during a June 14, 2022 investor conference held a few days later that due to Loyalty Ventures' stock price plummeting below the "floor" set forth in the 10b5-1 plan, the Company was unable to cash out and had been forced to significantly write down the value of its minority interest— before ultimately being forced to write it off altogether when Loyalty Ventures' stock price never recovered. ADS's last ditch effort to cash in on its minority share in Loyalty Ventures only two weeks before the fraud was revealed is highly probative of ADS's and Andretta's scienter.

## VII. LOSS CAUSATION

148. As further described above, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of Loyalty Ventures

securities at an artificially high level, and operated as a fraud or deceit on Class Period purchasers of Loyalty Ventures common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

149.    As detailed below, the truth was revealed through three corrective disclosures, causing Lead Plaintiff and the Class to suffer significant damages as a result.

150.    Lead Plaintiff and members of the Class purchased Loyalty Ventures common stock at artificially inflated prices during the Class Period. But for Defendants' fraudulent scheme and material misrepresentations and omissions, Lead Plaintiff and members of the Class would not have purchased Loyalty Ventures common stock at artificially inflated prices.

151.    As Defendants' fraudulent scheme and material misrepresentations and omissions were gradually revealed to the market through four corrective disclosures, the price of Loyalty Ventures common stock declined significantly. The corrective impact of the initial partial disclosures alleged herein was tempered, however, by Defendants' continued material misrepresentations and omissions, as detailed above.

152.    Lead Plaintiff and the Class suffered economic losses as the price of Loyalty Ventures common stock fell in response to the corrective disclosures, as demonstrated below.  The disclosures described below, however, do not necessarily represent an exhaustive list of all stock price declines attributable to Defendants' fraudulent conduct, given that fact and expert discovery in this case has not yet begun.  Lead Plaintiff expressly reserves the right to identify additional relevant disclosures and price declines following an opportunity to conduct full fact and expert discovery in this case.

## A.      February 3, 2022 Corrective Disclosure

153.    On February 3, 2022, after the market closed, Loyalty Ventures filed a Form 8-K accompanied by a press release which revealed poor financial results for 2021, noting "total revenue was $735 million compared to $765 million in 2020" and "[a]djusted EBITDA was $166 million compared to adjusted EBITDA of $173 million for 2020."  The press release also disclosed a 7% decrease in the number of miles issued in 4Q21 as compared to the same quarter in the prior year, explaining that the "decline in AIR MILES reward miles issuance relates to the non-renewal of two sponsors and their exit from the program in the first quarter of 2021."

154.    On this news, Loyalty Ventures' stock price fell from a closing price of $26.90 on February 3, 2022, to a closing price of $23.88 on February 4, 2022, a decline of approximately 11%.

155.    Notwithstanding the price decline following Defendants' February 3, 2022 disclosures, Loyalty Ventures' stock price remained artificially inflated as Defendants continued to materially mislead the market regarding the true state of Loyalty Ventures' business, including by concealing the true extent of the harm caused by the Sponsors lost in 2020 and 2021, the impending loss of additional major Sponsors, and the network effect of the loss of Sponsors.

## B.      April 28, 2022 Corrective Disclosure

156.    On April 28, 2022, after the market closed, Loyalty Ventures filed a Form 8-K accompanied by a press release which revealed a 4% decrease in the number of AIR MILES issued in 1Q22 as compared to the prior year quarter which "related to the non-renewal of two Sponsors in the first quarter of 2021."   On the earnings call held with investors to discuss the 1Q22 financial results, also held after market close on April 28, 2022, an analyst asked whether the Company saw "notable headwinds, particularly in Canada from the Omicron outbreak" and "if that might have

been part of the headwinds on some of the issuance of new miles with AIR MILES."  In response, Horn confirmed that the sole reason for the Company's disappointing results was in fact the departure of the two Sponsors:  "I really don't think [Omicron]  was much of a headwind for us. I **_think you should be more [comping] against two programs that are no longer with us_**, and so it makes it look like it's a little bit weaker than what it is, but **_I'd say nothing from Omicron_**."

157.    In response to these disclosures, Loyalty Ventures' stock price plummeted nearly 14% from a closing price of $14.79 on April 28, 2022 to a closing price of $12.79 on April 29, 2022.  Loyalty Ventures' share price continued to fall the next trading day as the market continued to digest the news, dropping an additional 12% on May 2, 2022 to close at $11.25.

158.    Notwithstanding the price decline following Defendants' April 28, 2022 disclosures, Loyalty Ventures' stock price remained artificially inflated because Defendants continued to materially mislead the market regarding the true state of Loyalty Ventures' business, including by concealing the full extent of the top Sponsors lost prior to the Spinoff, the impending loss of additional top Sponsors, including Sobeys and Staples, and the expected consequences of the loss of the top Sponsors.

### C.    June 8, 2022 Corrective Disclosure

159.    On June 8, 2022, before the market opened, Loyalty Ventures filed a Form 8-K accompanied by a press release which revealed that Sobeys was leaving the AIR MILES program. Specifically, the press release disclosed that "AIR MILES Reward Program segment and AIR MILES' Sponsor, Sobeys were unable to align on extension terms; consequently, Sobeys provided notice of its intent to exit the program on a region-by-region basis, beginning with Atlantic Canada, between August and the first quarter of 2023."  The press release also revealed that the "primary impact of this development in 2022 will be on the number of AIR MILES reward miles issued, as

Sobeys represented approximately 10% of Loyalty Ventures' adjusted EBITDA in 2021."  As a result, Loyalty Ventures was going to "re-evaluate its 2022 revenue and EBITDA guidance when there is more clarity."

160.    In response to these disclosures, Loyalty Ventures' stock price crashed from a closing price of $11.03 on June 7, 2022, to a closing price of $6.02 on June 8, 2022, a decline of over 45%.  Over the next three trading days, the Company's stock continued to fall as the fallout from Sobeys' departure continued, dropping more than 20% from $6.02 per share on June 8, 2022 to close at $4.80 per share on June 13, 2022.  Thus, in total, ***Loyalty Ventures' stock fell over 56% between June 8, 2022 and June 13, 2022*** in response to the news of Sobeys' departure.

## VIII.    PRESUMPTION OF RELIANCE

161.    At all relevant times, the market for the Company's common stock was an open, efficient and well-developed market for the following reasons, among others:

      a.     Loyalty Ventures' common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

      b.     As a regulated issuer, Loyalty Ventures filed periodic reports with the SEC and the NASDAQ;

      c.     Loyalty Ventures regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      d.      Loyalty Ventures was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

162.    As a result of the foregoing, the market for Loyalty Ventures' common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's common stock. All investors who purchased the Company's common stock during the Class Period suffered similar injury through their purchase of Loyalty Ventures' common stock at artificially inflated prices, and a presumption of reliance applies.

163.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Loyalty Ventures' business and operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

164.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The statements alleged to be false or misleading herein all

relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

165. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of Loyalty Ventures who knew that such statement was false when made.

## X. CLASS ACTION ALLEGATIONS

166. Lead Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all persons and entities that purchased Loyalty Ventures common stock between November 8, 2021 and June 7, 2022, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Loyalty Ventures and ADS at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

71

167.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Loyalty Ventures' shares were actively traded on the NASDAQ.  As of March 2, 2023, the Company had more than 24 million shares outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

168.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

169.    Lead Plaintiff will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

170.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

  a. whether the federal securities laws were violated by Defendants' acts, as alleged herein;

  b. whether the Defendants made statements to the investing public that were false, misleading or omitted material facts;

  c. whether Defendants acted with scienter; and

  d. the proper way to measure damages.

171.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF

**COUNT I**
**For Violations Of Section 10(b) Of The Exchange Act,**
**And SEC Rule 10b-5 Promulgated Thereunder**
**(Against Defendants)**

172.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

173.    This cause of action is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  Rule 10b-5(a) makes it unlawful for any person, directly or indirectly to employ any device, scheme, or artifice to defraud. Rule 10b-5(b) makes it unlawful for any person, directly or indirectly to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

174.    Lead Plaintiff asserts Section 10(b) and Rule 10b-5(a), (b) and (c) claims against all Defendants.

175.     During the Class Period, Defendants carried out a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Loyalty Ventures securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase Loyalty Ventures securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

176.     Defendants participated directly or indirectly in the preparation and/or issuance of the Registration Statement, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Loyalty Ventures securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Loyalty Ventures' finances and business prospects.

177.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the business, operations, and financial results of Loyalty Ventures as specified herein.

178.    Defendants ADS and Andretta are liable under Section 10(b) and SEC Rule 10b-5(b) for all conduct and materially false and misleading statements and omissions made prior to and in connection with the Spinoff, as alleged herein.

179.    Defendants Chesnut and Horn as executives of ADS and then Loyalty Ventures are liable under Section 10(b) and SEC Rule 10b-5(b) for all conduct and the materially false and misleading statements and omissions made before and after the Spinoff, as alleged herein.

180.    Defendants made or were responsible for the materially false and misleading statements and omissions alleged herein, which they knew or severely recklessly disregarded to be materially false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

181.    Defendants had actual knowledge of the materially false and misleading statements and omissions alleged herein, or severely recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal Loyalty Ventures' true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

182.    Defendants are also liable under SEC Rule 10b5(a) and SEC Rule 10b-5(c) for engaging in deceptive and manipulative acts in a scheme to defraud investors.  As part of their scheme to defraud investors in violation of SEC Rule 10b-5(a) and (c), Defendants directed that ADS artificially inflate the perceived value of the LoyaltyOne segment to ratings agencies, third party advisors, lenders, and investors, effectuate the Spinoff, including the payment to ADS, and continue to conceal the truth about Loyalty Ventures after the Spinoff occurred.

183.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Loyalty Ventures' common stock.

Lead Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Loyalty Ventures' common stock had been artificially inflated by Defendants' fraudulent course of conduct.

184.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

185.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

**COUNT II**

**For Violations Of Section 20(a) Of The Exchange Act
(Against ADS And The Individual Defendants)**

186.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

187.    This Count is asserted on behalf of all members of the Class against ADS and the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

**A.      Individual Defendants**

188.    The Individual Defendants participated in the operation and management of ADS and Loyalty Ventures, and conducted and participated, directly and indirectly, in the conduct of ADS's and Loyalty Ventures' business affairs.  Because of their senior positions, they knew the adverse non-public information about the LoyaltyOne segment's and Loyalty Ventures' business, operations, and financial results as specified herein.

189.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ADS and Loyalty Ventures disseminated in the marketplace concerning the

76

LoyaltyOne segment's and Loyalty Ventures' business operations and results.  The Individual Defendants exercised their power and authority to cause ADS and Loyalty Ventures to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of ADS and Loyalty Ventures within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Loyalty Ventures securities.

190.    Each of the Individual Defendants, therefore, acted as a controlling person of ADS and Loyalty Ventures.  By reason of their control, senior management positions and/or being directors of ADS and Loyalty Ventures, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ADS and Loyalty Ventures to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of ADS and Loyalty Ventures and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

191.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ADS and Loyalty Ventures.

**B.    ADS**

192.    ADS participated in the operation and management of Loyalty Ventures prior to the Spinoff, and conducted and participated, directly and indirectly, in the conduct of Loyalty Ventures' business affairs.  Because of its control over Loyalty Ventures, ADS knew the adverse non-public information about the LoyaltyOne segment's and Loyalty Ventures' business, operations, and financial results as specified herein.

193.     Because of its position of control and authority, ADS was able to, and did, control the contents of the various reports, press releases and public filings which Loyalty Ventures disseminated in the marketplace concerning the LoyaltyOne segment's and Loyalty Ventures' business operations and results prior to the Spinoff.  ADS exercised its power and authority to cause Loyalty Ventures to engage in the wrongful acts complained of herein.  Indeed, the Adversary Complaint describes in detail how ADS deliberately orchestrated the Spinoff to conceal the highly material information that Sobeys had informed ADS that it intended to terminate its participation in the AIR MILES program by the end of 2022, and how ADS's senior management threatened to terminate Defendants Horn and Chesnut if they did not participate in the fraud.  ADS, therefore, was a "controlling person" of Loyalty Ventures within the meaning of Section 20(a) of the Exchange Act.  In this capacity, ADS participated in the unlawful conduct alleged which artificially inflated the market price of Loyalty Ventures securities.

194.     ADS, therefore, acted as a controlling person of Loyalty Ventures.  By reason of its control, overlapping senior management positions, including Defendants Horn and Chesnut, and/or being the parent of Loyalty Ventures, ADS had the power to direct the actions of, and exercised the same to cause, Loyalty Ventures to engage in the unlawful acts and conduct complained of herein.  ADS exercised control over the general operations of Loyalty Ventures prior to the Spinoff and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

195.     By reason of the above conduct, ADS is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Loyalty Ventures.

## XII.   PRAYER FOR RELIEF

196.     WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a. Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b. Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## XIII.  JURY TRIAL DEMANDED

197.     Lead Plaintiff demands a trial by jury.

Dated:  March 21, 2024

Respectfully submitted,

By: */s/ John C. Camillus*
John C. Camillus (OH Bar No. 77435)
**LAW OFFICES OF JOHN C. CAMILLUS, LLC**
P.O. Box 141410
Columbus, OH 43214
Tel.: (614) 992-1000
Fax: (614) 559-6731
jcamillus@camilluslaw.com

*Local Counsel for Lead Plaintiff Newtyn Partners, LP and Newtyn TE Partners, LP*

Maya Saxena (admitted *pro hac vice*)
Lester R. Hooker (admitted *pro hac vice*)
Dianne M. Pitre (*pro hac vice* forthcoming)
Jonathan Lamet (admitted *pro hac vice*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com
jlamet@saxenawhite.com

-and-

Steven B. Singer (*pro hac vice* forthcoming)
Kyla Grant (admitted *pro hac vice*)
David J. Schwartz (admitted *pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
kgrant@saxenawhite.com
dschwartz@saxenawhite.com

*Counsel for Lead Plaintiff Newtyn Partners, LP and Newtyn TE Partners, LP*

80

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 21, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users and that I have mailed by FedEx the foregoing to the following representative of Defendants Horn and Chesnut:

> Peter A. Stokes
> Norton Rose Fullbright US LLP
> 98 San Jacinto Boulevard, Suite 1100
> Austin, Texas 78701-4255
> Tel: (512) 536-5287

> */s/ John C. Camillus*
> John C. Camillus