**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| NEWTYN PARTNERS, LP and NEWTYN TE PARTNERS, LP, Individually and on behalf of all others similarly situated, | Case No. 2:23-cv-01451-EAS-EPD |
| Plaintiff, | Hon. Edmund A. Sargus, Jr., District Judge |
| vs. | Hon. Elizabeth A. Preston Deavers, Magistrate Judge |
| ALLIANCE DATA SYSTEMS CORPORATION N/K/A BREAD FINANCIAL HOLDINGS, INC., CHARLES L. HORN, JOHN J. CHESNUT, and RALPH J. ANDRETTA, | <u>CLASS ACTION</u> |
| Defendants. | |

**PLAINTIFF'S OMNIBUS OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ........................................................................................... 1

II.    FACTUAL BACKGROUND ......................................................................... 7

       A.    ADS Announces The Spinoff And Touts Loyalty's "Deep, Long-Term
             Relationships" With AIR MILES' Top Ten Sponsors, Including Sobeys .............. 7

       B.    The Spinoff Occurs With An Inflated Share Price Of Nearly $50 Per
             Share, ADS Receives $750 Million from Loyalty Ventures, And
             Defendants Continue To Tout The Company's Top Sponsor Relationships ......... 10

       C.    Unbeknownst To Investors, AIR MILES Was Rapidly Declining Due To A
             Top Sponsor Exodus That Began Prior To The Spinoff—Including
             Sobeys—As Confirmed By Internal Company Documents And Sworn
             Pleadings ............................................................................................... 11

       D.    Defendants Not Only Deceived Investors About Sobeys' Planned
             Departure, But Also Third Party Lenders, Rating Agencies, And Advisors,
             In An Effort To Secure ADS' Massive $750 Million Payout ............................... 15

       E.    The Truth Is Slowly Revealed: Loyalty Ventures Discloses In Consecutive
             Quarters That The Loss Of Major Sponsors Negatively Impacted AIR
             MILES, And Finally On June 8, 2022 Is Forced To Disclose That Sobeys
             Terminated Its Contract ........................................................................... 17

III.   LEGAL STANDARDS .................................................................................. 19

IV.    ARGUMENT .................................................................................................. 20

       A.    Defendants Made Actionably False And Misleading Statements ...................... 20

             1.    Statements About Customer Relationships Were False And
                   Misleading ...................................................................................... 20

Defendants repeatedly touted AIR MILES' relationships with its ten largest retail clients, or "Sponsors," which were absolutely critical to the success of Loyalty's business. However, these representations were materially false and misleading, as confirmed by Defendant Horn's sworn declaration (the "Horn Declaration") and the Adversary Complaint, which relied on thousands of internal ADS documents. In reality, months prior to the Spinoff, AIR MILES had lost three top ten Sponsors, and two additional top ten Sponsors—including Sobeys, AIR MILES' second most important Sponsor—had given notice that they would terminate their AIR MILES contracts. Defendants concealed these highly material facts from investors. While Defendants argue these statements were "historically accurate," Defendants' statements that "we have maintained deep, longstanding relationships" with "existing" top Sponsors were in fact present tense statements. Moreover, once Defendants chose to speak about these top ten Sponsors, they had a duty to speak the whole truth. *See e.g., Helwig v. Vencor, Inc*., 251 F.3d 540, 561 (6th Cir. 2001); *In re FirstEnergy Corp. Sec. Litig*., 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004); *Weiner v. Tivity Health,*

i

*Inc.*, 365 F. Supp. 3d 900, 913 (M.D. Tenn. 2019); *Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *13 (S.D. Ohio Sept. 27, 2021). Defendants' puffery arguments similarly fail given the critical importance of these Sponsors to Loyalty's business. Statements about a company's success with its customer base and ability to retain clients are undeniably important to investors. In any event, materiality is inherently fact-specific and typically inappropriate to resolve at the pleading stage. *See e.g., Wang v. Cloopen Group Holding Ltd.*, 661 F. Supp. 3d 208, 220, 227, 229 (S.D.N.Y. 2023); *In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp. 3d 712, 725 (D. Minn. 2019); *Cardinal Health*, 2021 WL 4397946, at *1, 4; *Helwig*, 251 F.3d at 563.

2.    Statements About The Sobeys Relationship Were Misleading ................. 26

Defendants repeatedly highlighted AIR MILES' relationship with Sobeys, its second largest and most important Sponsor, as emblematic of the "deep, longstanding relationships" the Company "maintained" with "existing" top Sponsors. However, according to the sworn Horn Declaration and Adversary Complaint, Sobeys had given notice ten months before the Spinoff that it was terminating its contract with AIR MILES. Touting a key customer relationship is materially false and misleading where defendants know the relationship is imperiled. *See e.g., In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013); *Tivity Health*, 365 F. Supp. 3d at 904; *Wallace v. IntraLinks*, 2013 WL 1907685, at *7 (S.D.N.Y. May 8, 2013); *Tarapara v. K12 Inc.*, 2017 WL 3727112, at *15 (N.D. Cal. Aug. 30, 2017).

3.    The Risk Warnings Were Misleading ....................................................... 31

The Registration Statement and Form 10-K included risk warnings that if Loyalty Ventures lost any one of its critical top ten Sponsors, it could cause a material adverse impact on its business. These risk warnings were materially false and misleading because those risks had already come to fruition, five times over. As confirmed by the Horn Declaration and Adversary Complaint, months prior to the Spinoff, no less than half of AIR MILES' top ten Sponsors had either already completely left the AIR MILES program or had given notice that they would soon do so. *See e.g., Tivity Health*, 365 F. Supp. 3d at 909; *Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1076 (M.D. Tenn. 2022); *Cloopen*, 661 F. Supp. 3d at 228.

4.    Defendants Provided False Explanations For Slowing Air Miles
       Issuance .................................................................................................... 35

Defendants provided false explanations about the unexpected decline in AIR MILES issuance in Q3 2021. While Defendants attempted to attribute this downturn to other factors, in reality, and as Defendants would soon reveal, the decline was actually due to the loss of multiple top ten Sponsors in prior quarters who, unbeknownst to investors, were responsible for 10% of the Company's combined revenue.

B.    The Pre-Class Period Statements Are Actionable ................................................. 36

Courts in the Sixth Circuit and elsewhere have repeatedly recognized that statements made before a security is publicly traded are actionable even when they pre-date the alleged class period because such false and misleading statements artificially inflate the opening price of the security. *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *7 (M.D. Tenn. Apr. 19,

2018); *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *5 (D. Ariz. Feb. 2, 2023); *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 966 (N.D. Cal. 2005).

C.      The ADS Defendants Are Responsible For The Registration Statement.............. 40

As in *Zwick*, the ADS Defendants are "makers" of the Registration Statement given numerous facts, including (i) that Loyalty was owned and operated by ADS; (ii) Defendant Horn was an ADS employee; (iii) ADS and Loyalty reported consolidated financial statements; (iv) ADS appended a cover letter to the Registration Statement signed by Defendant Andretta that endorsed its contents and urged investors to rely on it; and (v) the filing expressly stated that it was "furnished" by ADS—with ADS admitting that it directly "participated in the preparation and filing of the [R]egistration [S]tatement." Moreover, the ADS Defendants "controlled…the contents of Loyalty Ventures' Registration Statement," were provided copies of the filing, and "had the ability and opportunity to prevent [its] issuance or cause [it] to be corrected." *See Zwick*, 2018 WL 2933406, at *3.

D.      The Complaint Adequately Alleges A Strong Inference Of Scienter................... 42

Plaintiff has stated with particularity facts which holistically raise a strong inference of scienter that is at least as compelling as any opposing inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-25 (2007); *Frank v. Dana Corp.,* 646 F.3d 954, 961 (6th Cir. 2011); *Cardinal Health,* 2021 WL 4397946, at **14-16; *Helwig*, 251 F.3d at 552.

1.      The Horn Declaration Contains Multiple Admissions That
Establish Scienter...................................................................................... 44

In the Horn Declaration, Defendant Horn admitted that the Company's statements touting its top ten Sponsors, including Sobeys, were materially false and misleading. Sworn evidence from a defendant is uncommon at this early stage and easily supports a finding of scienter. *See Levy v. Gutierrez*, 2017 WL 2191592, at *7, *13 (D.N.H. May 4, 2017); *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 677 (M.D. Tenn. 2022). The Horn Declaration establishes that Defendants knew well before the Spinoff that the AIR MILES business was on the verge of collapse, that multiple top ten Sponsors had left AIR MILES, and that Sobeys had given notice that it would leave AIR MILES. Thus, Defendants' statements to investors were materially false as they directly contradicted internal reports and disregarded current information (the second and sixth *Helwig* factors). *See In re CBL & Associates Properties, Inc. Sec. Litig.,* 2022 WL 1405415, at *14 (E.D. Tenn. May 3, 2022). The sharp divergence between the Horn Declaration and Defendants' public statements supports scienter. *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 (S.D. Ohio 2007) (Sargus, J.); *Grae v. Corr. Corp. of Am.,* 2017 WL 6442145, at *21 (M.D. Tenn. Dec. 18, 2017).

2.      The Adversary Complaint And Internal Documents Cited Therein
Confirm That Defendants Knowingly Or Recklessly Misled
Investors.................................................................................................... 45

The internal documents cited in the Adversary Complaint confirm all aspects of Defendants' fraud, including that: multiple major top ten Sponsors had left the AIR MILES program months prior to the Spinoff; Defendants knew no less than ten months prior to the Spinoff that Sobeys had also given notice that it was exiting the AIR MILES Program in 2022; Defendants had engaged in a

concerted effort to deceive investors in addition to third party lenders, rating agencies, and advisors about Sobeys' departure in order to accomplish the Spinoff and obtain a $750 million payout; and Defendants knew the loss of Sobeys would have a devastating impact on AIR MILES' business. *See Dougherty v. Esperion Therapeutics, Inc.,* 905 F.3d 971, 981 (6th Cir. 2018); *Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.,* 372 F. Supp. 3d 1139, 1154 (D. Colo. 2019). This is sufficient to support a strong inference of scienter. *See Clover Health*, 587 F. Supp. 3d at 678; *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 448 (D. Del. 2014).

3.    The ADS Defendants Threatened And Bribed Defendants Horn
      And Chesnut To Get Them To Go Along With The Fraud ...................... 47

The ADS Defendants' repeated threats to Defendants Horn and Chesnut that they would lose their jobs and compensation if they did not "align[] and support[]" the fraud—coupled with ADS executives telling Defendants Horn and Chesnut that it would be personally "beneficial" for them if they went along with the fraud—support a strong inference of Defendants' scienter. *See CBL,* 2022 WL 1405415, at *14.

4.    Motive And Opportunity Existed To Commit The Fraud ........................ 48

Although motive is not required, as the detailed allegations and internal documents cited in the Adversary Complaint make clear, Defendants' scheme was set in motion for the stated purpose of obtaining a $750 million payout for ADS so that it could pay down its $5 billion in debt, all while "maximizing the value of ADS" and unloading a doomed business. *Zwick*, 2018 WL 2933406, at *10; *Heritage Glob. Network Los Angeles, Inc. v. Welch*, 2024 WL 695772, at *14 (M.D. Tenn. Feb. 20, 2024). The Loyalty Defendants also had the self-interested motivation to save their salaries and jobs, *i.e.* the ninth *Helwig* factor. *FirstEnergy*, 2022 WL 681320, at *21.

5.    The Proximity Between The False Statements And Omissions And
      The Corrective Disclosures Support Scienter ........................................... 51

The Complaint satisfies the third *Helwig* factor, which looks at the proximity between the false statements and omissions and the corrective disclosures. *See Cardinal Health*, 2021 WL 4397946, at *15. Each alleged disclosure came just weeks after Defendants made false and misleading statements touting the Company's Sponsor relationships. *See Shupe v. Rocket Companies, Inc.*, 660 F. Supp. 3d 647, 681 (E.D. Mich. 2023).

6.    Numerous Other Facts Support Defendants' Scienter .............................. 52

First, the ADS and Loyalty Defendants' concerted scheme to deceive not only the market but also third-party lenders, ratings agencies, and advisors to secure the $750 million payout for ADS is highly probative of Defendants' scienter. Second, executives are presumed to be aware of matters related to their company's core operations, and it is indisputable that Loyalty's top ten Sponsors were critical to its business. *See Cardinal Health*, 2021 WL 4397946, at *16; *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *21 (M.D. Tenn. Dec. 18, 2017); *Welch*, 2024 WL 695772, at *14. Third, the magnitude of the fraud (securing a $750 million payout and Loyalty's impending bankruptcy) and the reality known to Defendants support an inference of scienter. *See Cardinal Health*, 2021 WL 4397946, at *15; *FirstEnergy*, 2022 WL 681320; *Dana Corp.,* 646 F.3d at 962.

E.    Defendants Are Liable For Their Deceptive Scheme ........................................... 53

Plaintiff has pleaded a scheme liability claim under Rule 10b5(a) and (c). *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *17-18 (D.N.J. June 5, 2020); *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 83 (2019). In the Sixth Circuit, plaintiffs need only "provide examples of specific" fraudulent conduct that are "representative samples" of the scheme. *FirstEnergy*, 2022 WL 681320, at *13. The numerous allegations of Defendants' fraudulent scheme include that (i) Defendants secretly provided Sobeys an enormous and undisclosed discount to delay public announcement of its departure; (ii) intentionally duped lenders and credit agencies about Sobeys' departure by providing "materially inaccurate" financial forecasts and "coaching" members of the "Spin Team" to act as if ADS did not know that Sobeys had relayed its intention to terminate its AIR MILES contract; (iii) perpetrated their scheme in order to enable Loyalty to receive huge loans, which were then funneled back to ADS in a massive $750 million payment; (iv) drafted and disseminated the misleading Registration Statement; and (v) effectuated the Spinoff, all while contemplating a near-term Loyalty bankruptcy.

F.      The Complaint Alleges Loss Causation ................................................................. 56

Alleging loss causation in the Sixth Circuit "is not meant to impose a great burden upon a plaintiff." *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017). The Complaint easily satisfies this low burden through the disclosures on February 3, 2022, April 28, 2022 and June 8, 2022. Defendants' challenges to loss causation for the February 3 and April 28 disclosures fail because: (i) Defendants cannot venture outside the four corners of the Complaint; (ii) what is publicly known and whether other factors contributed to the drops are highly fact intensive and not appropriate for consideration at this stage; and (iii) the market was unaware that the lost Sponsors were all key top ten Sponsors touted by Defendants. *See, e.g.*, *CBL*, 2022 WL 1405415, at *7, **15-16; *SmileDirectClub*, 633 F. Supp. 3d at 1080-81; *Zwick*, 2018 WL 2933406, at *10; *Cmty. Health Sys.*, 877 F.3d at 696; *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 388 (6th Cir. 2016). Regarding the June 8, 2022 drop, Sobeys' exit meets the materialization of the risk theory. *CBL*, 2022 WL 1405415, at *16; *Shupe*, 660 F. Supp. 3d at 677.

G.      The Complaint Alleges Claims Under Section 20(a) ............................................ 59

Because Defendants have failed to establish sufficient grounds to support dismissal of the Section 10(b) claims against them, their argument for dismissal of the 20(a) claims must also be rejected. *See Cardinal Health*, 2021 WL 4397946, at *17. The Complaint otherwise adequately alleges that ADS and Loyalty Ventures are "control persons" under Section 20(a). *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696-97 (6th Cir. 2004) (control is "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person"). With respect to ADS, the Adversary Complaint and internal documents cited therein make clear that ADS orchestrated and controlled everything related the Spinoff, to the extent that ADS executives directly threatened Defendants Horn and Chesnut with termination if they did not go along with the fraud. The control standard is also easily met with respect to Defendants Horn and Chesnut, Loyalty's CEO and CFO, respectively, who had control over public filings regarding Loyalty's business both before and after the Spinoff. *See FirstEnergy*, 2022 WL 681320, at *31.

V.      CONCLUSION ............................................................................................................ 61

v

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**CASES**

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ........................................................................................ 55

*Beach v. Healthways, Inc.*,
    2009 WL 650408 (M.D. Tenn. Mar. 9, 2009) ........................................... 60

*Bond v. Clover Health Invs., Corp.*,
    587 F. Supp. 3d 641 (M.D. Tenn. 2022) ........................................... *passim*

*Bondali v. Yum! Brands, Inc.*,
    620 F. App'x 483 (6th Cir. 2015) .............................................................. 32

*Borteanu v. Nikola Corp.*,
    2023 WL 1472852 (D. Ariz. Feb. 2, 2023) .............................. 36, 39, 40

*Byrd v. ViSalus, Inc.*,
    2018 WL 1637948 (E.D. Mich. Apr. 5, 2018) ........................................ 19

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    56 F. Supp. 3d 549 (S.D.N.Y. 2014) ........................................................ 41

*Chamberlain v. Reddy Ice Holdings, Inc.*,
    757 F. Supp. 2d 683 (E.D. Mich. 2010) .................................................. 47

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) ............................................................ 30, 33

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*,
    29 F.4th 802 (6th Cir. 2022) ...................................................................... 44

*Dougherty v. Esperion Therapeutics, Inc.*,
    905 F.3d 971 (6th Cir. 2018) ...................................................... 43, 45, 48

*Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015) ...................................................................... 50

*Franchi v. SmileDirectClub, Inc.*,
    633 F. Supp. 3d 1046 (M.D. Tenn. 2022) ...................................... *passim*

*Frank v. Dana Corp.*,
    646 F.3d 954 (6th Cir. 2011) .......................................................... *passim*

*Freeburg v. Wolf*,
    42 F. App'x 715 (6th Cir. 2002) .............................................................. 29

vi

*Grae v. Corr. Corp. of Am.*,
  2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017).............................................. 45, 53

*Grae v. Corr. Corp. of Am.*,
  2021 WL 1100799 (M.D. Tenn. Mar. 23, 2021) .............................................. 33

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) ................................................................. *passim*

*Heritage Glob. Network Los Angeles, Inc. v. Welch*,
  2024 WL 695772 (M.D. Tenn. Feb. 20, 2024)................................................ *passim*

*Hodges v. Akeena Solar, Inc.*,
  2010 WL 3705345 (N.D. Cal. May 20, 2010).................................................... 39

*Hutchins v. NBTY, Inc.*,
  2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012)................................................... 29

*I.B.E.W. v. Ltd. Brands, Inc.*,
  788 F. Supp. 2d 609 (S.D. Ohio 2011) ......................................................... 24

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) .................................................................... 42

*In re Bof'I Holding Inc. Sec. Litig*,
  977 F.3d 781 (9th Cir. 2020) ................................................................... 47

*In re Boston Sci. Corp. Sec. Litig.*,
  646 F. Supp. 3d 249 (D. Mass. 2022) ........................................................ 39

*In re Cardinal Health Inc. Sec. Litigations*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006) ........................................................ 59

*In re CBL & Associates Properties, Inc. Sec. Litig.*,
  2022 WL 1405415 (E.D. Tenn. May 3, 2022)................................................ *passim*

*In re CenturyLink Sales Practices & Sec. Litig.*,
  403 F. Supp. 3d 712 (D. Minn. 2019)........................................................... 25

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  2020 WL 3026564 (D.N.J. June 5, 2020) ..................................................... 53

*In re Crown Am. Realty Tr. Sec. Litig.*,
  1997 WL 599299 (W.D. Pa. Sept. 15, 1997)................................................... 37

*In re Envision Healthcare Corp. Sec. Litig.*,
  2022 WL 4551876 (M.D. Tenn. Sept. 29, 2022)............................................. 30

vii

*In re EveryWare Glob., Inc. Sec. Litig.*,
   175 F. Supp. 3d 837 (S.D. Ohio 2016) ................................................. 50

*In re Express Scripts Holding Co. Sec. Litig.*,
   2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) ........................................ 30

*In re FirstEnergy Corp. Sec. Litig.*,
   316 F. Supp. 2d 581 (N.D. Ohio 2004) ................................................ 22

*In re FirstEnergy Corp.*,
   2022 WL 681320 (S.D. Ohio Mar. 7, 2022) ................................ *passim*

*In re Ford Motor Co. Sec. Litig., Class Action*,
   381 F.3d 563 (6th Cir. 2004) ............................................................... 23

*In re Garrett Motion Inc. Sec. Litig.*,
   2022 WL 976269 (S.D.N.Y. Mar. 31, 2022) .................................. 39, 50

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021) .................................................. 31

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .................................. 29, 30

*In re Huffy Corp. Sec. Litig.*,
   577 F. Supp. 2d 968 (S.D. Ohio 2008) ...................................... 28, 34, 47

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998) ................................................................. 39

*In re Inv. Tech. Group, Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017) .................................................. 39

*In re KBC Asset Mgmt. N.V.*,
   572 F. App'x 356 (6th Cir. 2014) ......................................................... 59

*In re Miller Energy Res. Sec. Litig.*,
   2014 WL 415730 (E.D. Tenn. Feb. 4, 2014) ................................... 41, 56

*In re Nash Finch Co.*,
   502 F. Supp. 2d 861 (D. Minn. 2007) .................................................. 25

*In re Proquest Sec. Litig.*,
   527 F. Supp. 2d 728 (E.D. Mich. 2007) ............................................... 61

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
   2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ................................ 29, 59

*In re Unumprovident Corp. Sec. Litig.*,
    396 F. Supp. 2d 858 (E.D. Tenn. 2005) ........................................................... 20, 49

*In re Upstart Holdings, Inc. Sec. Litig.*,
    2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) ......................................................... 50

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2017 WL 3058563 (N.D. Cal. July 19, 2017) .................................................... 41, 42

*In re Washington Prime Group, Inc. Sec. Litig*,
    2024 WL 1307103 (S.D. Ohio Mar. 27, 2024) ......................................................... 25

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432 (D. Del. 2014) ........................................................................ 46

*Jackson Cty. Emples. Rt. Sys. v. Ghosn*,
    510 F. Supp. 3d 583 (M.D. Tenn. 2020) ................................................................ 37

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ......................................................................................... 40

*Kolominsky v. Root, Inc.*,
    667 F. Supp. 3d 685 (S.D. Ohio 2023) ............................................................ 23, 33

*Kolominsky v. Root, Inc.*,
    100 F.4th 675 (6th Cir. 2024) ............................................................................ 33

*Kyrstek v. Ruby Tuesday, Inc.*,
    2016 WL 1274447 (M.D. Tenn. Mar. 31, 2016) ..................................................... 46

*Levy v. Gutierrez*,
    2017 WL 2191592 (D.N.H. May 4, 2017) ......................................................... 44, 45

*Litwin v. Blackstone Group, L.P.*,
    634 F.3d 706 (2d Cir. 2011) ............................................................................... 34

*Lorenzo v. Sec. & Exch. Comm'n*,
    587 U.S. 71 (2019) ...................................................................................... 42, 54

*Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
    2021 WL 4397946 (S.D. Ohio Sept. 27, 2021) .............................................. *passim*

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024) ........................................................................................ 23

*Maiman v. Talbott*,
    2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) ......................................................... 50

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007) ............................................................................ 50

*Mediacom Se LLC v. BellSouth Telecomms., Inc.*,
672 F.3d 396 (6th Cir. 2012) ...................................................................................... 20

*Michigan Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*,
2019 WL 1429667 (M.D. Fla. Mar. 29, 2019) ........................................................ 29

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
929 F. Supp. 2d 740 (M.D. Tenn. 2013) ................................................................... 24

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*,
709 F.3d 109 (2d Cir. 2013) ....................................................................................... 34

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
877 F.3d 687 (6th Cir. 2017) ................................................................................ 56, 58

*North Port Firefighters' Pension--Local Option Plan v. Temple-Inland, Inc.*,
936 F. Supp. 2d 722 (N.D. Tex. 2013) ............................................................... 39, 41

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
830 F.3d 376 (6th Cir. 2016) ...................................................................... 19, 56, 58

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018) ....................................................................... 25

*Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.*,
372 F. Supp. 3d 1139 (D. Colo. 2019) ...................................................................... 45

*Pension Fund Group v. Tempur-Pedic Intern., Inc.*,
614 F. App'x 237 (6th Cir. 2015) .............................................................................. 25

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ...................................................................................... 51

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ...................................................................................... 59

*River Birch Capital, LLC v. Jack Cooper Holdings Corp.*,
2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) ........................................................... 24

*Robb v. Fitbit Inc.*,
216 F. Supp. 3d 1017 (N.D. Cal. 2016) .................................................................... 37

*Ross v. Abercrombie & Fitch Co.*,
501 F. Supp. 2d 1102 (S.D. Ohio 2007) ................................................................... 45

*Saddle Rock Partners, Ltd. v. Hiatt*,
  1996 WL 859986 (W.D. Tenn. Mar. 26, 1996) ........................................................ 39

*SEC v. Geswein*,
  2 F. Supp. 3d 1074 (N.D. Ohio 2014) ........................................................................ 42

*Sec. and Exch. Comm'n. v. Agfeed Indus., Inc.*,
  2016 WL 10934942 (M.D. Tenn. July 21, 2016) ..................................................... 41

*Shah v. Zimmer Biomet Holdings, Inc.*,
  2019 WL 762510 (N.D. Ind. Feb. 20, 2019) ............................................................. 47

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..................................................................... 49

*Shupe v. Rocket Companies, Inc.*,
  660 F. Supp. 3d 647 (E.D. Mich. 2023) ............................................................. 51, 59

*Srygley v. Crystal Emp. Servs.*,
  2016 WL 2591880 (E.D. Mich. May 5, 2016) ........................................................... 20

*Stein v. U.S. Xpress Enterprises, Inc.*,
  2020 WL 3584800 (E.D. Tenn. June 30, 2020) ........................................................ 37

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008) ................................................................................................... 55

*Tarapara v. K12 Inc.*,
  2017 WL 3727112 (N.D. Cal. Aug. 30, 2017) .......................................................... 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ....................................................................................... 42, 43, 48

*United States ex rel. Bledsoe v. Cmty. Health Sys. Inc.*,
  342 F.3d 634 (6th Cir. 2003) ..................................................................................... 61

*Urbach v. Sayles*,
  1991 WL 236183 (D.N.J. Sept. 4, 1991) .................................................................. 37

*Wallace v. IntraLinks*,
  2013 WL 1907685 (S.D.N.Y. May 8, 2013) ............................................................. 26

*Wang v. Cloopen Group Holding Ltd.*,
  661 F. Supp. 3d 208 (S.D.N.Y. 2023) ........................................................... 22, 25, 31

*Wash. State Inv. Bd. v. Odebrecht S.A.*,
  461 F. Supp. 3d 46 (S.D.N.Y. 2020) ......................................................................... 25

xi

*Weiner v. Tivity Health, Inc.*,
    365 F. Supp. 3d 900 (M.D. Tenn. 2019) ............................................................ *passim*

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017) ........................................................................... 33

*Willis v. Big Lots, Inc.*,
    2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) ......................................... 23

*Wiseman v. Spectrum Healthcare, Res.*,
    2021 WL 4399718 (W.D. Tenn. Sept. 27, 2021) ................................... 19

*Zaller v. Fred's, Inc.*,
    560 F. Supp. 3d 1146 (W.D. Tenn. 2021) ............................................. 26

*Zaluski v. United Am. Healthcare Corp.*,
    527 F.3d 564 (6th Cir. 2008) ....................................................................... 23

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005) .................................................. 36

*Zwick Partners, LP v. Quorum Health Corp.*,
    2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018) ............................... *passim*

**RULES**

Fed. R. Civ. P. 15(a) ......................................................................................... 61

## I.    INTRODUCTION[1]

This is a securities class action on behalf of investors in the now-bankrupt Loyalty Ventures. Leading up to the Class Period, ADS—a company that issues credit cards for retailers—had accumulated billions of dollars in debt to fund its credit card operations. In order to unload this crushing debt load, on November 5, 2021, ADS spun-off Loyalty Ventures, a business segment that operated loyalty programs for ADS's retail clients (the "Spinoff"). Notably, ADS orchestrated the Spinoff so that it would receive a much-needed $750 million cash payment from the newly independent Company as part of the transaction. To justify this massive payout, Defendants asserted that Loyalty was poised to thrive as a stand-alone Company precisely because its most-important operating segment—the Canadian-based AIR MILES Reward Program—successfully "maintained deep, long-standing relationships" with its top ten most important retail clients (or "Sponsors") that drove the Company's success.

Indeed, Defendants repeatedly represented that these top ten Sponsors were absolutely critical to Loyalty's business, as they represented 55% of its combined revenue in 2020 and were responsible for issuing over 90% of all Air Miles. Moreover, Defendants made clear that the Company's business depended on maintaining its relationships with ***each*** of its top ten Sponsors, stating in the Registration Statement for the Spinoff that "***the loss of any of these clients*** could

---

[1] In the interest of judicial economy, and to adequately respond to the arguments raised in the two motions to dismiss while avoiding unnecessary overlap and duplication, Plaintiff respectively files this omnibus opposition. All "¶" references are to the Second Amended Class Action Complaint, ECF No. 30 ("SAC" or the "Complaint"). Unless otherwise specified, capitalized terms have the same meaning as in the SAC. "ADS Defendants" are ADS, now known as Bread Financial Holdings, Inc., and ADS' CEO Ralph J. Andretta. "Loyalty Defendants" are Charles L. Horn, the former CEO of Loyalty Ventures, Inc. ("Loyalty," "Loyalty Ventures," or the "Company"), and John J. Chesnut, Loyalty's former CFO (collectively with the ADS Defendants, "Defendants"). "LYLT M." refers to the Loyalty Defendants' motion to dismiss (ECF No. 35) and "ADS M." refers to the ADS Defendants' motion to dismiss (ECF No. 37). Unless otherwise stated, all emphasis is added, and internal quotations and citations are omitted.

cause a significant reduction in our [] revenue." Accordingly, Defendants repeatedly emphasized in the Registration Statement that Loyalty "*maintained deep, long-standing relationships*" with these critical "large" Sponsors; that the Company's purported "*success with [S]ponsors*" was what "[drove] the appeal of the AIR MILES Reward Program"; and that the Company's largest and most important Sponsors had been with AIR MILES for "nearly thirty years," with the "top 6 [S]ponsors ha[ving] an average tenure of 25 years." Significantly, while none of Defendants' public statements or filings identified who these critical "top ten" Sponsors were, the Registration Statement and accompanying investor presentations specifically boasted about Loyalty's relationship with Sobeys, Canada's second largest grocer, which Defendants touted as being emblematic of Loyalty's key long-term "*Exclusive Relationships*" with "well-known worldwide brands" that ensured the success of AIR MILES.

On the backs of these representations, the Spinoff was a success, with Loyalty closing its first day of trading at nearly $50 per share. Numerous analysts credited Defendants' statements, praising AIR MILES as a "good asset." For example, Morgan Stanley highlighted that the Company's "*deep relationships with consumers, clients, and sponsors*, helps form its *competitive advantage*"; Sidoti & Company praised "the 30-year history of AIR MILES" and its "*attractive sponsor and customer bases*"; Morningstar called AIR MILES a "*reliable source of income*"; and Needham proclaimed that AIR MILES was a "*[p]owerhouse within Canada*" with "*Sobeys*" as one of its "*Key Clients*."

Defendants' statements, however, were utterly false. In reality, at the time of the Spinoff, Loyalty's business was disintegrating, and its purportedly successful AIR MILES program was in freefall. Indeed, as would ultimately be revealed at the end of the Class Period, *months prior to the Spinoff*, no less than *three* of Loyalty's top ten Sponsors *had completely exited the AIR*

*MILES program*—and *two other Sponsors* had given notice that they would soon terminate their AIR MILES contracts.  Remarkably, ***these departing Sponsors included the Company's second-largest and most important Sponsor, Sobeys***, which was alone responsible for almost 30% of all Air Miles issued, and more than 20% of AIR MILES' gross revenue.  Despite the fact that Defendants unequivocally knew that these Sponsor departures would decimate Loyalty's business, Defendants deliberately concealed these highly material facts from investors in order to complete the Spinoff and pocket the massive $750 million payment for ADS.

Investors learned the harsh reality soon after the Spinoff.  On both February 3, 2022 and April 8, 2022—the first two quarters Loyalty reported earnings as an independent company—Loyalty revealed that poor AIR MILES results were caused by the pre-Spinoff "exit" of "two sponsors" in the "first quarter of 2021."  In response to the revelation that Loyalty had lost two of its key Sponsors who were material contributors to AIR MILES, Loyalty's stock dropped 11% and 24%, respectively.  Then, on June 8, 2022, Loyalty stunned the market by announcing that Sobeys had prematurely terminated its AIR MILES' contract.  On this news, Loyalty's stock collapsed, falling almost ***60%*** over the next three trading days.

The loss of Loyalty's top Sponsors, including Sobeys, caused the Company to enter a death spiral from which it could not recover.  In March 2023—just sixteen months after the Spinoff—the Company filed for bankruptcy and began liquidating its assets, rendering its stock worthless.

In a rarity for a securities fraud action, documents submitted in Loyalty's bankruptcy proceeding—including a sworn declaration by the Company's own former CEO, Defendant Horn ("Horn Declaration"), and an adversary complaint brought by Loyalty's Liquidating Trustee ("Adversary Complaint")—confirm that Defendants unequivocally knew their statements were materially false when made.  For example, the Horn Declaration admitted that, contrary to

Defendants' positive statements about Loyalty's business in connection with the Spinoff, the AIR MILES business had in reality "been suffering the effects of an ongoing shift in the loyalty programs market" that had resulted in ***"multiple major client departures from the AIR MILES Reward Program in 2020 and 2021"***—including "**three top ten [S]ponsors**," with another top ten Sponsor having given notice in 2021 "that it was also leaving the AIR MILES Reward Program."

Similarly, internal ADS documents cited in the Adversary Complaint showed that, by no later than January 2021, Sobeys had directly informed ADS' senior management, including Defendants Andretta, Horn, and Chesnut, that it would terminate its AIR MILES contract before the end of 2022. The Adversary Complaint further detailed how Defendants deliberately concealed this highly material information not only from investors, but also from third party lenders, ratings agencies, and advisors, in order to secure the $750 million payout to ADS before Sobeys' departure. Furthermore, when Defendants Horn and Chesnut raised concerns about the effect of this $750 million payout on Loyalty's business post-Spinoff, the ADS Defendants went so far as to threaten Defendants Horn and Chesnut with termination, telling them "***to get with the program, or they would no longer be employed by ADS or [Loyalty]."*** Thus, as the Trustee made clear, ***"[i]t was known internally at ADS, but undisclosed to the public, that the success of the AIR MILES program was at risk because of Sobeys' impending and intended termination."***

In the face of these damning allegations, Defendants' chief argument in support of their motions to dismiss is that their statements were "historically accurate," *i.e.*, that they were once previously true. This is nonsense. *First*, on their face, Defendants' statements were present tense statements about Loyalty's "***existing***" customer relationships. For example, Defendants strongly assured investors that they "***have maintained*** deep, long-standing relationships" with Loyalty's "***existing***" biggest sponsors, and repeatedly touted Sobeys in particular as being emblematic of

AIR MILES' purported "*[s]table client base*" that "*generate[d] recurring campaign demand*." *Second*, it is axiomatic under the securities laws that "an actor [is required] to provide complete and non-misleading information with respect to subjects on which he undertakes to speak." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001). Defendants here repeatedly touted AIR MILES' success with its critical top ten Sponsors when in reality *no less than half of those Sponsors had either already left or given notice they would soon do so*. These statements, which gave investors the exact opposite impression of what the true state of Loyalty's business actually was, were materially false and misleading.

Defendants' contentions that these statements were mere puffery also fail. Defendants made clear that the success of AIR MILES was dependent on Loyalty's relationships with these critical top ten Sponsors—to the extent that the loss of even *one* of them could "significantly" impact revenues. This defies any notion that these statements could be deemed mere puffery. Nor can Defendants' warnings about the potential loss of a top ten Sponsor absolve them of liability under the securities laws. Indeed, the Complaint explicitly alleges those warnings were materially false and misleading, as the risk they warned of had *already materialized*—five times over.

Defendants' argument that they had no obligation to disclose that Sobeys had given notice of its termination because there was an outside chance that Sobeys might change its mind fares no better. This assertion is directly contradicted by Horn's sworn Declaration and documentary evidence cited in the Adversary Complaint, which make crystal clear that Sobeys' termination notice was so significant and definitive that it "loomed throughout 2021 in the lead up to the Spinoff" and was formally communicated by Defendants Andretta, Horn and Chesnut to ADS's Board by no later than January 2021. Moreover, the Liquidating Trustee—who had access to thousands of internal ADS documents—also made clear in the Adversary Complaint that Sobeys

never once "retracted [its] statement that it intended to terminate [its AIR MILES contract] in 2022," evidenced by the fact that all subsequent internal communications only confirmed Sobeys' decision to leave. Finally, as set forth above, once Defendants chose to highlight Sobeys as a quintessential example of AIR MILES' "deep, longstanding relationships" with its top ten Sponsors, they were obligated to tell the whole truth about that relationship—including the obviously highly material fact that Sobeys had informed Defendants that it was terminating its agreement with the Company.

Defendants' scienter arguments also fail. Recognizing that they cannot dispute that they unequivocally knew months prior to the Spinoff that no less than half of Loyalty's crucial top ten Sponsors had either already left the AIR MILES program or had given notice they would do so— facts that alone establish a strong inference of scienter—Defendants rely on dubious assertions that their respective investments in the future of Loyalty's business negate their scienter. But the ADS Defendants' claim that ADS's retention of a 19% interest in Loyalty negates their scienter completely ignores that ADS orchestrated the Spinoff for the purpose of obtaining a *$750 million* payout, *fifteen times* the size of that equity interest. Similarly, Defendants Horn and Chesnut's claims that their *de minimis* investments in Loyalty stock negates their scienter fares no better, as it completely ignores the Adversary Complaint's evidence establishing that they knew that the departure of the Company's most important Sponsors would decimate Loyalty's business, and that they failed to disclose that information only because ADS directly and repeatedly threatened their jobs and compensation if they did not keep their mouths shut.

Defendants' loss causation arguments also fail. Defendants assert that the market already knew about three of Loyalty's top ten Sponsors leaving AIR MILES before the Spinoff. However, Defendants neglect to mention that those outside-the-pleadings reports, even if they could be

considered on a motion to dismiss, only mentioned the fact of those Sponsors' departures—*not* that they were among Loyalty's critical ***top ten*** Sponsors. Moreover, even when Defendants were forced to reveal a significant revenue impact from the departures of these Sponsors, they told investors the exact opposite: that the lost Sponsors were of no consequence because they ***were not*** among Loyalty's "biggest partners." Defendants' argument that the announcement of Sobeys' exit did not correct any prior misstatements also fails, as it is directly at odds with their repeated promotion of Sobeys as emblematic of Loyalty's key Sponsor relationships, when in reality Sobeys had already noticed its termination ten months prior.

Defendants' motions should be denied in their entirety.

## II.    FACTUAL BACKGROUND

### A.    ADS Announces The Spinoff And Touts Loyalty's "Deep, Long-Term Relationships" With AIR MILES' Top Ten Sponsors, Including Sobeys

ADS consisted of three operating segments—Card Services, its largest segment by far, Epsilon, a provider of digital marketing services, and LoyaltyOne, the predecessor to Loyalty Ventures. ¶29. Leading up to the Spinoff, ADS was struggling, as it had amassed over $5 billion in debt to fund its Card Services business and compete with larger and more well-funded banks. ¶¶1, 30-31. To address this crushing debt load, ADS formed a plan to discard its two smaller businesses. ¶31. Accordingly, in July 2019, ADS sold the Epsilon business, with analysts expecting ADS to sell LoyaltyOne soon after. *Id.* However, unbeknownst to investors, ADS was unable to sell off LoyaltyOne despite repeated attempts in 2019 and 2020 due to its worsening business prospects. ¶73. ADS thus hatched a scheme: it would spin-off its failing LoyaltyOne segment as a separate business called Loyalty Ventures, and in connection with the Spinoff, the new publicly traded company would fund ***a $750 million cash payment back to ADS***. ¶¶31-33.

The centerpiece of Loyalty's business was AIR MILES, a Canadian customer loyalty

program. ¶¶36-38. In 2020 and 2019—the two years before the Spinoff—**AIR MILES comprised 67% and 77% of LoyaltyOne's adjusted EBITDA**, respectively. ¶38. Thus, to support the Spinoff's massive $750 million payout to ADS, Defendants needed to convince the market that AIR MILES was a strong business that would cause Loyalty to thrive as a stand-alone entity. ¶35. Accordingly, leading up to the Spinoff, Defendants repeatedly touted the success of the AIR MILES business, describing it as "the #1 loyalty program in Canada" with approximately "two-thirds of Canadian households participating." ¶39.

Significantly, Defendants made clear that the key to AIR MILES' success was its participating Sponsors, whose products and services allowed customers to earn Air Miles on everyday purchases such as groceries, pharmacy, and gas. ¶40. Indeed, the Registration Statement for the Spinoff—the final version of which was filed by Loyalty with the SEC on October 14, 2021, and included cover letters from Defendants Andretta and Horn endorsing its contents—repeatedly touted that Loyalty maintained *"deep, long-term relationships"* with its Sponsors, and proclaimed that the program's purported "**success with sponsors**" was what *"[drove] the appeal of AIR MILES Reward Program."* *Id.* The Registration Statement also specifically and repeatedly highlighted that Loyalty's relationships with its "**10 largest sponsors**" were especially critical to the success of AIR MILES. ¶41. Indeed, these top ten Sponsors issued over 90% of Air Miles in both 2019 and 2020, and the Registration Statement made clear that *"our 10 largest [S]ponsors represented approximately 55% of our revenue" in 2020. Id.*

The Registration Statement further strongly reassured investors that AIR MILES' "existing" relationships with these top ten Sponsors were longstanding and secure. For example, the Registration Statement stated that "*some of [these Sponsors] have been part of the program for almost 30 years,*" purportedly demonstrating that the Sponsors "*recognize[d the significant*

8

*benefit to staying in the AIR MILES Reward Program.*" *Id.* To underscore the point, the Registration Statement emphasized that while AIR MILES' contracts with its Sponsors "generally vary in length from three to five years," "*our top 6 [S]ponsors have an average tenures [with AIR MILES] of 25 years.*" *Id.*

Despite the critical importance of AIR MILES' top ten Sponsors, Defendants at no time provided any complete list of these Sponsors, or the percentage of combined revenue each of them represented.  ¶43.  Nonetheless, the Registration Statement repeatedly highlighted AIR MILES' relationship with Sobeys in particular, Canada's ubiquitous grocery chain, as a prime example of AIR MILES' "existing" "deep, longstanding relationships" with "well-known worldwide brands" who "recognize[d] the significant benefit to staying in the Air Miles Reward Program." *Id.*  As the Registration Statement stated (*see id.*):

> *Deep long-term relationships with clients and sponsors.*
>
> *We have maintained deep, long-standing relationships with the large consumer-based businesses,* including well-known worldwide brands, such as Shell Canada, *Sobey s Inc.,* Bank of Montreal, Rewe and Albert Heijn.
>
> For the AIR MILES Reward Program, we utilize our large collector base together with our data and analytical capabilities to deepen *our existing relationship with our sponsors, some of which have been part of the program for almost 30 years*, and continue to drive powerful benefits to collectors in the program.  By continuing to engage our collectors with personalized marketing experiences and scaled rewards, *our sponsors recognize the significant benefit to staying in the AIR MILES Rewards Program* and increasing their customer spend (issuance) opportunity.  We believe that *our success with sponsors and our ability to offer a variety of redemption options, both aspirational and instant, drive the appeal of the AIR MILES Reward Program* to collectors.

Loyalty's top ten Sponsors were so critical to the Company's success that the Registration Statement explicitly stated that the loss of even *one* of them "could have a material adverse effect on our combined revenue."  ¶44.  The Registration Statement further separately warned that "[i]f we are unable to maintain or renew our relationships with our most significant [S]ponsors," the

overall "value proposition" of the AIR MILES program to the remaining Sponsors could significantly decrease and cause them to leave the program—resulting in "a material adverse effect on our business, results of operations, financial condition and liquidity." ¶45.

### B. The Spinoff Occurs With An Inflated Share Price Of Nearly $50 Per Share, ADS Receives $750 Million from Loyalty Ventures, And Defendants Continue To Tout The Company's Top Sponsor Relationships

The Spinoff was effectuated on November 5, 2021, and Loyalty Ventures began publicly trading on November 8, 2021. ¶46. As announced in ADS's public filings, Loyalty raised over $650 million in new debt to fund the $750 million in cash Loyalty paid to ADS in connection with the Spinoff. *Id.* Significantly, analysts fully credited Defendants' prior positive statements about Loyalty's strong relationships with its top Sponsors. For example, Morgan Stanley highlighted that Loyalty Ventures' "***deep relationships with consumers, clients, and sponsors***, helps form its ***competitive advantage***"; Sidoti & Company praised AIR MILES' "***attractive sponsor and customer bases with high client retention***" in issuing Loyalty a "BUY" rating and an enterprise value of ***$1.83 billion***; and Morningstar called AIR MILES a "***good asset and a reliable source of income.***" ¶47. Thus, Defendants' pre-Spinoff statements had their intended effect—on its first day of trading as a public company, shares of Loyalty's stock closed at $49.05 per share. ¶48.

Even after the Spinoff, Defendants Chesnut and Horn perpetuated false statements touting AIR MILES' strong relationships with its top Sponsors. For example, on December 15, 2021, Loyalty issued an investor presentation that included a slide promoting Sobeys as an AIR MILES top Sponsor representing a "***Key Part of Everyday Commerce***" in both the crucial grocery and pharmacy sectors, and touting AIR MILES' purported "***[s]table client base***" represented by top Sponsors like Sobeys that could be relied upon to "***generate[] recurring campaign demand***." ¶49. The presentation also contained a slide touting AIR MILES' "***Exclusive Relationships***" with these key Sponsors as a crucial "***Point of Differentiation***" for the Company." *Id.*

**C.** **Unbeknownst To Investors, AIR MILES Was Rapidly Declining Due To A Top Sponsor Exodus That Began Prior To The Spinoff—Including Sobeys— As Confirmed By Internal Company Documents And Sworn Pleadings**

In a rarity for a securities class action pleading, documents submitted in Loyalty Ventures' bankruptcy proceedings—including the *sworn* Horn Declaration and the Adversary Complaint that relied on thousands of internal ADS documents—confirm that Defendants unequivocally knew that their Class Period statements to investors were materially false and misleading when made.

*First*, Defendant Horn admitted in his Declaration that, despite Defendants repeatedly touting their "deep, longstanding relationships" with Loyalty's top ten Sponsors, in reality, AIR MILES "***was and had been suffering the effects of an ongoing shift in the loyalty programs market prior to the Spinoff Transaction***"—resulting in "***multiple major client departures from the AIR MILES Reward Program in 2020 and 2021***." ¶70. Specifically, Horn admitted that "***[t]he AIR MILES Business lost three top ten [S]ponsors in 2020 and 2021***"—Rexall, Liquor Control Board of Ontario ("LCBO"), and Rona Inc./Lowe's Canada ("RONA")—"***which amounted to approximately 10% of the Sponsor revenue at the time***." Additionally, "in 2021," a fourth top ten Sponsor, Staples Canada, "***gave notice that it was also leaving [AIR MILES]***." ¶71. Horn further admitted that Defendants fully "expected" that the loss of *any* "top ten" Sponsor—let alone four—would cause a "broader 'network effect' on the value of the entire AIR MILES Reward Program to the remaining Sponsors," resulting in additional major Sponsor departures or renegotiations of their AIR MILES contracts on highly unfavorable terms. ¶72. The Adversary Complaint confirmed these facts, and further detailed that the loss of so many major Sponsors in 2020 and 2021 had caused the "network effect" risk to be "particularly acute" with respect to the Company's top three Sponsors—Bank of Montreal, Shell Canada, and Sobeys— because they all had contracts that were due to expire in 2022 and 2023. ¶¶73-74.

*Second*, the Horn Declaration and Adversary Complaint detailed how Sobeys—Loyalty's

11

second most important Sponsor, which in their own words was absolutely "critical" to its business—had directly informed Defendants **by no later than January 2021** that it would not renew its contract with AIR MILES, and that Defendants were fully aware of, and in fact "expected," a severe impact on AIR MILES' business due to this development. ¶¶77-78.

As both the Horn Declaration and Adversary Complaint explained, "[m]uch like an anchor tenant in a mall, **Sobeys was critical to the AIR MILES program**." ¶77. The Horn Declaration described how, **as early as late 2020, "Sobeys informed ADS that it was considering exercising its early termination rights"** and leaving AIR MILES—and that, as a result, Sobeys' imminent departure "**loomed throughout 2021 in the lead up to the Spinoff Transaction**." ¶78. Thus, Horn made clear that when Sobeys "informed the Company in June 2022 that it would discontinue its participation in AIR MILES," it was not a surprise to Defendants. To the contrary, Sobeys' departure was entirely "consistent with its [prior] statements" dating back to 2020. *Id.* Horn further explained that because of how "critical" Sobeys was to AIR MILES, its departure had **"the previously expected consequence"** of causing Loyalty's remaining top two Sponsors "to demand and obtain substantial price concessions upon renewal of their contracts," which **"substantially compressed the AIR MILES Business's earnings margin" and directly led to the Company's bankruptcy**. ¶¶78-79.

The Adversary Complaint provided further details, based on internal ADS documents, confirming that Defendants unequivocally knew **ten months before the Spinoff** that Sobeys intended to terminate its participation in AIR MILES. In line with the Horn Declaration, the Adversary Complaint explained that Sobeys informed ADS in late 2020 that it would discontinue its participation in AIR MILES and would exercise its early termination rights in 2022. ¶80. **Sobeys then "confirmed its intent to terminate in early 2021"**—a development that was so

12

significant it caused ADS management, including Defendants Andretta, Horn, and Chesnut, to formally inform the ADS Board of the issue via an internal Board presentation entitled "Project Legacy Update." *Id.* That presentation explicitly stated: ***"Sobey[s] relayed its intention to terminate [its participation in AIR MILES] by the end of 2022."*** ADS management understood full well that Sobeys would not change its mind, and that Sobeys' departure from AIR MILES would decimate the program, imperiling the viability of the Spinoff (and the $750 million payout that ADS would receive from Loyalty). As a result, the presentation urged that the Spinoff needed to be completed during Q4 2021—*i.e.*, before Sobeys' departure. *Id.*

The Adversary Complaint also made clear that Sobeys never retracted its decision to terminate its AIR MILES contract. To the contrary, internal ADS documents showed that Defendants took specific and concrete steps based on their understanding that Sobeys was leaving AIR MILES. For example, on February 18, 2021, Todd Gulbransen, LoyaltyOne's Senior Vice President, emailed Sandra Sanderson, Sobeys' Chief Marketing Officer, regarding the need to amend Sobeys' AIR MILES contract due to Sobeys' decision to terminate its AIR MILES contract by the end of 2022. ¶81. In that email, Gulbransen confirmed that while Sobeys' contract was not scheduled to expire until 2024, ***there was "a term that allows Sobeys to provide notice and exist sooner so long as that right is exercised in Q1 '21"—and "[u]nfortunately, Sobeys has made a decision to exercise this right."*** *Id.* The email then described how the parties had held discussions to amend Sobeys' contract in light of Sobeys' planned early termination. Significantly, the goal of this amendment was not to change Sobeys' decision, but rather to push back the "exit window" prescribed under the original contract, which was ***from July 15, 2021 to September 15, 2021— i.e., before the Spinoff.*** ¶82.

Accordingly, on March 12, 2021, Sobeys and ADS entered into an amendment that

provided that the contract would now expire in February 2023—a full year before the original expiration date—and that Sobeys' "exit window" would be delayed until July 2022, *i.e.*, **after the Spinoff**. ¶83. Thus, as the Adversary Complaint made clear, this amendment did not at all indicate that Sobeys was open to changing its mind about its 2022 departure. To the contrary, the goal of the amendment was to **"postpone Sobeys' inevitable and preordained exit from the AIR MILES program**" until after the Spinoff. *Id.* Tellingly, to get Sobeys to agree to this postponement, ADS was forced to provide Sobeys with enormously significant concessions—including a staggering **50% price discount** in its annual fee for 2021. *Id.* Remarkably, despite the critical importance of Sobeys to Loyalty as AIR MILES' second largest Sponsor, **the Registration Statement did not disclose any of these highly material facts to investors.** *Id.*

Subsequent internal ADS documents circulated between September 2021 and October 12, 2021—up until just before ADS signed off on the Spinoff on October 13, 2021—made clear that **the "reality" of Sobeys' inevitable departure "was in plain sight to the Defendants and their employees and Directors.**" ¶85. For example, in September 2021, a LoyaltyOne employee circulated an email at the direction of Gulbransen attaching a "Sobeys Exit Impact" analysis that "outline[d] the impact of a Sobeys exit." *Id.* LoyaltyOne employees continued to refine these internal analyses reflecting the expected impact of a Sobeys' exit up until ADS signed off on the Spinoff in mid-October 2021—and these analyses **"reflect[ed] that Sobeys' departure would have a devastating impact on the AIR MILES business."** *Id.* Significantly, the Adversary Complaint confirmed that, even by the time of ADS's final approval of the Spinoff in mid-October 2021, **"[Michael] Medline, [Sobeys' CEO], had not retracted Sobeys' statement that it intended to terminate [its AIR MILES contract] in 2022."** ¶86.

**D. Defendants Not Only Deceived Investors About Sobeys' Planned Departure, But Also Third Party Lenders, Rating Agencies, And Advisors, In An Effort To Secure ADS' Massive $750 Million Payout**

As the Adversary Complaint described, Defendants not only deceived the investing public regarding Sobeys' planned departure and the devastating effects it would have on Loyalty's business, but also third-party credit lending agencies, advisors, and lenders, in order to secure the necessary funding for the Spinoff so that ADS could obtain its $750 million payout. ¶87. As the Adversary Complaint explained, "[d]espite multiple internal acknowledgements by ADS that (i) they understood Sobeys to be terminating its contract, and (ii) internal acknowledgements of how important Sobeys['] role as an anchor sponsor was to the viability of the [AIR MILES] program," Sobeys' termination "wasn't incorporated into the financial projections that were considered by Moody's, S&P, E&Y, and Bank of America" because ***"it was concealed from the market."*** ¶88.

Indeed, the Adversary Complaint explained that ADS's most senior executives, including Defendant Andretta, "knew that prospective lenders who were asked to fund the Spinoff Transaction were spooked by the prospect that the contracts for BMO and Sobeys were up for renewal in 2023." ¶90. As a result, internal presentations for the ADS Board repeatedly and explicitly stated that a key part of the "thesis" for the Spinoff was its ***"[f]avorable [t]iming"***—*i.e.*, that it "could be accomplished in advance of the BMO and Sobeys renewal dates." *Id.*

Significantly, to conceal Sobeys' planned departure from lenders and rating agencies, the "Spin Team" ADS assembled—spearheaded by Defendants Horn and Chesnut—knowingly provided false financial forecasts projecting that, for 2021 through 2025, Sobeys would purportedly represent 28% to 30% of all Air Miles issued by the AIR MILES program. ¶91. Additionally, Defendant Chesnut, acting on behalf of ADS, "coached two then ADS 'Spin Team' members on talking points for meetings with Moody's and S&P, ***to act as if ADS did not know that 'Sobey[s] relayed its intention to terminate by the end of 2022***.'" *Id.*

15

The Adversary Complaint further detailed how whenever Defendants Horn and Chesnut internally raised concerns about the false information that was being provided to lenders and the crippling amount of debt Loyalty would be saddled with as a result, ADS's senior management threatened them with termination, telling them in no uncertain terms *"to get with the program, or they would no longer be employed by ADS or [Loyalty Ventures]."* ¶92. For example, during an August 2, 2021 Board meeting, when ADS sought to increase the dividend Loyalty would be required to pay to ADS to $750 million, Defendant Horn raised concerns about the severe impact this would have on Loyalty post-spin. *Id.* As a result, the meeting "became confrontational between Horn and Andretta," resulting in Horn being "effectively sidelined" from that point on. *Id.* When Horn again raised concerns to Andretta, the response he received from ADS was that *"the purpose of the spin is to maximize the value for RemainCo."* *Id.* A similar incident occurred in late August 2021, when ADS's CFO Perry Beberman called Defendant Chesnut to pressure him to complete the Spinoff on the terms ADS demanded. ¶93. During that call, Beberman directly threatened Chesnut: *"you need to get your guy [i.e., Horn] on board or else you won't like where this goes."* Beberman further told Chesnut that *it would be "beneficial" for his compensation if he "aligned and supported that outcome*, given that Roger [Ballou]"—an ADS Board Audit Committee member—"would be the chairman of [S]pinco and would have influence there." *Id.*

As a result of Defendants' deception, in September 2021, ADS successfully secured the $650 million in debt Loyalty would incur upon the Spinoff. However, and significantly, despite lenders repeatedly raising concern about Sobeys "renewal risk," Defendants at no point disclosed to them that the risk had already materialized. ¶94. Additionally, even when Horn again raised concerns to Ballou just prior to the Spinoff being approved and "pleaded to Ballou that the Spinoff Transaction simply required too much debt [for Loyalty Ventures] to service," Ballou responded

16

by telling Horn to *"think of it like a kidney stone; it's painful, but all you can do is wait for it to pass." Id.* Indeed, during the October 13, 2021 Board meeting in which ADS signed off on the Spinoff—one day before the Registration Statement was filed—the ADS Board *"openly contemplate[ed] a near-term bankruptcy of [Loyalty Ventures]"* due to the known devastating impact of Sobeys' impending departure. ¶96.

### E.   The Truth Is Slowly Revealed: Loyalty Ventures Discloses In Consecutive Quarters That The Loss Of Major Sponsors Negatively Impacted AIR MILES, And Finally On June 8, 2022 Is Forced To Disclose That Sobeys Terminated Its Contract

No sooner had ADS pocketed $750 million from the Spinoff than the market began to learn the truth about the loss of AIR MILES' most important Sponsors. On February 3, 2022, the Company reported its financial results for Q4 2021, its first full quarter as a separate company. In that announcement, which came just three months after the Spinoff, Loyalty revealed that AIR MILES issuance in Q4 '21 was down 7% due to the "*the non-renewal of two sponsors and their exit from the program in the first quarter of 2021*"—namely RONA and LCBO—the departures of which Defendants revealed for the first time had significantly impacted AIR MILES' business. ¶¶53-54. The news caused Loyalty's stock price to drop 11%. ¶55.

However, Defendants falsely minimized the loss of these Sponsors on the AIR MILES business. Defendant Horn, for example, touted the Company's *"roster of marquee clients"* and praised Loyalty's executives for effectively *"managing relationships with our sponsors,"* which would *"produce relatively stable results"* in 2022 for AIR MILES. ¶56. Defendant Chesnut further stated on the earnings call held that day that, despite the loss of these two Sponsors, Loyalty expected the number of miles issued in 2022 to grow *"between 4% and 5% . . . trending back up towards $5 billion of issuance." Id.*

Defendants continued to dramatically—and falsely—downplay the loss of RONA and LCBO during a March 23, 2022 investor conference. ¶58. Not only did Defendants fail to disclose that these two Sponsors were in fact two of the Company's crucial top ten Sponsors, they told investors the exact opposite. In response to a direct question about "the overall turnover with AIR MILES" and the "potential impact on near-term profitability," Chesnut falsely stated that both Sponsors had left for benign reasons that had nothing to do with any larger systemic problem with AIR MILES—and that their departures were of little significance due to them ***not*** being among AIR MILES' "biggest partners" who were responsible for "north of 2/3 of all MILES issued." *Id.*

However, the significance of the loss of RONA and LCBO was further revealed approximately one month later, on April 28, 2022, when Loyalty reported its financial results for the first quarter of 2022. ¶59. Loyalty reported that AIR MILES revenue had decreased 6%, with adjusted EBITDA down 19% as compared to the prior year—and that the number of AIR MILES issued had ***dropped by another 4%,*** which the Company again attributed to ***"the non-renewal of two Sponsors in the first quarter of 2021,"*** *i.e.*, RONA and LCBO. *Id.* On this news, Loyalty's stock fell 24% over the following two days, as investors realized the lost Sponsors were more critical than the Company had previously disclosed. ¶60.

Then on June 8, 2022—just seven months after the Spinoff—Loyalty shocked investors by disclosing that Sobeys had provided "notice of its intent to exit" the AIR MILES program, and that it would "exit the program on a region-by-region basis" between August 2022 and the first quarter of 2023. ¶62. The press release further disclosed how significant Sobeys was to the AIR MILES business, revealing that Sobeys "represented approximately 10% of Loyalty Ventures' adjusted EBITDA in 2021," and that Sobeys' departure would negatively affect the Company's revenue for years to come. ¶63. Given this massive loss, Loyalty was forced to rescind its

previously provided revenue and adjusted EBIDTA guidance for the remainder of 2022. *Id.*

The market reacted strongly to this news. On June 8, 2022, Loyalty's stock price plummeted ***45%***, from a close of $11.03 on June 7, 2022 to $6.02—and continued to fall over the next three trading days as the fallout from Sobeys' departure continued, dropping more than 20% from $6.02 per share on June 8, 2022 to close at $4.80 per share on June 13, 2022. Thus, in total, ***Loyalty's stock fell over 56%*** in response to the news of Sobeys' departure. ¶64.

The loss of Sobeys threw Loyalty Ventures' into a "previously expected" tailspin. ¶78. Within weeks, Staples made public its prior decision to exit AIR MILES, and soon thereafter, AIR MILES' remaining three largest Sponsors renegotiated their contracts with the Company on significantly less favorable terms. ¶66. On March 10, 2023, just sixteen months post-Spinoff, Loyalty Ventures filed for bankruptcy, rendering the Company's stock worthless. ¶67.

## III.    LEGAL STANDARDS

When deciding a motion to dismiss, courts are to "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 382-83 (6th Cir. 2016). A motion to dismiss is "based on the pleadings only" as plaintiffs "need not introduce any 'evidence' at the pleading stage." *Wiseman v. Spectrum Healthcare Res.*, 2021 WL 4399718, at *3 (W.D. Tenn. Sept. 27, 2021).

"[W]here, as here, Plaintiffs allege fraud under Section 10(b) of the Exchange Act, they must 'state with particularity the circumstances constituting fraud or mistake' under Rule 9b of the Federal Rules of Civil Procedure." *Byrd v. ViSalus, Inc.*, 2018 WL 1637948, at *3 (E.D. Mich. Apr. 5, 2018). As the Sixth Circuit has explained, however, Rule 9(b) "should ***not*** be read to defeat the general policy of 'simplicity and flexibility' in pleadings contemplated by the Federal Rules."

*Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 664 (M.D. Tenn. 2022). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.*

"While Congress unquestionably strengthened the pleading standard for securities fraud [by enacting the PSLRA], the [PSLRA] would hardly serve its purpose 'to protect investors and to maintain confidence in the securities markets,' were it to become a choke-point for meritorious claims." *Helwig*, 251 F.3d at 553. The PSLRA thus "does not convert" a motion to dismiss "into some sort of preliminary summary judgment motion in which the parties compare their respective collections of supporting facts and inferences." *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 878 (E.D. Tenn. 2005). Accordingly, courts must avoid "crediting the defendant's, rather than the plaintiff's version of facts." *Mediacom Se LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 399 (6th Cir. 2012); *see also Srygley v. Crystal Emp. Servs.*, 2016 WL 2591880, at *1 (E.D. Mich. May 5, 2016) ("[T]he court . . . does not concern itself with defendant's competing version of the facts").

## IV.     ARGUMENT

### A.     Defendants Made Actionably False And Misleading Statements

#### 1.     Statements About Customer Relationships Were False And Misleading

Defendants told investors that AIR MILES' "ten largest [Sponsors]" were critical to Loyalty Ventures' business, as they provided more than half the Company's revenues, and explicitly warned that the "***loss of any of these clients***" would be catastrophic. ¶¶41, 44, 105, 122, 124. Then, to reassure investors about the strength of its relationships with those exact Sponsors, Defendants continually asserted that "***we have maintained deep, long-standing relationships***"

20

with these *"existing"* Sponsors, that "*success with sponsors*" was a "*competitive strength*" for AIR MILES, that Loyalty had a "*stable client base*" that *"generate[d] recurring campaign demand,"* and that its six top Sponsors had a "tenure" with the Company that was longer than 25 years."  ¶¶101-102, 108, 122, 124.  The reality was starkly different.  At the time of these statements, *half* of the top ten Sponsors had already left AIR MILES or provided notice that they would do so soon after the Spinoff.  ¶¶50-51, 70-71, 75.  As confirmed by the Horn Declaration and Adversary Complaint, Loyalty "*lost three top ten Sponsors in 2020 and 2021*," responsible for well over 10% of Sponsor revenues, and received notice that two additional Sponsors were leaving post-Spinoff—yet these facts were concealed from investors.  ¶¶70-71; *see Helwig*, 251 F.3d at 560 (Defendants cannot "selective[ly] disclos[e] information known exclusively to defendants and essential to complete a picture they had only partially revealed").

Defendants' main argument as to why these statements were not false rests on their assertion that these representations only pertained to the past and were "historically accurate," *i.e.*, at one point they used to be true.  ADS M., ECF No. 37 at PageID 709, 714; LYLT M., ECF No. 35 at PageID 426-28.  This argument fails.  *First*, on their face, Defendants' representations were present tense statements regarding Loyalty's *"existing"* relationships with its top ten Sponsors.  For example, Defendants touted that "*we have maintained* deep, long-standing relationships" with Loyalty's *"existing"* top Sponsors.   Contrary to what Defendants contend, there is nothing past tense about the phrase *"we have maintained,"* which is a *present tense statement* about Loyalty's *current* Sponsor relationships.[2]  Moreover, Defendants further asserted that Loyalty had a "*stable client base*"—represented by top Sponsors like Sobeys—that could be relied upon to *"generate[]*

---

[2] "We have maintained" is the *present perfect tense* conjugation of the verb "maintain," which means "to *continue* to have." *See* Collins Dictionary, https://www.collinsdictionary.com/conjugation/english/maintain.

*recurring campaign demand."* ¶¶43, 108.

*Second*, it is axiomatic under the securities laws that once Defendants chose to highlight their relationships with their largest Sponsors, they were required to disclose material ***adverse*** information about those relationships as well. "[A] company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths." *Helwig*, 251 F.3d at 561; *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004) ("Once Defendants chose to speak on the issue of the state of the Davis-Besse facility, they could not obfuscate the true situation at Davis-Besse by selectively disclosing information about the plant"); *Weiner v. Tivity Health, Inc.*, 365 F.Supp.3d 900, 913 (M.D. Tenn. 2019) ("Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading").

In *Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, this Court explained that disclosure of even "accurate historic data" is misleading where a "company chooses to volunteer information" but fails to provide "complete and non-misleading information." 2021 WL 4397946, at *13 (S.D. Ohio Sept. 27, 2021) (Sargus, J.); *see also Wang v. Cloopen Group Holding Ltd.*, 661 F. Supp. 3d 208, 228 (S.D.N.Y. 2023) (finding actionable literally true "statements [that] would have left investors with an impression of strong and stable results in [company]'s customer retention, a critical component of [the company]'s business model, when in fact [the company]'s dollar-based net customer retention rate had plummeted"). Accordingly, even if it was technically true that the top ten Sponsors provided over 50% of Loyalty's 2020 revenues, it was materially false and misleading not to also disclose that half of those Sponsors had quit the AIR MILES program. Similarly, it was clearly false for Defendants to stress that AIR MILES' "relationships with our largest and most well-known sponsors" were still in place, tout Loyalty's "deep, long-

term relationships" with those Sponsors, and highlight that Loyalty boasted a "stable client base" without disclosing that half of those top ten Sponsors had either already left or given notice that they would do so.[3] ¶¶101, 108.

Defendants also misconstrue the Complaint in arguing that Defendants' statements were not misleading because they offered "no assurance of renewal" or that Loyalty would see "success going forward" with its Sponsors. LYLT M., ECF No. 35 at PageID 428, 430; ADS M., ECF No. 37 at PageID 710. "Put simply, Plaintiffs allege that Defendants misstated the company's current state, not its future state." *Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *32 (S.D. Ohio Jan. 21, 2016). Indeed, Defendants' statements were false for concealing that five of Loyalty's top Sponsors had ***already*** left or provided notice they were leaving. Moreover, in the same breath Defendants highlighted Loyalty's top ten Sponsors, they touted the "deep, long-standing relationships" with those Sponsors, and emphasized that the majority of those top ten Sponsor's "tenures" with the Company lasted more than 25 years—in contrast to the "three to five" year contracts with other Sponsors. ¶102. These statements were clearly intended to convey that AIR MILES' top Sponsors were integral parts of the AIR MILES program ***at the time*** and would

---

[3] Defendants' statements were misleading half-truths, and therefore, the holding in *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 260 (2024) (LYLT M., ECF No. 35 at PageID 426) finding "pure omissions" inactionable is irrelevant. The decision in *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (ADS M., ECF No. 37 at PageID 709), involved only mere recitation of "financial and earnings' statements" and stated nothing that indicated the results would continue. Similarly, in *Kolominsky v. Root, Inc.*, 667 F. Supp. 3d 685, 701 (S.D. Ohio 2023) ("*Kolominsky I*") (ADS M. ECF No. 37 at PageID 709; LYLT M., ECF No. 35 at PageID 426), the statements related only to information "*in the past*" and "did not imply anything about future circumstances." (emphasis in original). By contrast, Defendants claimed Loyalty would "deepen [AIR MILES] existing relationships," that the top Sponsors currently "account for a significant portion" of the revenues, and that by "continuing" with its business plan "our sponsors recognize the significant benefit of staying in AIR MILES." ¶¶101-102. In *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 574 (6th Cir. 2008) (LYLT M., ECF No. 35 at PageID 426), there was no indication that defendants even "anticipated" a potential "termination or modification of its contract" and therefore nothing to disclose.

continue as such post-Spinoff.  In fact, Defendants did not even mention when any of the top ten

Sponsor contracts expired or were up for renewal; they instead only stressed that the top Sponsors

were "longstanding" and secure.  *Heritage Glob. Network Los Angeles, Inc. v. Welch*, 2024 WL

695772, at *10 (M.D. Tenn. Feb. 20, 2024) ("entity was not the proven success that the defendants

suggested but was, in fact, in the midst of collapse").[4]

Defendants also assert that these statements were mere "puffery" and immaterial to

investors, (ADS M., ECF No. 37 at PageID 707-09; LYLT M., ECF No. 35 at PageID 427), but

this argument is directly belied by Defendants' own stark warnings that the loss of even ***one*** of

Loyalty's top ten Sponsors could materially adversely affect the Company's business.   ¶44.

Considering how crucial Loyalty's top ten Sponsors were to its business, Defendants' statements

about those Sponsors cannot be deemed mere puffery.  Indeed, analysts adopted the exact claims

that Loyalty's "deep relationships" with its Sponsors provided a "competitive advantage over the

longer term," highlighted that AIR MILES purportedly had "high client retention," and described

AIR MILES as a "reliable source of income."  ¶47; *see N. Port Firefighters' Pension-Local Option

Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 782 (M.D. Tenn. 2013) (analyst reports on

topic support materiality).[5]

---

[4] The ADS Defendants' reliance on *River Birch Capital, LLC v. Jack Cooper Holdings Corp.*, 2019 WL 1099943, at *4 (S.D.N.Y. Mar. 8, 2019) (ADS M., ECF No. 37 at PageID 710) is misplaced, as the statements at issue there "predated the relevant customer problems by three years" and the defendants were not "liable for failing to predict a customer downturn several years in the future." *Id.* at *5.  If anything, the facts in *River Birch* highlight Defendants' culpability here, as the defendant in *River Birch* disclosed that one customer "expressed concern" with its contract and another client relationship was in "jeopardy" well before any contracts were terminated or notices provided.  *Id.* at *2.

[5] Statements portraying Loyalty's "long-standing" relationships with key Sponsors are far more material to investors than the vague predictions of "future growth" the Court in *I.B.E.W. v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 633 (S.D. Ohio 2011) (LYLT M., ECF No. 35 at PageID 427; ADS M., ECF No. 37 at PageID 707-08) found were "clearly of the type of subjective, optimistic

Moreover, courts have repeatedly held that statements about a company's success with its customer base and ability to retain clients are undeniably important to investors. *See Cloopen*, 661 F. Supp. 3d at 220, 229 (registration statement's claims that "customers tend to stay with [company]" that "[company] maintains a diverse and loyal customer base" and a "steady revenue stream from repeat customers," not puffery); *In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp. 3d 712, 725 (D. Minn. 2019) (statements that company could "maintain ... customer relationships," "enhance customer loyalty," and "retain customers and increase usage of [company's] services" were materially false). This is especially true where the lost customers are vital to its success. *In re Nash Finch Co.*, 502 F. Supp. 2d 861, 880 (D. Minn. 2007) ("Plaintiff has sufficiently pled the materiality of the lost customers"); *see also Cardinal Health*, 2021 WL 4397946, at *1 (statements about "a key part of Cardinal's business strategy" are material); *Wash. State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 73-74 (S.D.N.Y. 2020) (statement about "competitive advantages" not puffery). Taken together, Defendants' statements "could reasonably be read as conveying a legitimate expectation of stability" with Sponsors. *Cloopen*, 661 F. Supp. 3d at 227.

---

fluff deemed to be immaterial puffery." In *Pension Fund Group v. Tempur-Pedic Intern., Inc.*, 614 F. App'x 237, 245 (6th Cir. 2015) (ADS M., ECF No. 37 at PageID 708), the Sixth Circuit found a statement about the company's general "competitiveness" immaterial precisely because it was an "unspecific reference" that was "untethered" to anything "a reasonable person would deem important." By contrast, Defendants' tied their "competitive strength" directly to AIR MILES "success with Sponsors" and its "long-standing relationships." ¶101. Unlike the statements in *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018) (ADS M., ECF No. 37 at PageID 708) which only addressed "non-verifiable" information, Defendants' statements about its "10 largest [Sponsors]" were verifiably false as half those exact customers had left. In *In re Washington Prime Group, Inc. Sec. Litig*, 2024 WL 1307103, at *23 (S.D. Ohio Mar. 27, 2024) (LYLT M., ECF No. 35 at PageID 427), the defendants' hope that a loan "should provide … a bridge to the other side of the pandemic" said nothing of the business's current affairs.

In any event, materiality is "inherently fact-specific," and should be left to the trier of fact. *Cardinal Health*, 2021 WL 4397946, at *4 (statements are not puffery where they are "made to reassure investors about the [company's] success"); *Zaller v. Fred's, Inc.*, 560 F. Supp. 3d 1146, 1171 (W.D. Tenn. 2021) ("materiality typically should not be decided at the motion to dismiss stage"). Indeed, statements cannot be dismissed as puffery "*unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance*"—which is not the case here. *Helwig*, 251 F.3d at 563 (emphasis in original).

### 2. Statements About The Sobeys Relationship Were Misleading

Defendants repeatedly touted the relationship with Sobeys as one of Loyalty's strengths, highlighted Sobeys as emblematic of AIR MILES' "existing relationships" with Sponsors that had "been part of the program for almost 30 years," and included Sobeys' name and logo at every opportunity to create the impression that Sobeys comprised the "[st]able client base" that was a reliable part of AIR MILES. ¶¶101-102, 108, 117, 124. These statements were materially false and misleading. As the Horn Declaration and Adversary Complaint set forth in great detail, in reality, by January 2021—ten months before the Spinoff—Sobeys had informed Defendants that it was terminating its AIR MILES contract by the end of 2022. ¶¶80-82. Rather than disclose this, Defendants engaged in a concerted effort to conceal it from investors, in addition to third party lenders, rating agencies, and advisors. ¶¶83-85, 90, 95. As confirmed by the Adversary Complaint, "[i]t was known internally at ADS, but undisclosed to the public, that the success of the AIR MILES program was at risk because of Sobeys' impending and intended termination." ¶76.

Courts routinely recognize that touting a key customer relationship is misleading where defendants know the relationship is imperiled. *See e.g., Tivity Health*, 365 F. Supp. 3d at 906 (misleading where company "continued to represent that its relationship with UHC was the same"); *Wallace v. IntraLinks*, 2013 WL 1907685, at *7 (S.D.N.Y. May 8, 2013) ("statements

26

touting the customer satisfaction, renewal rate and strong market demand were misleading for the failure to disclose the impending loss of its largest customer"); *Tarapara v. K12 Inc.*, 2017 WL 3727112, at *15 (N.D. Cal. Aug. 30, 2017) ("the facts as pled support the reasonable inference that defendants knew as of June 2012 that there would be no management contract after June 2015. Nevertheless, K12 did not disclose this fact").

Contrary to Defendants' argument, this is not a case about Sobeys' "past contract renewals," contract "negotiations," or the promise that Sobeys would renew in the future. ADS M., ECF No. 37 at PageID 709, 711-13; LYLT M., ECF No. 35 at PageID 428, 430. Rather, as confirmed by Defendant Horn's own sworn Declaration and internal documentary evidence detailed in the Adversary Complaint, Sobeys stated months before the Class Period began that it was terminating its AIR MILES contract by the end 2022 and never retracted that decision. In fact, Sobeys' decision was so significant and so definitive that Defendants felt compelled to formally inform the Board in writing in January 2021 that "Sobey[s] relayed its intention to terminate [its AIR MILES contract] by the end of 2022"—prompting the ADS and Loyalty Defendants to engage in a concerted effort to conceal that highly material information from investors, rating agencies, and lenders to secure the $750 million payout to ADS before the truth would be revealed. ¶¶78-96.

Defendants provide no support for their counterfactual claim that Sobeys and Loyalty were "renegotiating"[6] a longer-term renewal leading up to the Class Period, and instead only point to the March 2021 amendment as purported proof of ongoing negotiations. ADS M., ECF No. 37 at

---

[6] The Loyalty Defendants added the word "renegotiating" to a purported quote from the Complaint that Sobeys "was considering exercising its early termination rights *and renegotiating* or discontinuing its participation in the AIR MILES." LYLT M., ECF No. 35 at PageID 422. That allegation is *not* in the Complaint and the Loyalty Defendants' underhanded tactics should be disregarded. ¶¶52, 80.

PageID 711-12; LYLT M., ECF No. 35 at PageID 422-23, 431. The opposite is true, as the amendment only corroborates that Sobeys' position was definite. *First*, in the internal emails discussing the amendment, ADS executives explicitly acknowledged that Sobeys had ***"made a decision to exercise" its early termination right***. ¶81. *Second*, Sobeys' January 2021 notice confirmed termination "by the end of 2022." ¶80. The March 2021 amendment allowed Sobeys to keep that exact timeline, and merely prevented Sobeys from utilizing an early "exit window" that would have caused Sobeys to leave AIR MILES prior to September 2021, *i.e.*, ***before the Spinoff***. ¶¶81, 83-84. Moreover, and tellingly, to secure this postponement, ADS was forced to make significant concessions—including a ***50% price discount*** in Sobeys' 2021 annual fee that was never disclosed to investors. Thus, as the Adversary Complaint explained, the amendment amounted to a last-ditch effort by ADS to "***postpone Sobeys' inevitable and preordained exit***." ¶83. Indeed, true to its word, Sobeys did in fact exit AIR MILES in 2022, and, as set forth in the Horn Declaration, this timeline was entirely "consistent with [Sobeys'] statements" from before the Spinoff. ¶78.

*Third*, based on the Liquidating Trustee's unfettered access to Loyalty's internal documents and thousands of records produced by ADS, the Adversary Complaint stated that at the time of the Spinoff, Sobeys' CEO ***"had not retracted Sobeys' statement that it intended to terminate [its contract with AIR MILES] in 2022."*** ¶¶86, 138. Had any true negotiations occurred, documents or proposals relaying Sobeys' position would undoubtedly exist and would have been provided to the Trustee. *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 980 (S.D.

Ohio 2008) (crediting allegations set forth by a bankruptcy trustee and noting they "were made by an individual who has had custody of [the company's] internal books and records").[7]

*Fourth*, the Adversary Complaint further detailed how the ADS and Loyalty Defendants engaged in a concerted effort to actively conceal Sobeys' impending departure from third party lenders, ratings agencies, and advisors—including by knowingly providing materially false and misleading five-year projections to those third parties that continued to include Sobeys as a top Sponsor, and "coaching" ADS employees to deceive ratings agencies about Sobeys' notice of termination.  ¶91.  Such deceptive acts obviously would not have been necessary if Defendants did not believe that Sobeys' termination notice was real.

Moreover, even were negotiations truly ongoing as Defendants claim (ADS M., ECF No. 37 at PageID 712-13; LYLT M., ECF No. 35 at PageID 421-422), "a corporation has a duty to disclose a major dispute or uncertainty that exists in an important business relationship where the company publicly touts that specific relationship and the uncertainty may significantly affect the corporation's financial success."  *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *13 (S.D.N.Y. Dec. 2, 2013); *Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *6 (E.D.N.Y. Mar. 30, 2012) ("It is plausible that a reasonable investor would view NBTY's *potential loss* of Wal–Mart's business—or retaining it at lower prices—significant to an investment decision"); *see also Helwig*, 251 F.3d at 562 (rejecting argument that defendants had no obligation to address

---

[7] In *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *2 (S.D.N.Y. Mar. 26, 2019) (ADS M., ECF No. 37 at PageID 712), there was merely an "increased risk" that a contract would be terminated, not a termination notice acknowledged by the parties.  ¶¶80-81.  So too in *Michigan Carpenters' Pension Fund v. Rayonier Advanced Materials, Inc.*, 2019 WL 1429667, at *22 (M.D. Fla. Mar. 29, 2019) (ADS M., ECF No. 37 at PageID 712), where the complaint did "not include any allegations that [the customer] threatened to terminate the contract, or even that 2013 and 2014 negotiations had gone poorly."  Reliance on *Freeburg v. Wolf*, 42 F. App'x 715, 716 (6th Cir. 2002) (ADS M., ECF No. 37 at PageID 712-13) is particularly inappropriate as it involved disclosure of substantive provisions of a contract the parties ultimately entered into.

"contingent events" because "a company should not be allowed to bolster its stock price by predicting rosy earnings while knowing… that legislation is nearing its finals stages that could capsize those projections").[8]  This particularly applies where, as here, the Company "publicly hyped the importance of its relationship with" the customer, and "touted its stable, long-term relationship."  *Hi-Crush*, 2013 WL 6233561 at *8, *14.  Accordingly, it was misleading for Defendants to specifically and repeatedly promote the all-important Sobeys relationship without disclosing the undeniably material information that Sobeys had provided notice of an early exit, and that Loyalty had granted Sobeys a 50% reduction in fees merely to entice it to stay just a few short extra months.[9]

While the Loyalty Defendants posit that requiring disclosure of the purported contract negotiations is bad policy that would "hurt, not help investors" (LYLT M.,  ECF No. 35 at PageID 431-32), this argument turns the federal securities laws on their head.  It was Defendants themselves who chose to tout the Sobeys relationship in the Registration Statement and investor presentations.  Defendants could have remained silent about Sobeys but did not.  Having included

---

[8] *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *12 (S.D.N.Y. Aug. 1, 2017) (ADS M., ECF No. 37 at PageID 713; LYLT M., ECF No. 35 at PageID 428) is readily distinguishable because the defendant provided updates about an ongoing customer dispute and the customer publicly noted it was "hopeful that it would reach a resolution" with the defendant. Here, investors were kept entirely in the dark about any problems with Sobeys all while Defendants portrayed Sobeys as emblematic of Loyalty's "deep, long-standing relationships" and "stable client base." ¶¶102, 108.

[9] The Loyalty Defendants' argument (LYLT M., ECF No. 35 at PageID 417) that the investor presentation was not referencing AIR MILES when discussing the "stable client base" despite its clear inclusion of the AIR MILES' and Sobeys' logos (¶108) is erroneous, and inappropriate at the pleading stage. *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 683 (6th Cir. 2005) ("our willingness to draw inferences in favor of the plaintiff remains unchanged" by the PSLRA). A reasonable investor would certainly interpret the presentation as promoting Sobeys as a reason to invest in the Company. *In re Envision Healthcare Corp. Sec. Litig.*, 2022 WL 4551876, at *8 (M.D. Tenn. Sept. 29, 2022) ("Construing the facts in the light most favorable to Plaintiffs, the Court finds that a reasonable investor could interpret [defendant's] statement in the manner Plaintiffs suggest").

Sobeys on the list of prime Sponsors with whom "we have maintained deep, long-standing relationships," and using Sobeys' logo on a slide bragging of a "stable client base," Defendants were obligated under the federal securities laws to disclose the full picture to investors. ¶¶101, 108; *see Helwig*, 251 F.3d at 561 ("an actor [is required] to provide complete and non-misleading information with respect to subjects on which he undertakes to speak"); *Cardinal Health*, 2021 WL 4397946, at *13 (same).[10]

### 3. The Risk Warnings Were Misleading

The risk warnings in the Registration Statement and Form 10-K are independently actionable. ¶¶105, 126-127. It was misleading to warn that a loss of "any of these" top ten Sponsors "***could***" affect the Company or that "***if*** " AIR MILES was "unable to maintain or renew relationships with [its] most significant clients" the value of the program "***may be impacted***" when in reality no less than half of AIR MILES' top ten Sponsors had either already completely exited AIR MILES or given notice that they would do so. Indeed, those statements "speak[] entirely of as-yet-unrealized risks and contingencies" but fail to "alert[] the reader that some of these risks may already have come to fruition." *Tivity Health*, 365 F. Supp. 3d at 909 (finding risk warnings false and misleading); *Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1076 (M.D. Tenn. 2022) (same); *Cloopen*, 661 F. Supp. 3d at 228 ("risk warnings were materially misleading because a reasonable investor, equipped with the then-existing but undisclosed fact of the steep 4Q decline in the dollar-based net customer retention rate, would have concluded that the warned-of prospective risks had occurred").

---

[10] The decision in *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 309 (S.D.N.Y. 2021) (LYLT M., ECF No. 35 at PageID 432) is inapposite as it rejected the "risible" theory that the "initial description" of a contractual provision was rendered misleading when company ultimately decided to waive the provision months later. It had nothing to do with promotion of a specific customer who had already provided notice it was leaving.

The ADS Defendants' claim that the Registration Statement only warned of a potential decrease in "revenue" and therefore the risk "had yet to materialize" because there was no "significant reduction…in revenue due to lost customers" is nonsense.  ADS M., ECF No. 37 at PageID 710.  The obvious subject-matter of these risk warnings was the "loss of any of these [top ten Sponsors]"—a risk that had already materialized, five separate times—which Defendants warned in turn could have a host of negative impacts, including "a significant reduction in our combined revenue," "a decrease in pricing or activity," and further Sponsor departures—all of which had also already materialized.   Indeed, **_prior to the Spinoff_**, three top Sponsors that Defendant Horn admitted constituted 10% of Loyalty's revenue had already completely exited the AIR MILES program, meaning that revenue **_would inevitably be lost._**  Moreover, in addition to those departures, two more top Sponsors had given notice of early termination—including Sobeys, which was responsible for 10% of Loyalty's combined revenue that would also soon inevitably be lost.  Were Defendants truly pursuing accuracy rather than deception, they could have detailed each of these events in their risk warnings and then warned of further fallout—but of course they did not.  _Helwig_, 251 F.3d at 560 (finding it "untenable" to allow a company to "offer a patchwork of honesty and omission" by "choos[ing] which contingencies to expose and which to conceal").  That Loyalty ultimately disclosed the loss of Sobeys and the expected financial impact before Sobeys' actual departure date undermines the ADS Defendants' tortured reading.  Obviously, the Company knew that it had an obligation to address the loss of top Sponsors before revenue was impacted.  ¶¶62-63.[11]

---

[11] The ADS Defendants' authorities are inapposite. ADS M., ECF No. 37 at PageID 710-11. In _Bondali v. Yum! Brands, Inc._, 620 F. App'x 483, 490-91 (6th Cir. 2015), the risk statement revealed that "[f]ood safety issues _have occurred in the past_" and, unlike here, the underlying problem was immaterial because it would not affect the company's major revenue source. The court in

For similar reasons, the Loyalty Defendants' assertion that "none of the challenged risk disclosures represented that no sponsors had already decided not to renew" (LYLT M., ECF No. 35 at PageID 429) is at odds with the plain language of the warnings stating that the loss of the Company's top ten Sponsors was purely hypothetical.

The Loyalty Defendants' claim that the loss of top ten Sponsors LCBO, RONA, and Rexall was publicly known such that Defendants' risk warnings were not misleading also fails. LYLT M., ECF No. 35 at PageID 432-34. *First*, the press reports Defendants cite are not referenced in the Complaint and therefore cannot be considered on a motion to dismiss. *In re CBL & Associates Properties, Inc. Sec. Litig.*, 2022 WL 1405415, at *7 n.9 (E.D. Tenn. May 3, 2022) (disregarding press articles that defendants submitted to show that undisclosed facts was "a matter of public record").[12]

*Second*, even if this were not the case, ***Defendants never disclosed that these lost Sponsors were members of the all-important "ten largest clients"*** specifically included in the Registration Statement's cautionary language. To the contrary, Chesnut unequivocally assured investors that

---

*Kolominsky v. Root, Inc.*, 100 F.4th 675, 689 (6th Cir. 2024), explained that a claim cannot be based on a cautionary statement only "when there is no evidence that the warnings were not false themselves." Notably, the trial court previously found that the short "spike" in the underlying metric was disclosed prior to the IPO and "there [were] no factual allegations suggesting that [defendants] knew the September 2020 increase was the beginning of a long-term elevation." *See Kolominsky I*, 667 F. Supp. 3d at 707, 713. In *Williams v. Globus Med., Inc.*, 869 F.3d 235, 238-39 (3d Cir. 2017), the parties were under contract at the time of the filing, and therefore, the risk had not yet materialized. Moreover, the *Globus* plaintiffs failed to allege that a "drop in sales was inevitable" due to the loss of the distributor. *Id.* at 243. Here, the Horn Declaration admits that the lost Sponsors represented well over 10% of all Sponsor revenue, and that Defendants appreciated the loss of even "one" top ten Sponsor would have dire consequences. ¶¶71-72.

[12] The Loyalty Defendants misleadingly cite to *Grae v. Corr. Corp. of Am.*, 2021 WL 1100799, at *14 (M.D. Tenn. Mar. 23, 2021) (LYLT M., ECF No. 35 at PageID 411, 432), but that court was evaluating a motion for summary judgment and was permitted to look beyond the four corners of the complaint. In *Bridgestone Corp.*, 399 F.3d at 676 (LYLT M., ECF No. 35 at PageID 411, 432), the Court only used the media reports to support the allegations in the Complaint—not contradict them.

LCBO and RONA were *not* among AIR MILES "biggest partners," thereby preventing the market from comprehending the import of the losses.  ¶¶43, 51, 144; *see Helwig*, 251 F.3d at 559 (public information about proposed legislation did not counteract misleading statement because it "offered investors no guidance about the ***consequences of health care reform*** upon the company's business"); *Huffy*, 577 F. Supp. 2d at 1009 ("the Court will not dismiss the Plaintiffs' claims predicated upon masking the *significance* of the increase in SG&A expense") (emphasis in original); *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 719 (2d Cir. 2011) (statement misleading despite public information where "potential future *impact* was certainly not public knowledge") (emphasis in original).

Indeed, "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document … on the basis that the information is public knowledge and otherwise available to them."  *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 127 (2d Cir. 2013).  Here, the most critical facts concerning the losses of those two Sponsors—that they were two of Loyalty's crucial "top ten" Sponsors—was decidedly *not* public knowledge as it was never communicated to investors.

Given the misleading risk warnings, the Loyalty Defendants' argument that Defendant Chesnut's February 3, 2022 statement that the Company's AIR MILES issuance would "trend[] back up towards that $5 billion of issuance that we had last year" was forward-looking and protected by the PSLRA safe harbor (LYLT M., ECF No. 35 at PageID 439-40) fails.  *See Cardinal Health*, 2021 WL 4397946, at * 10 (no safe harbor protection when risk warnings are inadequate); *Tivity Health*, 365 F. Supp 3d at 913 (risk warnings not "meaningful" when conflicting with "historical facts").  Moreover, by February 2022, Sobeys had long ago issued its termination notice, such that its departure from AIR MILES was imminent—which Defendant Horn

34

acknowledged would have the "previously expected consequence" of causing the Company's remaining top Sponsors to renegotiate their AIR MILES contracts with highly unfavorable terms, thereby decimating the Company's business.   Under these facts, even if Chesnut's statement was forward-looking—which it is not—it is not protected by the PSLRA safe harbor for the additional reason that, contrary to Defendants' assertions, Chesnut had actual knowledge of its falsity and that the AIR MILES issuance would instead trend in the opposite direction.  *See id.*

### 4. Defendants Provided False Explanations For Slowing Air Miles Issuance

Defendants provided false explanations about the unexpected dip in AIR MILES issuance in Q3 2021.  Specifically, on November 3, 2021, just days before the Spinoff, ADS claimed that AIR MILES issuance decreased in the quarter "due to [the] timing of promotional activity" which was "not present in the current year."  ¶111.  Loyalty Ventures repeated the exact claim less than a month later.  ¶115.  These statements were false because, as the Horn Declaration and Adversary Complaint confirmed, they concealed that the slump was actually due to the loss of multiple top ten Sponsors in the prior quarters who were responsible for 10% of the Company's combined revenue.  ¶¶112, 116.

Defendants argue that the Q3 decline in Air Miles was not due to the loss of Sponsors, and for support, claim that in the ***second quarter*** of 2021 Air Miles issuance increased year-over-year by 2% (ADS M. ECF No. 37 at PageID 715-16; LYLT M., ECF No. 35 at PageID 431)–but the slight increase in Air Miles in Q2 says nothing of whether AIR MILES was harmed by the loss of major Sponsors; in other words, Air Miles issuance would have greatly exceeded 2% in Q2 2021 were LCBO, RONA, and Rexall still in the program.  Indeed, the Horn Declaration confirmed that the Company's top ten Sponsors "generated more than 90% of the Reward Miles issued" in 2019 and 2020, that these three Sponsors were responsible for 10% of combined revenue, and that, as

35

Defendants' admitted, the loss of even one Sponsor (let alone multiple Sponsors) could materially and adversely impact the Company's revenue.  ¶¶70-72. Therefore, a reasonable inference exists at this stage that the loss of *three* top ten Sponsors by early 2021 negatively impacted Air Miles issuance by Q3 of 2021, as alleged.[13]

### B. The Pre-Class Period Statements Are Actionable

In an attempt to skirt liability, the ADS Defendants argue that their statements—made in the Registration Statement, the accompanying investor presentation, and the Q3 2021 Form 10-Q, all of which contained highly material information pertaining to Loyalty and the Spinoff—are not actionable because they pre-date the Class Period.  ADS M., ECF No. 37 at PageID 715-17.[14]  Not so.  Courts in the Sixth Circuit and elsewhere have repeatedly recognized that statements made before a security is publicly traded are actionable even when they pre-date the alleged class period because such statements affect the opening price of the security.  *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *7 (M.D. Tenn. Apr. 19, 2018) (pre-class period misstatements included in registration statement were actionable); *Borteanu v. Nikola Corp.*, 2023 WL 1472852, at *5 (D. Ariz. Feb. 2, 2023) ("declin[ing] to dismiss the Complaint's pre-Class Period allegations" where the company "miss[poke] *before* its shares [were] offered to the public" because "the inflation caused by the company's misstatements is baked into the security price and investors who purchase[d] shares d[id] so at an inflated price"); *Zelman v. JDS Uniphase Corp.*,

---

[13] Moreover, Defendants ask this Court to ignore that the 7% drop in Air Miles in *Q4* 2021, which Loyalty admitted was due to the loss of the large Sponsors, was *identical* to the 7% drop in Q3 2021.  ¶¶115, 153.  Such "coincidences" should not be disregarded.  *In re FirstEnergy Corp.*, 2022 WL 681320, at *14 (S.D. Ohio Mar. 7, 2022) (rejecting an "alternate inference" that "would rest on fantastical coincidence").

[14] The Loyalty Defendants "adopt and join" this argument.  *See* Supplement to LYLT Defendants' Motion to Dismiss, ECF No. 41 at PageID 1371.

376 F. Supp. 2d 956, 966 (N.D. Cal. 2005) ("The fact that the proposed class period begins after the first of the alleged misstatements does not make those earlier statements irrelevant or not actionable. The Court rejects the argument that Plaintiff cannot maintain an action on the basis of statements made before the proposed class period."); *see also Robb v. Fitbit Inc.,* 216 F. Supp. 3d 1017, 1028 (N.D. Cal. 2016) (actionable misstatements were made "both before and after the IPO and in the IPO Prospectus").[15]

The decision in *Zwick* is directly on point. 2018 WL 2933406, at *7. There, like here, the proposed class period began on the first trading day after a parent company spun-off Quorum, a subsidiary. *Id.* at *3. As here, the alleged misstatements were contained in a registration statement filed approximately a month prior to the spinoff. *Id.* In rejecting the exact argument the ADS Defendants assert here, the Court reasoned that the dates of a class period "function only to define the plaintiff class, not to restrict the universe of relevant or actionable facts in the case." *Id.* at *6. The Court therefore determined that the earlier misstatements regarding Quorum's business "were incorporated into Quorum's beginning stock price"—such that plaintiffs who "purchased Quorum stock during [the] class period relied upon and were affected by the alleged misrepresentations" which were "not so stale as to be immaterial." *Id.* at *7; *see also Jackson Cty. Emples. Rt. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 615 (M.D. Tenn. 2020) (citing *Zwick* in holding that "the proposed

---

[15] The ADS Defendants' Sixth Circuit authority is in accord. *See Stein v. U.S. Xpress Enterprises, Inc.*, 2020 WL 3584800, at *25, *41 (E.D. Tenn. June 30, 2020) (ADS M., ECF No. 37 at PageID 716) (finding multiple pre-IPO statements "actionable" as a matter of law but dismissed for lack of scienter); *see also Urbach v. Sayles*, 1991 WL 236183, at *9 (D.N.J. Sept. 4, 1991) (finding statements in a proxy issued "three and one-half months before the class period" actionable where "[t]he class period begins on the date of the execution of the merger"); *In re Crown Am. Realty Tr. Sec. Litig.*, 1997 WL 599299, at *15 (W.D. Pa. Sept. 15, 1997) ("The fact that the statement was made at a time before any of the class members purchased shares would seem to be irrelevant, as it still could have been partly responsible—along with the other alleged misrepresentations—for the injury to investors who purchased their shares over a year later").

class period dates function only to define the plaintiff class, not to restrict the universe of relevant or actionable facts in the case"),

So too here, the pre-Spinoff statements directly impacted Loyalty's opening trading price. These alleged misstatements were not from outdated ADS conference calls or press releases unconnected to the Spinoff, they came from the Registration Statement and an accompanying investor presentation specifically prepared for "investors…in connection with the Separation." ¶¶101-108. Andretta expressly "urge[d]" investors to review the Registration Statement "carefully," and Horn stressed that it was provided for investors to "learn more about Loyalty Ventures and [its] business." ¶¶18, 100. The November 3, 2021 Form 10-Q was similarly vital to Loyalty's opening price as it was issued just days before the Spinoff and was the only source of updated information about Loyalty's operations before trading began. ¶111. These documents directly related to the Spinoff and directly impacted the value of Loyalty as a soon-to-be stand-alone company.

Even if this Court were to ignore the weight of authority from this Circuit and others and find that the pre-Class Period statements are not actionable (which it should not), the ADS Defendants clearly had a duty to correct or update their prior materially false and misleading statements once Loyalty's stock began publicly trading. While the ADS Defendants argue that no such duty existed because they did not "learn[] any new information about Loyalty Ventures after the Spinoff" (ADS M., ECF No. 37 at PageID 716), once Loyalty began trading as a public company, ADS knew those prior statements, which materially misstated the state of Loyalty's business, would now mislead investors—thus triggering a duty to update. *See Zwick*, 2018 WL 2933406, at *7 (stating that even if pre-Class Period statements were not actionable, defendants had a "duty to correct statements that [were] false at the time they were made" particularly "[g]iven

38

the increasing and continued poor performance" of Quorum during the class period).   Indeed, it would completely undercut the purpose of the securities laws for the ADS Defendants to be allowed to knowingly make materially false and misleading statements that directly impacted Loyalty's stock without having any duty to retract or correct those statements once Loyalty's stock began publicly trading.

The authorities the ADS Defendants rely on are inapposite (ADS M., ECF No. 37 at PageID 715-16), as virtually all of them address statements that were made when the securities were **_already trading_**—such that the plaintiffs in those cases "could have sought to include this statement in the class period but they did not." *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).[16]

---

[16] *See Saddle Rock Partners, Ltd. v. Hiatt*, 1996 WL 859986, at *16 (W.D. Tenn. Mar. 26, 1996); *Hodges v. Akeena Solar, Inc.*, 2010 WL 3705345, at *2 (N.D. Cal. May 20, 2010); *In re Boston Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 281 (D. Mass. 2022); *In re Inv. Tech. Group, Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017). *North Port Firefighters' Pension--Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 743 (N.D. Tex. 2013) (ADS M., ECF No. 37 at PageID 716) is also distinguishable, as that case involved allegations that an outside director made misstatements during a pre-class period conference call—not a Registration Statement—and the plaintiff in that case never even asserted that those pre-class period statements were actionable. Thus, the **only** case the ADS Defendants rely on that addressed pre-class period misstatements in a registration statement is the out-of-Circuit case of *In re Garrett Motion Inc. Sec. Litig.*, 2022 WL 976269, at *16 (S.D.N.Y. Mar. 31, 2022).  ADS M., ECF No. 37 at PageID 715-16.  However, that case—which involved pre-class period misstatements made in a registration statement by an individual defendant who was a former officer of Garrett—ignored the weight of authority holding that such pre-trading statements are actionable.  In contrast, here, *Zwick* directly addressed pre-trading statements and is directly on point, and is in line with the weight of authority on the issue in this Circuit and elsewhere.  Indeed, under the ADS Defendants' analysis, they were entirely free to make materially false and misleading statements in connection with the Spinoff in order to ensure their $750 million payout, simply because the stock did not begin to trade until shortly after the Registration Statement was filed.  As the Court in *Nikola* reasoned in rejecting the exact same argument, "a *per se* rule prohibiting pre-class period statements from being actionable conduct creates a loophole for the company; even though the plaintiffs were harmed by the company's fraudulent inflation of their stock price, the company cannot be held liable for the fraud because it conveniently made that misstatement before the class period."  *Nikola* 2023 WL 1472852, at *5.

The Loyalty Defendants' argument (LYLT M., ECF No. 35 at PageID 439) that the "October 15, 2021" [*sic.*] investor presentation[17] and ADS's Q3 2021 Form 10-Q are "ADS filings" for which they cannot be held liable is frivolous because the Loyalty Defendants repeated these ***identical*** misstatements after the Spinoff.  *See* ¶115 (including the statement from ADS's Form 10-Q in Loyalty's November 24, 2021 Form 10-Q); ¶117 (reproducing ADS slides in a December 15, 2021 investor presentation); *see Nikola*, 2023 WL 1472852, at *6 ("the pre-Class Period misrepresentations alleged by Plaintiff were repeated in some capacity *during* the Class Period, rendering any dismissal of the pre-Class Period misrepresentation rather meaningless") (emphasis in original).

### C.  The ADS Defendants Are Responsible For The Registration Statement

Relying on *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the ADS Defendants next claim they are not "responsible" for the Registration Statement because they were not signatories and did not file the document with the SEC.[18]  ADS M., ECF No. 37 at PageID 717-19.  This argument ignores the fact that the very first line of the Registration Statement unambiguously states that "***Alliance Data Systems Corporation ('ADS') is furnishing this information statement*** in connection with the separation." *See* ADS Ex. 2, ECF No. 38-2 at PageID 741; *Welch*, 2024 WL 695772, at *12 (defendants deemed "makers" of statements where the text of private placement memorandum "reiterated" their "centrality" in the scheme).  To make the point even more clear, ADS included with the Registration Statement a cover letter from Defendant Andretta that specifically endorsed its contents and urged investors to rely on it.  ¶100.

---

[17] There are no alleged misstatements on October 15, 2021, Plaintiffs interpret this argument as applying to the investor presentation filed on October 14, 2021. ¶¶107-108.

[18] Notably, the ADS Defendants concede they are "makers" of the investor presentation and the Q3 2021 Form 10-Q. ADS M., ECF No. 37 at PageID 717.

Courts are clear that "even without a signature," a statement is attributable to those who "actually participated in and had authority over the [issuer's] filing process." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.,* 2017 WL 3058563, at *8 (N.D. Cal. July 19, 2017). Thus, parent companies and their employees are regularly considered "makers" of a subsidiary's statements. *Id.* (finding parent-company CEO maker of subsidiary's offering memorandum); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 558 (S.D.N.Y. 2014) (holding that parent corporation, its president, and its subsidiary all makers of statement under *Janus*). In *Zwick*, 2018 WL 2933406, at *3, for example, the court found that the pre-spin parent company and its CEO were "makers" of the registration statement where, at the time the of filing, all the "outstanding shares of [the spun-off company were] currently owned by [the parent]," the signatory of the statement was employed by the parent, the parent and subsidiary issued "consolidated financial statements," and the registration statement was "accompanied by a letter on [the parent's] letterhead from [the parent's] President and CEO." *Id.*[19]

Here, in addition to all the facts present in *Zwick*—*i.e.,* Loyalty was owned by and an operating part of ADS, Horn was an ADS employee, ADS and Loyalty reported consolidated financial statements, and ADS appended a letter to the Registration Statement signed by Andretta (¶¶32, 40, 89, 100)—the filing itself expressly stated that it was "furnished" by ADS, and ADS admitted that it directly "***participated in the preparation and filing*** of the [R]egistration

---

[19] The *Zwick* court expressly considered and rejected the holdings in *Temple-Inland*, 936 F. Supp. 2d at 741 and *Sec. and Exch. Comm'n. v. Agfeed Indus., Inc.*, 2016 WL 10934942 at *11 (M.D. Tenn. July 21, 2016), both of which are cited by the ADS Defendants (ADS M., ECF No. 37 at PageID 717-18), because like here, the parent company "did more than simply assist" with the filing. *See* 2018 WL 2933406, at **3-4. The complaint in *In re Miller Energy Res. Sec. Litig.*, 2014 WL 415730, at *10 (E.D. Tenn. Feb. 4, 2014) (ADS M., ECF No. 37 at PageID 718), lacked allegations that the defendant "played any role whatsoever in preparing or issuing the alleged false or misleading statements."

[S]tatement." ¶99; ADS Ex. 2, ECF No. 38-2 at PageID 741. As if that were not enough, the Complaint also alleges that the ADS Defendants' "control[led]…the contents of Loyalty Ventures' Registration Statement," were provided copies of the filing, "had the ability and opportunity to prevent [its] issuance or cause [it] to be corrected," and worked behind the scenes to orchestrate the fraud, including by threatening Horn's and Chesnut's jobs were the truth revealed. ¶¶24, 91-93. Nothing more is required. *See SEC v. Geswein*, 2 F. Supp. 3d 1074, 1080 (N.D. Ohio 2014) (determination of "ultimate authority" and "maker" status require fact-intensive discovery); *Volkswagen*, 2017 WL 3058563, at *8 (executives deemed maker of statement where they allegedly "were able to and did control the content" of offerings and "were provided with copies…prior to or shortly after their issuance").

Furthermore, as discussed in more detail *infra*, not only are the ADS Defendants "makers" of the Registration Statement, they are also liable under Rule 10b-5(a) and (c) for disseminating the false statements in connection with the fraudulent scheme to spin off Loyalty. *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 78 (2019) (scheme liability is "sufficiently broad to include within [its] scope the dissemination of false or misleading information with the intent to defraud"); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021) ("Persons who do not 'make' statements [under *Janus*], but who disseminate false or misleading statements to potential investors with the intent to defraud, can be found to have violated the *other* parts of Rule 10b-5").

### D.    The Complaint Adequately Alleges A Strong Inference Of Scienter

"[S]cienter includes a knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Cardinal Health*, 2021 WL 4397946, at *14. Courts must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor*

42

*Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (emphasis in original). An inference of scienter "need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Rather, scienter may be pled even when reasonable, nonculpable inferences exist. *Id.* at 325.

The Sixth Circuit endorses a "non-exhaustive list of factors that do not necessarily establish scienter but are usually relevant to its analysis" ("*Helwig* Factors").[20] *Frank v. Dana Corp.,* 646 F.3d 954, 958 n.2 (6th Cir. 2011). The Court examines these factors and others as part of its holistic analysis.[21] *Id.* at 961 ("Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees"). Thus, "[t]he ultimate question is whether the allegations, viewed holistically and not piecemeal, give rise to the inference of scienter and at least as compelling as any opposing inference one could draw from the facts alleged." *Cardinal Health,* 2021 WL 4397946, at *15. Indeed, *Tellabs* "awards the draw to the plaintiff." *Id.* at *16; *Tivity Health,* 365 F.Supp.3d at 916.

---

[20] The *Helwig* factors are: "(1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs." *Cardinal Health*, 2021 WL 4397946, at *15 (citing *Helwig*, 251 F.3d at 552).

[21] Contrary to the Loyalty Defendants' assertion (LYLT M., ECF No. 35 at PageID 437), "[t]he *Helwig* factors are an analytical tool for courts, not a pleading requirement" and plaintiffs need not allege a majority of the *Helwig* factors. *Clover Health*, 587 F. Supp. 3d at 676; *see also CBL,* 2022 WL 1405415, at *13 ("The Court need not conclude that Plaintiffs have satisfied every one of these factors, only those that are relevant to the case"). As discussed below, *Helwig* factors two, three, four, five, six, and nine all support a finding of scienter here. *See Dougherty v. Esperion Therapeutics, Inc.,* 905 F.3d 971, 981-82 (6th Cir. 2018) (considering three of the factors and finding scienter where "[n]one of the other *Helwig* factors apply in this case").

1. **The Horn Declaration Contains Multiple Admissions That Establish Scienter**

The Horn Declaration confirms that Defendants knew that their statements to investors were materially false and misleading when made, as they contradicted internal reports and disregarded current information (the second and sixth *Helwig* factors).  *See CBL,* 2022 WL 1405415, at *14.  Such sworn evidence is uncommon at this stage and easily satisfies pleading requirements.  *See Levy v. Gutierrez*, 2017 WL 2191592, at *7, *13 (D.N.H. May 4, 2017) (scienter where "the bankruptcy-related declarations of [the Company's COO] paint a picture of [the Company] during the class period that is diametrically opposed to [the Company's] public statements during that time"); *see also Clover Health*, 587 F. Supp. 3d at 677 ("the facts supporting scienter are so clear that they go beyond merely supporting a 'strong inference.' … the defendants' own position is that they were aware . . . and affirmatively chose not to disclose").

Indeed, Horn admitted that "prior to the Spinoff," AIR MILES was on the verge of collapse, was "suffering the effects of an ongoing shift in the loyalty programs market," and sustained "multiple major client departures" whose losses "would have a broader 'network effect' on the value of the entire AIR MILES Reward Program."  ¶¶70-72, 103, 106, 121, 128, 130, 136-137. Similarly, the Horn Declaration leaves no doubt that Sobeys' impending departure was known to Defendants "***in late 2020***" and had "***loomed throughout 2021***."  ¶¶78, 137.  Horn further admitted that Sobeys' exit in June 2022 was not a surprise to Defendants, as it was entirely "consistent with its [prior] statements," and lead to the "previously expected consequence" of Loyalty's bankruptcy. ¶¶78-79, 137.  Defendants nevertheless misrepresented the overall health of Loyalty Ventures and touted its relationship with these exact Sponsors. *See e.g.*, ¶¶101-102, 108, 117, 124; *see City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.,* 29 F.4th 802, 813 (6th Cir. 2022) ("Suffice it to say that a holistic review of [defendant's] statements reveals a theme: relentless,

unfounded optimism that was contradicted by the undisclosed facts"); *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 (S.D. Ohio 2007) (Sargus, J.) ("a strong inference of scienter is shown through Plaintiffs' allegations that Defendants knew about [the company's] declining gross margins and storewide markdowns throughout the class period, yet failed to disclose the information").

Tellingly, the ADS Defendants ignore the Horn Declaration entirely, and the Loyalty Defendants' passing reference to it fails to confront these damming admissions. *See* LYLT M., ECF No. 35 at PageID 424 (only referencing the Horn Declaration to discuss Staples' departure). The sharp divergence between the Horn Declaration and Defendants' public statements supports scienter. *See Gutierrez,* 2017 WL 2191592, at *13 (bankruptcy declarations were "evidence of [company] leadership's understanding at the time," "how those views contradicted [company's] public statements" and "the officer defendants' awareness of vital information later withheld"); *Grae v. Corr. Corp. of Am.,* 2017 WL 6442145, at *21 (M.D. Tenn. Dec. 18, 2017) (scienter where "executives would have been aware of facts contradicting their public statements").

### 2. The Adversary Complaint And Internal Documents Cited Therein Confirm That Defendants Knowingly Or Recklessly Misled Investors

Numerous internal ADS and Loyalty documents included in the Adversary Complaint similarly provide overwhelming evidence of Defendants' knowing fraud. *See Dougherty,* 905 F.3d at 981 (discrepancy between internal reports and external statements on the same subject is a "***key factor***" supporting scienter); *see also Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.,* 372 F. Supp. 3d 1139, 1154 (D. Colo. 2019) ("Plaintiffs allege, with reference to internal documents… that Defendants made these statements with the intent to deceive investors").

The internal documents cited in the Adversary Complaint confirm that: (i) Defendants unequivocally knew ***ten months prior to the Spinoff*** that Sobeys was exiting AIR MILES Program

in 2022 (¶¶80, 86); (ii) Defendants were not only planning for Sobeys' departure (¶¶84-86), but amended their agreement with Sobeys to accomplish the Spinoff in light of Sobeys' decision to leave (¶¶81-83, 95); (iii) Defendants knew the loss of Sobeys would have a devastating impact on AIR MILES' gross margin (¶85); (iv) Defendants intentionally concealed information about Sobeys' upcoming departure from third party lenders, advisors, and ratings agencies, and instead created false projections incorporating Sobey's purported significant expected contributions through 2025 (¶¶88-91); and (v) a near-term bankruptcy of Loyalty Ventures was expressly contemplated pre-Spinoff (¶96).

Given these internal documents, Loyalty Ventures' post-Spinoff collapse was "both glaring and known within the company"—these allegations are "sufficient to support a strong inference at least of recklessness." *Clover Health*, 587 F. Supp. 3d at 678; *see also Kyrstek v. Ruby Tuesday, Inc.*, 2016 WL 1274447, at *9 (M.D. Tenn. Mar. 31, 2016) ("[c]ommon sense dictates that disclosing the good while withholding the bad, especially when the bad is so readily known, suggests deliberate concealment"). Indeed, these allegations make crystal clear that, as the Adversary Complaint stated, ***"[i]t was known internally at ADS, but undisclosed to the public, that the success of the AIR MILES program was at risk because of Sobeys' impending and intended termination."*** ¶76; *see In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 448 (D. Del. 2014) (scienter supported by "internal emails along with the contents of those, evidence that some of the officer defendants knew of and discussed [the fraud]").

Contrary to the Loyalty Defendants' claims, this is not a case where Plaintiff is merely relying on "allegations from lawyers in another suit" that are not based on "information quoted from specific internal documents or provided by witnesses with personal knowledge." LYLT M., ECF No. 35 at PageID 438. The exact opposite is true. The Liquidating Trustee had thousands of

46

internal Loyalty Ventures and ADS documents available to it—many of which were cited to and quoted verbatim in the Adversary Complaint—to support that complaint's detailed allegations, which were in turn consistent with and fully corroborated by the sworn Horn Declaration. Under these circumstances, Courts permit "allegations from [] complaints in other lawsuits" to "establish the heightened level of scienter required in securities fraud cases." *Shah v. Zimmer Biomet Holdings, Inc.,* 2019 WL 762510, at *7, *9 (N.D. Ind. Feb. 20, 2019); *In re Bof'I Holding Inc. Sec. Litig,* 977 F.3d 781, 793 (9th Cir. 2020) (crediting allegations from another complaint filed by "a former insider of the company"); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 714 (E.D. Mich. 2010) (finding scienter via "allegations of the [ancillary] complaint alleging first hand knowledge, based upon a conversation with a top executive"); *see also Huffy*, 577 F. Supp. 2d at 979-981, 995 (crediting allegations of bankruptcy trustee).[22]

### 3. The ADS Defendants Threatened And Bribed Defendants Horn And Chesnut To Get Them To Go Along With The Fraud

Under the fourth *Helwig* factor, "evidence of bribery by a top Company official" supports a strong inference of scienter. That factor is present here. The Adversary Complaint's detailed allegations show that Defendants Horn and Chesnut were repeatedly told by the ADS Defendants, including Defendant Andretta, that they had to "***get with the program***"—*i.e.*, deceive the market in addition to third party lenders, rating agencies, and advisors about Sobeys' impending departure—"***or they would no longer be employed by ADS or [Loyalty Ventures]***." ¶92. The ADS Defendants repeated these threats any time Defendants Horn or Chesnut raised concerns

---

[22] *Helwig*'s fifth factor considers "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit." 251 F.3d at 552. While the adversary lawsuit has not settled, the Adversary Complaint alleges fraudulent conduct which supports scienter. *See Reddy Ice*, 757 F. Supp. 2d at 714 n.8 ("The existence of such investigations is not sufficient, standing alone, to support a strong inference of scienter but is not irrelevant to the analysis").

about the fraud or the $650 million in debt Loyalty would be forced to take on as part of the Spinoff, with ADS's CFO Beberman responding that "*the purpose of the spin is to maximize the value of RemainCo.*" *Id.* Beberman further directly threatened Defendant Chesnut that "*you need to get your guy [i.e., Horn] on board or else you won't like where this goes*," and that it would be "*beneficial*" for Chesnut's compensation if he "*aligned and supported*" the Spinoff on the terms ADS was demanding "*given that Roger [Ballou]*," a member of the ADS Board Audit Committee, "*would also be the chairman of [S]pinco and would have influence there.*" ¶93*; see CBL*, 2022 WL 1405415, at *14 (where "Mr. Sewell conspired with Valquest to carry out the fraudulent scheme," and the plaintiffs "allege[d] precisely how he participated in and advanced the conspiracy," the fourth *Helwig* factor was satisfied).

The ADS Defendants' repeated threats to Defendants Horn and Chesnut that they would lose their jobs and compensation if they did not "align[] and support[]" the fraud—coupled with ADS executives telling Horn and Chesnut that it would be personally "beneficial" for them if they went along with the fraud—support a strong inference of Defendants' scienter.

### 4. Motive And Opportunity Existed To Commit The Fraud

Although motive is not required,[23] the Complaint sets forth Defendants' strong motivation to commit the fraud, as stated in their own words: "*maximize the value for RemainCo.*" *See e.g.*, ¶¶12, 92-93, 138, 145. Indeed, Defendants' scheme was set in motion so ADS could reap the $750 million dividend from Loyalty all while unloading a doomed business. *See e.g.*, ¶¶1, 31-32, 90; *Zwick*, 2018 WL 2933406, at *10 ("Defendants had a significant *motive* … they could secure $1.2 billion of financing needed for the spin off") (emphasis in original); *Welch*, 2024 WL 695772, at *14 (company's financial motive contributes to scienter). The Loyalty Defendants also had "the

---

[23] *See Tellabs*, 551 U.S. at 325 ("absence of a motive allegation is not fatal"); *Dougherty,* 905 F.3d at 982 (same).

self-interested motivation of … saving their salaries or jobs," *i.e.*, the ninth *Helwig* factor. *FirstEnergy*, 2022 WL 681320, at \*21.   As set forth above, when Horn and Chesnut raised concerns about the fraud, they were "***told to get with the program[] or they would no longer be employed by ADS or [Loyalty]***" and promised increased compensation were the scheme successful.  ¶¶92-93.  This was not empty rhetoric, as ADS's CFO directly told Defendant Chesnut that ADS Board member "Roger [Ballou] would also be the chairman of [s]pinco and would have influence there" over the Loyalty Defendants' compensation.  ¶93.

Any claim that ADS's retention of approximately 19% of Loyalty Ventures' equity defeats scienter is absurd.  ADS M., ECF No. 37 at PageID 720.  The $750 million in proceeds from the Spinoff is ***fifteen times larger*** than the purported $50 million equity interest.   Moreover, Defendants ignore that ADS attempted to cash out its position and suspiciously entered into a 10b5-1 plan on May 25, 2022—just days before Sobeys' telegraphed June 2022 departure.  ¶147.

Defendants' claim that Chesnut and Horn purchased Loyalty shares does not change the scienter analysis.  ADS M., ECF No. 37 at PageID 719-20; LYLT M., ECF No. 35 at PageID 437. As an initial matter, the Complaint makes no mention of Horn's or Chesnut's stock holdings or transactions, and Defendants' introduction of these purported facts is improper.   *See Unumprovident*, 396 F. Supp. 2d at 877–78 ("Defendants are offering the SEC forms for the truth of the matter asserted (*i.e.*, the occurrence of the transactions disclosed therein) … to diminish whatever inference of scienter might be supported by [the] allegations … the Court cannot do this without converting Defendants' motion into one for summary judgment"); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1124 (N.D. Cal. 2017) ("Although the Court may compare competing explanations and inferences, those inferences still must arise from the facts alleged in the

complaint…The Complaint mentions no stock sales of any kind…the Court will not take judicial notice of [defendants'] Forms 4").[24]

Moreover, even if the Court were to consider these purchases, they were insignificant under the circumstances present here—totaling less than $50,000 for Chesnut and $475,000 for Horn (LYLT M., ECF No. 35 at PageID 408)—as they were far outweighed by the $750 million ADS received in the Spinoff, as well as the substantial compensation (and continued employment) Chesnut and Horn received for not disclosing the truth about Loyalty's business. Defendants also fail to provide any context regarding these purchases, such as whether Horn and Chesnut were required to own Company shares as executives of the new Company, whether the shares were purchased for tax purposes, where the funds came from to purchase the shares, *etc*. Courts, including Defendants' own cited authority, "reject[] the idea that stock purchases negate an inference of scienter without information about the context of the purchases." *In re Upstart Holdings, Inc. Sec. Litig.,* 2023 WL 6379810, at *20 (S.D. Ohio Sept. 29, 2023) (LYLT M., ECF No. 35 at PageID 438); *see also Maiman v. Talbott,* 2010 WL 11421950, at *7 (C.D. Cal. Aug. 9, 2010) ("Defendants have not provided sufficient context of the stock purchases reflected in the Form 4s…even if the Court were to take judicial notice of Defendants' stock purchases, such purchases would not negate the strong inference of scienter"). And the lack of insider ***sales*** is

---

[24] Defendants' authorities are not on point. In *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 246 (1st Cir. 2015) (ADS M., ECF No. 37 at PageID 720), *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 857 (S.D. Ohio 2016) (LYLT M., ECF No. 35 at PageID 437) and *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 150 (D. Conn. 2007) (LYLT M., ECF No. 35 at PageID 437), the plaintiffs included insider trading facts in the complaint. In *Garrett*, 2022 WL 976269, at *13 (ADS M., ECF No. 37 at PageID 719), the executives' "compensation packages" which plaintiffs claimed showed scienter were tied to long-term post-spinoff growth.

irrelevant as "insider trad[ing] is not part of most securities fraud cases." *Welch*, 2024 WL 695772, at *13.

In any event, Defendants Horn and Chesnut's stock purchases cannot negate the numerous detailed allegations—including a sworn Declaration by Horn himself—making clear that Defendants unequivocally knew that their statements touting Loyalty's top ten Sponsors were materially false and misleading when made.

5. **The Proximity Between The False Statements And Omissions And The Corrective Disclosures Support Scienter**

The Complaint also satisfies the third *Helwig* factor, which looks at the proximity between the false statements and omissions and the corrective disclosures. *Cardinal Health*, 2021 WL 4397946, at *15. Each alleged disclosure came just weeks after Defendants made false and misleading statements. *Compare* ¶¶114, 117 (statements on November 24 and December 15, 2021) *with* ¶153 (disclosures on February 3, 2022); *compare* ¶129 (statements on March 23, 2022) *with* ¶156 (disclosure on April 28, 2022); *compare* ¶134 (statement on May 6, 2022) *with* ¶159 (June 8, 2022 disclosure). Such immediacy falls well within the "six-to-nine weeks' gap" courts have found "comfortably supports scienter." *Shupe v. Rocket Companies, Inc.*, 660 F.Supp.3d 647, 681 (E.D. Mich. 2023).

That Sobeys abandoned ship only seven months post-Spinoff, and Loyalty filed for bankruptcy just nine months thereafter, only further supports the inference. *Dana Corp.,* 646 F.3d at 962 ("It is difficult to grasp the thought that [defendants] really had no idea that [the company] was on the road to bankruptcy … the company fell to its demise in a matter of nine months. [Defendants] only appear more culpable when considering the loan obtained by [the company], which almost surely would have been denied if the company's true financial status was publicly reported"); *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) (auditors' resignations

within "three to four months" and company's bankruptcy "a mere eight months" following misleading press releases, were both "temporally connected" to the releases).

### 6. Numerous Other Facts Support Defendants' Scienter

Additional non-*Helwig* factors contribute to a strong inference of scienter. *First*, the ADS and Loyalty Defendants' concerted scheme to conceal their knowledge of Sobeys' impending departure and deceive not only the market but also third-party lenders, ratings agencies, and advisors in order to secure the $750 million payout for ADS is highly probative of Defendants' scienter. As the Adversary Complaint detailed, Defendants were acutely aware that "lenders who were asked to fund the Spinoff Transaction were spooked by the prospect that the contracts for BMO and Sobeys were up for renewal in 2023"—and that, as a result, **"the news that Sobeys planned to terminate in 2022" was intentionally "withheld [by Defendants] from [] prospective lenders."** ¶90. Indeed, in furtherance of this scheme, Defendants Horn and Chesnut, at the direction of ADS, "***knowingly***" submitted 5-year forecasts to third party lenders, rating agencies, and advisors that were "***materially inaccurate***" because they projected that Sobeys would represent 28% to 30% of all AIR MILES issued by the AIR MILES program over that five-year period. ¶¶89, 91. Defendant Chesnut, acting on behalf of ADS, also **"*coached two then ADS 'Spin Team' members on talking points for meetings with Moody's and S&P, to act as if ADS did not know that 'Sobey[s] relayed its intention to terminate by the end of 2022.'"** ¶91.

*Second*, the "importance" of AIR MILES and its relationships with top Sponsors was vital to Loyalty's "core business" and therefore supports scienter. *See Cardinal Health*, 2021 WL 4397946, at *16. Defendants themselves repeatedly highlighted the critical nature of the "ten largest [Sponsors]" and warned that the loss of even one would be calamitous. *See e.g.,* ¶¶105, 126. Further, in 2020, AIR MILES generated 77% of the Company's adjusted EBITDA and the "top ten" Sponsors alone comprised "over half" of Loyalty's combined revenue. ¶¶3, 38-41, 141.

Sobeys itself generated 20% of AIR MILES' 2020 gross revenue and over 10% of the entire Company's adjusted EBITDA. ¶¶9, 141; *Grae,* 2017 WL 6442145, at *21 ("The overall health of [company]'s relationship with [large client], which provided between 11% and 13% of the company's annual revenue, was central to [company]'s operations"). It is absurd to suggest that Defendants were unaware of issues with Loyalty's largest and most profitable revenue sources. *Welch*, 2024 WL 695772, at *14 ("high-level executives *can* be presumed to be aware of matters central to their business's operation") (emphasis in original).

    *Third*, "the magnitude of the post-Class Period impact…and other problems Defendants concealed from investors" favors a finding of scienter. *Cardinal Health*, 2021 WL 4397946, at *15; *FirstEnergy*, 2022 WL 681320, at *22 ("the magnitude of the fraud and the direct and personal involvement of senior leadership are even more reason to find scienter"). Just sixteen months after the Spinoff, Loyalty's stock was worthless, the Company was forced to file for bankruptcy, and Loyalty Ventures ceased to exist—something Defendants contemplated all along. ¶96; *see Dana Corp.,* 646 F.3d at 962 ("It is difficult to grasp the thought that [defendants] really had no idea that [the company] was on the road to bankruptcy").

### E. Defendants Are Liable For Their Deceptive Scheme

    Defendants are also liable under SEC Rules 10b-5(a) and (c) for engaging in a "scheme" that operated as a fraud on investors. Notably, under recent Supreme Court precedent, "unlike prior precedent, a plaintiff need not necessarily allege deceptive conduct that extends beyond the alleged misstatement itself," as "scheme liability can be based purely on conduct involving *only* a misstatement." *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *17 (D.N.J. June 5, 2020) (emphasis in original). However, pleading both deceptive conduct and dissemination of false information strengthens a scheme liability claim. *See id.* at **17-18. In the

Sixth Circuit, plaintiffs need only "provide[] examples of specific" fraudulent conduct that are "representative samples" of the scheme. *FirstEnergy*, 2022 WL 681320, at *13.

The Complaint provides numerous allegations of Defendants' fraudulent scheme here. Defendants secretly provided Sobeys an enormous discount to delay public announcement of its departure (¶83), duped lenders and credit agencies to enable Loyalty to receive huge loans— funneled back to ADS in a massive $750 million payment (¶¶87-91)—drafted and disseminated the misleading Registration Statement (¶¶35-45), and effectuated the Spinoff (¶46), all while contemplating a near-term Loyalty bankruptcy (¶96).

Defendants argue that the Complaint fails to allege "an inherently deceptive act that is distinct from an alleged misstatement" or one that is "different and separate from the nondisclosure claim." ADS M., ECF No. 37 at PageID 720; LYLT M., ECF No. 35 at PageID 442. That is not the law. The Supreme Court explicitly held that "[t]hose who disseminate false statements with intent to defraud are primarily liable under Rules 10b–5(a) and (c)." *Lorenzo*, 587 U.S. at 83. Defendants cannot deny that they all "disseminated" allegedly false statements. ADS admittedly "participated" in the filing of the Registration Statement and "***furnish[ed] th[e] information statement***" to shareholders (¶99; ADS Ex. 2, ECF No. 38-2 at PageID 741), Andretta and Horn sent cover letters which "enclosed" and "attached" the Registration Statement (¶100; ADS Ex. 2, ECF No. 38-2 at PageID 739, 740), and Horn and Chesnut filed documents with allegedly false information (¶¶114, 122-123, 134). In addition, the Complaint alleges "distinct" acts, including that Defendants used false projections and "coached" employees to mislead credit agencies and lenders, delayed announcement of Sobeys' departure, and tricked the public into believing that Loyalty Ventures was a viable Company. ¶¶40-45, 83-85, 88-91. Nothing more is required.

Defendants also assert the Complaint fails to plead reliance on the scheme because the

deception only tricked "credit agencies" and "lenders."  ADS M., ECF No. 37 at PageID 721;

LYLT M., ECF No. 35 at PageID 443.  Again, Defendants are wrong.  Reliance may be alleged

"on the public-facing product of [the company's] scheme."  *FirstEnergy*, 2022 WL 681320, at

*27.  That is because the "fraud-on-the-market" theory set forth in *Basic Inc. v. Levinson*, 485 U.S.

224 (1988) is fully applicable to scheme liability.  *Id.* at *26.  In *FirstEnergy*, the court found

reliance for a fraudulent scheme which "avoided a serious risk of [the company's] credit rating

being downgraded and in fact significantly improved the Company's credit rating and cost of

capital," specifically because the "market factored that material information into its pricing of

[company] securities, and Plaintiffs purchased securities under that inflated pricing."  *Id.* at **25-

26.  The Court rejected the argument that the deceptive acts must be "publicly disclosed" for

reliance, as that would lead to the "illogical" result that Defendants "could be liable for securities

fraud only if they willingly put [their] fraud into broad daylight."  *Id.* at *27.[25]

Here, Defendants' scheme produced "public-facing" results.  ¶¶87, 182.  The whole point

of auditors and credit agencies like S&P and Moody's is for the public to rely upon their findings

and to instill faith in the public markets.  Moreover, the scheme and Defendants'

misrepresentations were designed to ensure the success of the Spinoff—Defendants' concerted

concealment of Sobeys' departure allowed Loyalty to obtain large loans, which it then made

public, providing the false appearance that Loyalty was a viable company worthy of $650 million

---

[25] Like in *FirstEnergy*, 2022 WL 681320, at *27, Defendants here have "attributed too great a meaning to" the decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta*, Inc., 552 U.S. 148 (2008) (LYLT M. ECF No. 35 at PageID 443; ADS M., ECF No. 37 at PageID 721-22). However, the defendants *in Stoneridge* (unlike here) were all "external" to the issuer and therefore the "Supreme Court found reliance lacking because these external parties were connected to the company's fraudulent financial statements only by an indirect chain." *FirstEnergy*, 2022 WL 681320, at *27.  Reliance is pleaded where, as here, the scheme involved officers directly connected to the issuer (or its parent company) and the results of the scheme are publicized.  *Id.*

in debt that could succeed as a stand-alone entity.  The scheme also involved the dissemination of the Registration Statement containing materially false and misleading statements about the state of Loyalty's business, which obviously affected its stock price and was relied upon by the market.

The Loyalty Defendants' argument that the Complaint fails to allege the "precise" misstatements made to third parties (LYLT M., ECF No. 35 at PageID 443) is misguided.  Liability is not premised on those statements, but on the scheme to implement the Spinoff, delay Sobeys' departure, obtain loans without revelation of Sobey's departure, and funnel the money back to ADS.  Each element of that scheme is alleged in the Complaint.  Even so, the Complaint alleges specific misstatements made to third parties, including "false financial forecasts" that were "materially inaccurate," specific instructions to conceal that "Sobey[s] relayed its intention to terminate by the end of 2022," and a presentation to rating agencies that falsely identified Sobeys as a "Key Brand[]" and "Premium Sponsor[]" that was "emblematic of AIR MILES' Deep and Long-Term Relationships." ¶91.

### F.    The Complaint Alleges Loss Causation

"As pleading requirements go," alleging loss causation in the Sixth Circuit "is not meant to impose a great burden upon a plaintiff." *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc*., 877 F.3d 687, 695 (6th Cir. 2017).  A plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Cardinal Health*, 2021 WL 4397946, at *16.  Loss causation is alleged where a corrective disclosure revealed defendants' fraud.  *Fed. Home Loan,* 830 F.3d at 384.  "[T]o be corrective, the disclosure need not precisely mirror the earlier misrepresentation." *Miller Energy*, 2014 WL 415730, at *22.  Loss causation can also be alleged via the "materialization of the risk" theory.  *See Fed. Home Loan*, 830 F.3d at 384-385.  Under that theory, "a plaintiff must allege that negative investor inferences from a

specific event or disclosure caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement." *CBL*, 2022 WL 1405415, at *14.

The Complaint easily satisfies this low burden. The relevant truth was gradually revealed through three disclosures on February 3, 2022, April 28, 2022 and June 8, 2022—each of which disclosed the loss of Sponsors or the impact on the Company, and each caused Loyalty stock to plummet. *See e.g.*, ¶¶53-64; 153-160. Moreover, the poor Miles issuance revealed on February 3, 2022 and April 28, 2022 was a materialization of the risk of the loss of three top ten Sponsors, and Sobeys' termination was the natural outcome of concealing Sobeys' prior termination notice.

Pointing to press articles, Defendants argue that the February 3 and April 28 disclosures included information that was public. LYLT M., ECF No. 35 at PageID 440-41; ADS M., ECF No. 37 at PageID 722-23. But the Court should "decline[] to venture outside the four corners of Plaintiffs' complaint to consider this argument." *CBL*, 2022 WL 1405415, at *7 n.9 (disregarding press articles that defendants submitted to defeat loss causation); *SmileDirectClub*, 633 F. Supp. 3d at 1080 ("were the Court to rely on these exhibits … this would … convert the motion to dismiss into one for summary judgment"). Furthermore, what the market knew "is a fact-intensive issue and improper for consideration here at the pleading stage." *CBL*, 2022 WL 1405415, at *15; *Zwick*, 2018 WL 2933406, at *10 ("Defendants also contend that the information…was publicly known… Because this argument is intensely fact-specific, it is not appropriate for the Court to consider it on these Motions to Dismiss").

Regardless, Defendants are incorrect. As the Complaint alleges, the market was unaware that the lost Sponsors were all key top ten Sponsors touted by Defendants. ¶51. It was only when the Company disclosed that the loss of the Sponsors materially ***impacted*** AIR MILES' results that the relevant truth became known. *CBL*, 2022 WL 1405415, at **15-16 (loss causation where

public lawsuit was filed against company, but defendants downplayed the merit of the lawsuit and impact on company); *SmileDirectClub*, 633 F. Supp. 3d at 1081 ("Defendants employed aggressive tactics to subvert revelations…It is thus reasonable that this information was not already public, and in any event, the Court must construe this factual dispute in Plaintiffs' favor").

Defendants' argument that "other information" may have caused the declines in Loyalty's stock prices (LYLT M., ECF No. 35 at PageID 441; ADS M., ECF No. 37 at PageID 723), is inappropriate at this stage. *See Cmty. Health Sys.,* 877 F.3d at 696 ("There might have been other causes. But whether the Funds' losses flowed from the disclosures…or anything else is for the parties to dispute at the summary-judgment stage or at trial, rather than for us to decide on the pleadings"); *Fed. Home Loan*, 830 F.3d at 388 (rejecting argument that the plaintiff failed to "plead[] facts sufficient to exclude more likely explanations for its alleged losses," because plaintiff "need only allege sufficient facts to support a plausible claim—not the most likely—at this stage").[26] Moreover, the ADS Defendants' assertion that these stock declines were due to the COVID-19 pandemic (ADS M., ECF No. 37 at PageID 723) is directly contradicted by Defendant Horn's admission in April 2022, when he stated in response to a direct analyst question that the pandemic was not "much of a headwind" for the Company and it was instead *the "two programs that are no longer with" AIR MILES that had made the miles issuance "weaker."* ¶59.

Contrary to Defendants' claims (LYLT M., ECF No. 35 at PageID 442; ADS M., No. 37 at PageID 724), the public loss of Sobeys corrected Defendants' constant promotion of Sobeys as

---

[26] That AIR MILES' "revenue" increased at certain points is irrelevant because revenue was also tied to customer redemption of Air Miles and says nothing of the number of Miles issued. ADS M., ECF No. 37 at PageID 723. Similarly, whether Loyalty's stock dropped on other dates is immaterial where, as here, the Complaint alleges significant stock drops in response to the corrective disclosures. ADS M., ECF No. 37 at PageID 723-24. Nothing more is needed to allege loss causation.

a loyal client.[27]  The later revelation that Sobeys informed Defendants of its departure **pre-Spin** confirms the market reaction.  *See In re Cardinal Health Inc. Sec. Litigations*, 426 F. Supp. 2d 688, 760 (S.D. Ohio 2006) (loss causation adequately pled "even though the true extent of the fraud was not revealed to the public until [after the class period]"); *FirstEnergy*, 2022 WL 681320, at *29 ("Where, as here, details of wrongdoing emerge in the Class Period and a series of disclosures continues beyond it, no rule prohibits loss causation as to the later events").  Moreover, Sobeys' exit was the obvious risk of concealing of the termination notice, and therefore "Plaintiff[] ha[s] sufficiently alleged a 'close correlation between the alleged revelation or materialization of the risk and the immediate fall in stock price.'" *CBL*, 2022 WL 1405415, at *16; *Shupe*, 660 F. Supp. 3d at 677 (plaintiff can plead "loss causation based on 'materialization of the risk' because defendants accused of securities fraud should not escape liability by simply avoiding a corrective disclosure").

### G.     The Complaint Alleges Claims Under Section 20(a)

Since the Complaint adequately alleges violations under Section 10(b), Plaintiff has pleaded a control person claim under Section 20(a) against the ADS and Loyalty Defendants.  *See Cardinal Health*, 2021 WL 4397946, at *17.  Whether control person liability applies depends on "the practical ability to direct the actions of the people who committed the violation." *FirstEnergy*, 2022 WL 681320, at *30; *see also PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696-97 (6th Cir.

---

[27] Defendants' authorities are inapposite.  LYLT M., ECF No. 35 at PageID 442; ADS M., ECF No. 37 at PageID 723-24. In *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360-61 (6th Cir. 2014), the court explained that loss causation could not be premised on "public information that the market had absorbed" two years earlier.  Here, however, the announcement of Sobeys' departure revealed entirely new information that was never previously made public. Unlike here, the plaintiffs in *Tempur Sealy,* 2019 WL 1368787, at *15, did "not assert that the[] alleged facts ever were disclosed to the market."

2004) (control is "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person").

This standard is easily met with respect to ADS.  ADS clearly participated in the operation and management of Loyalty (its former business segment) before the Spinoff, controlled the contents of the Registration Statement and other public filings submitted to the market concerning the Spinoff, and in fact deliberately orchestrated the Spinoff to "maximize the value of RemainCo" and obtain a $750 million payout while concealing the highly material information that half of Loyalty's crucial top ten Sponsors—including its second most important Sponsor, Sobeys—had either already left AIR MILES or given notice that they would do so.  ¶¶192-93.  Indeed, the ADS Defendants engaged in a concerted effort to knowingly conceal this information from the market in addition to third party lenders, ratings agencies, and advisors, in order to ensure that none of it was disclosed in public filings concerning Loyalty.  ADS's control is further demonstrated by the fact that ADS's senior management directly threatened Defendants Horn and Chesnut with termination from both ADS and Loyalty if they did not participate in the fraud.  *Id.*  Significantly, the ADS Defendants nowhere dispute that they had this control.  ADS M., ECF No. 37 at PageID 724-25.

The Loyalty Defendants' control is easily established.  As the CEO and CFO of Loyalty, they obviously controlled Loyalty's dissemination of public statements to the market.  ¶¶188-91.  The Loyalty Defendants' argument they lacked control over certain pre-Spinoff public statements because they were not "senior" to the ADS officers who signed those statements—*i.e.*, the October 14, 2021 investor presentation and Form 10-Q for 3Q21—fails.  LYLT M., ECF No. 35 at PageID 444.  *First*, "[w]hether a person is a controlling person is normally a question of fact that cannot be determined at the pleading stage." *Beach v. Healthways, Inc.*, 2009 WL 650408, at *6 (M.D.

Tenn. Mar. 9, 2009). Indeed, "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity." *FirstEnergy,* 2022 WL 681320, at *31. *Second*, being more "senior" is not the standard—particularly considering that Defendants Horn and Chesnut were themselves very senior ADS executives at that time who had been appointed as the executives in charge of the "Spin Team" for the Spinoff. ¶¶19-20, 89; *FirstEnergy,* 2022 WL 681320, at *31 (finding "less-senior" defendant liable under Section 20(a) as well as defendants working at company subsidiaries who participated in "predicate acts"); *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 741 (E.D. Mich. 2007) (rejecting argument that defendant was a "mid-level executive"). *Third*, the contents of the statements at issue dealt directly with AIR MILES and Loyalty, over which Horn and Chesnut—who were again the ADS executives assigned to lead the "Spin Team" for the Spinoff—unquestionably had "at least some level of control." *See Zwick*, 2018 WL 2933406, at *11 ("Smith and Cash exercised at least some control over Quorum's allegedly misrepresented financials, particularly because Quorum was still a part of CHS at the times of the alleged misstatements"). *Fourth*, as noted above (§IV.B), the argument is irrelevant because Horn and Chesnut made *identical* statements after the Spinoff.

V.    **CONCLUSION**

For all of these reasons, Defendants' motions to dismiss should be denied.[28]

Dated:  August 9, 2024                              Respectfully submitted,

                                                   By: */s/ John C. Camillus*
                                                   John C. Camillus (OH Bar No. 77435)
                                                   **LAW OFFICES OF JOHN C. CAMILLUS, LLC**
                                                   P.O. Box 141410
                                                   Columbus, OH 43214

---

[28] If the Court grants Defendants' motions to dismiss, or any part of it, Plaintiff respectfully requests leave to amend. Fed. R. Civ. P. 15(a); *United States ex rel. Bledsoe v. Cmty. Health Sys. Inc.*, 342 F.3d 634, 644 (6th Cir. 2003) ("[W]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice.").

Tel.: (614) 992-1000
Fax: (614) 559-6731
jcamillus@camilluslaw.com

*Local Counsel for Lead Plaintiff Newtyn Partners, LP and Newtyn TE Partners, LP*

Maya Saxena (admitted *pro hac vice*)
Lester R. Hooker (admitted *pro hac vice*)
Dianne M. Pitre (*pro hac vice* forthcoming)
Jonathan Lamet (admitted *pro hac vice*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com
jlamet@saxenawhite.com

-and-

Steven B. Singer (*pro hac vice* forthcoming)
Kyla Grant (admitted *pro hac vice*)
David J. Schwartz (admitted *pro hac vice*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
kgrant@saxenawhite.com
dschwartz@saxenawhite.com

*Counsel for Lead Plaintiff Newtyn Partners, LP and Newtyn TE Partners, LP*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users and that I have mailed by FedEx the foregoing to the following representative of Defendants Horn and Chesnut:

> Peter A. Stokes
> Norton Rose Fullbright US LLP
> 98 San Jacinto Boulevard, Suite 1100
> Austin, Texas 78701-4255
> Tel: (512) 536-5287

> */s/ John C. Camillus*
> John C. Camillus