UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

NEWTYN PARTNERS LP, and
NEWTYN TE PARTNERS, LP,

        Plaintiffs,

        v.

ALLIANCE DATA SYSTEMS
CORPORATION N/K/A BREAD
FINANCIAL HOLDINGS, INC., *et al.*,

        Defendants.

**Case No. 2:23-cv-1451**
**Judge Edmund A. Sargus, Jr.**
**Magistrate Judge Elizabeth P. Deavers**

## OPINION AND ORDER

Plaintiff Newtyn Partners, LP and Newtyn TE Partners, LP (collectively referred to as "Plaintiff") brings this securities fraud action against Alliance Data Systems Corporation ("ADS") (now known as Bread Financial Holdings, Inc.), ADS CEO Ralph J. Andretta ("ADS Defendants") and against two individuals who became the CEO (Charles L. Horn) and CFO (John J. Chestnut) of Loyalty Ventures, Inc. ("Loyalty Defendants"), a business spun-off from ADS in November 2021. This matter is before the Court on Motions to Dismiss filed by Loyalty Defendants (Loyalty Mot., ECF No. 35) and by ADS Defendants (ADS Mot., ECF No. 37).

For the reasons stated in this Opinion and Order, the Court **GRANTS** Loyalty Defendants' Motion to Dismiss (ECF No. 35) and **GRANTS** ADS Defendants' Motion to Dismiss (ECF No. 37). Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

## BACKGROUND

Plaintiff filed its Complaint in April 2023 (ECF No. 1), a First Amended Complaint in January 2024 (ECF No. 25), and a Second Amended Complaint in March 2024 ("SAC," ECF No.

30). Plaintiff brings this action on behalf of itself and others similarly situated as part of a prospective class. (SAC, PageID 296.)

## I. Summary

This securities fraud case revolves around the November 2021 spinoff of a business segment of ADS that became known as Loyalty Ventures, Inc. (the "Spinoff"). (SAC ¶¶ 1, 46.) In short, Plaintiff alleges that Defendants orchestrated the Spinoff as part of a plan to alleviate ADS's "crushing debt load" while knowing that Loyalty faced significant business headwinds as a new, separate entity. (*Id.* ¶ 1.) After establishing Loyalty as a separate, publicly traded company, Loyalty "incur[red] substantial debt financing to fund a $750 million cash payment back to ADS," a "massive payout" that Plaintiff alleges came at the expense of Loyalty's new investors. (*Id.*) In Plaintiff's view, Defendants oversold Loyalty's prospects and fraudulently misled investors about Loyalty's relationships with critical corporate partners in its AIR MILES customer rewards program. (*Id.*) After months of decline in its stock price after the Spinoff, Loyalty filed for Chapter 11 bankruptcy in March 2023. (*Id.* ¶¶ 10, 21.)

Plaintiff's fraud allegations rely on documents filed in Loyalty's bankruptcy proceedings, including a sworn declaration from Loyalty CEO Charles Horn (Horn Declaration, ECF No. 51-2) and a February 20, 2024 Adversary Complaint against ADS filed by the Bankruptcy Trustee of Loyalty's liquidating trust ("Adversary Complaint"). These documents, in part, relate to Defendants' knowledge regarding the Spinoff, including that one of the business's most important clients, Sobeys, renegotiated its contract with ADS shortly before the Spinoff. Plaintiff alleges that Defendants deceived the market by concealing Sobeys's potential departure and "deliberately tim[ing] the Spinoff to occur before that news would become public." (SAC ¶ 68.) ADS filed a motion to dismiss the Adversary Complaint in the bankruptcy proceeding on May 20, 2024.

*Pirinate Consulting Group, LLC v. Bread Financial Holdings, Inc.*, Adv. Pro. No. 24-03027 (Bankr. S.D. Tex. May 20, 2024). That motion is pending as of this Opinion and Order. *See id.*

Defendants retort that Plaintiff merely alleges "fraud-by-hindsight" and that the allegedly false or misleading statements highlighted in the SAC represent non-actionable opinions, statements of historical fact, statements of corporate optimism, *i.e.*, "puffery," or statements that Defendants did not have a duty to disclose. (ADS Mot., PageID 696–97; *see* Loyalty Mot., PageID 405–06.) They also emphasize the tentative nature of Sobeys's potential exit from the program.

## II.    ADS's Businesses and Pre-Spinoff Posture

The remainder of the Background section is based on allegations in the SAC unless otherwise stated. Before 2020, ADS consisted of three overall operating segments: (1) Card Services, which issued private label and co-branded credit cards and accounted for over 75% of ADS's operating income, (2) Epsilon, which provided digital marketing services, and (3) LoyaltyOne, which consisted of two programs designed to help retail clients institute and operate customer loyalty programs. (SAC ¶ 29.) By 2019, ADS had accumulated over $5 billion in debt. (*Id.* ¶ 30.) It designed a plan to narrow its scope and to pay off its debt by selling off its two smaller business segments: Epsilon and LoyaltyOne. (*Id.* ¶¶ 30–31.) ADS sold off Epsilon first in July 2019. (*Id.* ¶ 31.) Then, on May 12, 2021, ADS announced it would spin off LoyaltyOne by the fourth quarter ("Q4") of 2021. (*Id.* ¶ 32.) ADS later announced that the new company would be called Loyalty Ventures, Inc. ("Loyalty") and that, as part of the spinoff, Loyalty would pay $750 million in cash to ADS. (*Id.* ¶ 33.) At the time, a market analyst described ADS's Spinoff move and the Loyalty payment as a means for ADS to "strengthen its [balance sheet] via de-leveraging." (SAC ¶ 33–34.)

### A.  Loyalty's Business

LoyaltyOne—and later, Loyalty—contained two distinct operating entities: AIR MILES, a Canadian-based customer loyalty rewards program, and BrandLoyalty, a Netherlands-based marketing company that designed and implemented short-term rewards programs for grocers. (*Id.* ¶¶ 36–37.) Under the AIR MILES segment, participating retail clients, known as "Sponsors," issued their customers "Air Miles" rewards points that could be redeemed for travel, merchandise, and other rewards. (*Id.* ¶ 36.) Sponsors paid LoyaltyOne a fee-per-mile issued, and AIR MILES in return provided all marketing, customer service, and redemption services. (*Id.*) In 2019 and 2020, AIR MILES comprised 77% and 67%, respectively, of LoyaltyOne's adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA"), a key financial metric. (*Id.* ¶ 38.)

AIR MILES had expansive reach, with about two-thirds of Canadian households participating, and had Sponsors providing rewards points for purchases like gas, groceries, and pharmaceuticals. (*Id.* ¶ 39–40.) As of October 2021, AIR MILES had approximately 135 participating Sponsors. (*Id.* ¶ 102.) The top ten Sponsors accounted for 55% of LoyaltyOne's combined revenue for 2020. (*Id.*)

### B.  Sponsor Trouble

Plaintiff's claims rest largely on its allegations that several "top ten" AIR MILES Sponsors left the program (by terminating or otherwise not renewing their contracts) before the Spinoff and that several key Sponsors had contracts due to expire after the planned Spinoff. (*See id.* ¶¶ 49–67.) With this knowledge, Plaintiff claims, Defendants downplayed the threats posed by these departures and misled investors about Loyalty's post-Spinoff prospects. (*Id.*)

4

### i. Exit of Several "Top Ten" Sponsors

Rexall, a pharmacy company, "left" the AIR MILES program before the end of 2020. (*Id.* ¶ 51.) Rona Inc., also known as Lowe's Canada ("RONA"), and the Liquor Control Board of Ontario ("LCBO") left the AIR MILES program in the first quarter of 2021. (*Id.*) As alleged, "in 2020 and 2021, media reports circulated that Rexall, LCBO, and RONA had terminated their participation in the AIR MILES program."[1] (SAC ¶ 143.) Plaintiff claims that each of these Sponsors were "top ten" Sponsors, a category repeatedly referenced by ADS and Loyalty in United States Securities and Exchange Commission ("SEC") filings and investor presentations. (*Id.* ¶¶ 51, 106.) Additionally, as alleged, AIR MILES's "top three Sponsors—BMO [Bank], Sobeys, and Shell Canada—all had contracts that were due to expire in 2022 and 2023." (*Id.* ¶ 74.)

### ii. Exit of Sobeys and Staples Canada

In January 2021, ten months before the November 2021 Spinoff, Plaintiff alleges that ADS's management informed ADS's Board of Directors that Sobeys, AIR MILES's "second largest client," had "relayed its intention to terminate [its AIR MILES contract] by the end of 2022." (*Id.* ¶ 2, 7, 52.) Plaintiff alleges that "Defendants not only deceived investors about Sobeys' impending exit, but they also deliberately concealed this critical information from third party ratings agencies and lenders." (*Id.* ¶ 12.) Plaintiff also relies on the Horn Declaration, in which Mr. Horn states that, "in late 2020, Sobeys informed ADS that it was considering exercising its early termination rights and renegotiating or discontinuing its participation" in AIR MILES.[2] (Horn

---

[1] These news articles were alleged in the SAC, so taking judicial notice of the reports is unnecessary. Even so, the Court notes that a court may "take judicial notice of the fact that the media articles cited [] were published, without reaching any conclusions about their truth." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 662 n.10 (6th Cir. 2005).

[2] In the SAC, Plaintiff recites part of, but not all of, this quote from the Horn Declaration, omitting

Declaration, ¶ 39.) As will be discussed later, though, Sobeys instead renegotiated its AIR MILES contract and did not exercise its right to early termination until June 2022. (*See* SAC ¶¶ 62, 83.)

Plaintiff also alleges that Staples Canada, a "top ten" Sponsor, "formally notified ADS before the Spinoff in 2021 that it would terminate its relationship with AIR MILES effective in 2022." (*Id.* ¶ 51.) Plaintiff does not allege that Defendants marketed Sobeys or Staples Canada as a Sponsor after they official exited the program.

Seven months after the Spinoff, on June 8, 2022, Loyalty filed a "Current Report" on a SEC Form 8-K disclosing that on June 7, 2022, Sobeys had provided "notice of its intent to exit the [AIR MILES] program." (*Id.* ¶ 62.) Loyalty further announced that Sobeys would "exit the program on a region-by-region basis" between August 2022 and Q1 2023. (*Id.*) On the day of the Sobeys announcement, Loyalty's stock price fell 45%. (*Id.* ¶ 64.) Two weeks later, on June 21, 2022, Staples Canada announced its exit from the AIR MILES program, effective July 1, 2022. (*Id.* ¶ 66.)

## III. The Spinoff and Creation of Loyalty Ventures, Inc.

Before the Spinoff on November 5, 2021, Defendants made several statements and representations about Loyalty's prospects. Plaintiff alleges that when Mr. Horn and Mr. Chestnut

---

the "and renegotiating or discontinuing" part of the quote. (See SAC ¶ 78.) Loyalty Defendants provide this missing part of the quote in their Motion. (Loyalty Mot., PageID 422.) In its Response, Plaintiff states that Loyalty Defendants misquoted the Complaint and urges that Defendants' "underhanded tactics should be disregarded." (Resp., PageID 1461.)

Because Loyalty Defendants accurately provided the full quote from the Horn Declaration, which is a public court record and is integral to Plaintiff's claims, the Court considers the full quote, not just the portion recited in the SAC. *See Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360–61 (6th Cir. 2001) ("[T]his Court may consider the full text of the SEC filings, prospectus, analysts' reports and statements "integral to the complaint," even if not attached, without converting the motion [to dismiss] into one for summary judgment under Fed.R.Civ.P. 56.")

raised internal concerns about the Spinoff, ADS senior management told them "to get with the program, or they would no longer be employed by ADS or [Loyalty]." (SAC ¶ 92.)

### A. Loyalty's Registration Statement

On October 14, 2021, the soon-to-be-spun-off Loyalty filed a Registration Statement with the SEC. (*Id.* ¶ 40; Registration Statement, ECF No. 38-2, PageID 739–945.) Plaintiff alleges the following statements in the Registration Statement were materially false and misleading and omitted material facts when made. (SAC ¶ 103.) Under a section titled "Our competitive strengths," Loyalty stated:

> We have maintained deep, long-standing relationships with large consumer-based businesses, including well-known worldwide brands, such as Shell Canada, Sobeys Inc., Bank of Montreal, Rewe and Albert Heijn.
>
> For the AIR MILES Reward Program, we utilize our large collector base together with our data and analytical capabilities to deepen our existing relationships with our sponsors, some of which have been part of the program for almost 30 years, and continue to drive powerful benefits to collectors in the program. By continuing to engage our collectors with personalized marketing experiences and scaled rewards, our sponsors recognize the significant benefit to staying in the AIR MILES Reward Program and increasing their customer spend (issuance) opportunity. We believe that our success with sponsors and our ability to offer a variety of redemption options, both aspirational and instant, drive the appeal of AIR MILES Reward Program to collectors.

(Registration Statement, PageID 312; SAC ¶¶ 41–43, 101.) Under a section titled "Our Sponsors," Loyalty further stated:

> Approximately 135 brand name sponsors participate in our AIR MILES Reward Program. . . . Relationships with our largest and most well-known sponsors account for a significant portion of our combined revenue. For the year ended December 31, 2020, our 10 largest sponsors represented approximately 55% of our revenue. . . . Contracts with our sponsors generally vary in length from three to five years. However, our top 6 sponsors have an average tenure of 25 years.

(Registration Statement, PageID 835; SAC ¶¶ 42, 102.) Additionally, under a section titled "Risks relating to our business strategy and operations," Loyalty stated:

Our 10 largest clients represented 55% and 46%, respectively, of our combined revenue for the years ended December 31, 2020 and 2019, and the loss of any of these clients could cause a significant reduction in our combined revenue.

We depend on a limited number of large clients for a significant portion of our combined revenue. Our 10 largest clients represented approximately 55% and 46%, respectively, of our revenue for the years ended December 31, 2020 and 2019. . . . A decrease in revenue from any of our significant clients, including Bank of Montreal, for any reason, including a decrease in pricing or activity, or a decision either to utilize another service provider or to no longer procure the services we provide, could have a material adverse effect on our combined revenue.

(Registration Statement, PageID 770; SAC ¶ 44.)

### B. Additional Pre-Spinoff Statements and Filings

Also on October 14, 2021, Loyalty filed an investor presentation with the SEC on a Form 8-K. (SAC ¶ 107.) The presentation referenced the logo of Sobeys, who was still a Sponsor at the time, and touted Loyalty's "stable client base" of large Sponsors that could be relied on to "generate recurring campaign demand." (*Id.* ¶ 108.) On October 28, 2021, Loyalty filed a Form 8-K including a press release announcing its Q3 2021 financial results, touting the company's "long-term potential." (*Id.* ¶ 109.)

On November 3, 2021, ADS filed a Form 10-Q for Q3 2021, signed by Mr. Andretta, accompanied by an ADS press release. (*Id.* ¶ 110–11.) Plaintiff alleges that "ADS provided false explanations for why AIR MILES had issued fewer miles than in the past" by stating that Air Miles rewards points issued in that quarter decreased year-over-year by 7%, "reflecting certain promotional activity in the prior year not present in the current year." (*Id.* ¶ 111.)

### C. Execution of the Spinoff

ADS spun off Loyalty into a separate entity on November 5, 2021, and Loyalty began regular trading on Monday, November 8, 2021. (SAC ¶ 46.) Loyalty announced that it raised over $650 million, which was used to fund the majority of its $750 million payment to ADS in

connection with the Spinoff. (*Id.*) It closed its first day of trading at $49.08 per share. (*Id.* ¶ 48.)

### D. Post-Spinoff Statements and Filings

Plaintiff claims that Loyalty, Mr. Horn, and Mr. Chestnut made various post-Spinoff statements, detailed below, that were misleading and false and omitted material facts when made. (*Id.* ¶¶ 121, 125, 128.)

On November 9, 2021, Loyalty filed a Form S-8 signed by Mr. Chestnut and Mr. Horn that included the Registration Statement. (*Id.* ¶ 113.) On November 24, 2021, Loyalty filed a quarterly report on a Form 10-Q, signed by Mr. Chestnut and Mr. Horn, providing the same allegedly false explanation for the 7% year-over-year decline in Q3 2021 Air Miles rewards points issued as claimed by ADS above—that the decline was due to timing of promotional activity. (*Id.* ¶ 114–15.)

In a December 15, 2021 investor presentation, which was disclosed to the SEC on a Form 8-K, Loyalty again included a slide with the logo of Sobeys, a current Sponsor, and touted the program's "stable client base" that could be relied on to "generate[] recurring campaign demand." (*Id.* ¶¶ 49, 117.) The presentation also touted AIR MILES's "exclusive relationships" with key Sponsors. (*Id.*) Plaintiff attributes this presentation to Mr. Chestnut and Mr. Horn. (*Id.* ¶ 49.)

On February 3, 2022, Loyalty issued a press release reporting its Q4 2021 financial results. (*Id.* ¶ 119.) Mr. Horn congratulated the Loyalty team for navigating a challenging business environment "while managing relationships with our sponsors" and stated that Loyalty had "a roster of marquee clients to which we can offer a . . . solid financial position." (*Id.*) This release also revealed that Loyalty issued 7% less Air Miles rewards points in Q4 2021 year-over-year, attributed to "the non-renewal of two sponsors [RONA and LCBO] and their exit from the program the first quarter of 2021." (*Id.* ¶ 54.)

On an earnings call the same day, Mr. Horn claimed the company maintained "long-standing customer relationships" with Sponsors, which was a "key" reason to invest in Loyalty. (*Id.* ¶ 120.) Mr. Chestnut stated that Loyalty expected the number of Air Miles rewards points issued in 2022 to grow between 4% and 5%, "trending back up towards $5 billion of issuance." (*Id.*) Loyalty's stock price fell 11% on February 4, 2022. (*Id.* ¶ 55.)

On February 8, 2022, Loyalty filed a Form S-8, which incorporated by reference the October 14, 2021 Registration Statement. (*Id.* ¶ 122.) Later that month, on February 28, 2022, Loyalty filed a Form 10-K, its first and only annual report. (*Id.* ¶ 123.) In that report, Loyalty stated,

> We have over 100 brand name sponsors that participate in our AIR MILES Reward Program, including Shell Canada Products, Jean Coutu, Amex Bank of Canada, Sobeys Inc. and Bank of Montreal. . . . Relationships with our largest and most well-known sponsors account for a significant portion of our consolidated and combined revenue, including approximately 17% from Bank of Montreal for the year ended December 31, 2021.

(*Id.* ¶ 124.) Loyalty also reported the following "risk factors":

> Our 10 largest clients represented 58%, 55% and 46% respectively, of our consolidated and combined revenue for the years ended December 31, 2021, 2020 and 2019, and the loss of any of these clients could cause a significant reduction in our consolidated revenue. . . . A decrease in revenue from any of our significant clients, including Bank of Montreal, for any reason, including a decrease in pricing or activity, or a decision either to utilize another service provider or to no longer procure the services we provide, could have a material adverse effect on our consolidated revenue.

(*Id.* ¶ 126.)

## IV.    Loyalty's Slide into Bankruptcy

After the 11% decline in Loyalty's stock price on February 4, 2022, Plaintiff alleges Defendants discussed the significance of RONA and LCBO's departures at a March 23, 2022 investor conference. (SAC ¶ 58.) Mr. Chestnut stated that the departures were for benign reasons

and that RONA and LCBO were not among AIR MILES's "biggest partners" that, as a group, issued more than two-thirds of all Air Miles rewards points. (*Id.* ¶¶ 58, 129.) Mr. Chestnut also said that "you'll see us focus on delivering the new sponsors and new ways to earn throughout 2022." (*Id.* ¶ 129.)

On April 28, 2022, Loyalty reported its Q1 2022 financial results, including a 6% decrease in year-over-year revenue and a 19% decrease in year-over-year EBIDTA. (*Id.* ¶ 59.) Air Miles rewards points issued in the quarter fell again, this time by 4%, attributed again to the exit of RONA and LCBO. (*Id.*) On an earnings call discussing the results, Mr. Horn and Mr. Chestnut discussed the continuing negative effects of RONA and LCBO's departures. (*Id.* ¶ 131–33.) Loyalty's stock price fell by 24% over the next two days, down to $11.25 on May 2, 2022. (*Id.* ¶ 60.)

On June 8, 2022, Loyalty filed a Form 8-K including a press release stating that Loyalty and "AIR MILES' Sponsor, Sobeys[,] were unable to align on extension terms; consequently, on June 7, 2022, Sobeys provided notice of its intent to exit the program on a region-by-region basis, beginning with Atlantic Canada, between August 2022 and the first quarter of 2023."[3] (*See* SAC ¶ 62.) The release stated that Sobeys "represented approximately 10% of Loyalty Ventures' adjusted EBITDA in 2021." (*Id.* ¶ 63.) As a result, Loyalty would rescind its previously provided revenue and adjusted EBITDA guidance for the remainder of 2022. (*Id.*)

By the close of trading on June 8, 2022, Loyalty's stock price fell 45%, down to $6.02. (*Id.* ¶ 64.) It continued to fall in the following days, down to $4.80 per share on June 13, 2022, for a

---

[3] *See* Loyalty Ventures, Inc., Current Report (Form 8-K), Item 8.01 (June 8, 2022). Because this SEC filing is referenced in the SAC, is a matter of public record, and is integral to the SAC, the Court relies on the full statement from the SEC filing rather than the version from the SAC (*see* SAC ¶ 62), which omits part of the quote. *See Bovee*, 272 F.3d at 360–61.

total decline of 56% from the market's opening on June 8. (*Id.*) As stated above, Staples Canada announced on June 21, 2022 that it too was leaving the program, effective July 1, 2022. (*Id.*) Sobeys's exit announcement "prompted three other top Sponsors, namely BMO [Bank], Shell Canada, and Metro Ontario Inc., to renegotiate their contracts with AIR MILES with substantially worse economics." (*Id.* ¶ 66.)

Eventually, on March 10, 2023, Loyalty's stock closed at $0.24, down from its peak of nearly $50 per share. (*Id.*) That day, Loyalty filed a petition in the Bankruptcy Court for the Southern District of Texas and proceeded with a liquidation of its assets. (*Id.* ¶ 67.)

## V.  Post-Bankruptcy Statements

As previewed above, Plaintiff's claims rely heavily on documents filed as part of Loyalty's bankruptcy proceedings, including Mr. Horn's Declaration and the Adversary Complaint filed by the Bankruptcy Trustee against ADS. (SAC ¶ 68.)

### A.  The Horn Declaration

In a declaration filed at the start of Loyalty's bankruptcy proceedings on March 10, 2023, Mr. Horn described the disposition of Loyalty's AIR MILES program before the Spinoff. (*Id.* ¶¶ 68–69.) Loyalty Defendants attached the Horn Declaration to their Reply. (Horn Declaration, ECF No. 51-2.)

Mr. Horn stated,

The AIR MILES Business was and had been suffering the effects of an ongoing shift in the loyalty programs market prior to the Spinoff Transaction, with retailers increasingly launching their own inhouse loyalty programs and multiple major client departures from the AIR MILES Reward Program in 2020 and 2021.

(SAC ¶ 70.) Additionally, Mr. Horn stated that the "departure of one [top ten Sponsor] would have a broader 'network effect' on the value of the entire AIR MILES Reward Program to the remaining Sponsors and Collectors." (*Id.* ¶ 72.) Mr. Horn explained that "[t]he fewer the Sponsors from

12

whom consumers can earn or redeem rewards, the less the program's value to customers and hence the less the incentive for retailers to become or remain sponsors." (*Id.*)

Regarding Sobeys's participation in the AIR MILES program, Mr. Horn stated that "in late 2020, Sobeys informed ADS that it was considering exercising its early termination rights and renegotiating or discontinuing its participation in the AIR MILES Reward Program before the expiration of its contract." (Horn Declaration, ¶ 39.) Mr. Horn also stated that Sobeys's eventual departure from the program in 2022 was "consistent with its [prior] statements dating back to 2020." (SAC ¶ 78; Horn Declaration ¶ 22.) He added that Sobeys's potential departure "loomed throughout 2021 in the lead up to the Spinoff." (SAC ¶ 78.)

As Mr. Horn further explained, after Sobeys left the program in 2022,

> Sobeys's departure had the previously expected consequence of causing the remaining two of the AIR MILES Reward Program's top three customers (BMO and Shell Canada) to demand and obtain substantial price concessions upon renewal of their contracts. . . . In light of the Company's limited negotiating power (due to the customer concentration risk represented by those three clients) and crippling debt burden, along with the reduced network effect as a result of Sobeys's exit, these contract renewals incorporated reduced economics, shorter terms and certain termination risks. The price concessions substantially compressed the AIR MILES Business's earnings margin.

(*Id.*) Last, Mr. Horn explained that the effects of Sobeys's departure would "be felt over a three-year period" and that "[w]ith the loss of Sobeys as a Sponsor and the repricing of the BMO, Shell Canada and Metro contracts, the debt service on the Company's Credit Agreement was more than the cash flow being generated." (Horn Declaration, ¶¶ 48–49; SAC ¶ 79.)

### B.  Adversary Complaint

The Bankruptcy Trustee's Adversary Complaint filed against ADS in February 2024 stated that AIR MILES's business was "distressed" before the Spinoff, that ADS unsuccessfully tried to sell that part of its business, and that Defendants knew that "the loss of any major sponsor" would

"severely impact the AIR MILES business and [Loyalty] as a whole." (SAC ¶¶ 73–74.) It also stated that the risk of Sponsors demanding more favorable terms was "particularly acute" after several Sponsor departures in early 2021 and because major sponsors including Sobeys had contracts due to expire in 2022 and 2023. (*Id.* ¶ 74.) It emphasized the importance of maintaining Sobeys and BMO as Sponsors. (*Id.*)

The Adversary Complaint also recited internal communications, including that Sobeys "intended to terminate its participation in the AIR MILES Program." (*Id.* ¶ 80.) In January 2021, four months before ADS announced the Spinoff, the Adversary Complaint alleges that Sobeys was "transparent about its intention to terminate" its contract with AIR MILES by the end of 2022, "with the full knowledge of the employees of [Loyalty] and ADS." (*Id.*) Sobeys "confirmed its intent to terminate in early 2021," leading ADS management (including Mr. Andretta and Mr. Chestnut) to inform the ADS Board in January 2021 that "Sobeys relayed its intention to terminate [its participation in the AIR MILES program] by the end of 2022." (*Id.*)

In an email on February 18, 2021, LoyaltyOne's Senior Vice President sent an email to a Sobeys official about the AIR MILES program, stating that Sobeys's AIR MILES contract was not scheduled to expire until April 2024 but that "unfortunately, Sobeys has made a decision to exercise" its right "to provide notice and exit sooner so long as that right is exercised in Q1 [2021]." (*Id.* ¶ 81–82.) The early "exit window" authorized by Sobeys's Q1 2021 notice was July 15, 2021 to September 15, 2021. (*Id.* ¶ 82.)

But as explained in the Adversary Complaint and the SAC, Sobeys and ADS renegotiated Sobeys's AIR MILES contract rather than terminating it. As Plaintiff alleges, ADS agreed to amend Sobeys's AIR MILES contract on March 12, 2021, after Sobeys had expressed an intent to leave the program. (*Id.* ¶ 83.) ADS and Sobeys agreed to move the contract's expiration date up to

14

February 2023, to delay Sobeys's early exit window until July 2022, and to give Sobeys a 50% price discount in its 2021 annual fee. (*Id.*) The SAC does not allege that Sobeys conveyed a new intent to exit the program after Sobeys and ADS agreed to an amended contract. Sobeys did not exit the program until June 2022, when it exercised its right to terminate early in the delayed early exit window under the amended contract.

The Adversary Complaint alleges that Sobeys's planned 2022 departure "was in plain sight to the Defendants and their employees and Directors." (*Id.* ¶ 84.) In September 2021, one month before ADS approved of the Spinoff, a LoyaltyOne employee circulated a "Sobeys Exit Impact" analysis presenting five different scenarios, ranging from "No Impact" to "100% Loss." (*Id.* ¶ 85.)

Plaintiff alleges Defendants withheld information about Sobeys's potential departure and its projected effects on the AIR MILES business from prospective lenders used to fund the Spinoff. (*Id.* ¶¶ 88–91.) Specifically, Plaintiff claims Mr. Horn and Mr. Chestnut "knowingly provided false financial forecasts projecting that, for [2021] through [2025], Sobeys would purportedly represent 28% to 30% of all Air Miles issued by the AIR MILES program." (*Id.* ¶ 91.) That allegation depends on the view that Sobeys's decision to exit was final at the time. But as explained above, Sobeys renegotiated its contract in March 2021 rather than terminating it that year.

On October 13, 2021, the ADS Board met to make a final decision on the Spinoff. (*Id.* ¶ 95.) One participant asked about what would happen if Loyalty went bankrupt, and the Board discussed that Sobeys had not retracted its statement that it intended to terminate its AIR MILES contract in 2022. (*Id.* ¶¶ 95–96.) The Board discussed that the timing of the Spinoff in November 2021 was ideal "because it preceded critical upcoming attempted sponsor contract renewals." (*Id.* ¶ 95.) The ADS Board approved the Spinoff of Loyalty, which occurred on November 5, 2021. (*Id.* ¶¶ 46, 96.)

15

## VI. Procedural History

Plaintiff brought this lawsuit as a class action under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, in April 2023. (ECF No. 1.) Plaintiff filed an Unopposed Motion for Appointment as Lead Plaintiff and Approval of Selection of Counsel. (ECF No. 4.) The Court approved the Motion, designating Newtyn Partners LP and Newtyn TE Partners, LP as Lead Plaintiff of the prospective class under 15 U.S.C. § 78u-4(a)(3)(B). (ECF No. 20.) The prospective class consists of "all persons and entities that purchased Loyalty Ventures common stock between November 8, 2021 and June 7, 2022, inclusive" (the "Class Period"). (SAC ¶ 166; ECF No. 20.) Excluded from the prospective class are Defendants, officers and directors of ADS and Loyalty, their family and representatives, and others as described in the SAC. (SAC ¶ 166.)

Plaintiff brings two claims against all Defendants. First, Plaintiff claims violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under that statute, 17 C.F.R. § 240.10b-5. (*Id.* ¶¶ 173–85.) Second, Plaintiff brings "control person" claims under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (*Id.* ¶¶ 186–95.)

Loyalty Defendants moved to dismiss all claims against them under Rule 9(b) and Rule 12(b)(6) of the Federal Rules of Civil Procedure and the PSLRA. (Loyalty Mot.) ADS Defendants also moved to dismiss all claims on similar grounds. (ADS Mot.) Plaintiff filed an Omnibus Opposition to Defendants' Motions to Dismiss. (Resp., ECF No. 44.) ADS Defendants replied. (ADS Reply, ECF No. 50.) Loyalty Defendants replied. (Loyalty Reply, ECF No. 51.)

## LEGAL STANDARD

## I. Motion to Dismiss Standard

To state a claim upon which relief may be granted, plaintiffs must satisfy the pleading requirements set forth in Rule 8(a), which requires a pleading to contain a "short and plain

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (clarifying the plausibility standard from *Twombly*, 550 U.S. at 556). Furthermore, "[a]lthough for purposes of a motion to dismiss [a court] must take all the factual allegations in the complaint as true, '[the court is] not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

## II.     Standard for Section 10(b) Securities Fraud Claims

"Section 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder prohibit 'fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.'" *Louisiana Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008)). Under Rule 10b-5, issued by the SEC,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17

17 C.F.R. § 240.10b-5.

Ultimately, "[t]o state a securities fraud claim under Section 10(b), a plaintiff 'must allege, [1] in connection with the purchase or sale of securities, [2] the misstatement or omission of a material fact, [3] made with scienter, [4] upon which the plaintiff justifiably relied and [5] which proximately caused the plaintiff's injury.'" *Louisiana Sch.*, 622 F.3d at 478 (quoting *Frank*, 547 F.3d at 569).

### III.  Pleading Standards for Securities Fraud Claims

Additionally, "[s]ecurities fraud claims arising under Section 10(b) must satisfy the particularity pleading requirements of Federal Rule of Civil Procedure 9(b)." *Louisiana Sch.*, 622 F.3d at 478. Accordingly, the plaintiff's complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank*, 547 F.3d at 56.

Furthermore, under the PSLRA, a plaintiff alleging securities fraud must meet more "[e]xacting pleading requirements" regarding scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). In a complaint where the plaintiff alleges untrue statements of material fact or omissions of material fact causing statements to be fraudulently misleading,

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). Additionally,

> in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

18

*Id.* at 78u-4(b)(2)(A) (emphasis added).

Accordingly, under the PSLRA, a plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313 (quotation and citation omitted). To meet the PSLRA's "strong inference" standard, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. In the Sixth Circuit, the scienter requirement for Section 10(b) claims is akin to recklessness: "A plaintiff may survive a motion to dismiss only by pleading with particularity facts that give rise to a strong inference that the defendant acted with knowledge or conscious disregard of the fraud being committed." *Louisiana Sch.*, 622 F.3d at 478–79.

## ANALYSIS

The Court starts by considering whether any of the statements raised in the SAC constitute an untrue misstatement or misleading omission of material fact. The Court then turns to scienter.

### I. Untrue Misstatement or Misleading Omission of Material Fact

Principally, Plaintiff alleges that Defendants defrauded investors and other interested parties about Loyalty's prospects for success based on internal knowledge about AIR MILES program Sponsors who left or were planning to leave the program. Most importantly, Plaintiff alleges that Defendants fraudulently misled investors by touting ADS's and Loyalty's relationship with Sobeys and other key Sponsors, when, in fact, those Sponsors had conveyed their intent to stop participating in the AIR MILES program. But based on the key documents and statements relied on by Plaintiff, Plaintiff's claims run into fatal roadblocks: under applicable law, none of the allegedly fraudulent statements that Defendants had a duty to disclose conveyed false or materially misleading information by statement or omission.

### A. Standard for False and Misleading Statements and Omissions

"To state a claim under § 10(b) or Rule 10b–5, Plaintiffs must allege that Defendants made a misrepresentation or omission of material fact that Defendant had a duty to disclose." *Ley v. Visteon Corp.*, 543 F.3d 801, 807 (6th Cir. 2008). An omission of fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (citation omitted). "When a company chooses to speak, it must 'provide complete and non-misleading information.'" *Ind. State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009) (quoting *Rubin v. Schottenstein, Zox, and Dunn*, 143 F.3d 263, 268 (6th Cir. 1998)).

Statements that constitute mere corporate "puffery" are not considered to be material. In this regard, "[c]ourts have consistently found immaterial a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important." *Id.* at 944 (quotation and citation omitted). Furthermore, "the disclosure of accurate historical data does not become misleading even if the company might predict less favorable results in the future." *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 570 (6th Cir. 2004) (quotation and citation omitted) (cleaned up).

Additionally, the PSLRA established a safe harbor for forward-looking statements. *See* 15 U.S.C. § 78u–5. The PSLRA defines "forward-looking statement" to include:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

*Id.* § 78u–5(i)(1).

The Sixth Circuit has held that a plaintiff may overcome the safe-harbor protection for forward-looking statements "only if the statement was material; if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as 'forward-looking' or lacked meaningful cautionary statements." *Helwig v. Vencor Inc.*, 251 F.3d 540, 548 (6th Cir. 2001). "[I]f the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind." *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).

Similarly, the "Bespeaks Caution" doctrine, which "survived the codification of the PSLRA," "addresses 'situations in which optimistic projections are coupled with cautionary language,' affecting the materiality and reasonableness of relying on forward-looking statements." *Kolominsky v. Root, Inc.*, 100 F.4th 675, 687–88 (6th Cir. 2024) (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1408 (9th Cir. 1996)). Under that doctrine, "certain alleged misrepresentations . . . are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language." *Id.* at 689 (quotation omitted) (cleaned up).

### B. Sobeys's Departure from the AIR MILES Program

Plaintiff alleges that Defendants knew Sobeys, one of Loyalty's most important Sponsors,

intended to terminate its participation in the AIR MILES program and touted ADS's and Loyalty's relationship with Sobeys anyway, thus misleading investors that Sobeys would be a consistent, stable participant in the program after the Spinoff. But based on the allegations in the SAC and the bankruptcy documents on which Plaintiff heavily relies, all of Defendants' allegedly fraudulent statements and omissions occurred amid negotiations between Sobeys and ADS before Sobeys officially terminated its contract. Even though Plaintiff alleges that Sobeys's intent to leave the program was "so definitive" that it was a foregone conclusion, Plaintiff fails to establish that Defendants had a duty to disclose information about Sobeys's participation in the program based on the factual allegations in the SAC. (SAC ¶ 80.)

The Horn Declaration and the allegations raised in the Adversary Complaint are central to Plaintiff's claims regarding Sobeys. As publicly disclosed in the Registration Statement, ADS's contracts with AIR MILES Sponsors were for fixed terms, subject to renewal.[4] According to the Adversary Complaint and the SAC, Sobeys's contract to participate in the AIR MILES program was set to expire in April 2024. Sobeys had the option to terminate is contract early, between July 15, 2021, and September 15, 2021, so long as it exercised that right by Q1 2021.

Instead of terminating its contract with ADS, Sobeys renegotiated. As stated in Mr. Horn's Declaration but omitted in part in Plaintiff's SAC, "in late 2020, Sobeys informed ADS that it was *considering* exercising its early termination rights and *renegotiating or discontinuing* its participation" in AIR MILES. (Horn Declaration, ¶ 39 (emphasis added); *see* SAC ¶ 78.) In

---

[4] *See* Loyalty Ventures, Inc., Registration of Securities [Section 12(b)] – amendment (Form 10-12B/A) Exhibit 99.1, Page 26 (Oct. 14, 2021) ("These [Sponsor] relationships are governed by agreements with fixed terms and varying provisions regarding termination, ranging from notice to events of default and cure."). As explained above, this Court can consider relevant SEC filings at this stage. *See Bovee*, 272 F.3d at 360–61.

January 2021, ten months before the Spinoff, ADS's management informed ADS's Board that Sobeys had "relayed its intention to terminate" its contract "by the end of 2022." (SAC ¶¶ 52, 80.) But Sobeys *did not* terminate its contract early at that time. Instead, according to the SAC, Sobeys entered into an agreement with ADS on March 12, 2021 to *amend* its contract to move up the termination date to February 2023 and to delay the early exit window option until July 2022. (*Id.* ¶ 83.)

The SAC makes no allegation that Sobeys conveyed its intent to terminate its participation in the AIR MILES program under the newly amended contract until June 2022. As disclosed by Loyalty in an SEC filing on June 8, 2022, Sobeys formally provided notice to Loyalty on June 7, 2022, that it was exercising its right to exit the AIR MILES program. (*Id.* ¶ 86.) It would leave the program starting as soon as August 2022, exercising its right to terminate under the delayed early exit window. (*Id.*) Plaintiff does not claim that Loyalty's June 8 statement was false or misleading. (*See* SAC.)

### C. Omission and Duty to Disclose Sobeys's Purported Intent to Terminate

Plaintiff argues that many of Defendants' statements listed in the Background section were fraudulently false or misleading by omission because Defendants referenced ADS's and Loyalty's relationship with Sobeys but failed to disclose Sobeys's purported pre-Spinoff intent to terminate its participation in AIR MILES. Plaintiff also contends that "[e]ven with [the March 12, 2021] amendment, Defendants knew that Sobeys still intended to exit AIR MILES by the end of 2022 as it had previously stated." (SAC ¶ 84.)

"Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic*, 485 U.S. at 239 n. 17 (1988). "A duty to affirmatively disclose 'may arise when there is insider trading, a statute requiring disclosure, . . . [or] an inaccurate, incomplete[,] or misleading prior disclosure.'"

*In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 471 (6th Cir. 2014) (quoting *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005)).

In deciding whether omitted facts constitute material information for which a § 10(b) defendant has a duty to disclose, the Sixth Circuit "distinguishe[s] between 'hard' and 'soft' information." *City of Monroe*, 399 F.3d at 669 (citation omitted). "Hard information is typically historical information or other factual information that is objectively verifiable." *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 (6th Cir. 1997) (quotation and citation omitted). "Publicly disclosed, hard information is actionable if false and material." *City of Monroe*, 399 F.3d at 669. "Soft information, on the other hand, includes predictions and matter of opinions." *Id.* (quotation and citation omitted) (cleaned up). The failure to disclose material soft information is actionable "'only if [it is] . . . virtually as certain as hard facts.'" *Id.* (quoting *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir. 1985)).

In a similar § 10(b) case in this Circuit, a plaintiff alleged securities fraud where the health care company Humana did not disclose the status of "tense negotiations" with Columbia/HCA Corporation, the owner of a hospital chain with whom Humana had a contract that was expiring in a few months. *Freeburg v. Wolf*, 42 F. App'x 715, 715–16 (6th Cir. 2002). Humana and Columbia reached a deal to renew the contract, which Humana announced to the public upon renewal, but the plaintiff alleged that Humana should have disclosed the status of pending contract negotiations because Humana's deal "wasn't going to be as good as a contract as in the past." *Id.* at 715. The Sixth Circuit adopted and affirmed the district's holding that "[d]efendants had no legal duty to inform the public of these developments until the outcome of the negotiations became as certain as hard facts." *Id.* at 716; *see also Reiss v. Pan Am. World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir. 1983) (holding that there was no duty for a § 10(b) defendant to disclose "complex bargaining

24

between two (and often more) parties which may fail as well as succeed, or may succeed on terms which vary greatly from those under consideration at the suggested time of disclosure"); *River Birch Cap., LLC v. Jack Cooper Holdings Corp.*, No. 17CV9193, 2019 WL 1099943, at *4 (S.D.N.Y. Mar. 8, 2019) (holding that a defendant's historically accurate statements about "past success in contract renewal negotiations" are not actionable as a matter of law and rejecting the argument that such statements "create an implicit promise" as to the company's future success).

Here, Plaintiff alleges that Sobeys conveyed an intent to exit AIR MILES to Defendants in late 2020 and possibly again in early 2021, more than a year before Loyalty's June 8, 2022 announcement that Sobeys was exiting the program. But the statements Plaintiff relies on for that assertion occurred before Sobeys agreed to amend its agreement with ADS rather than terminate it early in the Q3 2021 early exit window. Plaintiff does not allege that Sobeys informed Defendants of its intent to leave the AIR MILES program *after* it reached an amended contract with ADS that included more favorable terms for Sobeys. Additionally, Plaintiff's conclusory assertions that Sobeys's departure was "inevitable and preordained" are contradicted by the facts alleged, including (1) Mr. Horn's statements that Sobeys was "*considering* exercising its early termination rights" and that the parties were "*renegotiating*" the contract, and (2) the resulting agreement between ADS and Sobeys to amend its contract rather than terminate it. (*Id.* ¶¶ 78, 83; Horn Declaration ¶ 39.)

Regardless, Sobeys's alleged intent to leave the program in 2022 is "soft" information not on the level of its firmer notice on June 7, 2022 that it would terminate its contract in the 2022 early exit window, which only occurred after the parties "were unable to align on extension terms." Loyalty Ventures, Inc., Current Report (Form 8-K), Item 8.01 (June 8, 2022). Indeed, Sobeys's March 2021 renegotiation of its contract with ADS *after* it allegedly informed Defendants in late

2020 of its "intent" to terminate its contract demonstrates the "soft" nature of the "intent" that Plaintiff alleges.

Notably, under Item 1.02 on SEC Form 8-K, the SEC requires a registered company to disclose that a "material definitive agreement" has been terminated under certain conditions. 69 Fed. Reg. 15594, 15620 (Mar. 25, 2004). But "[n]o disclosure is required solely by reason of this Item 1.02 during negotiations or discussions regarding termination of a material definitive agreement unless and until the agreement has been terminated." *Id.* Such is the case here, as demonstrated above.

Put simply, even accepting Plaintiff's allegations in the SAC as true, Sobeys's final termination of its AIR MILES contract was not "as certain as hard facts" until it exited the program during the renegotiated early exit window in 2022. Before that point, Defendants did not have a duty to disclose that Sobeys would no longer participate as an AIR MILES Sponsor.[5]

### D. Loyalty's Registration Statement

Many of Defendants' allegedly fraudulent statements and omissions stem from Loyalty's Registration Statement, filed on October 14, 2021, about three weeks before the Spinoff on November 5, 2021, and from post-Spinoff statements that Plaintiff contends adopted the Registration Statements by reference. In light of the standards and analysis above, the Court concludes that, as a matter of law, the Registration Statement does not contain any misstatements

---

[5] The Court emphasizes that its holding is based in large part on the lack of an express, formal notice of termination from Sobeys under the terms of the amended contract before June 2022. Had ADS received a firm notice of termination from Sobeys after the renegotiation but prior to the Spinoff, the situation would have been different. The Court's holding does not preclude a potential duty to disclose under such circumstances. Instead, here, Sobeys warned of a potential termination, the parties renegotiated a new contract with terms more favorable to Sobeys, and eight months passed before the Spinoff.

or omissions actionable as fraud under § 10(b). The Court assesses the allegations in associated groups.

First, Loyalty stated, "We have maintained deep, long-standing relationships with large consumer-based businesses, including well-known worldwide brands, such as Shell Canada, Sobeys Inc., Bank of Montreal, Rewe and Albert Heijn." (SAC ¶ 43.) The statement that Loyalty's client relationships are "deep" and "long-standing" are immaterial corporate puffery and are matters of opinion about the company's history, not fraud. *See Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 245 (6th Cir. 2015) (holding that a statement that corporation had "strengthened [its] competitiveness" was immaterial because it was "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision" (citing *City of Monroe*, 399 F.3d at 671)). Loyalty's identification of specific Sponsors is not misleading because that part of the statement is rooted in a basic historical fact that these companies were corporate Sponsors in the AIR MILES program.

Second, Loyalty touted its "capabilities to deepen our existing relationships with our sponsors, some of which have been part of the program for almost 30 years." (SAC ¶ 43.) The same analysis applies. This statement contains statements of history, opinion, and corporate optimism, not fraud. "The disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *In re Sofamor Danek Grp.*, 123 F.3d at 401 n.3.

Third, Loyalty stated "our sponsors recognize the significant benefit to staying in the AIR MILES Rewards program." (SAC ¶ 43.) Again, this is a statement of corporate optimism and puffery. To the extent the statement is potentially misleading regarding Sponsors who had already left the program at the time of the Registration Statement, Plaintiff admits that those departures

27

were already publicly reported in the media. (SAC ¶ 143.) Although these statements do not mention the confirmed departures of Rexall, RONA, and LCBO, those departures were already public knowledge, so they are not fraudulently misleading by omission. *See City of Monroe*, 399 F.3d at 676 (6th Cir. 2005) ("It makes logical sense that a claim based on the alleged withholding from the public of information that contradicts information publicly stated is defeated by a demonstration that the allegedly withheld information was in fact disclosed to the public.") Regardless, the statement about Sponsors recognizing the benefits of the program is best characterized as rosy optimism and recognizes those Sponsors still in the program at the time.

Fourth, Loyalty identified various risk factors, including its "10 largest clients represented 55% and 46%, respectively, of our combined revenue for the years ended December 31, 2020 and 2019, and the loss of any of these clients could cause a significant reduction in our combined revenue." (SAC ¶ 44.) It also stated that "[a] decrease in revenue from any of our significant clients . . . could have a material adverse effect on our combined revenue." (*Id.*) As the Sixth Circuit recently held,

> when companies . . . make forward-looking statements contained in a registration statement or in connection with an initial public offering, the Bespeaks Caution doctrine will shield those companies from liability when the forward-looking statements are accompanied by meaningfully cautionary language so that a reasonable investor would understand the statements.

*Kolominsky*, 100 F.4th at 689.

Plaintiff asserts these risk statements are fraudulently misleading for omitting that several top Sponsors had already exited the program and because Sobeys and Staples Canada had conveyed their intent to exit the program. (*Id.* ¶ 128.) But the statement about 2020 and 2019 revenue is a historical statement that Plaintiff does not allege is factually inaccurate. And the assertion that certain client departures "could" significantly affect revenue is an appropriate risk

warning that cautions investors about the business's reliance on clients with independent business interests, like the top ten Sponsors.

Even so, in Plaintiff's view, the statement is misleading because it speaks in terms of as-yet-unrealized risks when in fact those risks had already materialized. (Resp., PageID 1465.) But to the extent risks had already materialized, the public already knew about them—the departures of Rexall, RONA, and LCBO were already reported in the media. And the "intended" departure of Sobeys, as explained above, is not actionable because Defendants did not have a duty to disclose its potential exit, which had not yet materialized. The same duty analysis applies to Staples Canada, who conveyed its intent to exit in 2021, but did not terminate its contract until 2022. Furthermore, the statement that "a decrease in revenue from any of our significant clients . . . could" materially affect combined revenue "is labeled a risk factor, . . . is forward-looking," and "falls squarely within the Bespeaks Caution doctrine's protection." *See Kolominsky*, 100 F.4th at 689 ("[The plaintiff's] argument that [the defendant] should have said its marketing strategy *was* affecting [the defendant's customer-acquisition cost], instead of saying that it *could*, fails." (emphasis in original)).

In sum, the Registration Statement does not contain statements actionable as fraud under § 10(b). The statements are all either true, statements of historical fact, statements of opinion, forward-looking projections, corporate puffery and rosy optimism, relate to matters of public knowledge, or relate to risks yet unrealized that Defendants lacked a duty to disclose. Accordingly, the allegedly fraudulent statements and omissions that merely incorporated the Registration Statement by reference also are not actionable, including the November 9, 2021 Form S-8 and the February 8, 2022 Form S-8.

### E. Additional Statements

Plaintiff alleges that Defendants made additional materially false or misleading statements or omissions in various press releases, earnings calls, presentations, and SEC filings. But rather than painting a picture of fraud, Plaintiff repeats similar arguments relying on the same basic facts and types of statements that the Court concludes are not actionable as fraud based on the above-recited law. Even though the additional statements of alleged fraud assessed below are similar to those analyzed above, the Court addresses them each in turn for comprehensiveness.

First, ADS's October 14, 2021 Investor Presentation, filed with the SEC, identifies Sobeys and its affiliate Safeway as part of the AIR MILES program. (SAC ¶¶ 107–08.) Plaintiff alleges that this presentation is fraudulently false or misleading because it fails to state that Sobeys intended to exit the program and that other top Sponsors had already exited the program. But at the time of the presentation, Sobeys *was* a part of the program. And as explained above, Defendants did not have a duty to disclose that Sobeys had conveyed an intention to exit the program. Also as explained above, the contract terminations of Rexall, RONA, and LCBO were already publicly disclosed. Regardless, Plaintiff does not allege that Defendants identified our touted their relationship with those departed Sponsors in the presentation. Defendants' statements that Loyalty had a "stable client base" that "generates recurring campaign demand" are protected as corporate puffery and as matters of opinion. Loyalty's similar statements in the December 15, 2021 Form 8-K are also not actionable for the same reasons. (*Id.* ¶ 117.)

Next, ADS stated in its October 28, 2021 press release and November 3, 2021 Form 10-Q for Q3 2021 that AIR MILES reward miles issued were down 7% year-over-year and attributed the decline to higher promotional activity in 2020. (SAC ¶¶ 110–11.) Loyalty made similar statements in a November 24, 2021 Form 10-Q filing. (*Id.* ¶¶ 114–15.) Plaintiff argues the

explanation was false because the decline was due to the loss of Sponsors Rexall, LCBO, and RONA. (*Id.* ¶¶ 112, 116.) But Plaintiff's argument depends on its assertion that on February 3, 2022, Loyalty issued a "partial corrective disclosure" that attributed a decline in AIR MILES issued in the *fourth* quarter of 2021 to the non-renewal of two Sponsors and their exit from the program in Q1 2021. (*See* ¶¶ 112, 153.) This filing was not a partial corrective disclosure regarding the explanation for Q3 2021 results because it related to results for a different quarter. And of course, the reason for revenue changes can be different from quarter to quarter, and Plaintiff does not allege other facts to support its assertion that the promotional activity explanation was false. Plaintiff has not sufficiently alleged that these statements were materially false or misleading by omission.

Additionally, Loyalty's February 3, 2022 press release and earnings call statements congratulating staff for "managing relationships with our sponsors" and touting Loyalty's "long-standing customer relationships" are not actionable for the same reasons that similar statements in the Registration Statement are not actionable—they are mere corporate puffery and opinions about the company's history. (SAC ¶¶ 119–120.) Statements that Loyalty had "a roster of marquee clients to which we can offer a . . . solid financial position" is a statement of rosy optimism covered in the protection for puffery statements. (*Id.* ¶ 119.) Mr. Chestnut's statement on the earnings call that he expected the number of miles issued in 2022 to grow between 4% and 5% is protected as a forward-looking economic outlook statement. (*Id.* ¶ 120.)

Furthermore, the statements of history, corporate optimism, and precaution in Loyalty's February 28, 2022 Annual Report on Form 10-K are not actionable. (SAC ¶ 123–24.) Loyalty touted its "100 brand name sponsors" (an accurate statement of present fact), including Sobeys. Again, Sobeys was a present Sponsor at the time, and Defendants did not have a duty to disclose

the status of ongoing contract negotiations or Sobeys's alleged "intent" to exit the program. The statements of risk in this report are nearly identical to those from the Registration Statement and are not actionable for the same reasons. The same analysis applies for the statements of risk repeated in the May 6, 2022 Form 10-Q filing. (*Id.* ¶ 134.)

Mr. Chestnut's March 23, 2022 statements at the Sidoti Conference also are not actionable as fraud. Mr. Chestnut's response to a question about the departure of RONA and LCBO, in which he touts Loyalty's "biggest partners" that represent "north of 2/3 of all MILES issued" is not false or misleading by omission. (*Id.* ¶ 129.) This is a statement of fact, which Plaintiff does not allege is false, that offers typical corporate optimism to investors and the public about Loyalty's prospects despite the loss of smaller Sponsors. Mr. Chestnut's statement that Loyalty is "excited about the pipeline that we have" is protected as a forward-looking statement of corporate performance and as rosy corporate optimism.

Last, Mr. Horn's April 28, 2022 statement attributing the Q1 2022 decrease in Air Miles rewards miles issued to "nonrenewals" is not false or misleading by omission. (*Id.* ¶ 132.) Plaintiff only alleges this was misleading because it failed to include statements about the departures of Rexall, RONA, and LCBO and the "planned" departures of Staples Canada and Sobeys. As discussed above, Defendants did not have a duty to disclose these facts at the time.

Ultimately, Plaintiff allegations in the SAC include no statements that were materially false or misleading by omission. Accordingly, Plaintiff's claims against Defendants for securities fraud under § 10(b) fail on that element.

## II.    Scienter

Even if any of the statements assessed above were actionable as false or misleading statements or omissions of fraud, Plaintiff's claims would fail because Plaintiff has not sufficiently

alleged scienter under the heightened pleading requirements of the PSLRA. As explained above, to meet the PSLRA's "strong inference" standard, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (quotation and citation omitted). In making this determination, a court must collectively examine all the facts alleged. *Id.* at 323.

The Sixth Circuit articulated the following non-exhaustive list of factors relevant to the issue of scienter:

> (1) insider trading at a suspicious time or in an unusual amount;
> (2) divergence between internal reports and external statements on the same subject;
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
> (4) evidence of bribery by a top company official;
> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
> (6) disregard of the most current factual information before making statements;
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
> (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
> (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig*, 251 F.3d at 552, *abrogated on other grounds*, *Tellabs*, 551 U.S. 308.

In Plaintiff's theory of the case, based on the facts as alleged, Defendants acted with recklessness or intent to deceive investors by spinning off Loyalty knowing that the new company would face significant post-Spinoff challenges and was at risk of failure. (SAC ¶¶ 135–47.) Defendants contend that Plaintiff's theory of fraud is less plausible than the alternative, non-fraudulent explanation that Defendants expected the Loyalty Spinoff to succeed and that Defendants' statements appropriately informed investors of the risks of its business. (ADS Reply, PageID 1518; Loyalty Reply, 1550.) The Court agrees with Defendants. Although the SAC may

suggest that some of the *Helwig* factors are present in this case to some degree, the totality of the facts and circumstances leads the Court to conclude that any inference of scienter is less plausible and less compelling as the opposing, more benign inferences drawn from the facts.

First, Plaintiff has not alleged insider trading, the disclosure of confusing accounting information, or interested directors concealing stock sales. (*See* SAC.)

Next, Plaintiff's argument that ADS officials bribed Mr. Horn and Mr. Chestnut to "get with the program" and lead the Spinoff despite concerns over its post-Spinoff debt load is unconvincing and not supported by the alleged facts. (SAC ¶¶ 87–96.) The SAC's facts around this purported "threat" do not relate to the disclosures and statements that Plaintiff alleges were fraudulent—they relate to Defendants' support of the Spinoff overall. Rather than fraudulent scienter, Plaintiff's allegations merely raise the more reasonable inference that Mr. Horn and Mr. Chestnut advocated for friendlier terms for the company they were set to lead and wanted the Spinoff to succeed. Of course, ADS and its executives wanted ADS to succeed through the Spinoff as well. As this Court has observed, "courts have rejected the assertion that an inference of fraudulent intent can be drawn from the mere fact that an executive is given an incentive to ensure that his or her corporation succeeds." *I.B.E.W. v. Limited Brands, Inc.*, 788 F. Supp. 2d 609, 631 (S.D. Ohio 2011); *see PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 690 (6th Cir. 2004) ("All corporate managers share a desire for their companies to appear successful. That desire does not comprise a motive for fraud. . . . Neither does an executive's desire to protect his position within a company or increase his compensation." (quotation and citation omitted)), *abrogated on other grounds*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011).

Additionally, as publicly disclosed on SEC filings, both Mr. Horn and Mr. Chestnut purchased open-market Loyalty stock—approximately $475,000's worth for Mr. Horn and

$50,000's worth for Mr. Chestnut. (*See* ECF Nos. 36-2, 36-3, 38-6, 38-7; Loyalty Mot., PageID 408.) Similarly, ADS retained a 19% minority stake in Loyalty, valued at $50 million. (SAC ¶ 32.) Mr. Horn and Mr. Chestnut were personally invested in the success, not the failure, of Loyalty, both in the form of personal stock and keeping their new jobs as Loyalty executives. Although not dispositive, these facts suggest that Defendants did not expect the company to fail and did not need to take bribes to lead the new company. *See I.B.E.W.*, 788 F. Supp. 2d at 631 (taking notice of publicly available SEC filings indicating that the defendants purchased stock in the company during the class period and holding that those purchases "undermine any inference of scienter"); *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.,* 778 F.3d 228, 246 (1st Cir. 2015) (holding that defendant's increase in stock holdings during the class period "negate[d] any inference that he had a motive to artificially inflate [the company's] stock during that period"). These facts meaningfully contradict any inference of Defendants' scienter.

Defendants' alleged scienter is also negated by the SAC's allegation that the core scheme— offloading ADS's debt through a cash infusion from Loyalty funded by new investors—was disclosed to investors and the public. Plaintiff alleges that ADS disclosed, before the Spinoff, that "Loyalty Ventures would pay a total of $750 million in cash to ADS," and that analysts understood ADS's Spinoff move and the Loyalty payment as a means for ADS to "strengthen its [balance sheet] via de-leveraging." (SAC ¶¶ 33–34.) Reasonable investors would be expected to consider these facts and the related analysis as part of the publicly available mix of information when deciding whether to invest in Loyalty. Based on the SAC, these publicly disclosed facts about the Spinoff payment do not give rise to an inference of scienter.

The *Helwig* factors about divergence between internal information and external statements and about disregard of the most recent information also do not significantly support an inference

of scienter. As discussed above, Defendants had no duty to disclose the alleged "intent" of Sobeys to exit the AIR MILES program before termination, and the departures of other top Sponsors were publicly reported, not concealed. Even though Defendants referenced Sobeys as a current sponsor before and after the Spinoff, their statements about Sobeys were accurate at the time, and § 10(b) does not require that they disclose the status of negotiations and Sobeys's potential termination. As alleged, Defendants never touted a Sponsor as current when Defendants had internal information that the Sponsor in fact had already terminated its agreement to participate in AIR MILES.

Next, regarding the existence of an ancillary lawsuit, Plaintiff alleges that the Bankruptcy Trustee had access to internal documents that were used to support the allegations in the Adversary Complaint, which in turn support Plaintiff's allegations of scienter in this lawsuit. (Resp., PageID 1480–81.) The Court notes that the Adversary Complaint is a set of allegations through the eyes of the claimant, not a neutral party's assessment of facts. And as stated above, ADS's motion to dismiss the Adversary Complaint is currently pending. Although the Court accepts Plaintiff's allegations in the SAC as true, Plaintiff's reliance on the allegations in the Adversary Complaint, for the purposes of the scienter analysis, does not significantly contribute to an inference of Defendants' scienter. As the Court concluded above based on the SAC's allegations, including assertions taken from the Adversary Complaint and accepted as true, Defendants made no actionable statements or misleading omissions. Additionally, Plaintiff does not allege that the Adversary Complaint resulted in a quick settlement. Overall, the ancillary lawsuit factor does not lead to a strong inference of Defendants' scienter.

Ultimately, taken together, Plaintiff's allegations do not raise the "strong inference" of scienter necessary to state a claim for securities fraud under § 10(b). 15 U.S.C. § 78u-4(b)(2)(A).

Again, taking all the alleged facts collectively, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (quotation and citation omitted). Any inference of recklessness or intent to defraud from the facts alleged in the SAC is significantly less plausible than the opposing inference that Defendants planned to use the Spinoff to pay off ADS's debt (as publicly disclosed), expected Loyalty to succeed, and attempted to achieve that success. Accordingly, the element of scienter is insufficiently pled under the PSLRA, and Plaintiff's § 10b-5 claims also fail on that independent ground.

## III.    Rule 10b-5 "Scheme-Liability" Claim

Under Rule 10b-5(a) and (c), a Plaintiff may allege a "different and separate" "scheme-liability" claim that "encompass[es] conduct beyond disclosure violations." *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023) (quotation and citation omitted); 17 CFR § 240.10b-5(a), (c). Although the Sixth Circuit "has not defined the elements required to state a claim for scheme liability," it favorably recited the following standard from the Second Circuit: "To state a scheme liability claim, a plaintiff must show: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Teamsters*, 83 F.4th at 525 (citing *Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021)).

To the extent Plaintiff states a "scheme-liability" theory of fraud in the SAC, Plaintiff relies on the same basic facts as it relies on for the § 10(b) false and misleading statement claims. Accordingly, the same scienter analysis applied to the nondisclosure claims above applies to Plaintiff's scheme fraud claim, and Plaintiff thus has not sufficiently pled a scheme-liability theory of fraud under the PSLRA. *See id.* at 533 (holding that the scienter analysis for the plaintiff's

nondisclosure claims applied to the plaintiff's scheme-liability claim because the claims "relie[d] on the same factual circumstances").

## IV. Section 20(a) "Control Person" Claim

In addition to the § 10(b) claim, Plaintiff alleges a § 20(a) "control person" claim against all Defendants. Section 20(a) establishes instances in which individuals controlling others who have violated the Exchange Act can be deemed personally liable. *See* 15 U.S.C. § 78t(a). Because the Court concludes that no underlying § 10(b) claim is sufficiently pled, Plaintiff's § 20(a) necessarily fails as well.

### CONCLUSION

For the reasons stated in this Opinion and Order, the Court **GRANTS** Loyalty Defendants' Motion to Dismiss (ECF No. 35) and **GRANTS** ADS Defendants' Motion to Dismiss (ECF No. 37). Plaintiff's claims under §§ 10(b) and 20(a) of the Exchange Act are **DISMISSED WITH PREJUDICE**. The Clerk is **DIRECTED** to enter judgment and terminate this case on the Court's docket.

**IT IS SO ORDERED.**

<u>3/20/2025</u>                          <u>s/Edmund A. Sargus, Jr.</u>
DATE                            EDMUND A. SARGUS, JR.
                                UNITED STATES DISTRICT JUDGE